Kara M. Wolke - State Bar No. 241521
Marc L. Godino - State Bar No. 182689
Jonathan M. Rotter - State Bar No. 234137
Raymond D. Sulentic - State Bar No. 316913
Pavithra Rajesh - State Bar No. 323055
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067-2561
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

Ekwan E. Rhow - State Bar No. 174604
  erhow@birdmarella.com
Thomas R. Freeman - State Bar No. 135392
  tfreeman@birdmarella.com
Marc E. Masters - State Bar No 208375
  mmasters@birdmarella.com
**BIRD MARELLA BOXER WOLPERT NESSIM
DROOKS LINCENBERG & RHOW P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiffs and the Putative Class
*Additional Counsel Appear on Signature Block*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sydney Ji, June Abe, Lee Shubert, Kira Tomlinson, Ranela Sunga, and Stefanie Bonner, individually and on behalf of all others similarly situated, | CASE NO. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR:** |
| vs. | **(1) Negligence**<br>**(2) Intrusion upon Seclusion**<br>**(3) Violation of the Right to Privacy - California Constitution**<br>**(4) Violation of the California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et sea.*** |
| NAVER CORPORATION, a corporation; NAVER CLOUD CORPORATION, a corporation; | |

| | |
|---|---|
| NAVER CLOUD AMERICA INC. f/k/a NAVER BUSINESS PLATFORM AMERICA INC., a corporation; SNOW CORPORATION, a corporation; SNOW INC., a corporation; Z HOLDINGS CORPORATION, a corporation; LINE CORPORATION, a corporation; LINE PLUS CORPORATION, a corporation; and LINE EURO-AMERICAS CORPORATION, a corporation.<br><br>Defendants. | **(5) Violation of the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq.***<br>**(6) Violation of the California Invasion of Privacy Act, Cal. Pen. C. § 630 *et seq.***<br>**(7) Violation of the Electronic Communications Privacy Act. 18 U.S.C. §§ 2510 *et seq.***<br>**(8) Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030**<br>**(9) Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.***<br>**(10) Restitution / Unjust Enrichment**<br><br>**DEMAND FOR JURY TRIAL** |

## I.   <u>INTRODUCTION</u>

1.      This is a data privacy case involving several technology companies (collectively "Defendants") that offer two widely popular and interconnected mobile applications ("apps"). Through these apps, Defendants surreptitiously collect vast troves of private and/or personally identifiable user data without user consent – including unique biometric information and private message content.

2.      The first app, LINE Messenger, is a mobile messenger app akin to WhatsApp.[1] Embedded within LINE Messenger is the China-based SenseTime software development kit ("SDK") through which LINE Messenger collects users' biometric information such as face geometry scans. LINE Messenger also claims to provide "end-to-end" encryption for user chats such that user messages cannot be read except by the sender and recipient. But that claim is false. Instead, while in transit, material portions of user messages – *i.e.*, videos, URLs, and certain keywords – are intercepted and taken in unencrypted form. LINE Messenger users have not consented to these activities.

3.      The second app, B612, is a photo and video altering app targeted at younger consumers which allows users to change their appearance with various beautification filters. B612 has been compared to Snapchat.[2] Like LINE Messenger, the SenseTime SDK is embedded within B612, which enables B612 to collect users' biometric information such as face geometry scans. B612 also transmits these face geometry scans from user devices to at least one of Defendants' servers. B612 collects user data that it transmits to non-secure servers in China and Hong Kong, where, on information and belief, it is available to the Chinese Communist Party for retention in a database used for intelligence gathering and other purposes. B612 users have not consented to these activities.

---

[1] WhatsApp is not alleged to have been involved in the misconduct here.

[2] Snapchat is not alleged to have been involved in the misconduct here.

4.     Defendants' conduct violates privacy, data, and consumer protections established by constitutional and statutory authority as well as the common law.

## II.     THE PARTIES

5.     Plaintiff Sydney Ji is, and has been, an individual and resident of Berkeley, California, and a citizen of the State of California.

6.     Plaintiff June Abe is, and has been, an individual and resident of Irvine, California, and a citizen of the State of California.

7.     Plaintiff Lee Shubert is, and has been, an individual and resident of Chicago, Illinois, and a citizen of the State of Illinois.

8.     Plaintiff Kira Tomlinson is, and has been, an individual and resident of Midway City, California, and a citizen of the State of California.

9.     Plaintiff Ranela Sunga is, and has been, an individual and resident of Garden Grove, California, and a citizen of the State of California.

10.     Plaintiff Stefanie Bonner is, and has been, an individual and resident of Palm Springs, California, and a citizen of the State of California.

11.     Defendant Naver Corporation ("Naver") is a South Korean corporation originally founded in 1999 and located at 6, Buljeong-ro, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea (13561).

12.     Defendant Naver Cloud Corporation ("Naver Cloud") is a South Korean corporation located at 117, Bundangnaegok-ro, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea (13529). Naver Cloud is a wholly owned subsidiary of Naver.

13.     Defendant Naver Cloud America Inc. f/k/a Naver Business Platform America Inc. ("Naver Cloud America") is a U.S. company located at 2033 Gateway Place, Ste. 500, San Jose, CA 95110. Naver Cloud America is a wholly-owned subsidiary of Naver Cloud.

14.     Defendant Snow Corporation ("Snow Corp.") is a South Korean company located on the 8th Floor of Krafton Tower, 117, Bundangnaegok-ro,

Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea 13529. Snow Corp. is a wholly owned subsidiary of Naver.

15.     Defendant Snow Inc. ("Snow Inc.") is a Delaware corporation located at 5750 Wilshire Blvd., Ste. 640, Los Angeles California 90036. Snow Inc. is a wholly owned subsidiary of Snow Corp.

16.     Defendant Z Holdings Corporation ("Z Holdings") is a Japanese company located at Kioi Tower 1-3 Kioicho, Chiyoda-ku, Tokyo 102-8282, Japan. Z Holdings is a subsidiary of a joint venture between Naver and third-party SoftBank Group Corporation ("SoftBank").

17.     Defendant LINE Corporation ("LINE Corp.") is a Japanese company located at JR Shinjuku Miraina Tower, 23rd Floor, 4-1-6 Shinjuku, Shinjuku-ku, Tokyo, 160-0022, Japan. LINE Corp. is a wholly owned subsidiary of Z Holdings.

18.     Defendant LINE Plus Corporation ("LINE Plus") is a South Korean company located at 42, Hwangsaeul-ro 360 Beon-gil, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea. LINE Plus is a wholly owned subsidiary of LINE Corp.

19.     Defendant LINE Euro-Americas Corp. ("LINE Euro-Americas") is a Delaware corporation located in Palo Alto, California and Los Angeles, California. LINE Euro-Americas is a wholly owned subsidiary of LINE Plus.

**III.     <u>JURISDICTION AND VENUE</u>**

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States, and supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims.

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) and 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants, and also because some Defendants are citizens or subjects of a foreign state.

1

### A.   <u>The Naver Defendants</u>

2        22.    Naver, Naver Cloud, Naver Cloud America, Snow Corp., and Snow

3  Inc. (collectively, the "Naver Defendants") rely on the U.S. market to promote and

4  advertise various mobile applications and products targeted at consumers in the U.S.

5  through the Google Play Store and the Apple App Store.

6        23.    This Court has personal jurisdiction over Naver, and venue is proper in

7  this District, because Naver owns and operates, and at all relevant times owned and

8  operated, the B612 app, and Naver's tortious conduct is, and at all relevant times

9  was, directed into this District. Naver's corporate website states it has an overseas

10 office in the U.S. and its "Contact Us" page lists two U.S. addresses in Palo Alto,

11 California and Los Angeles, California. Naver's LinkedIn page connects to a

12 LinkedIn page for its "Chief Business Officer, North America," whose LinkedIn

13 profile states he is located in Palo Alto, California. Naver also represents on its

14 LinkedIn page that it and certain affiliated and/or subsidiary corporations have

15 employees in the San Francisco Bay Area, including in San Jose, Mountain View,

16 Santa Clara, and Palo Alto. Naver also has a number of U.S.-based subsidiaries,

17 including: Naver Cloud America (San Jose, California), Snow Inc. (Palo Alto,

18 California and Los Angeles, California), Webtoon Entertainment (Los Angeles,

19 California), and Naver Band (Palo Alto, California). In its 2019 annual report, Naver

20 stated that it has over 10 million monthly average users of its Naver Webtoon

21 product in North America, and the company anticipates making "a strong case for

22 Naver Webtoon's long-term growth in the U.S." Because Naver maintains sufficient

23 minimum contacts with the forum so as not to offend traditional notions of fair play

24 and substantial justice, it would not be unreasonable or unfair for this Court to

25 exercise personal jurisdiction over it.

26        24.    This Court has personal jurisdiction over Naver Cloud, and venue is

27 proper in this District, because Naver Cloud supports the operation and, at all

28 relevant times, supported the operation of the B612 and LINE Messenger apps and

Naver Cloud's tortious conduct is, and at all relevant times was, directed into this District. Specifically, Naver Cloud supports the Information Technology ("IT") infrastructure for the Naver Defendants, and also serves as an Internet Service Provider ("ISP") for, and uses its own devices to host, certain domains registered to Snow Corp. and LINE Corp. that are directly involved in the misconduct (below) involving U.S. user data (including data from users in this District). Moreover, Naver Cloud is deeply involved with the Naver Defendants' facial recognition patents and technologies (below) that, on information and belief, are applied to U.S. user videos as discussed below. And Naver Cloud represents on its LinkedIn page that it has employees in the U.S. Because Naver Cloud maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

25.    This Court has personal jurisdiction over Naver Cloud America, and venue is proper in this District, because Naver Cloud America supports the operation, and at all relevant times supported the operation, of the B612 and LINE Messenger apps. and Naver Cloud America's tortious conduct is, and at all relevant times was, directed into this District. Specifically, Naver Cloud America supports the IT infrastructure for the Naver Defendants within the U.S., and also serves as an ISP for, and uses its own devices to host, certain domains registered to Snow Corp. and LINE Corp. that are directly involved in the misconduct (below) involving U.S. user data (including data from users in this District).[3] Moreover, Naver Cloud America's Chief Executive Officer, Secretary, and Chief Financial Officer are all located at Naver Cloud America's San Jose, California offices. And Naver Cloud America's California agent for service of process is Yeong-Sae Kim at 1700 Wyatt

---

[3] Naver Cloud America is involved in "internet based services" according to its March 9, 2021 Statement of Information filed with the California Secretary of State.

Dr., Suite 9, Santa Clara, California 95054. Because Naver Cloud America maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

26.     This Court has personal jurisdiction over Snow Corp., and venue is proper in this District, because Snow Corp. owns and operates and, at all relevant times, owned and operated the B612 app and Snow Corp.'s tortious conduct is, and at all relevant times was, directed into this District. Snow Corp. represents on its LinkedIn page that it has employees in the U.S., including its "US General Manager." Moreover, Snow Corp. is the registrant of a key domain directly involved in the misconduct (below) involving U.S. user data (including data from users in this District). Because Snow Corp. maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

27.     This Court has personal jurisdiction over Snow Inc., and venue is proper in this District, because Snow Inc. owns and operates, and at all relevant times owned and operated, the B612 app and Snow Inc.'s tortious conduct is, and at all relevant times was, directed into this District.[4] Snow Inc.'s Chief Executive Officer, Secretary, and Chief Financial Officer are all located at Snow Inc.'s Los Angeles, California offices. Snow Inc. also represents on the Google Play store that it has offices at 575 High Street, Suite 110, Palo Alto California 94301. Snow Inc.'s California agent for service of process, like Naver Cloud America's, is Yeong-Sae Kim at 1700 Wyatt Dr., Suite 9, Santa Clara, California 95054. Because Snow Inc. maintains sufficient minimum contacts with the forum so as not to offend traditional

---

[4] Snow Inc. is in the business of "online entertainment services" according to its October 20, 2020 Statement of Information filed with the California Secretary of State.

notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

28.     Based on the facts alleged above and below, as well as the fact they share some U.S. offices and employees, the Naver Defendants are each an alter ego of one another, and the Naver Defendants are engaged in a single enterprise, such that personal jurisdiction over one establishes personal jurisdiction over the others.

### B.    The Z-LINE Defendants

29.     Z Holdings, LINE Corp., LINE Plus, and LINE Euro-Americas (collectively, the "Z-LINE Defendants") rely on the U.S. market to promote and advertise various mobile applications and products targeted at consumers in the U.S. through the Google Play Store and the Apple App Store.

30.     This Court has personal jurisdiction over Z Holdings, and venue is proper in this District, because Z Holdings owns and operates, and at all relevant times owned and operated, the LINE Messenger app and Z Holdings' tortious conduct is, and at all relevant times was, directed into this District. The following is one published description of Z Holdings and its ownership and operation of LINE Messenger: "SoftBank's internet business Yahoo Japan has completed its merger with Japanese chat app Line, the affiliate firm of South Korean internet portal Naver. … Following the completion of the deal, Z Holdings – the rebranded name of Yahoo Japan – will take on the operations of the merged entity. A Holdings, [the joint venture] which was created by SoftBank and Naver, controls 65.3% of publicly traded Z Holdings shares. Both companies each own an equal stake in A Holdings."[5]

---

[5] Doris Yu, *Softbank, Naver's affiliates complete merger to launch $30b tech giant*, Tech in Asia (Mar. 3, 2021), https://www.techinasia.com/softbank-navers-affiliates-complete-merger-launches-30b-joint-venture. An April 23, 2021 Goldman Sachs analyst report further evidences Z Holdings's involvement in LINE Messenger operations, describing the integration of LINE Messenger and Yahoo! Japan data collection systems at page 6: "As a messaging app, LINE has difficulty acquiring user data that contributes to conversion (e.g., product purchase history).

Also, Z Holdings lists LINE Corp. (its subsidiary) and LINE Plus (LINE Corp.'s subsidiary) as two of its "Major Group Companies" on its website.[6] Because Z Holdings maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

31.     This Court has personal jurisdiction over LINE Corp., and venue is proper in this District, because LINE Corp. owns and operates and, at all relevant times, owned and operated the LINE Messenger app and LINE Corp.'s tortious conduct is and, at all relevant times, was directed into this District. LINE Corp. states on its corporate website and on its LinkedIn page that it has offices in Palo Alto, California. LINE Corp. also represents on its LinkedIn page that it and certain affiliated and/or subsidiary corporations have employees in California, including LINE Corp.'s Chief Executive Officer (Los Angeles), Chief Compliance Officer (San Francisco), and at least one of its engineers (San Francisco). LINE Corp.'s website also confirms LINE Corp's involvement in LINE Messenger operations: "With the LINE messaging app as the cornerstone, LINE Corporation's business encompasses development and operation of a wide range of mobile-first services – including communication, content, and entertainment – and advertising, as well as new businesses in Fintech, AI, and other domains."[7] Moreover, LINE Corp. is the registrant of key domains directly involved in the misconduct (below) involving U.S. user data (including data from users in this District), and LINE Corp. also

_____

However, the Yahoo! Japan site operated by Z Holdings collects data that can contribute to conversion, including data on search history (to uncover potential customers) and purchased products systems, which we expect to enable more effective collection of customer data."

[6] Z Holdings, Major Group Companies, https://www.z-holdings.co.jp/en/company/groupcompanies/ (updated Apr. 14, 2021).

[7] Line, About Line Corporation, https://linecorp.com/en/company/info (last accessed June 25, 2021).

serves as an ISP for, and uses its own devices to host, certain domains that are directly involved in the misconduct (below) involving U.S. user data (including data from users in this District). Also, until recently, LINE Corp. had U.S.-listed shares that traded on the New York Stock Exchange. Because LINE Corp. maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

32.     This Court has personal jurisdiction over LINE Plus, and venue is proper in this District, because LINE Plus operates and, at all relevant times, operated the LINE Messenger app and LINE Plus' tortious conduct is, and at all relevant times was, directed into this District. LINE Corp.'s website states LINE Plus "supports LINE's global business development with programmers, designers, marketers, sales personnel, and PR managers of 50 different nationalities working together."[8] Snow Corp. acquired LINE Plus's camera application business, including B612, as of May 1, 2017.[9] Because LINE Plus maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

33.     This Court has personal jurisdiction over LINE Euro-Americas, and venue is proper in this District, because LINE Euro-Americas operates and, at all relevant times, operated the LINE Messenger app and LINE Euro-Americas' tortious conduct is and, at all relevant times, was directed into this District. LINE

---

[8] Line, About Line Corporation, https://linecorp.com/en/company/info (last accessed June 25, 2021).

[9] Consolidated Financial Statements of Snow Corporation for the years ended December 31, 2018 and 2017, at 8, *available at* https://www.sec.gov/Archives/edgar/data/1611820/000119312519184938/d744546d ex151.htm.

Euro-Americas' Chief Executive Officer, Secretary, and Chief Financial Officer are all located in LINE Euro-Americas' Palo Alto, California offices. LINE Euro-Americas' LinkedIn page links to its corporate website that introduces the LINE Messenger app and its other products in English.[10] Like Naver Cloud America and Snow Inc., LINE Euro-Americas Corp.'s California agent for service of process is Yeong-Sae Kim at 1700 Wyatt Dr., Suite 9, Santa Clara, California 95054. Because LINE Euro-Americas maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

34.     Based on the facts alleged above and below, as well as the fact they share some U.S. offices and employees, the Z-LINE Defendants are each an alter ego of one another, and the Z-LINE Defendants are engaged in a single enterprise, such that personal jurisdiction over one establishes personal jurisdiction over the others. Indeed, in a strategy presentation given by Z Holdings on March 1, 2021, it boasted of its plan to "create a unique ecosystem through deeper collaborations" between its products and those of LINE Corp. The same presentation also admitted to using artificial intelligence ("AI") to link IDs and members of LINE Corp. and Z Holdings, and "share know-how, form [an] alliance."

35.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because: (i) a substantial part of the conduct giving rise to Plaintiffs' claims occurred in and/or emanated from this District; (ii) Defendants transact business in this District; (iii) at least one Defendant has offices in this District; and (iv) Plaintiff Syndey Ji resides in this District.

---

[10] LINE Euro-America's March 9, 2021 Statement of Information filed with the California Secretary of State identifies its business as "mobile software."

## IV.       **GENERAL ALLEGATIONS**

### A.       **Defendants And Their Apps Are Interconnected**

36.     The relationship between Defendants, including their respective apps (which are diagrammed below as circles), is as follows:



37.     Naver wholly owns Snow Corp. and, through Snow Corp., Snow Inc. These three Defendants own and operate B612 and certain domains involved in the collection and transmission of B612 user data (below). Naver also wholly owns Naver Cloud and, through Naver Cloud, Naver Cloud America. These two Defendants use their own devices to host Snow Corp. and LINE Corp. domains involved in the collection and transmission of B612 and LINE Messenger user data (below), and support the Naver IT infrastructure involved in the collection and transmission of B612 and LINE Messenger user data (below).

38.     Naver used to wholly own LINE Corp. However, Naver formed a joint

venture with SoftBank, and this joint venture now owns approximately 65% of Z Holdings (with the other approximately 35% publicly owned). Z Holdings, in turn, wholly owns LINE Corp; LINE Corp. wholly owns LINE Plus; and LINE Plus wholly owns LINE Euro-Americas. The Z-LINE Defendants own and operate LINE Messenger; LINE Corp. owns certain domains involved in the collection and transmission of LINE Messenger user data (below); and LINE Corp. uses its own devices to host its domains involved in the collection and transmission of LINE Messenger user data (below).

39.     The LINE Messenger and B612 apps use a common user identifier, called a "TMID," to identify their shared users and track them across the two apps and elsewhere on the internet.

### B.     LINE Messenger Is A Popular Messenger App

40.     LINE Messenger began as a messenger app in June 2011, but later grew into a global communication platform. In a strategy presentation to analysts, Z Holdings described how LINE Messenger has 167 million users in just four countries with 27.4 billion average daily messages exchanged of as of September 30, 2020. LINE Messenger is one of the fastest growing mobile messenger apps in the world, and is currently available on smartphones, including iPhones and Android devices, and also on PCs and Macs.

41.     LINE Messenger allows users to send written messages, make voice calls, and send videos. It also has a timeline feature through which users can share their photos and/or videos with friends and the public.

### C.     B612 Is A Popular Photo And Video Editing App

42.     B612 is a photo and video editing app popular among younger consumers, including minors. Indeed, as Naver boasts in its 2019 annual report, Snow is "leading communication trends for teens around the world" and has the leading "global avatar service for Generation Z, with 92% of overseas users being

1    aged 13 to 18."[11]

2       43.    B612 allows users to take photos in various styles, record videos, and

3    create digital graffiti. It allows users to edit photos and videos, create collages, and

4    pair videos with music.

5       44.    B612 also features a wide range of built-in augmented reality ("AR")

6    applications. AR allows users to utilize filters to alter their image, including, for

7    example, making their skin appear smoother or changing their image into an

8    animated display like a stuffed animal.

9       45.    According to download data from Google's Google Play metrics, B612

10   has been downloaded more than 500 million times.[12] As Naver acknowledges, as of

11   the end of 2019, the number of global monthly active users (MAUs) of B612

12   exceeded 260 million, with a high proportion of overseas users. Those overseas

13   users include users throughout the United States.

14         **D.    Naver Has A History Of Committing Privacy Violations**

15      46.    Naver is South Korea's largest web search engine and messenger

16   service, with over 200 million users around the world.[13] Naver describes itself as a

17   business that enables widespread access to advanced technologies.[14] As of 2017,

18   Naver had over 2,700 employees and generated over $3.6 billion in revenue.[15]

19      47.    Naver's products are also used for developing artificial intelligence

20   _____

21   [11] Dynamic Tech Cube, Naver Annual Report 2019,
     https://www.navercorp.com/navercorp_/ir/annualReport/2020/NAVER_2019AR_D
22   esign_TCG0604_ENG.pdf at 36.

23   [12] B612 – Best Free Camera & Photo/Video Editor,
     https://play.google.com/store/apps/details?id=com.linecorp.b612.android&hl=en_U
24   S&gl=US

25   [13] Naver Company, https://www.navercorp.com/en/naver/company (last accessed
26   Jue 25, 2021).

27   [14] *Id.*

28   [15] *Id.*

_____

("AI").

48.     Naver has collected sensitive private data without user consent for some time. For instance, the *Korea Times* reports Naver allegedly collected sensitive user information as far back as 2016, including social security numbers and Internet Personal Identification Numbers (IPINs), without user consent.[16]

49.     The *Korea Times* also reported that Naver has been accused of collecting and storing children's information, including their nicknames, personal information, and family photos, in contravention of Korean law.[17]

50.     In addition to the unlawful collection and storage of such private information without user consent, the *location* of where such private data was stored is also troubling. Specifically, the data was sent to Hong Kong, where it is accessible by the Chinese Communist Party.[18]

51.     Naver admitted to destroying potentially inculpatory evidence of its misconduct: "Between July 6 and 10 [2020], we have physically destroyed the backup data server in Hong Kong, and are transferring all data to Singapore," a Naver official was quoted as saying.[19]


///


///


///

---

[16] Kim Hyun-bin, *Naver collects sensitive private data without user consent*, The Korea Times (July 24, 2020),
https://www.koreatimes.co.kr/www/tech/2020/07/133_293187.html
[17] *Id.*
[18] *Id.*
[19] *Id.*

**E.**   **LINE Messenger and B612 Unlawfully Collect User**
**Biometrics with the Aid of the Dangerous SenseTime SDK**
**and Through Other Means**

**1.**   **SenseTime Is a China-Based Technology Company**
**Focused on AI, Which it Uses to Assist the Chinese**
**Communist Party With Its Political, Military, and**
**Policing Agenda.**

52.   SenseTime is a highly sophisticated global technology company in China that focuses on AI applications.[20] It has the largest deep learning center in mainland China and is the largest algorithm provider in China.[21]

53.   SenseTime claims its AI technology is so sophisticated that it can detect a person's face out of a crowd better than a person can.[22] SenseTime boasts of having an internal "training database" that includes over 2 billion faces, which is greater than the number of living persons in China, the United States, Japan, Korea, and Australia combined.[23]

---

[20] SenseTime, AI for a Better Tomorrow, https://www.sensetime.com/en/about-index (last accessed June 25, 2021).

[21]Zheng Zhiyu Olivia, *China's "Sky Eye" face recognition technology comes from Hong Kong Shentang Technology CEO Xu Li: Monitor tens of thousands of people in one second* (Apr. 9, 2018) (translated from its original Chinese), https://medium.com/@tszyucheng/%E4%B8%AD%E5%9C%8B-%Zheng E5%A4%A9%E7%9C%BC-%E4%BA%BA%E8%87%89%E8%BE%A8%E8%AA%8D%E6%8A%80%E8%A1%93%E4%BE%86%E8%87%AA%E9%A6%99%E6%B8%AF-%E5%95%86%E6%B9%AF%E7%A7%91%E6%8A%80ceo%E5%BE%90%E7%AB%8B-%E4%B8%80%E7%A7%92%E7%9B%A3%E8%A6%96%E5%B9%BE%E8%90%AC%E4%BA%BA-a57ebc737a36.

[22] *Id.*

[23] Shu-Ching Jean Chen, *SenseTime: The Faces Behind China's Artificial Intelligence Unicorn*, Forbes (Mar. 30, 2018)

54.     SenseTime monetizes its massive database through, among other means, deals with the Chinese government, including for military and police applications.[24]

55.     The Chinese government has consolidated that database with intelligence gathered from other Chinese technology companies to identify and/or verify a person from a digital image or a video frame from a video source. Facial recognition systems offer something that fingerprint recognition and iris recognition cannot – they do not require contact with the subject. "Biometric surveillance powered by artificial intelligence is categorically different than any surveillance we have seen before. It enables real-time location tracking and behavior policing of an entire population at a previously impossible scale."[25]

56.     The Chinese government is seizing on its broad information database. The *New York Times* published a July 2018 article entitled "Inside China's Dystopian Dreams: A.I., Shame and Lots of Cameras" in which it reported that: "Beijing is embracing technologies like facial recognition and artificial intelligence to identify and track 1.4 billion people. It wants to assemble a vast and unprecedented national surveillance system, with crucial help from its thriving technology industry."[26]

57.     Baidu, Alibaba, and Tencent are "China's original tech titans",[27] and

https://www.forbes.com/sites/shuchingjeanchen/2018/03/07/the-faces-behind-chinas-omniscient-video-surveillance-technology/?sh=67b1e7e04afc.

[24] *Id.*

[25] Evan Greer, *Opinion: Don't Regulate Facial Recognition.  Ban It.*, BuzzFeed News (July 18, 2019), https://www.buzzfeednews.com/article/evangreer/dont-regulate-facial-recognition-ban-it.

[26] Paul Monzur, *Inside China's Dystopian Dreams: A.I., Shame and Lots of Cameras*, The New York Times (July 8, 2018), https://www.nytimes.com/2018/07/08/business/china-surveillance-technology.html.

[27] Rebecca Fannin, *Baidu, Alibaba, Tencent Clash to Lead China's Tech Future*

historically dominated the fields of artificial intelligence, social media, and the internet in China. On April 9, 2018, SenseTime announced it had received $600 million from Alibaba. The effect of this transaction, according to the Harvard Business School Digital Initiative ("*HBSDI*"), was to "underscore[] the gravity of the Chinese government's national policy announcement just a year prior to become the world's leader in the research."[28]

58.     In November 2017, the *Wall Street Journal* published a disturbing article about the strong ties between various technology giants and the Chinese government entitled "China's Tech Giants Have a Second Job: Helping Beijing Spy on its People." This article reported on the Chinese government's use of these tech giants in investigations of purported criminal activity and political dissent, as well as surveillance activities:

> The Chinese police "request data from Alibaba for their own investigations, … tapping into the trove of information the tech giant collects through its e-commerce and financial payment networks. … Companies including Alibaba [], Tencent [], and Baidu [] are required to help China's government hunt down criminal suspects and silence political dissent. Their technology is also being used to create cities wired for surveillance. … Apple disclosed that more than 35,000 user accounts were affected by 24 Chinese law-enforcement requests in the first half of this year [2017], many in connection with fraud investigations. It said it provided information on about 90% of them. Chinese companies don't release any information on the number of

---

*While A New 'B' Arises*, Forbes (Apr. 23, 2019), https://www.forbes.com/sites/rebeccafannin/2019/08/23/baidu-alibaba-tencent-clash-to-lead-chinas-tech-future-while-a-new-b-arises/#18cc42e414d0.

[28] Toni Campbell & Oliver Badenhorst, *SenseTime and Public Safety*, Digital Initiative (Nov. 14, 2018), https://digital.hbs.edu/platform-rctom/submission/sensetime-and-public-safety.

requests from the government, the nature of the requests or the compliance rate."[29]

59.     This *Wall Street Journal* article also documented another frightening aspect of the Chinese government's use of for-profit technology companies to sort and analyze information, including information gathered from smartphones:

> Along with access to online data, China's government wants something else from tech companies – the cloud computing prowess to sort and analyze information. China wants to crunch data from surveillance cameras, smartphones, government databases and other sources to create so-called smart cities and safe cities. … Police now work with Alibaba to use surveillance footage and data processing to identify 'persons of interest' and keep them out, local police official Dai Jinming said at a recent conference sponsored by Alibaba. Tencent is working with police in the southern city of Guangzhou to build a cloud-based 'early-warning system' that can track and forecast the size and movement of crowds, according to a statement from the Guangzhou police bureau.[30]

60.     In a subsequent March 2018 article entitled "The Uncomfortable Marriage Between China and Its Tech Giants," the *Wall Street Journal* reported on the significant patronage that large Chinese technology companies receive from the Chinese government, the growing number of tech entrepreneurs who have become members of the legislature under President Xi Jinping (including, for example, Tencent's Tony Ma), and certain technology companies that have made pledges of

---

[29] Liza Lin and Josh Chin, *China's Tech Giants Have a Second Job: Helping Beijing Spy on Its People*, The Wall Street Journal (Nov. 30, 2017), https://www.wsj.com/articles/chinas-tech-giants-have-a-second-job-helping-the-government-see-everything-1512056284.

[30] *Id*.

loyalty to the Chinese government.[31] "'The government is always the boss and the tech firms are there to serve the goals of the Chinese government.'"[32]

61.     SenseTime is deeply involved in this public/private partnership between China-based for-profit entities and the Chinese Communist Party.[33] Indeed, as noted by *HBSDI*, SenseTime deals directly with the Chinese government as a customer to "help police officers identify suspects and root out potential [purported] criminals by matching faces identified in video with corresponding faces on government-issued IDs." The *HBSDI* article also noted: "Questions of privacy and the potential for government and corporate misuse have consistently dogged the company since its early days of product development and commercialization."

62.     SenseTime technology has been used by the Chinese government for policing and controlling the flow of demonstrations in Hong Kong[34] and for various internet censoring activities.[35]

### 2.     Defendants Use the SenseTime SDK Embedded in LINE Messenger and B612 to Unlawfully Collect Users' Face Geometry Scans.

63.     SenseAR, an SDK produced by SenseTime, is embedded within LINE Messenger and B612. An SDK like SenseAR is a set of software development tools in one installable package that helps developers create and implement specific functionality in apps such as LINE Messenger and B612.

64.     LINE Messenger and B612 utilize SenseAR for its facial "key-point

---

[31] Li Yuan, *The Unformattable Marriage Between China and Its Tech Giants*, The Wall Street Journal (Mar. 8, 2018), https://www.wsj.com/articles/the-godfathers-of-chinese-tech-get-an-offer-they-cant-refuse-1520510404.

[32] *Id.*

[33] Campbell and Badenhorst, *supra* n. 28.

[34] *Id.*

[35] Shu-Ching Jean Chen, *supra* n. 23.

---

tracking" and "eye contour tracking" features,[36] which allows for "a precise extraction of the user's facial features and contour."[37] LINE Messenger and B612 also rely on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements."[38] Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face and thus constitute face geometry scans within the meaning of the Illinois Biometric Information Privacy Act.

65.     Each LINE Messenger and B612 user who uses and, at all relevant times, used the AR features of the apps for photos or videos of their faces has and, at all relevant times, had their face geometry scans executed by SenseAR and collected by LINE Messenger and B612 without user consent.

66.     B612 also transmits and, at all relevant times, transmitted the face geometry scans performed by SenseAR along with the registered user's Android ID and TMID to the domain log.snow.me without user consent. And, for unregistered users who are not signed into B612, B612 transmits and, at all relevant times, transmitted the face geometry scans performed by SenseAR along with the unregistered user's Android ID to the domain log.snow.me without user consent.

67.     A domain name such as log.snow.me "identifies a network domain, or it represents an Internet Protocol (IP) resource, such as a personal computer used to access the Internet, a server computer hosting a website, or the website itself or any other service communicated via the Internet."[39]

---

[36] SenseTime, B612 app Introduction, https://www.sensetime.com/en/case-detail?categoryId=1631 (last accessed June 25, 2021).

[37] SenseTime, Sense AR Augmented Reality Platform Product Description, https://www.sensetime.com/en/product-detail?categoryId=1162 (last accessed June 25, 2021).

[38] *Id.*

[39] Wikipedia Entry for "Domain Name,"

68.     The Internet Protocol ("IP") addresses for log.snow.me are and, at all relevant times, were 210.89.168.190 and 210.89.168.191. The IP "is the principal communications protocol in the Internet protocol suite for relaying datagrams across network boundaries. Its routing function enables internetworking, and essentially establishes the Internet. IP has the task of delivering packets from the source host to the destination host solely based on the IP addresses in the packet headers."[40] Moreover, an IP address like 210.89.168.190 and 210.89.168.191 "is a numerical label assigned to each device connected to a computer network that uses the Internet Protocol for communication."[41] The devices linked to IP addresses 210.89.168.190 and 210.89.168.191 are and, at all relevant times, were located in South Korea.

69.     The domain log.snow.me is and, at all relevant times, was registered to Snow Corp.

70.     The ISPs for the domain log.snow.me include and, at all relevant times, included Naver Cloud and Naver Cloud America. An ISP like Naver Cloud and Naver Cloud America "is an organization that provides a myriad of services for accessing, using, or participating in the Internet. … Internet services typically provided by ISPs can include Internet access, Internet transit, domain name registration, web hosting, Usenet service, and colocation."[42] "Internet transit is the service of allowing network traffic to cross or 'transit' a computer network, usually used to connect a smaller [] ISP to the larger Internet."[43] "A web hosting service

---

https://en.wikipedia.org/wiki/Domain_name; *see also* Domain Name, https://zerotechit.com/domain-name/ (last modified Mar. 24, 2021).

[40] Wikipedia Entry for "Internet Protocol," https://en.wikipedia.org/wiki/Internet_Protocol

[41] Wikipedia Entry for "IP address," https://en.wikipedia.org/wiki/IP_address

[42] Wikipedia Entry for "Internet service provider," https://en.wikipedia.org/wiki/Internet_service_provider

[43] Wikipedia Entry for "Internet transit,"

(often shortened to web host) is a type of Internet hosting service that allows individuals and organizations to make their website accessible via the World Wide Web. Web hosts are companies that provide space on a server owned or leased for use by clients, as well as providing Internet connectivity, typically in a data center. Web hosts can also provide data center space and connectivity to the Internet for other servers located in their data center, called colocation, also known as *housing* in Latin America or France."[44] On information and belief, Naver Cloud and Naver Cloud America provide and, at all relevant times, provided these various services, including internet transit, web hosting, and colocation services, for the domain log.snow.me.

71.    Naver Cloud supports the IT infrastructure of Naver and its affiliates. Naver Cloud America supports Naver and its affiliates' IT infrastructure within the United States. IT "is the use of computers to store or retrieve data and information. … An information technology system (IT system) is generally an information system, a communications system, or, more specifically speaking, a computer system – including all hardware, software, and peripheral equipment – operated by a limited group of IT users."[45] Moreover, IT infrastructure is "a set of information technology (IT) components that are the foundation of an IT service; typically physical components (computer and networking hardware and facilities), but also various software and network components."[46] On information and belief, Naver's IT infrastructure supported by Naver Cloud and Naver Cloud America is involved in

---

https://en.wikipedia.org/wiki/Internet_transit

[44] Wikipedia Entry, "Web hosting service," https://en.wikipedia.org/wiki/Web_hosting_service.

[45] Wikipedia Entry, "Information technology," https://en.wikipedia.org/wiki/Information_technology.

[46] Wikipedia Entry, "IT infrastructure," https://en.wikipedia.org/wiki/IT_infrastructure

the transmission of the face geometry scans by B612 from B612 user devices to the domain log.snow.me.

72. Snow Inc. owns and operates and, at all relevant times, owned and operated B612. In fact, the Google Play Store identifies Snow Inc. as the publisher of B612.

73. Thus, through the B612 app, the domain log.snow.me, the provision of internet services for the domain log.snow.me, and the management of Naver's IT infrastructure, the Naver Defendants collect and transmit the face geometry scans performed by SenseAR on B612 users without user consent.

**3. Defendants, on Information and Belief, Also Unlawfully Conduct Face Geometry Scans from LINE Messenger and B612 User Videos They Have Collected.**

74. Defendants upload LINE Messenger and B612 user videos from user devices and, on information and belief, conduct face geometry scans on such videos.

75. Defendants' use of face geometry scans is reflected in their patents and patent applications. For example, United States Patent Application US20190005309A1, assigned to LINE Corp., describes extracting facial geometry such as the height at which an eye is open, a height at which a mouth is open, a distance between an eyebrow and an eye, and an angle of an eyebrow. Similarly, Japanese Patent Application JP2016201144A, assigned to Naver, discusses a face recognition module that automatically recommends the name of a friend in a photo. Another Japanese Patent Application, JP2021068455A, assigned to LINE Plus, describes a method of recognizing a user's face from an image by analyzing the dialogue content of messages shared via an instant messaging service. United States Patent Application US20210127239A1, assigned to LINE Plus, also discusses performing facial recognition and using the facial information to identify a participant in a video call as part of a method of fair billing based on the duration of the call.

76.     Defendants' use of face geometry scans is also reflected in their commercial product offerings. Naver Cloud offers a "CLOVA"-branded face recognition technology that was developed "based on the abundant data we have collected over the years," and notes that its CLOVA systems were "built from Naver and LINE's AI research."[47] CLOVA is an AI platform that incorporates speech, image recognition and artificial neural network translation into one interactive engine. CLOVA will be built into various NAVER and LINE products, NAVER's smart speaker WAVE, Friends, and other third-party devices and services.[48] The CLOVA API "service is useful to recognize faces with input vision data or to create applications using face detection. It detects faces in images to find a look-alike celebrity or to get information including contours, positions of eyes, noses and mouths, and expressions."[49] Similarly, LINE Messenger features a "face recognition filter and effects from other standalone Line camera apps — namely its B612 app, which offers 'beautification adjustments' for selfies."[50]

### F.     LINE Messenger Promises Users End-to-End Encryption of Their Chat Messages, but Instead, User Videos, URLs, and Certain Keywords from Those Chat Messages Are Unlawfully Intercepted.

77.     The Z-LINE Defendants appeal and, at all relevant times, appealed to

---

[47] Introducing NAVER Cloud Platform's AI services and technology (Sept. 23, 2020), https://www.youtube.com/watch?v=CvkVIfx_ViQ.

[48] Naver, Featured Services, https://www.navercorp.com/en/service/featured (last accessed June 25, 2021).

[49] Naver Cloud Platform, CLOVA Face Recognition (CFR) Overview, https://api.ncloud-docs.com/docs/en/ai-naver-clovafacerecognition (last accessed June 25, 2021).

[50] Natasha Lomas, *Messaging app Line adds livestreaming for group chats*, Tech Crunch (Aug. 16, 2017), https://techcrunch.com/2017/08/16/messaging-app-line-adds-livestreaming-for-group-chats.

consumers who value privacy by claiming LINE Messenger uses end-to-end-encryption ("E2EE") to encrypt all messages between users such that *only* the sender and recipient can view the content of messages transmitted between them via LINE Messenger. But this claim is and, at all relevant times, was false. Certain content within the encrypted messages – videos, URLs, and particular keywords – is and, at all relevant times, was intercepted and obtained without encryption while in transit without user consent. Such interception of nonencrypted information is not and, at all relevant times, was not necessary for the transmission of the encrypted messages.

78.     The transmission pathway for the encrypted messages runs from the sender's device through the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) to the recipient's device. But Defendants utilize other devices separate from devices tied to domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) to intercept videos, URLs, and particular keywords located within the encrypted messages while such messages are in transit between sender and recipient.[51]

### 1.     Interception of Videos.

79.     Naver, Naver Cloud, Naver Cloud America, and the Z-LINE Defendants use and, at all relevant times, used one or more devices linked to the domain obs-us.line-apps.com to intercept and obtain videos contained within otherwise encrypted messages while such messages are and, at all relevant times, were in transit via the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) from one LINE Messenger user to another.

80.     The domain obs-us.line-apps.com is and, at all relevant times, was registered to LINE Corp. The ISPs for the domain obs-us.line.apps.com are and, at all relevant times, were Naver Cloud, Naver Cloud America, and Naver Business

---

[51] At certain times, Defendants used the domain ga2g.line.naver.jp.

Platform Asia Pacific Pte., Ltd. ("NBPAP"). On information and belief, NBPAP is and, at all relevant times, was a subsidiary of Naver Cloud. Moreover, on information and belief, Naver Cloud, Naver Cloud America, and NBPAP provide and, at all relevant times, provided ISP services, such as internet transit, web hosting, and colocation services, for the domain obs-us.line-app.com.

81.     The IP addresses for the domain obs-us.line-apps.com are and, at all relevant times, were 203.104.160.13 and 203.104.160.14, and these IP addresses are and, at all relevant times, were distinct from the IP addresses for the domain ga2u.line.naver.jp. Devices linked to the IP addresses 203.104.160.13 and 203.104.160.14 are and, at all relevant times, were located in Los Angeles, California, New York, New York, Newark, New Jersey, and South Korea. The devices linked to the domain obs-us.line-apps.com and IP addresses 203.104.160.13 and 203.104.160.14 are and, at all relevant times, were distinct from the devices linked to the domain ga2u.line.naver.jp and its distinct IP addresses.

## 2.     Interception of URLs.

82.     The Z-LINE Defendants use and, at all relevant times, used one or more devices linked to IP addresses 147.92.179.111, 147.92.179.108, and 147.92.179.106 (the "Three 147.92.179 IP Addresses") to intercept and obtain unencrypted URLs contained within otherwise encrypted messages while such messages are and, at all relevant times, were in transit via the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) from one LINE Messenger user to another.

83.     The ISP for the Three 147.92.179 IP Addresses is and, at all relevant times, was LINE Corp. On information and belief, LINE Corp. provides and, at all relevant times, provided the services typically provided by ISPs, such as internet transit, web hosting, and colocation services, for the Three 147.92.179 IP Addresses.

84.     The Three 147.92.179 IP Addresses are and, at all relevant times, were distinct from the IP addresses for the domain ga2u.line.naver.jp. Devices linked to

the Three 147.92.179 IP Addresses are and, at all relevant times, were located in Japan. The devices linked to the Three 147.92.179 IP Addresses are and, at all relevant times, were distinct from the devices linked to the domain ga2u.line.naver.jp and its distinct IP addresses.

### 3.     Interception of Keywords.

85.     Embedded within LINE Messenger is a dictionary file that contains various single words and phrases, and LINE Messenger uses this dictionary file to identify particular keywords in user messages matching such single words and phrases. Such single words and phrases within user messages are taken letter-by-letter prior to transmission and also in completed form *during* transmission of the messages.

86.     The Z-LINE Defendants use and, at all relevant times, used one or more devices linked to the domain uts-front.line-apps.com to intercept and obtain particular keywords identified by the dictionary file and contained within otherwise encrypted messages while such messages are and, at all relevant times, were in transit via the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) from one LINE Messenger user to another.

87.     The domain uts-front.line-apps.com is and, at all relevant times, was registered to LINE Corp. The ISP for the domain uts-front.line-apps.com is and, at all relevant times, was LINE Corp. On information and belief, LINE Corp. provides and, at all relevant times, provided the services typically provided by ISPs, such as internet transit, web hosting, and colocation services, for the domain uts-front.line-apps.com.

88.     The IP address for the domain uts-front.line-apps.com is and, at all relevant times, was 147.92.146.179, and this IP address is and, at all relevant times, was distinct from the IP addresses for the domain ga2u.line.naver.jp. Devices linked to the IP address 147.92.146.179 are and, at all relevant times, were located in Japan. Devices linked to the domain uts-front.line-apps.com and IP address

1  147.92.146.179 are and, at all relevant times, were distinct from the devices linked

2  to the domain ga2u.line.naver.jp and its distinct IP addresses.

3          **G.      LINE Messenger Has Been Banned By the Japanese**

4                   **Government Due to Data Privacy and Security Concerns.**

5          89.     On March 19, 2021, the Japanese government prohibited its

6  government employees from using LINE Messenger following a data breach

7  suspected of originating in China.[52] Given the widespread ban the Japanese

8  government placed on LINE Messenger, the strong and compelling inference is the

9  Japanese government believed the Chinese Communist Party was behind the data

10  breach.

11          90.     In response to the data breach, it was reported the Japanese government

12  found at least 32 LINE server links were registered with Beijing.[53] The report also

13  found China could trace telephone numbers, home addresses, and email addresses of

14  LINE Messenger users without their consent as far back as 2018.

15          91.     LINE admitted in part its fault. "We are very sorry for causing anxiety

16  and concerns due to our inadequate explanations," the company said in a statement

17  as quoted by *Kyodo News*.[54]

18          **H.      B612 Collects Personally Identifiable User Data and**

19                   **Unlawfully  Transmits It to China Where It Is Accessible By**

20                   **the Chinese Communist Party.**

21          92.     B612 transmits and, at all relevant times, transmitted personally

---

[52] Zaini Majeed, *Japan Halts Use of Line App for Government Officials Over Chinese Data Breach*, RepublicWorld (Mar. 19, 2021), https://www.republicworld.com/world-news/rest-of-the-world-news/japan-halts-use-of-line-app-for-government-officials-over-chinese-data-breach.html.

[53] *Id.*

[54] *Japan halts govt use of Line app*, Big New Network (March 19, 2021), https://www.bignewsnetwork.com/news/268160696/japan-halts-govt-use-of-line-app.

---

identifiable user data to the domain adg-data.kajicam.com and the domain adg.kajicam.com (the "Kajicam Domains") without user consent. Such information includes and, at all relevant times, included: the Android Device ID (sometimes referred to as the DUID), which is essentially a hardware serial number; the WiFi MAC address, which is unique to the WiFi hardware in use; the make and model of the user's device; the version of Android the user is using; the City code for where the device is being used; the IP address; and the identity of the features of B612 the user has been using and on what days and at what times of day such features have been used (collectively, the "Kajicam Data").

93.    B612 also transmits and, at all relevant times, transmitted a YRK ID along with the Kajicam Data to the Kajicam Domains. YRK is an acronym for the China-based company that developed and operates the Kajicam app in China. This YRK ID is identical to the user's Android Device ID. Both the YRK ID and the Android Device ID are and, at all relevant times, were transmitted by B612 to the Kajicam Domains with each packet of information transmitted by B612 from B612 users' devices to the Kajicam Domains. Consequently, the Kajicam Domains tie and, at all relevant times, tied the information received from B612 to the specific, individual B612 user.

94.    B612 transmits and, at all relevant times, transmitted the Kajicam Data (along with the user's Android ID and YRK ID) to the Kajicam Domains for both registered B612 users and unregistered B612 users who were not signed on.

95.    The Kajicam Domains are and, at all relevant times, were registered to an entity in China, and the registrar is and, at all relevant times, was Alibaba Cloud Computing (Beijing) Co., Ltd. The Kajicam Domains have and, at all relevant times, had IP addresses of 162.62.82.90 and 162.62.82.193, which on information and belief are and, at all relevant times, were located in Hong Kong. Moreover, on information and belief, in addition to transmitting the Kajicam Data to the Kajicam Domains, B612 also transmits or "tunnels" the Kajicam Data to mainland China in a

surreptitious manner not directly observable by usual tracing methods.

96.     The following are and, at all relevant times, were the ISPs for the Kajicam Domains: 16 Collyer Quay; Tencent Building, Kejizhongyi Avenue ("Tencent Building"); Tencent Cloud Computing (Beijing) Co.; and Shenzhen Tencent Computer Systems Company Limited. On information and belief, these four ISPs provide and, at all relevant times, provided the services typically provided by ISPs, such as internet transit, web hosting, and colocation services, for the Kajicam Domains.

97.     Tencent Building is located in China and has numerous IP addresses located in China and Hong Kong. It also has related networks that, on information and belief, are and, at all relevant times, were owned and/or operated in part or in whole by the Chinese Communist Party, including: CHINATELECOM Hunan Province Xiangxi 5G Network (AS140375), Guizhou Provincial Radio and Television Information Network Inc. (AS63704), Shanghai MBN Telecommunication Technology Co., Ltd. (AS139091), CHINANET Guongdong Province Network (AS134764), and CHINANET Sichuan Province Suining MAN Network (AS59302).

98.     Accordingly, the Naver Defendants transmit and, at all relevant times, transmitted the Kajicam Data to China, where it is and, at all relevant times, was accessible by the Chinese Communist Party, without user consent.

### I.     LINE Messengers Collects Other Personally Identifiable User Data.

99.     LINE Messenger collects other personally identifiable information from its users during the registration process – such as the device ID, the client ID, the Google advertising ID, the phone number, and the model of the phone – and transmits this data to the domain ga2u.line.naver.jp.

100.     LINE Messenger also tracks videos watched, created, "liked", and/or commented on by users. When a LINE Messenger user is operating within the Line

Messenger timeline feature, the app tracks each time the user likes another user's post, and each time the user cancels a like on a post. Also, each time a user watches another user's video, the app tracks the video watched, the time spent watching such video, and each comment made on such video.

**J.**   **Defendants Unjustly Profit from their Unlawful Activities While Plaintiffs and the Class and Subclass Members Suffer Concrete Harm.**

101.   Defendants use the stolen User/Device Identifiers to create a dossier of private and personally-identifiable information for each user. These are living files that are supplemented over time with more private and personally-identifiable user data, and used now and in the future for various economic and financial purposes.

102.   For example, Defendants' control over these ever-expanding dossiers make tracking and profiling users, and targeting them with advertising, much more efficient and effective. Defendants unjustly earn substantial profits from such targeted advertising and/or from the sale of user data and/or information or services derived from such data outright.

103.   SenseTime, which provides the facial recognition SDK to Defendants, routinely assists the Chinese government in the surveillance of its people through biometric data.

104.   Meanwhile, Plaintiffs and members of the class and subclass incurred harm as a result the invasion of their privacy through Defendants' theft of the personal information. Further, Plaintiffs and members of the class and subclass suffered injuries in the form of damage to their devices because the battery, memory, CPU and bandwidth of Plaintiffs' device and the class and subclass members' devices have been compromised as a result of Defendants' clandestine and unlawful activities.

**V.**   **FRAUDULENT CONCEALMENT AND TOLLING**

105.   The applicable statutes of limitations are tolled as a result of

Defendants knowing and active concealment of their conduct alleged above –
through, among other things, their misleading public statements about, among other
things, user data being encrypted when it was not, and hidden and ambiguous
privacy policies and terms of use.

106.    In the case of Line, such representations were reiterated as recently as
March 19, 2021 when the Company, in response to a data breach made public by the
Japanese government, reiterated that its messenger service was purportedly
encrypted "end-to-end" and that "it is not possible to check the contents of the data
just by accessing the database."[55] Plaintiff, class and subclass members were
ignorant of the information essential to pursue their claims, with no fault or lack of
diligence on their own part.

107.    And when the action was filed, Defendants were under a duty to
disclose the true character, quality, and nature of their activities to Plaintiffs and the
class and subclass members. Defendants are therefore estopped from relying on any
statute of limitations.

108.    Defendants' fraudulent concealment is common to the class and
subclass.

## VI.    NAMED PLAINTIFF ALLEGATIONS

### Plaintiff Ji

109.    Plaintiff Ji used the mobile and desktop versions of LINE Messenger
since at least 2015 to, among other things, send text messages, photographs, and
memes. Plaintiff Ji continued using LINE Messenger regularly until approximately
the summer of 2020.

110.    During the time that LINE Messenger was installed on Plaintiff Ji's
mobile device and desktop computer, Defendants tracked Plaintiff Ji via a TMID (a
user ID created by and shared among Defendants) and a TAID (the Android

---

[55] Majeed, *supra* n. 51.

Advertising ID).

111.   Embedded within LINE Messenger is a dictionary file that contains various single words and phrases. When Plaintiff Ji sent text communications through LINE Messenger, Defendants used this dictionary file to identify particular keywords in their messages matching such single words and phrases, which were taken letter-by-letter prior to Plaintiff Ji's transmission and also in completed form during transmission of the messages. Defendants used one or more of the devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular keywords identified by the dictionary file and contained within encrypted messages in transit from Plaintiff Ji to another LINE Messenger via the domain ga2u.line.naver.jp.

112.   Some or all the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Ji's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Ji that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

113.   Plaintiff Ji has incurred harm as a result of Defendants' invasion of their privacy rights. Further, Plaintiff Ji suffered injury as damage to their mobile device. The battery, memory, CPU and bandwidth of Plaintiff Ji's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

### **Plaintiff Abe**

114.   Plaintiff Abe has used LINE Messenger on her mobile device since at

least 2018. Plaintiff Abe use LINE Messenger to, among other things, send text messages, photographs, and URLs.

115.   During the time that LINE Messenger was installed on Plaintiff Abe's mobile device, Defendants tracked Plaintiff Abe via a TMID (a user ID created by and shared among Defendants) and a TAID (the Android Advertising ID).

116.   Devices associated with IP addresses 147.92.179.111, 147.92.179.108, and 147.92.179.106 (the "three IP addresses") are and at all relevant times were located in Japan. The devices associated with the three IP addresses are distinct from those associated with the domain ga2u.line.naver.jp. The three IP addresses are and at all relevant times were hosted by Defendant LINE Corp, which is and at all relevant times was the internet service provider for the three IP addresses.

117.   Defendants used one or more of the devices associated with the three IP addresses to intercept and decrypt URLs contained within encrypted messages in transit from Plaintiff Abe to another LINE Messenger user via the domain ga2u.line.naver.jp.

118.   Embedded within LINE Messenger is a dictionary file that contains various single words and phrases. When Plaintiff Abe sent text communications through LINE Messenger, Defendants used this dictionary file to identify particular keywords in her messages matching such single words and phrases, which were taken letter-by-letter prior to Plaintiff Abe's transmission and also in completed form during transmission of the messages. Defendants use one or more of the devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular keywords identified by the dictionary file and contained within encrypted messages in transit from Plaintiff Abe to another LINE Messenger via the domain ga2u.line.naver.jp.

119.   Some or all the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts

without Plaintiff Abe's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Abe that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

120.   Plaintiff Abe has incurred harm as a result Defendants' invasion of her privacy rights. Further, Plaintiff Abe suffered injury as damage to her mobile device. The battery, memory, CPU and bandwidth of Plaintiff Abe's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

### Plaintiff Shubert

121.   Around the middle of 2019, Plaintiff Shubert began using LINE Messenger and B612 on his mobile device. He used LINE Messenger to, among other things, send text messages, photographs, and URLs.

122.   Plaintiff Shubert used B612 on his mobile device to, among other things, take and send photographs, including photographs of real estate and various construction projects for business use. Plaintiff Shubert also used B612 for personal use, including to take and send photographs.

123.   Plaintiff Shubert continued using LINE Messenger and B612 regularly from the middle of 2019 until approximately late 2020.

124.   During the time that LINE Messenger was installed on Plaintiff Shubert's mobile device, Defendants surreptitiously took Content IDs (identifying the particular video viewed), Story IDs (identifying the "story" – i.e., a particular collection of videos in which the video viewed is located) along with a TMID (a user ID created by and shared among Defendants) and a TAID (the Android Advertising ID) to the domain ga2u.line.naver.jp. Plaintiff Shubert never consented

to such information being taken. Moreover, Plaintiff Shubert's videos were also surreptitiously taken and transferred to the domain obs-us.line-apps.com.

125.   Defendants used one or more of the devices associated with the domain obs-us.line-apps.com, which are distinct from those associated with the domain ga2u.line.naver.jp, to intercept and decrypt videos contained within encrypted messages in transit from Plaintiff Shubert to another LINE Messenger user via the domain ga2u.line.naver.jp.

126.   Devices associated with IP addresses 147.92.179.111, 147.92.179.108, and 147.92.179.106 (the "three IP addresses") are and at all relevant times were located in Japan. The devices associated with the three IP addresses are distinct from those associated with the domain ga2u.line.naver.jp. The three IP addresses are and at all relevant times were hosted by Defendant LINE Corp, which is and at all relevant times was the internet service provider for the three IP addresses.

127.   Defendants used one or more of the devices associated with the three IP addresses to intercept and decrypt URLs contained within encrypted messages in transit from Plaintiff Shubert to another LINE Messenger user via the domain ga2u.line.naver.jp.

128.   Embedded within LINE Messenger is a dictionary file that contains various single words and phrases. When Plaintiff Shubert sent text communications through LINE Messenger, Defendants used this dictionary file to identify particular keywords in his messages matching such single words and phrases and were taken letter-by-letter prior to Plaintiff Shubert's transmission and also in completed form during transmission of the messages. Defendants used one or more of the devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular keywords identified by the dictionary file and contained within encrypted messages in transit from Plaintiff Shubert to another LINE Messenger via the domain ga2u.line.naver.jp.

129.   Together with the identification information above, Plaintiff Shubert's

Biometric Identifiers were also taken when he used the AR features of LINE Messenger and also, separately, when he used B612 to take and send pictures, including pictures of his face. An SDK produced by SenseTime – the SenseAR SDK – is embedded within LINE Messenger and B612.

130.   LINE Messenger and B612 utilized SenseAR for their facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour." LINE Messenger and B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

131.   Plaintiff Shubert used the AR features of the apps for photos or videos of his face and thus had his facial geometry scans performed by the SenseAR SDK and collected by LINE Messenger and B612 without his consent.

132.   B612 also transmitted the face geometry scans performed by SenseAR to the domain log.snow.me and did so without Plaintiff Shubert's consent. Devices associated with the domain log.snow.me are and at all relevant times were located in South Korea. The domain log.snow.me is and at all relevant times was registered to Defendant Snow Corp., and the internet service providers for this domain are and at all relevant times were Naver Cloud and Naver Cloud Americas.

133.   Thus, through the B612 app and the domain log.snow.me, Defendants Naver, Naver Cloud America, Snow Corp., and Snow Inc. collected Plaintiff Shubert's facial geometry scans performed by SenseAR through B612.

134.   Some or all the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Shubert's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially

valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Shubert that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

135.   Plaintiff Shubert has incurred harm as a result Defendants' invasion of his privacy rights through the taking of his videos, Biometric Identifiers and User/Device Identifiers. Further, Plaintiff suffered injury as damage to his mobile device. The battery, memory, CPU and bandwidth of Plaintiff Shubert's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

### Plaintiff Tomlinson

136.   Plaintiff Tomlinson began using LINE Messenger on her mobile device beginning in 2016 and continued using it through 2021. Plaintiff Tomlinson used LINE Messenger to, among other things, send text messages, photographs, videos, URLs, and even sensitive personal information such as banking information and personal information about children.

137.   During the time that LINE Messenger was installed on Plaintiff Tomlinson's mobile device, Defendants surreptitiously took Content IDs (identifying the particular video viewed), Story IDs (identifying the "story" – i.e., a particular collection of videos in which the video viewed is located) along with a TMID (a user ID created by and shared among Defendants) and a TAID (the Android Advertising ID) to the domain ga2u.line.naver.jp. Plaintiff Tomlinson never consented to such information being taken. Moreover, Plaintiff Tomlinson's videos were also surreptitiously taken and transferred to the domain obs-us.line-apps.com.

138.   Defendants used one or more of the devices associated with the domain obs-us.line-apps.com to intercept and decrypt videos contained within encrypted

messages in transit from Plaintiff Tomlinson to another LINE Messenger user via the domain ga2u.line.naver.jp.

139.   Devices associated with IP addresses 147.92.179.111, 147.92.179.108, and 147.92.179.106 (the "three IP addresses") are and at all relevant times were located in Japan. The devices associated with the three IP addresses are distinct from those associated with the domain ga2u.line.naver.jp. The three IP addresses are and at all relevant times were hosted by Defendant LINE Corp, which is and at all relevant times was the internet service provider for the three IP addresses.

140.   Defendants used one or more of the devices associated with the three IP addresses to intercept and decrypt URLs contained within encrypted messages in transit from Plaintiff Tomlinson to another LINE Messenger user via the domain ga2u.line.naver.jp.

141.   Embedded within LINE Messenger is a dictionary file that contains various single words and phrases. When Plaintiff Tomlinson sent text communications through LINE Messenger, Defendants used this dictionary file to identify particular keywords in her messages matching such single words and phrases, which were taken letter-by-letter prior to Plaintiff Tomlinson's transmission and also in completed form during transmission of the messages. Defendants used one or more of the devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular keywords identified by the dictionary file and contained within encrypted messages in transit from Plaintiff Tomlinson to another LINE Messenger via the domain ga2u.line.naver.jp.

142.   Together with the identification information above, Plaintiff Tomlinson's Biometric Identifiers were also taken when she used the AR features of LINE Messenger. An SDK produced by SenseTime – the SenseAR SDK – is embedded within LINE Messenger.

143.   LINE Messenger utilizes SenseAR for its facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the

user's facial features and contour." LINE Messenger also relies on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

144.   Plaintiff Tomlinson used the AR features of the apps for photos or videos of her face and thus had her facial geometry scans performed by the SenseAR SDK and collected by LINE Messenger without her consent.

145.   Some or all the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Tomlinson's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Tomlinson that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

146.   Plaintiff Tomlinson has incurred harm as a result Defendants' invasion of her privacy rights through the taking of her videos, Biometric Identifiers and User/Device Identifiers. Further, Plaintiff Tomlinson suffered injury as damage to her mobile device. The battery, memory, CPU and bandwidth of Plaintiff Tomlinson's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

**Plaintiff Sunga**

147.   Plaintiff Sunga began using B612 on her mobile device around 2017.

148.   Plaintiff Sunga used B612 for personal use including to take photographs of herself and others with the app.

---

CLASS ACTION COMPLAINT

149.    Plaintiff Sunga also used the AR features of B612 for photos of her face and thus had her facial geometry scans performed by the SenseAR SDK and collected by B612 without her consent.

150.    Unbeknownst to Plaintiff Sunga, an SDK produced by SenseTime – the SenseAR SDK – was embedded within B612. This SDK is utilized for facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour."

151.    B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

152.    B612 also transmitted the face geometry scans performed by SenseAR to the domain log.snow.me and did so without Plaintiff Sunga's consent. Devices associated with the domain log.snow.me are and, at all relevant times were, located in South Korea. The domain log.snow.me is and at all relevant times was registered to Defendant Snow Corp., and the internet service providers for this domain are and at all relevant times were Naver Cloud and Naver Cloud Americas.

153.    Thus, through the B612 app and the domain log.snow.me, Defendants Naver, Naver Cloud America, Snow Corp., and Snow Inc. collected Plaintiff Sunga's facial geometry scans performed by SenseAR through B612.

154.    Some or all the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Sunga's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Sunga that can be used for further commercial advantage

and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

155.   Plaintiff Sunga has also incurred harm as a result Defendants' invasion of her privacy rights through the taking of her Biometric Identifiers. Further, Plaintiff Sunga suffered injury as damage to her mobile device. The battery, memory, CPU and bandwidth of Plaintiff Sunga's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

### Plaintiff Bonner

156.   Plaintiff Bonner began using B612 on her mobile device around the middle of 2020.

157.   Plaintiff Bonner works in property management and used B612 for both personal and business use.  At times, Plaintiff Bonner also took photographs of her children using B612.

158.   Unbeknownst to Plaintiff Bonner, an SDK produced by SenseTime – the SenseAR SDK – was embedded within B612. This SDK is utilized for facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour."

159.   B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

160.   B612 also transmitted the face geometry scans performed by SenseAR to the domain log.snow.me and did so without Plaintiff Bonner's consent. Devices associated with the domain log.snow.me are and, at all relevant times were, located in South Korea. The domain log.snow.me is and at all relevant times was registered to Defendant Snow Corp., and the internet service providers for this domain are and at all relevant times were Naver Cloud and Naver Cloud Americas.

161.   Thus, through the B612 app and the domain log.snow.me, Defendants

Naver, Naver Cloud America, Snow Corp., and Snow Inc. collected Plaintiff Bonner's facial geometry scans performed by SenseAR through B612.

162.   Some or all the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Bonner's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Bonner that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

163.   Plaintiff Bonner has also incurred harm as a result Defendants' invasion of her privacy rights through the taking of her videos and Biometric Identifiers. Further, Plaintiff Bonner suffered injury as damage to her mobile device. The battery, memory, CPU and bandwidth of Plaintiff Bonner's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

## VII.        CLASS ALLEGATIONS

164.   Plaintiffs seek class certification of the class set forth herein under Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiffs seek class certification of all claims for relief herein on behalf of a class and subclass defined as follows:

**Class:** All persons in the United States who used one or more of the Defendants' apps on their mobile device.

**Illinois Subclass:** All persons located in Illinois who used one of Defendants' apps on their mobile device and had their biometric identifiers taken without consent.

**California Subclass:** All persons in California who used the Defendants'

1    apps on their mobile device.

2    165.   Plaintiffs reserve the right to modify or refine the class and subclass

3    definitions based on discovery of new information and to accommodate any of the

4    Court's manageability concerns.

5    166.   Excluded from the class and subclass are: (i) any judge or magistrate

6    judge presiding over this action and members of their staff, as well as members of

7    their families; (ii)  Defendants' predecessors, parents, successors, heirs, assigns,

8    subsidiaries, and any entity in which any Defendant or its parents have a controlling

9    interest, as well as Defendants' current or former employees, agents, officers, and

10   directors; (iii) persons who properly execute and file a timely request for exclusion

11   from the class; (iv) persons whose claims have been finally adjudicated on the

12   merits or otherwise released; (v) counsel for Plaintiffs and Defendants; and (vi) the

13   legal representatives, successors, and assigns of any such excluded persons.

14   167.   **Numerosity (Rule 23(a)(1))**. The class and subclass are so numerous

15   that joinder of individual members herein is impracticable. The exact number of

16   class and subclass members, as herein identified and described, is not known, but

17   download figures show that the Defendants' apps have been downloaded hundreds

18   of millions of times throughout the world and billions of messages are sent and

19   intercepted daily.

20   168.   **Commonality (Rule 23(a)(2))**. Common questions of fact and law

21   exist for each cause of action and predominate over questions affecting only

22   individual class and subclass members, including the following:

23       a.      Whether Defendants engaged in the activities and practices

24   referenced above;

25       b.      Whether Defendants' activities and practices referenced above

26   constitute negligence;

27       c.      Whether Defendants' activities and practices referenced above

28   constitute an intrusion upon seclusion;

1           d.     Whether Defendants' activities and practices referenced above

2 violate the Right to Privacy under the California Constitution;

3           e.     Whether Defendants' activities and practices referenced above

4 violate the California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et seq.*;

5           f.     Whether Defendants' activities and practices referenced above

6 violate the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq.*;

7           g.     Whether Defendants' activities and practices referenced abov

8 violate the California Invasion of Privacy Act, Cal. Pen. C. § 630 *et seq.*;

9           h.     Whether Defendants' activities and practices referenced above

10 violate the Electronic Communications Privacy Act (ECPA) 18 U.S.C. §§ 2510–22;

11           i.     Whether Defendants' activities and practices referenced above

12 violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

13           j.     Whether Defendants' activities and practices referenced above

14 violate the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et.seq;

15           k.     Whether Defendants' activities and practices referenced above

16 constitute unjust enrichment concerning which restitution and/or disgorgement is

17 warranted;

18           l.     Whether Plaintiffs and members of the class sustained damages

19 as a result of Defendants' activities and practices referenced above, and, if so, in

20 what amount;

21           m.     Whether Defendants' profited from their activities and practices

22 referenced above, and, if so, in what amount;

23           n.     What is the appropriate injunctive relief to ensure that

24 Defendants no longer unlawfully: (i) offer technology capable of surveillance within

25 the United States; (ii) take private and personally-identifiable user data; (iii) profile

26 and target users with advertisements; (iv) utilize private and personally-identifiable

27 user data to develop and patent commercially-valuable technologies; (v) transfer

28 such private and personally-identifiable user data to servers in China and to third

parties; (vi) cause injury to users' devices; (vii) retain the unlawfully assembled user dossiers. And what is the appropriate injunctive relief to ensure that Defendants take reasonable measures to ensure that they and the relevant third parties destroy such private and personally-identifiable user data in their possession.

169.   **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of members of the class and subclass because, among other things, Plaintiffs and members of the class and subclass sustained similar injuries as a result of Defendants' uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Defendants.

170.   **Adequacy (Rule 23(a)(4))**. Plaintiffs will fairly and adequately protect the interests of the class and subclass. Plaintiffs' interests do not conflict with the interests of the class and subclass members, and  Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the class and subclass.

171.   **Predominance & Superiority (Rule 23(b)(3))**. Aside from satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual class and subclass members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available is insufficient to make litigation addressing Defendants' conduct economically feasible without the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

172.   **Final Declaratory or Injunctive Relief (Rule 23(b)(2))**. Plaintiffs also

satisfies the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the class and subclass, making final declaratory and/or injunctive relief appropriate with respect to the class and subclass as a whole.

173.  **Particular Issues (Rule 23(c)(4))**. Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues common to all class and subclass members and are capable of class-wide resolution that will significantly advance the litigation.

## VIII.      <u>CAUSES OF ACTION</u>

### <u>First Cause of Action</u>

### (Negligence – All Plaintiffs)

174.  Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

175.  Plaintiffs and the class entrusted Defendants with private and personally-identifiable information including their face geometry scans, video viewing histories, user identifiers, device identifiers and certain contents of their chat messages. Defendants had a duty to handle that information with care due to the sensitivity of such information, and the expectation that such information would not be shared with third parties. For Z-LINE Defendants, this duty included following through on their assurances that all messages transmitted via LINE Messenger were encrypted end-to-end such that only the sender and recipient could view the content of messages.

176.  The willingness of Plaintiffs and the class to entrust Defendants with their data and content was predicated on the understanding that Defendants would take appropriate measures to protect it. Defendants had a special relationship with Plaintiffs and members of the class as a result of being entrusted with their private and personally-identifiable information, which provided an independent duty of care.

177.   Defendants knew that private and personally-identifiable information of Plaintiffs and members of the class had value, and Defendants have earned substantial revenues and profits as a result of collecting and using such information. This includes Defendants' revenues and profits from targeted advertising, sale of such information, and services and products derived from such information.

178.   Defendants failed to use reasonable care to safeguard that information, giving third parties access to it without taking precautions to protect Plaintiffs and members of the class. Indeed, Defendants took no precautions at all, instead making Plaintiffs' and class members' data directly available to third parties in jurisdictions with inadequate privacy protections and in jurisdictions with inadequate constraints on governmental use of private and personally-identifiable information.

179.   Defendants' failure to use care in allowing access to Plaintiffs' and class members' data has caused foreseeable harm. Private and personally-identifiable information that can be used to track and profile Plaintiffs and class members, and that is biometrically unique to each of the Plaintiffs and the members of the class has been transmitted to domains that are accessible to the Chinese government, exposing Plaintiffs and the class to a heightened, imminent risk of misuse, fraud, identity theft, Chinese government surveillance and financial harm.

180.   The data Defendants negligently allowed third parties to access allows such information to be aggregated with other data to identify, profile and target Plaintiffs and the class. Thus, it is reasonable for Plaintiffs and the class to obtain identity protection and credit monitoring services, and to recover the cost of these services from Defendants.

181.   The injury to Plaintiffs and the class was a proximate, reasonably foreseeable result of Defendants' breaches of duty.

182.   Defendants' conduct also constitutes gross negligence because of their extreme departure from ordinary standards of care, and their knowledge that they had failed to secure Plaintiffs' and the class's private and personally-identifiable

1  information.

2  **<u>Second Cause of Action</u>**

3  **(Intrusion Upon Seclusion – Plaintiffs Ji, Abe, Tomlinson, Sunga, and Bonner)**

4  183.   Plaintiffs repeat and incorporate by reference all preceding paragraphs

5  as if fully set forth herein.

6  184.   California follows the Restatement (2nd) of Torts approach to liability

7  for intrusion upon seclusion. "One who intentionally intrudes, physically or

8  otherwise, upon the solitude or seclusion of another or his private affairs or

9  concerns, is subject to liability to the other for invasion of his privacy, if the

10  intrusion would be highly offensive to a reasonable person." Restatement (2nd) of

11  Torts § 652B.

12  185.   Plaintiffs and the class have a reasonable expectation of privacy in their

13  face geometry scans, video viewing histories, user identifiers, device identifiers and

14  contents of their chat messages.

15  186.   In the case of LINE Messenger, the reasonableness of Plaintiffs' and

16  the class's expectations of privacy is supported even more by their reliance on Z-

17  LINE Defendants' claim that all messages on the app are encrypted end-to-end.

18  Moreover, Z-LINE Defendants' privacy policy provided assurances to Plaintiffs and

19  the class that Z-LINE Defendants were taking "strict technical and organizational

20  security measures" including "strict access control based on a need-to-know basis"

21  and "external authentication for objectively evaluating our security measures."

22  187.   Nevertheless, Defendants intentionally intruded – and continue to

23  intrude – upon Plaintiffs' and the class's solitude, seclusion and private affairs by

24  intentionally and secretively collecting Plaintiffs' and the class's private and

25  personally-identifiable information and making them available to third parties.

26  188.   These intrusions are highly offensive to a reasonable person, as

27  evidenced by substantial research, literature and governmental enforcement and

28  investigative efforts to protect consumer privacy against surreptitious technological

intrusions. The offensiveness of Defendants' intrusion is heightened by their making Plaintiffs' and the class's private and personally-identifiable information available to third parties, including a foreign governmental entity whose interests oppose those of United States citizens. The intentionality of Defendants' conduct, and the steps they have taken to disguise – and in the case of Z-LINE Defendants, deny – it, also reveal the highly offensive nature of their conduct.

189.    Further, Defendants' conduct targeted Plaintiffs' and the class's mobile devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain Plaintiffs' the class's private and personally-identifiable information.

190.    Plaintiffs and the class were all harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint. No proof of economic injury is required for this claim.

191.    Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiffs and the class.

192.    Plaintiffs and the class seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure Plaintiffs and the class, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

193.    Plaintiffs and the class seek injunctive relief to remedy Defendants' actions, including, but not limited to, requiring Defendants to stop taking private and biometric information from users' mobile devices; to make clear disclosures of the information that is reasonably necessary to operate LINE Messenger and B612; and to recall and destroy all information already taken in contravention of Plaintiffs' and the class's privacy rights.

194.    Plaintiffs and the class seek restitution and disgorgement for Defendants' intrusion upon seclusion. A person acting in conscious disregard of the

rights of another must disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

### Third Cause of Action

**(Violation of the Right to Privacy – California Constitution –**

**Plaintiffs Ji, Abe, Tomlinson, Sunga, and Bonner)**

195.    Plaintiffs incorporate by this reference each and every preceding paragraph.

196.    Plaintiffs and the class hold a legally protected privacy interest in their private and personally-identifiable information – including face geometry scans, video viewing histories, user identifiers, device identifiers and certain contents of their chat messages – that Defendants have taken.

197.    Plaintiffs and the class have a reasonable expectation of privacy concerning that information under the circumstances present, particularly because Z-LINE Defendants falsely claimed to offer "end-to-end encryption" of all messages transmitted on LINE Messenger. In other words, Defendants held themselves out as respecting consumers' privacy.

198.    The reasonableness of Plaintiffs' and the class's expectations of privacy is supported by the clandestine nature of Defendants' taking of Plaintiffs' and the class's private and personally-identifiable information from their mobile devices and unauthorized disclosure of such information to third parties. Defendants acted with deceit and disregard for Plaintiffs' and the class's privacy.

199.    Defendants' conduct constituted and continues to constitute a serious invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and use Plaintiffs' and the class's private

and personally-identifiable information. Defendants intentionally invaded Plaintiffs' and the class's privacy interests by intentionally designing their apps, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain Plaintiffs' and the class's private and personally-identifiable information.

200.   These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by Z-LINE Defendants' false representations to Plaintiffs and the class that their messages transmitted on LINE Messenger were encrypted "end-to-end" such that only the sender and recipient can see the contents of messages.

201.   The offensiveness of Defendants' intrusion is further heightened by the fact that they utilize a SDK produced by SenseTime – a China-based company that is known to use its artificial intelligence technology to assist the Chinese government with its political, military, and policing agenda – to collect Plaintiffs' and the class's private and personally-identifiable information and make available to third parties, including the Chinese government.

202.   The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also show the highly offensive nature of their conduct.

203.    Further, Defendants' conduct targeted Plaintiffs' and the class's mobile devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain Plaintiffs' and the class's private and personally-identifiable information.

204.   Plaintiffs and the class were harmed by the intrusion as detailed throughout this Complaint.

205.   Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiffs and the class.

206.   Plaintiffs and the class seek nominal and punitive damages as a result

of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure Plaintiffs and the class, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

207.   Plaintiffs and the class seek injunctive relief to remedy Defendants' actions, including, but not limited to, requiring Defendants to stop taking private and biometric information from users' mobile devices; to make clear disclosures of the information that is reasonably necessary to operate LINE Messenger and B612; and to recall and destroy all information already taken in contravention of Plaintiffs' and the class's privacy rights.

208.   Plaintiffs and the class seek restitution and disgorgement for Defendants' violation of their privacy rights. A person acting in conscious disregard for the rights of another must disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

## Fourth Cause of Action

### (Violation of the California Unfair Competition Law,

### Bus. & Prof. Code §§ 17200, *et seq.* – Plaintiffs Ji, Abe, Tomlinson, Sunga, and Bonner)

209.   Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

210.   The Unfair Competition Law, California Business & Professions Code §§ 17200, et seq. ("UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which can include false or misleading advertising.

211.   Defendants violated, and continue to violate, the "unlawful" prong of

the UCL through violation of statutes, Constitutional provisions and common law, as alleged in the Complaint.

212.   Defendants violated, and continue to violate, the "unfair" prong of the UCL because they took private and personally-identifiable data and content from Plaintiffs' and the class's mobile devices when Plaintiffs and the class would have no reason to know that such data was being taken. Plaintiffs and the class had no reason to know because there was no effective disclosure of Defendants' collection and transfer of Plaintiffs' and the class's face geometry scans, video viewing histories, user identifiers, device identifiers and certain contents of their chat messages.

213.   Z-LINE Defendants violated, and continue to violate, the "fraudulent" prong of the UCL because LINE Messenger made it appear that Plaintiffs and the class were communicating through a secure, or encrypted messaging device, when in fact, it does the opposite: it intercepts and transfers portions of Plaintiffs' and the class's communications in an unencrypted form.

214.   Naver Defendants violated, and continue to violate, the "fraudulent" prong of the UCL because they collected and transmitted Plaintiffs' and the class's face geometry scans without disclosing that they were collecting and transmitting such information and without obtaining consent.

215.   Defendants have intentionally refrained from disclosing their use of Plaintiffs' and the class's private and personally-identifiable data, and Z-LINE Defendants provided misleading reassurances about their data practices. Plaintiffs and the class were likely to be misled by Defendants' concealment, and had no reason to believe that Defendants had taken the private and personally-identifiable information that they had taken.

216.   Plaintiffs and the class have been harmed by Defendants' UCL violations. The battery, memory, CPU and bandwidth of their devices have been compromised as a result of Defendants' UCL violations. They also have incurred

data usage and electricity costs that they would not have incurred but for Defendants' unlawful, unfair, and fraudulent conduct.

217.  As a result of their conduct, Defendants have been able to reap unjust revenues and profits in violation of the UCL.

218.  Unless restrained and enjoined, Defendants will continue to misrepresent their data practices and will not recall and destroy all wrongfully collected data. Thus, injunctive relief is appropriate.

### Fifth Cause of Action

**(Violation of the California False Advertising Law,**

**Bus. & Prof. Code §§ 17500, *et seq.* – Plaintiffs Ji, Abe, Tomlinson, Sunga, and Bonner)**

219.  Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

220.  California's False Advertising Law ("FAL")—Cal. Bus. & Prof. Code §§ 17500, *et seq.*—prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services.

221.  Z-LINE Defendants' advertising regarding LINE Messenger is, and at all relevant times was, untrue. LINE Messenger purports to offer end-to-end encryption of all messages transmitted via the app so that only the sender and recipient can view the content of messages, when it really intercepts certain private contents of the users' messages — including videos, URLs and particular keywords — that consumers seek to safeguard.

222.  Naver Defendants' advertising regarding the B612 app is, and at all relevant times was, misleading because it fails to disclose that SenseTime has access to, and likely does access, the facial geometries contained in the videos that are uploaded and/or edited through B612. The advertising also fails to disclose that SenseTime likely shares such data with the Chinese government.

223.  Reasonable consumers, like Plaintiffs and the class, were likely to be

misled by Defendants' misrepresentations. Reasonable consumers lack the means to verify Defendants' representations about their data practices or to understand the fact or significance of Defendants' data practices.

224.   Plaintiffs and the class suffered economic injury as a result of Defendants' misrepresentations. First, they have suffered harm in the form of diminution of the value of their private and personally-identifiable information. Second, they have suffered harm to their mobile devices. The battery, memory, CPU and bandwidth of their devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they have incurred additional data usage and electricity costs as a result of Defendants' misrepresented data practices. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally-identifiable information – including their face geometry scans, video viewing histories, user identifiers, device identifiers and certain contents of their chat messages.

225.   Defendants, as a result of their misrepresentations, have been able to reap unjust profits and revenues, including from their targeted advertising, sale of Plaintiffs' and the class's private and personally-identifiable information, and services and products derived from such information.

226.   Unless restrained and enjoined, Defendants will continue to misrepresent their practices regarding the collection and use of private and personally-identifiable information, and will not recall and destroy Plaintiffs' and the class's wrongfully collected private and personally-identifiable information. Accordingly, injunctive relief is appropriate.

**Sixth Cause of Action**

**(Violation of California Invasion of Privacy Act,**

**California Penal Code §§ 630, *et seq.* – Plaintiffs Ji, Abe, Tomlinson, Sunga,**

**and Bonner)**

227.   Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

228.   California's Invasion of Privacy Act ("CIPA") prohibits interception of communications transmitted between cellular phones without the consent of all parties to the communication. California Penal Code ("CPC") § 632.5(a).

229.   Defendants intentionally intercepted and continue to intercept videos, URLs, and particular keywords contained in Plaintiffs' and the class's chat messages transmitted via LINE Messenger without the participants' consent or knowledge.

230.   Messages on LINE Messenger are transmitted from the sender's cellular phone through the domain ga2u.line.naver.jp, then to the recipient's cellular phone. While the messages are being transmitted between sender and recipient via the domain ga2u.line.naver.jp, Defendants use devices linked to the domain obs-us.line-apps.com to intercept videos contained in those chat messages. Naver Cloud, Naver Cloud America, and NBPAP are the ISPs for the domain ovs-us.line-apps.com and are thus involved in the interception of communications on LINE Messenger. Similarly, URLs and certain keywords contained in the chat messages are intercepted during the transmission between sender and recipient without the consent or knowledge of the participants of the chats.

231.   Chat participants could not provide consent to the interception because they did not know that their messages were being intercepted. They did not know that their messages were being intercepted because they relied on Defendants' representation that all messages on LINE Messenger are encrypted in their entirety.

232.   Plaintiffs and the class suffered economic injury as a result of

Defendants' unlawful interceptions of communications. The battery, memory, CPU and bandwidth of their cellular devices have been compromised and thus incurred additional data and electricity costs that they otherwise would not have.

233.   Plaintiffs and the Class seek $5,000 or three times the amount of actual damages, whichever is greater, for each violation of the CIPA by Defendants.

### Seventh Cause of Action

### (Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* – All Plaintiffs)

234.   Plaintiffs incorporate herein by this reference each and every preceding paragraph.

235.   Z-LINE Defendants' acts violate § 2511(1)(a) of the Electronic Communications Privacy Act ("ECPA") because Defendants intentionally endeavored to intercept, and did in fact intercept, electronic messages transmitted by Plaintiffs and the class using LINE Messenger, despite representing that the entirety of their messages on the LINE Messenger app were encrypted end-to-end such that only the sender and recipient could view the content of messages.  In fact, Z-LINE Defendants intentionally intercepted and continue to intercept certain contents of the chat messages on LINE Messenger – videos, URLs, and particular keywords – while the messages are in transit between the sender and recipient.

236.   Z-LINE Defendants intercept videos, URLs and certain keywords contained in Plaintiffs' and the class's chat messages on LINE Messenger by using devices that are distinct from the devices associated with the transmission of the messages between sender and recipient.

237.   The videos, URLs, and keywords contained in Plaintiffs' and the class's chat messages that Z-LINE Defendants intercept are substantive communication that senders intended to convey to recipients.

238.   Naver Defendants are also involved in the interception of videos contained in Plaintiffs' and the class's chat messages on LINE Messenger.

Plaintiffs' and the class's messages on LINE Messenger, once encrypted, are transmitted from the sender's device through the domain ga2u.line.naver.jp to the recipient's device. Videos contained in these chats are intercepted by devices linked to the domain obs-us.line-apps.com. The ISPs of the domain obs-us.line-apps.com include Naver Cloud and Naver Cloud America.

239.   Z-LINE Defendants' acts violate § 2511(1)(c) of the ECPA because they intentionally disclosed to third parties – Naver Defendants, via their provision of the obs-us.line-apps.com domain – the videos that they intercepted during the transmission of Plaintiffs' and the class's messages on LINE Messenger.

240.   Plaintiffs and the class seek: (i) injunctive relief to correct Defendants' actions, including, but not limited to, requiring Defendants to stop intercepting any portion of Plaintiffs' and the class's chat messages on LINE Messenger; (ii) the sum of actual damages suffered by them and any profits Defendants made as a result of their violations of the ECPA, but in no event less than $1,000; and (iii) reasonable attorneys' fees and costs under 18 U.S.C. § 2707(c).

<u>**Eighth Cause of Action**</u>

**(Violation of the Computer Fraud and Abuse Act,**

**18 U.S.C. § 1030 – All Plaintiffs)**

241.   Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

242.   Plaintiffs' and the class's mobile devices are, and at all relevant times were, used for interstate communication and commerce and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

243.   Defendants intentionally accessed Plaintiffs' and the class's protected computers and obtained information thereby, and in doing so exceeded authority granted by Plaintiffs and the class to access the protected computers in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).

244.   Z-LINE Defendants surreptitiously took Content IDs (identifying the

particular video viewed), Story IDs (identifying the particular collection of videos in which the video viewed is located), user identifier and device identifiers from Plaintiffs' and the class's mobile devices during the time that LINE Messenger was installed on them. Plaintiffs and the class never consented to such information being taken. Z-LINE Defendants also surreptitiously accessed Plaintiffs and the class's mobile devices and obtained videos, URLs and certain keywords contained in their chat messages on LINE Messenger. Plaintiffs and the class did not authorize Z-LINE Defendants to access or take such information.

245.   Naver Defendants also obtained face geometry scans performed and collected by SenseAR SDK embedded within the B612 app from Plaintiffs' and the class's mobile devices. Plaintiffs and the class never authorized Naver Defendants' access to or taking of such information.

246.   Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the surreptitious collection and transmission of information described above, and constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV), due to private and personally-identifiable information being made available to foreign actors, including foreign intelligence services, in locations without adequate legal privacy protections. As Senators Schumer and Cotton wrote in an October 23, 2019 letter to the Acting Director of National Intelligence "[s]ecurity experts have voiced concerns that China's vague patchwork of intelligence, national security, and cybersecurity laws compel Chinese companies to support and cooperate with intelligence work controlled by the Chinese Communist Party. Without an independent judiciary to review requests made by the Chinese government for data or other actions, there is no legal mechanism for Chinese companies to appeal if they disagree with a

request."[56]

247.   For these reasons, and those discussed in this Complaint, Plaintiffs and the class are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

**Ninth Cause of Action**

**(Violation of the Illinois Biometric Information Privacy Act,**

**740 ILCS 14/1, *et seq.* – Plaintiff Shubert)**

248.   Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

249.   The Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA") makes it unlawful for any private entity to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier . . . unless it first: (1) informs the subject . . . in writing that a biometric identifier . . . is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier . . . is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier . . . ." 740 ILCS 14/15(b) (emphasis added).

250.   Plaintiff Lee Shubert is, and at all relevant times was, an adult and resident of Illinois, and thus is, and at all relevant times was, a "person" and/or a "customer" within the meaning of BIPA. 740 ILCS 14/15(b).

251.   All Defendants are, and at all relevant times were, "private entities" under BIPA. 740 ILCS 14/10.

252.   As explained in detail above, Shubert's and the Illinois Subclass's

---

[56] Ben Kochman, *Sens. Want TikTok Investigated for National Security Threats*, Law360 (Oct. 24, 2019), https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats.

faceprints or face geometry are "biometric identifiers" and "biometric information" under 740 ILCS 14/10.

253. Defendants systematically collected, used, and stored Shubert's and the Illinois Subclass's biometric identifiers without first (1) properly informing Shubert and the Illinois Subclass in writing that their biometric identifiers were being collected and stored, as required by 740 ILCS 14/15(b)(1), (2) properly informing Shubert or the Illinois Subclass in writing of the specific purpose and length of term for which a biometric identifier is being collected, stored, and used, as required by 740 ILCS 14/15(b)(2), and (3) without obtaining from Shubert or the Illinois Subclass the specific written release required by 740 ILCS 14/15(b)(3).

254. In fact, Defendants failed to properly inform the Shubert and the Illinois Subclass in writing (or in any other way) that their "biometric identifiers" and "biometric information" were being "collected or stored" by Defendants. Nor did Defendants inform Shubert or the Illinois Subclass in writing of the specific purpose and length of term for which their "biometric identifiers" and "biometric information" were being "collected, stored and used" as required by 740 ILCS 14/15(b)(1)-(2).

255. Defendants unlawfully collected, stored and used biometric identifiers of Shubert and the Illinois Subclass who used the AR function of LINE Messenger with the aid of SenseAR, the SenseTime SDK capable of performing face geometry scans. LINE Messenger app includes codes such as "sTMobileFaceInfo," "getFaceAction" and "StMobileFaceInfo.face106.getID," which evidence that SenseAR is embedded within the app. Moreover, codes such as "getAndroidId" and "getMacAddress," also included in the LINE Messenger app, show that SenseAR also has the capability to pull additional personal information.

256. Defendants also unlawfully collected, stored and used biometric identifiers of Shubert and the Illinois Subclass who used the B612 app with the aid of SenseAR. The B612 app includes codes such as "public STMobileFaceInfo[]

faces" and "public float hairScore," which reveal that the app collects its users' face geometry data. The B612 app later transmits this data, along with the users' identifiers, to the domain log.snow.me without user consent. Naver Cloud and Naver Cloud America are, and at all relevant times were, the ISPs for the domain log.snow.me. Thus, Naver Defendants are, and at all relevant times were, also involved in the transmission of the face geometry data from B612 user devices to the domain log.snow.me.

257.    Defendants did not properly inform Shubert and the Illinois Subclass in writing of this collection, the specific purpose and length of term for which these biometric identifiers were collected, stored or used, and without obtaining the specific written release as required by BIPA.

258.    BIPA also makes it unlawful for a private entity "in possession of a biometric identifier or biometric information" to "sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

259.    Defendants are, and at all relevant times were, "in possession of" Shubert's and the Illinois Subclass's "biometric identifiers," including but not limited to their face geometry scans, and "biometric information." Defendants profited from such "biometric identifiers" and "biometric information" by using them for targeted advertising, improvements to their artificial intelligence technologies, their patent applications, and the generation of increased demand for and use of their other products. 740 ILCS 14/15(c).

260.    By collecting, storing and using Shubert's and the Illinois Subclass's biometric identifiers as described herein, Defendants violated Shubert's and the Illinois Subclass's rights to privacy in their biometric identifiers under the BIPA, 740 ILCS 14/1, *et seq*.

261.    BIPA mandates that a private entity "in possession of biometric identifiers or biometric information" "develop a written policy, made available to

the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a).

262.   But Defendants do not publicly provide any written policy establishing any retention schedule or guidelines for permanently destroying Shubert's or the Illinois Subclass's "biometric identifiers" and "biometric information." 740 ILCS 14/15(a).

263.   BIPA also commands private entities "in possession of a biometric identifier or biometric information" to: (1) store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and (2) store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits and protects other confidential and sensitive information. 740 ILCS 14/15(e). Based on the facts alleged herein, including Defendants' lack of a public written policy, their failure to inform Shubert and the Illinois Subclass who use LINE Messenger and B612 apps that Defendants obtain "biometric identifiers" and "biometric information," their failure to obtain written consent to collect or otherwise obtain "biometric identifiers" and "biometric information," and their unauthorized transmission of "biometric identifiers" and "biometric information," Defendants have violated this provision too.

264.   Defendants recklessly or intentionally violated each of BIPA's requirements and infringed Shubert's and the Illinois Subclass's rights to keep their immutable and uniquely identifying biometric identifiers and biometric information private. As individuals subjected to each of Defendants' BIPA violations described above, Shubert and the members of the Illinois Subclass are and have been

1    aggrieved. 740 ILCS 14/20.

2    265.   On behalf of himself and the Illinois Subclass, Shubert seeks: (i)

3    injunctive and equitable relief as is necessary to protect the interests of Shubert and

4    the Illinois Subclass by requiring Defendants to comply with BIPA's requirements

5    for the collection, storage, and use of biometric identifiers; (ii) statutory damages of

6    $5,000 per intentional or reckless violation of BIPA under 740 ILCS 14/20(2) and

7    statutory damages of $1,000 per negligent violation of the BIPA under 740 ILCS

8    14/20(1); and (iii) reasonable attorneys' fees and costs and other litigation expenses

9    under 740 ILCS 14/20(3).

10

11    **Tenth Cause of Action**

12    **(Restitution / Unjust Enrichment – All Plaintiffs)**

13    266.   Plaintiffs repeat and incorporate by reference all preceding paragraphs

14    as if fully set forth herein.

15    267.   Plaintiffs and the class have conferred substantial benefits on

16    Defendants by downloading and using Defendants' apps. These benefits include

17    Defendants' collection and use of the Plaintiffs' and the class's private and

18    personally-identifiable information and the revenues and profits resulting from

19    targeted advertising and other uses of the information Defendants have taken from

20    Plaintiffs and the class.

21    268.   Defendants have knowingly and willingly accepted and enjoyed these

22    benefits.

23    269.   Defendants either knew or should have known that the benefits

24    rendered by Plaintiffs and the class were given and received with the expectation

25    that they would not take and use the private and personally-identifiable information

26    that they have taken without permission. For Defendants to retain those benefits

27    under these circumstances is inequitable.

28    270.   Through deliberate violation of Plaintiffs' and the class's privacy

interests and statutory and constitutional rights, Defendants reaped benefits that led to each Defendant wrongfully receiving profits.

271.   Equity demands disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of Plaintiffs and the class.

272.   As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiffs and the class are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits and other compensation obtained by Defendants through this inequitable conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request relief against Defendants as set forth below:

A.      Entry of an order certifying the proposed class and subclass pursuant to Federal Rule of Civil Procedure 23;

B.      Entry of an Order appointing Plaintiffs as representatives of the class and subclass;

C.      Entry of an Order appointing Plaintiffs' counsel as co-lead counsel of the class and subclass;

D.       Entry of an Order for injunctive and declaratory relief as described herein, including but not limited to:

(i) enjoining Defendants from transmitting user data from the United States to China or to other locations where such data can be accessed from within China;

(ii) enjoining Defendants from collecting facial recognition data such as face geometries, including via the SenseTime SDK embedded into the Apps, contrary to user expectations;

(iii) enjoining Defendants from intercepting keywords, URLs, and videos, contrary to user expectations, sent in LINE Messenger chats that supposedly are encrypted end-to-end;

1           (iv) enjoining Defendants from taking and transmitting more private

2     and personally-identifiable data than is reasonably necessary for operation of

3     the Defendants' apps;

4           (v) enjoining Defendants from tracking users between the LINE

5     Messenger and B612 apps, contrary to user expectations;

6           (vi) enjoining Defendants from taking and transmitting to anyone else

7     the above-described user data;

8           (vii) requiring Defendants to remove from their apps all third party

9     analytic libraries and SDKs that take and/or transmit user data;

10          (viii) requiring Defendants to destroy the user data taken pursuant to

11    the above practices, including that user data in the possession of third parties;

12          (ix) requiring Defendants to provide confirmation that the above steps

13    have been implemented;

14    E.     Entry of judgment in favor of each class and subclass member for

15  damages suffered as a result of the conduct alleged herein, punitive damages,

16  restitution, and disgorgement, to include interest and prejudgment interest;

17    F.     Award Plaintiffs reasonable attorneys' fees and costs; and

18    G.    Grant such other and further legal and equitable relief as the court

19  deems just and equitable.

20                  **<u>DEMAND FOR JURY TRIAL</u>**

21    Plaintiffs demand a trial by jury on all issues so triable.

22

23

24

25

26  DATED:  July 2, 2021          By: */s/ Jonathan M. Rotter*

27  _____

28                  Kara M. Wolke - State Bar No. 241521

Marc L. Godino - State Bar No. 182689
Jonathan M. Rotter - State Bar No. 234137
Raymond D. Sulentic - State Bar No. 316913
Pavithra Rajesh - State Bar No. 323055
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067-2561
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Plaintiff Lee Shubert*

DATED: July 2, 2021          By: */s/ Amy E. Keller*
_____

Amy E. Keller (to apply pro hac vice)
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel. (312) 214.7900
akeller@dicellolevitt.com

*Attorneys for Plaintiff Lee Shubert*

DATED: July 2, 2021          By: */s/ Marc E. Masters*
_____

Ekwan E. Rhow - State Bar No. 174604
  erhow@birdmarella.com
Thomas R. Freeman - State Bar No. 135392
  tfreeman@birdmarella.com
Marc E. Masters - State Bar No 208375
  mmasters@birdmarella.com
**BIRD MARELLA BOXER WOLPERT
NESSIM DROOKS LINCENBERG &
RHOW P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

1

*Attorneys for Plaintiffs Sydney Ji, June Abe,
Kira Tomlinson, Ranela Sunga, and Stefanie
Bonner*

2

3

DATED:  July 2, 2021          By: */s/ Marc S. Williams*

4

5

Marc S. Williams – State Bar No. 198913
mwilliams@cohen-williams.com

6

Youngbin Son – State Bar No. 324547
yson@cohen-williams.com

7

**COHEN WILLIAMS LLP**

8

724 South Spring Street, 9th Floor

9

Los Angeles, CA 90014

10

Tel: 213-232-5162
Fax: 213-232-5167

11

12

*Attorneys for Plaintiffs Sydney Ji, June Abe,
Kira Tomlinson, Ranela Sunga, and Stefanie
Bonner*

13

14

DATED:  July 2, 2021          By: */s/ Lesley E. Weaver*

15

16

Lesley E. Weaver – State Bar No. 191305
Joshua Samra – State Bar No. 313050

17

**BLEICHMAR FONTI & AULD LLP**

18

555 12th Street, Suite 1600
Oakland, California 94607

19

Tel. (415) 445-4003

20

lweaver@bfalaw.com
jsamra@bfalaw.com

21

22

*Attorneys for Plaintiffs Sydney Ji, June Abe,
Kira Tomlinson, Ranela Sunga, and Stefanie
Bonner*

23

24

25

26

### **ATTESTATION**

27

I, Jonathan Rotter, am the ECF user whose identification and password are

28

being used to file this document. In compliance with Local Rule 5-1(i)(3), I hereby

attest that each of the Signatories herein concur in this filing.

DATED:  July 2, 2021                         By: */s/ Jonathan M. Rotter*
                                             Jonathan M. Rotter