1   Jonathan M. Rotter - State Bar No. 234137
    **GLANCY PRONGAY & MURRAY LLP**
2   1925 Century Park East, Suite 2100
    Los Angeles, California 90067-2561
3   Tel.: (310) 201-9150
    Fax.: (310) 201-9160
4   info@glancylaw.com

5   Marc E. Masters – State Bar No. 208375
    **BIRD MARELLA BOXER WOLPERT**
6   **NESSIM DROOKS LINCENBERG &**
    **RHOW P.C.**
7   1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
8   Tel.: (310) 201-2100
    Fax.: (310) 201-2110
9   mmasters@birdmarella.com

10  Lesley E. Weaver – State Bar No. 191305
    **BLEICHMAR FONTI & AULD LLP**
11  555 12th Street, Suite 1600
    Oakland, California 94607
12  Tel. (415) 445-4003
    Fax: (415) 445-4020
13  lweaver@bfalaw.com

14  *Attorneys for Plaintiffs and the Putative Class*
    [Additional Counsel Appear on Signature Block]
15

16              **UNITED STATES DISTRICT COURT**

17              **NORTHERN DISTRICT OF CALIFORNIA**

18  Sydney Ji, June Abe, Lee Shubert, Kira          CASE NO.  4:21-cv-05143-HSG
    Tomlinson, Ranela Sunga, and Stefanie
19  Bonner, individually and on behalf of all       **FIRST AMENDED CLASS ACTION**
    others similarly situated,                      **COMPLAINT FOR:**
20
                Plaintiff,                           **(1) Intrusion upon Seclusion**
21                                                   **(2) Violation of the Right to Privacy -**
            vs.                                      **California Constitution**
22                                                   **(3) Violation of the California Unfair**
    NAVER CORPORATION, a corporation;               **Competition Law, Bus. & Prof. C. §§ 17200**
23  NAVER CLOUD CORPORATION, a                      *et seq.*
    corporation; NAVER CLOUD AMERICA               **(4) Violation of the California False**
24  INC. f/k/a NAVER BUSINESS PLATFORM             **Advertising Law, Bus. & Prof. C. §§ 17500**
    AMERICA INC., a corporation; SNOW              *et seq.*
25  CORPORATION, a corporation; SNOW INC.,         **(5) Violation of the California Invasion of**
    a corporation; Z HOLDINGS                      **Privacy Act, Cal. Pen. C. § 630** *et seq.*
26  CORPORATION, a corporation; LINE               **(6) Violation of the Electronic**
    CORPORATION, a corporation; LINE PLUS          **Communications Privacy Act. 18 U.S.C. §§**
27  CORPORATION, a corporation; and LINE           **2510** *et seq.*
    EURO-AMERICAS CORPORATION, a                    **(7) Violation of the Computer Fraud and**
28  corporation.                                    **Abuse Act, 18 U.S.C. § 1030**

                        AMENDED CLASS ACTION COMPLAINT

Defendants.

**(8) Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.***
**(9) Larceny, Cal. Pen. C. § 496**
**(10) Conversion**
**(11) Restitution / Unjust Enrichment**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   THE PARTIES ............................................................................................................... 2

III.  JURISDICTION AND VENUE ..................................................................................... 4

      A.   Subject Matter Jurisdiction .................................................................................. 4

      B.   Personal Jurisdiction: Common Enterprise - Defendants' Shifting Maze of
           Interrelated Corporate Entities ............................................................................ 4

      C.   Personal Jurisdiction: The Naver Defendants ..................................................... 7

           1.   Naver Corporation ...................................................................................... 8

           2.   Naver Cloud Corporation .......................................................................... 10

           3.   Naver Cloud America Inc. ......................................................................... 13

           4.   Snow Corporation ...................................................................................... 15

           5.   Snow Inc. .................................................................................................... 16

           6.   Common Enterprise Summary ................................................................... 18

      D.   Personal Jurisdiction: The Z-LINE Defendants ................................................... 19

           1.   Z Holdings Corporation ............................................................................. 19

           2.   LINE Corporation ....................................................................................... 23

           3.   LINE Plus Corporation ............................................................................... 26

           4.   LINE Euro-Americas Corp. ........................................................................ 28

           5.   Common Enterprise Summary ................................................................... 29

      E.   Venue .................................................................................................................... 30

IV.   GENERAL ALLEGATIONS ......................................................................................... 30

      A.   LINE Messenger Is A Popular Messenger App .................................................... 30

      B.   B612 Is A Popular Photo And Video Editing App ................................................ 30

      C.   Naver Has A History Of Committing Privacy Violations...................................... 31

      D.   LINE Messenger and B612 Unlawfully Collect User Biometrics with the Aid of the
           Dangerous SenseTime SDK and Through Other Means ....................................... 32

1.     SenseTime Is a China-Based Technology Company Focused on AI, Which it Uses to Assist the Chinese Communist Party With Its Political, Military, and Policing Agenda. ................................................................. 32

2.     Defendants Use the SenseTime SDK Embedded in LINE Messenger and B612 to Unlawfully Collect Users' Face Geometry Scans. ........................ 37

3.     Defendants, on Information and Belief, Also Unlawfully Conduct Face Geometry Scans from LINE Messenger and B612 User Videos They Have Collected ................................................................................................. 40

E.     LINE Messenger Promises Users End-to-End Encryption of Their Chat Messages, but Instead, User Videos, URLs, and Certain Keywords from Those Chat Messages Are Unlawfully Intercepted. ................................................................................ 41

1.     Interception of Videos. ...................................................................... 42

2.     Interception of URLs. ........................................................................ 43

3.     Interception of Keywords. ................................................................. 43

F.     LINE Messenger Has Been Banned By the Japanese Government Due to Data Privacy and Security Concerns. ................................................................ 44

G.     B612 Collects Personally Identifiable User Data and Unlawfully Transmits It to China Where It Is Accessible By the Chinese Communist Party. ......................... 45

H.     The LINE Messenger App Collects Other Personally Identifiable User Data. ....... 47

I.     Plaintiffs' Personal Information Has Economic Value and There is a Market for this Information ........................................................................................ 47

J.     Plaintiffs Suffered an Economic Injury ................................................................ 50

K.     Plaintiffs Also Were Injured Because Their Devices' Battery Life Was Significantly Impacted by the LINE Messenger and B612 Apps ........................... 52

V.     FRAUDULENT CONCEALMENT AND TOLLING ....................................... 54

VI.     INAPPLICABILITY OF PURPORTED POLICIES AND TERMS OF USE .................. 55

VII.     NAMED PLAINTIFF ALLEGATIONS ........................................................... 55

VIII.     CLASS ALLEGATIONS .................................................................................. 65

IX.     CAUSES OF ACTION ..................................................................................... 69

First Cause of Action ..................................................................................... 69
(Intrusion Upon Seclusion – By Plaintiffs Ji, Abe, Tomlinson, Sunga, and Bonner ("California Plaintiffs") Against All Defendants) ..................................................... 69

Second Cause of Action ..................................................................... 73
    (Violation of the Right to Privacy – California Constitution – ...................................... 73

Third Cause of Action ........................................................................ 77
    (Violation of the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.* – By California Plaintiffs Against All Defendants) ............................................. 77

Fourth Cause of Action....................................................................... 81
    (Violation of the California False Advertising Law, .................................................. 81

Fifth Cause of Action ........................................................................ 82
    (Violation of California Invasion of Privacy Act, California Penal Code §§ 630, *et seq.* – California Plaintiffs Against All Defendants)........................................................... 82

Sixth Cause of Action......................................................................... 85
    (Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* – All Plaintiffs Against All Defendants)......................................................................... 85

Seventh Cause of Action ..................................................................... 87
    (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 – All Plaintiffs Against All Defendants).......................................................................................... 87

Eighth Cause of Action........................................................................ 92
    (Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* – Plaintiff Shubert Against All Defendants)........................................................... 92

Ninth Cause of Action ........................................................................ 98
    (Larceny / Receipt of Stolen Property, Cal. Penal Code § 496(a) and (c) – California Plaintiffs Against All Defendants) ..................................................................... 98

Tenth Cause of Action ........................................................................ 99
    (Conversion – California Plaintiffs Against All Defendants) ...................................... 99

Eleventh Cause of Action ................................................................... 100
    (Restitution / Unjust Enrichment – California Plaintiffs Against All Defendants) .... 100

PRAYER FOR RELIEF........................................................................ 101

DEMAND FOR JURY TRIAL............................................................... 102

## I.     <u>INTRODUCTION</u>

1.     This is a data privacy case involving two widely popular and interconnected mobile applications ("apps"). Through these apps, Defendants surreptitiously collect vast troves of personally identifiable user data without user consent – including unique biometric information and private message content.

2.     Defendants are a group of interrelated companies.  Their formal ownership and operational reporting lines have shifted continuously during the relevant period (see Figures 1-5 below), but throughout, they have acted as a common enterprise with regard to the ownership, operation, IT infrastructure, and promotion of the apps, and specifically, with regard to the misconduct alleged below. Acting through this interrelated web of companies, Defendants unlawfully collect, use, and share personal data from users of the apps for their own commercial purposes.

3.     The first app, LINE Messenger, is a mobile messenger app. The second app, B612, is a photo and video altering app targeted at younger consumers which allows users to change their appearance with various beautification filters.  Defendants embedded within both apps the China-based SenseTime software development kit ("SDK") which collects users' unique biometric identifiers and biometric information.  SenseTime is deeply enmeshed in China's intelligence and surveillance apparatus.  The United States Department of Treasury's Office of Foreign Assets Control designated SenseTime as a Non-SDN Chinese Military-Industrial Complex Company pursuant to Executive Order of June 3, 2021, "Addressing the Threat from Securities Investments that Finance Certain Companies of the People's Republic of China."  In that Order, President Biden found "that the use of Chinese surveillance technology outside the PRC and the development or use of Chinese surveillance technology to facilitate repression or serious human rights abuse constitute unusual and extraordinary threats, which have their source in whole or substantial part outside the United States, to the national security, foreign policy, and economy of the United States."  The previous administration had prohibited certain technology exports to SenseTime by placing it on the U.S. Entity List in 2019.

4.     No company should be using the SenseTime SDK in an app offered to U.S.

consumers.  But not only do the Defendants embed the SenseTime SDK in the two apps, one of the companies (SoftBank) involved in the ownership of several Defendants also owns a significant stake in SenseTime.  See Figures 3-5, below.

5. When using LINE Messenger, users are subject not only to the Defendants' collection of biometric identifiers and biometric information, but also to Defendants' interception in transit of material portions of user messages – *i.e.*, videos, URLs, and certain keywords – in unencrypted form.  That is so even though Defendants promise "end-to-end" encryption for user chats on LINE Messenger such that user messages cannot be read except by the sender and recipient.  Defendants also transmit personally identifiable user data to SenseTime.  LINE Messenger users have not consented to these activities.

6. When using B612, users are subject not only to the Defendants' collection of biometric identifiers and biometric information, which Defendants transmit to their servers, but also to Defendants transmitting personally identifiable user data to non-secure servers in China and Hong Kong, where, pursuant to Chinese law and corporate practice, it is available to the Chinese Communist Party for retention in a database used for intelligence gathering and other purposes. B612 users have not consented to these activities.

7. Plaintiffs seek redress for Defendants' conduct, which violates privacy, data, and consumer protections established by constitutional and statutory authority as well as the common law.

## II.     **THE PARTIES**

8. Plaintiff Sydney Ji, an individual, is a resident of Oakland, California, and a citizen of the State of California.

9. Plaintiff June Abe, an individual, is a resident of Irvine, California, and a citizen of the State of California.

10. Plaintiff Lee Shubert, an individual, is a resident of Chicago, Illinois, and a citizen of the State of Illinois.

11. Plaintiff Kira Tomlinson, an individual, is a current resident of Beaverton, Oregon, and a citizen of the State of Oregon. At all relevant times, Plaintiff Tomlinson was a resident of

Midway City, California, and a citizen of the State of California.

12.     Plaintiff Ranela Sunga, an individual, is a resident of Garden Grove, California, and a citizen of the State of California.

13.     Plaintiff Stefanie Bonner, an individual, is a resident of Palm Springs, California, and a citizen of the State of California.

14.     Defendant Naver Corporation ("Naver") is a South Korean corporation originally founded in 1999 and located at 6, Buljeong-ro, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea (13561).

15.     Defendant Naver Cloud Corporation ("Naver Cloud") is a South Korean corporation located at 117, Bundangnaegok-ro, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea (13529). Naver Cloud is a wholly owned subsidiary of Naver.

16.     Defendant Naver Cloud America Inc. f/k/a Naver Business Platform America Inc. ("Naver Cloud America") is a U.S. company located at 2033 Gateway Place, Ste. 500, San Jose, CA 95110. Naver Cloud America is a wholly-owned subsidiary of Naver Cloud.

17.     Defendant Snow Corporation ("Snow Corp.") is a South Korean company located on the 8th Floor of Krafton Tower, 117, Bundangnaegok-ro, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea 13529. Snow Corp. is a wholly owned subsidiary of Naver.

18.     Defendant Snow Inc. ("Snow Inc.") is a Delaware corporation located at 5750 Wilshire Blvd., Ste. 640, Los Angeles California 90036. Snow Inc. is a wholly owned subsidiary of Snow Corp.

19.     Defendant Z Holdings Corporation ("Z Holdings") is a Japanese company located at Kioi Tower 1-3 Kioicho, Chiyoda-ku, Tokyo 102-8282, Japan. Z Holdings is a subsidiary of a joint venture between Naver and third-party SoftBank Group Corporation ("SoftBank").

20.     Defendant LINE Corporation ("LINE Corp.") is a Japanese company located at JR Shinjuku Miraina Tower, 23rd Floor, 4-1-6 Shinjuku, Shinjuku-ku, Tokyo, 160-0022, Japan. LINE Corp. is a wholly owned subsidiary of Z Holdings.

21.     Defendant LINE Plus Corporation ("LINE Plus") is a South Korean company located at 42, Hwangsaeul-ro 360 Beon-gil, Bundang-gu, Seongnam-si, Gyeonggi-do, South

Korea. LINE Plus is a wholly owned subsidiary of LINE Corp.

22.     Defendant LINE Euro-Americas Corp. ("LINE Euro-Americas" or "LINE E-A") is a Delaware corporation located in Palo Alto, California and Los Angeles, California. LINE Euro-Americas is a wholly owned subsidiary of LINE Plus.

**III.     JURISDICTION AND VENUE**

**A.     Subject Matter Jurisdiction**

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States, and supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims.

24.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) and 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants, and also because some Defendants are citizens or subjects of a foreign state.

**B.     Personal Jurisdiction: Common Enterprise - Defendants' Shifting Maze of Interrelated Corporate Entities**

25.     As described above, the Naver Defendants and the Z-LINE Defendants operate a common enterprise using a maze of interrelated corporate entities, some of which are located in California and all of which target California (as discussed below). Defendants' overlapping ownership and formal corporate relationships have continually shifted throughout the relevant period.  Figures 1-5 below, attached in enlarged form as Exhibits 1-5, provide a graphical representation of the ownership and operational entwinements between the Naver Defendants and the Z-LINE Defendants, as Defendants have reconfigured them from 2017 to the present.  As described above and illustrated below, throughout this period, both the Naver Defendants and the Z-LINE Defendants have owned, operated, and supported both the LINE Messenger and B612 apps.  Further, even in the current corporate configuration and nominal ownership structure for the LINE Messenger and B612 apps, there continues to be significant operational overlap with regard to the operation of the apps, including data sharing and the use of a common user identifier, called

a "TMID," to identify their shared users and track them across the two apps and elsewhere on the internet.



**Figure 1**
(As of December 31, 2017)

**Figure 2**
(As of December 31, 2018)





**Figure 3**
(As of December 31, 2019)



**Figure 4**
(As of December 31, 2020)



### C.  Personal Jurisdiction: The Naver Defendants

26.     Naver, Naver Cloud, Naver Cloud America, Snow Corp., and Snow Inc. (collectively, the "Naver Defendants") – in collaboration among themselves and with the Z-LINE Defendants (defined below) – rely on the United States and California markets to promote and advertise various mobile applications and products targeted at consumers in the United States and California through, among others, the Google Play Store and the Apple App Store. Specifically, the Naver Defendants collaborated among themselves and with the Z-LINE Defendants to create a common enterprise that: developed, operated, and maintained the LINE Messenger and B612 apps within the United States and California; marketed the LINE Messenger and B612 apps to United States and California consumers; unlawfully collected and transmitted private United States and California user data through the LINE Messenger and B612 apps; and generated advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps.

27.     There were approximately 3,150,000 users of LINE Messenger in the United States as of September 2019.

1                                  **1.      Naver Corporation**

2          28.     This Court has personal jurisdiction over Naver, and venue is proper in this

3    District.

4          29.     Naver owned and operated the LINE Messenger app at all relevant times prior to

5    the completion of the March 2021 Z Holdings transaction, and Naver's tortious conduct through

6    the LINE Messenger app (discussed below) was directed into this District. At all relevant times,

7    such operations included but were not limited to the unlawful collection and transmission of LINE

8    Messenger user data (discussed below).

9                 a.      According to Naver's website, "NAVER Corp. is a global [information

10   communication technology] company, providing South Korea's number one search portal

11   'NAVER' and its subsidiaries and affiliates provide services, including LINE messenger, SNOW

12   camera app . . . ."

13                b.      Naver admitted in a public securities filing in South Korea that it had

14   "control" of the LINE Messenger app until "its business integration with Z Holdings, which was

15   completed on March 1, 2021."  Likewise, in multiple earlier public filings, Naver admitted that it

16   "services" LINE Messenger and "generates revenue" from the app "through ads business, contents

17   business (sale of mobile games and 'stickers' through LINE), and sale of character goods." Naver

18   also has identified LINE Messenger in multiple public filings as the second "key service" that

19   Naver offers.

20                c.      Naver has generated substantial revenue from the operation of the LINE

21   Messenger app by selling various types of advertisements that run on the app, as well as content

22   on mobile games and "stickers" within the app. Naver was a party to a Service Partnership

23   Agreement, agreeing to provide advertising tools, marketing planning, operational activities,

24   content, and APIs for the LINE Messenger app – all for the express purpose of "increas[ing] . . .

25   [the] number of new subscribers" (including American subscribers) for the LINE Messenger app.

26                d.      Z Holdings confirmed that LINE Corp. – an operator and distributor of the

27   LINE Messenger app – was dependent on Naver for many aspects of the LINE Messenger app

28   business: "LINE Corporation had received significant human resource support related to the

business of LINE Corporation up to this point from NAVER which used to be the parent company; there is cooperation in specific fields through joint development or development consignment, and there are many cases that requests for development are being made to the Development Division of NAVER (LINE Corporation especially were dependent on NAVER's high technical strength in AI and search fields)."

30.     Naver owns and operates and, at all relevant times, owned and operated the B612 app, and Naver's tortious conduct through the B612 app (discussed below) is, and at all relevant times was, directed into this District. Such operations include but are not limited to, and at all relevant times included but were not limited to, the unlawful collection and transmission of B612 user data (discussed below).

31.     Naver is and, at all relevant times, was physically present and doing business in California.  At least as of 2021: its corporate website stated it has an overseas office in the United States and its "Contact Us" page listed two California addresses in Palo Alto and Los Angeles; it expressly admitted that it has four employees in the United States, one of which – a member of Naver's finance team – provides support to Naver's United States subsidiaries; its LinkedIn page connected to a LinkedIn page for its "Chief Business Officer, North America," whose LinkedIn profile stated he is located in Palo Alto, California; it represented on its LinkedIn page that it and certain affiliated and/or subsidiary corporations have numerous employees in the San Francisco Bay Area, including in San Jose, Mountain View, Santa Clara, and Palo Alto.

32.     Naver has and, at all relevant times, had two California-based subsidiaries: Naver Cloud America (San Jose, California) and Snow Inc. (Palo Alto, California and Los Angeles, California). The contacts of Naver's California-based subsidiaries and foreign subsidiaries with California (discussed below) are imputed to Naver because such subsidiaries are Naver's agents.

a.     Naver generates revenue largely from advertising sales to companies advertising on Naver's platforms, including the LINE Messenger and B612 apps. Naver offers consumers access to the LINE Messenger and B612 apps for no monetary fee. Naver's business – and the success and profitability of its advertising sales – depend on expanding the user base of its platforms, including the LINE Messenger and B612 apps. Naver profits by offering its advertising

clients valuable information (data) about the users of the apps, which help these advertisers more effectively target their goods and services to the right audience. If Naver did not have subsidiaries, including Snow Corp., Snow Inc., Naver Cloud, Naver Cloud America, and (at least until March 2021) LINE Corp., helping Naver operate the LINE Messenger and B612 apps, helping Naver unlawfully collect and transmit private United States and California user data through these apps, and helping Naver expand these apps into markets such as California, Naver would have had to have undertaken such tasks on its own for the sake of advancing its business and profitability.

33.    Naver – and each of the Naver Defendants and the Z-LINE Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for Naver's role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. Naver – and each of the Naver Defendants and the Z-LINE Defendants – continuously and deliberately exploited the United States and California for commercial gain.

34.    Because Naver maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that it lacks California-specific jurisdiction over Naver, it nonetheless has personal jurisdiction over Naver under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, Naver has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 2.    Naver Cloud Corporation

35.    This Court has personal jurisdiction over Naver Cloud, and venue is proper in this District.

36.     Naver Cloud supports and, at all relevant times, supported the operation and maintenance of the LINE Messenger and B612 apps, and Naver Cloud's tortious conduct through these apps (discussed below) is and, at all relevant times, was directed into this District.

a.      Naver Cloud supports the Information Technology ("IT") infrastructure for the Naver Defendants and the Z-LINE Defendants, and also uses its own devices to host certain domains registered to Snow Corp. and LINE Corp. (discussed below) that are directly involved in the unlawful collection and transmission of private United States and California user data by the LINE Messenger and B612 apps (including data from users in this District). Naver Cloud devices linked to the IP addresses for at least one of these domains are and, at all relevant times, were located in Los Angeles, California (discussed below).

b.      Naver Cloud expressly admits it "provides global IT infrastructure management and enterprise solutions for NAVER Corporation, its parent, and NAVER Corp.'s subsidiaries, including SNOW Corporation."  At all relevant times, Naver Cloud operated under a contract to provide LINE Corp. "a service of establishing, operating and managing [LINE Corp.'s] Information System," which is defined as "all operating system and computer facilities" including "all hardware, software and network." Under this contract, Naver Cloud acquired, installed, operated, and managed LINE Corp.'s server, data storage, and data management with respect to user data. This included user data from the United States and California, as Naver Cloud provided a network for "domestic and foreign users" and procured facilities and networks to deliver internet content to "users" on behalf of LINE Corp.

c.      LINE Corp. reported Naver Cloud's (f/k/a Naver Business Platform Corporation) revenues for servicing the LINE Messenger and B612 apps as follows: "NAVER Business Platform Corporation provides data hosting services to us . . . [under the] information technology service agreement . . . dated April 1, 2013. For such services, we recognized expenses payable to NAVER Business Platform Corporation of ¥8,490 million in 2019 [approximately US $74 million] . . . ."

d.      Naver Cloud also serves as an Internet Service Provider ("ISP") for the aforementioned domains registered to Snow Corp. and LINE Corp. (discussed below) that are

directly involved in the unlawful collection and transmission of private United States and California user data by the LINE Messenger and B612 apps (including data from users in this District). By having a related entity (Naver Cloud) under common control serve as ISP, rather than having an independent third party serve as ISP, Snow Corp., LINE Corp., and the rest of the Naver Defendants and Z-LINE Defendants make the unlawful collection and transmission of the private United States and California user data less detectable to independent third parties.

37.     Naver Cloud is and, at all relevant times, was deeply involved with the Naver Defendants' facial recognition patents and technologies that, on information and belief, are applied to United States and California user videos (discussed below).

38.     Naver Cloud is and, at all relevant times, was physically present and doing business in the United States and California. At least as of 2021, Naver Cloud represented on its LinkedIn page that it has employees in the United States, and it also admits that it has one employee based in California.

39.     Naver Cloud has and, at all relevant times, had a California-based subsidiary: Naver Cloud America (San Jose, California). The contacts of Naver Cloud America with California (discussed below) are imputed to Naver Cloud because Naver Cloud America is Naver Cloud's agent. If Naver Cloud did not have Naver Cloud America helping it support the operation and maintenance of the LINE Messenger and B612 apps, and helping it unlawfully collect and transmit the private United States and California user data through these apps, Naver Cloud would have had to have undertaken such tasks on its own for the sake of advancing its business and profitability.

40.     Naver Cloud – and each of the Naver Defendants and the Z-LINE Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for Naver

Cloud's role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. Naver Cloud – and each of the Naver Defendants and the Z-LINE Defendants – continuously and deliberately exploited the United States and California for commercial gain.

41.     Because Naver Cloud maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that it lacks California-specific jurisdiction over Naver Cloud, it nonetheless has personal jurisdiction over Naver Cloud under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, Naver Cloud has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 3.     Naver Cloud America Inc.

42.     This Court has personal jurisdiction over Naver Cloud America, and venue is proper in this District.

43.     Naver Cloud America supports and, at all relevant times, supported the operation and maintenance of the LINE Messenger and B612 apps, and Naver Cloud America's tortious conduct through these apps (discussed below) is and, at all relevant times, was directed into this District.

a.     Naver Cloud America supports the IT infrastructure for the Naver Defendants and the Z-LINE Defendants within the United States and California, and also uses its own devices to host certain domains registered to Snow Corp. and LINE Corp. (discussed below) that are directly involved in the unlawful collection and transmission of private United States and California user data by the LINE Messenger and B612 apps (including data from users in this District).  Naver Cloud America devices linked to the IP addresses for at least one of these domains are and, at all relevant times, were located in Los Angeles, California (discussed below).

b.     Naver Cloud America also serves as an ISP for the aforementioned domains registered to Snow Corp. and LINE Corp. (discussed below) that are directly involved in the unlawful collection and transmission of private United States and California user data by the LINE

Messenger and B612 apps (including data from users in this District). By having a related entity (Naver Cloud America) under common control serve as ISP, rather than having an independent third party serve as ISP, Snow Corp., LINE Corp., and the rest of the Naver Defendants and Z-LINE Defendants make the unlawful collection and transmission of the private United States and California user data less detectable to independent third parties.

44.    Naver Cloud America is and, at all relevant times, was physically present and doing business in California. Naver Cloud America is and, at all relevant times, was headquartered in San Jose, California. Naver Cloud America's Chief Executive Officer, Secretary, and Chief Financial Officer are and, at relevant times, were located at Naver Cloud America's San Jose, California offices.

45.    Naver Cloud America has a California agent for service of process – Yeong-Sae Kim at 1700 Wyatt Dr., Suite 9, Santa Clara, California 95054 – and this individual is the same agent for service of process for Snow Inc., LINE Euro-Americas, and LINE Friends (a LINE entity discussed below).

46.    Naver Cloud America – and each of the Naver Defendants and the Z-LINE Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for Naver Cloud America's role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. Naver Cloud America – and each of the Naver Defendants and the Z-LINE Defendants – continuously and deliberately exploited the United States and California for commercial gain.

47.    Because Naver Cloud America is headquartered in California and is "at home" here, it is subject to general jurisdiction in this Court. Alternatively, because Naver Cloud America

1   maintains sufficient minimum contacts with the forum so as not to offend traditional notions of

2   fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise

3   personal jurisdiction over it.

4                          **4.      Snow Corporation**

5          48.    This Court has personal jurisdiction over Snow Corp., and venue is proper in this

6   District.

7          49.    Snow Corp. owns and operates and, at all relevant times since 2017, owned and

8   operated the B612 app, and Snow Corp.'s tortious conduct through the B612 app (discussed

9   below) is and, at all relevant times, was directed into this District. In its June 2019 Consolidated

10  Financial Statements, Snow Corp. explicitly states that it "acquired camera application business

11  from LINE Plus Corporation as of May 1, 2017. The camera application business includes

12  services such as B612 …."  Snow Corp.'s operation of the B612 app includes but is not limited to,

13  and at all relevant times included but was not limited to, the unlawful collection and transmission

14  of B612 user data (discussed below).

15         50.    Snow Corp. is and, at all relevant times, was the registrant of a key domain directly

16  involved in the unlawful collection and transmission of private United States and California user

17  data (discussed below), including data from users in this District.

18         51.    On August 19, 2022, Snow Corp. published a Privacy Policy for the B612 app in

19  which Snow Corp. specifically addresses California users in the "California Consumer Privacy

20  Rights" section, which states: "If you are a California resident, you have rights under the

21  California Consumer Privacy Act of 2018 (CCPA), as applicable, to exercise free of charge." Even

22  though B612 users are not on notice of this Privacy Policy and do not consent to its terms, this

23  provision of the Privacy Policy indicates Snow Corp.'s intent to direct the B612 app to California

24  residents.

25         52.    Snow Corp. is and, at all relevant times, was physically present and doing business

26  in the United States. At least as of 2021, Snow Corp. represented on its LinkedIn page that it has

27  employees in the United States, including its "US General Manager."

28         53.     Snow Corp. has and, at all relevant times, had a California-based subsidiary: Snow

---

AMENDED CLASS ACTION COMPLAINT

15

Inc. (Palo Alto, California and Los Angeles, California). The contacts of Snow Inc. with California (discussed below) are imputed to Snow Corp. because Snow Inc. is Snow Corp's agent. If Snow Corp. did not have Snow Inc. helping it operate the B612 app, and helping it unlawfully collect and transmit the private United States and California user data through the B612 app, Snow Corp. would have had to have undertaken such tasks on its own for the sake of advancing its business and profitability.

54.     Snow Corp. – and each of the Naver Defendants and the Z-LINE Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for Snow Corp.'s role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. Snow Corp. – and each of the Naver Defendants and the Z-LINE Defendants – continuously and deliberately exploited the United States and California for commercial gain.

55.     Because Snow Corp. maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that it lacks California-specific jurisdiction over Snow Corp., it nonetheless has personal jurisdiction over Snow Corp. under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, Snow Corp. has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 5.     Snow Inc.

56.     This Court has personal jurisdiction over Snow Inc., and venue is proper in this District.

57.     Snow Inc. owns and operates and, at all relevant times since May 2017, owned and

operated the B612 app, and Snow Inc.'s tortious conduct through the B612 app (discussed below)

is and, at all relevant times, was directed into this District.  The Google Play Store identifies Snow

Inc. as the publisher of the B612 app. Snow Inc.'s operation of the B612 app includes but is not

limited to, and at all relevant times included but was not limited to, the unlawful collection and

transmission of B612 user data (discussed below).

58.     Snow Inc. published a Terms of Use and a Privacy Policy for the B612 app that are

directed at California users, apply California law, and require user disputes to be resolved in

California. The Terms of Use dated September 1, 2017, state: (1) "you agree to be bound by the

laws of California"; and (2) "[a]ny dispute you have with SNOW must be resolved by you in a

court located in Santa Clara County, California, unless otherwise agreed in writing. You agree to

the personal jurisdiction of the federal and state courts located in Orange County, California." The

Privacy Policy dated February 4, 2021, like that of Snow Corp. (discussed above), states: "If you

are a California resident, you have the right under the California Consumer Privacy Act of 2018

(CCPA), as applicable, to exercise free of charge." It also references California law under a

separate section on personal information. Even though B612 users are not on notice of this Privacy

Policy or this Terms of Use, and do not consent to the terms of either document, these provisions

of the Privacy Policy and Terms of Use indicate Snow Inc.'s intent to direct the B612 app to

California residents.

59.     Snow Inc. is and, at all relevant times, was physically present and doing business in

California. Snow Inc.'s Chief Executive Officer, Secretary, and Chief Financial Officer are all

located at Snow Inc.'s Los Angeles, California offices. At least as of 2021, Snow Inc. also

represented on the Google Play Store that it has offices at 575 High Street, Suite 110, Palo Alto,

California 94301.

60.     Snow Inc. has a California agent for service of process – Yeong-Sae Kim at 1700

Wyatt Dr., Suite 9, Santa Clara, California 95054 – and this individual is the same agent for

service of process for Naver Cloud America, LINE Euro-Americas, and LINE Friends.

61.     Snow Inc. – and each of the Naver Defendants and the Z-LINE Defendants – acted

as part of a global enterprise of affiliated companies working together to: develop, operate, and

maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for Snow Inc.'s role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. Snow Inc. – and each of the Naver Defendants and the Z-LINE Defendants – continuously and deliberately exploited the United States and California for commercial gain.

62.     Because Snow Inc. is headquartered in California and is "at home" here, it is subject to general jurisdiction in this Court. Alternatively, because Snow Inc. maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

### 6.      Common Enterprise Summary

63.     Based on the facts alleged above and below, the Naver Defendants are engaged in a single, common enterprise with each other and with the Z-LINE Defendants, such that personal jurisdiction over one of the named defendants establishes personal jurisdiction over all of the others. The Naver Defendants exhibit vertical commonality among themselves and horizontal commonality with the Z-LINE Defendants because their economic interests are interdependent and they pool assets (the LINE Messenger app, the B612 app, the IT infrastructure and devices, and the domains involved in the unlawful collection and transmission of private United States and California user data) to siphon private United States and California user data and generate advertising revenues. This commingling of assets is illustrated by the fact that the B612 app was transferred from LINE Corp. and LINE Plus to Snow Corp. and Snow Inc. in 2017, and the LINE Messenger app was transferred from Naver to the Z-LINE Defendants in 2021. Moreover, until early 2021, the Naver Defendants, LINE Corp., LINE Plus, and LINE Euro-Americas were under the common control of Naver. After early 2021, the Naver Defendants and the Z-LINE Defendants

remain under the common control of Naver as well as Z Holdings, with Naver owning 50% of the entity that owns over 65% of Z Holdings. Additionally, as indicated above and below, certain Naver Defendants and Z-LINE Defendants share offices, employees, and an agent for service of process. The Naver Defendants and the Z-LINE Defendants transact business, including that centered on the LINE Messenger and B612 apps, through a maze of interrelated companies, which is further highlighted by their unified branding on their websites that often fails to distinguish among the Naver Defendants and the Z-LINE Defendants.  Figures 1-5 below, attached in enlarged form as Exhibits 1-5, provide a graphical representation of the ownership and operational entwinements between the Naver Defendants and the Z-LINE Defendants.

### D. <u>Personal Jurisdiction: The Z-LINE Defendants</u>

64.     Z Holdings, LINE Corp., LINE Plus, and LINE Euro-Americas (collectively, the "Z-LINE Defendants") – in collaboration among themselves and with the Naver Defendants – rely on the United States and California markets to promote and advertise various mobile applications and products targeted at consumers in the United States and California through, among others, the Google Play Store and the Apple App Store. Specifically, the Z-LINE Defendants collaborated among themselves and with the Naver Defendants to create a common enterprise that: developed, operated, and maintained the LINE Messenger and B612 apps within the United States and California; marketed the LINE Messenger and B612 apps to United States and California consumers; unlawfully collected and transmitted private United States and California user data through the LINE Messenger and B612 apps; and generated advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps.

### 1. **Z Holdings Corporation**

65.     This Court has personal jurisdiction over Z Holdings, and venue is proper in this District.

66.     Since March 2021, Z Holdings owns and operates the LINE Messenger app, and Z Holdings' tortious conduct through the LINE Messenger app (discussed below) is and, at all relevant times, was directed into this District. Such operations include but are not limited to the

unlawful collection and transmission of LINE Messenger user data (discussed below).

        a.      One published description of Z Holdings and its ownership and operation of the LINE Messenger app states: "SoftBank's internet business Yahoo Japan has completed its merger with Japanese chat app Line, the affiliate firm of South Korean internet portal Naver. … Following the completion of the deal, Z Holdings – the rebranded name of Yahoo Japan – will take on the operations of the merged entity. A Holdings, [the joint venture] which was created by SoftBank and Naver, controls 65.3% of publicly traded Z Holdings shares. Both companies each own an equal stake in A Holdings."

        b.      Z Holdings' strategy in acquiring the LINE Messenger app was to leverage the app's business to expand Z Holdings' other businesses and create synergy across various services. In a strategy presentation given by Z Holdings on March 1, 2021, it boasted of its plan to "create a unique ecosystem through deeper collaborations" between its products and those of LINE Corp. The same presentation also admitted to using artificial intelligence ("AI") to link IDs and members of LINE Corp. and Z Holdings, and "share know-how, form [an] alliance." "Our corporate group has broadened [itself] by merging with LINE Corporation such that [our] services can be provided in as many as 230 countries and regions. . . . as short-term undertaking due to merging with LINE Corporation, [we] will integrate loyalty programs of all the companies, Yahoo, PayPay [and] LINE and utilize their three origins and will thereby promote [the users] to become cross users among the services of all the companies and further broaden the sphere of [our] economy. As mid-term and long-term undertaking, [we] will develop 'Social Commerce' utilizing the communication function of LINE. One measure to implement it is to develop 'Smart Store Project' utilizing knowledge and experience of NAVER Corporation." The presentation also stated that "[we] will, from now on, while utilizing AI technology of NAVER Corporation and the assets of LINE Corporation . . . . Further, accumulated data will be utilized in combination with PayPay, LINE official accounts, etc., . . . [and we will] implement '1:1' marketing with suggestions that are optimal for each individual person and thereby target increasing his/her use frequency."

        c.      An April 23, 2021 Goldman Sachs analyst report further evidences Z

Holdings' involvement in the LINE Messenger app operations, describing the integration of the LINE Messenger app and Yahoo! Japan data collection systems as follows: "As a messaging app, LINE has difficulty acquiring user data that contributes to conversion (e.g., product purchase history). However, the Yahoo! Japan site operated by Z Holdings collects data that can contribute to conversion, including data on search history (to uncover potential customers) and purchased products systems, which we expect to enable more effective collection of customer data." This report also indicates that Z Holdings plans to introduce "team purchases, social gifts, and live commerce" on the LINE Messenger app and improve advertising precision and increase operating profits by integrating the LINE Messenger app and Yahoo! Japan IDs.

　　　　　　　d.　　　On October 18, 2021, Z Holdings again confirmed that it was more than just a "holding company" when it published a report of the Special Committee for Global Data Governance.　Z Holdings established that committee and tasked it with verification and evaluation of data handling at Z Holdings through external experts after media outlets reported mishandling of LINE Messenger users' personal information in China and abroad (i.e., outside of Japan). The report confirmed that Z Holdings governs the handling of user data by the LINE Messenger app and its other portfolio businesses. According to the report, "data utilization," "research/development," "privacy protection," "security," and "risk management" are all functions of Z Holdings. The report also acknowledges that Z Holdings is responsible for data security issues that arise in connection with the LINE Messenger app: "In the case similar problems occur [concerning data storage location] in its relationship with the governments of other countries in relation to LINE Corporation developing its business globally, this problem is not a problem of LINE Corporation alone, but also will extend to being a problem for the entire ZHD group; therefore, ZHD Corporation must appropriately build a global governance system in the policy liaison field for the entire ZHD group, including LINE Corporation."

　　　　　　　e.　　　Further acknowledging its involvement in the LINE Messenger app operations, Z Holdings listed LINE Corp. (its wholly owned subsidiary) and LINE Plus (LINE Corp.'s wholly owned subsidiary) – both of which are involved in the operation of the LINE Messenger app (discussed below) – as two of its "Major Group Companies" on its website.

67.     Z Holdings has and, at all relevant times since March 2021, had a California-based subsidiary: LINE Euro-Americas (Palo Alto, California and Los Angeles, California). The contacts of Z Holdings' California-based (LINE Euro-Americas) and foreign (LINE Corp. and LINE Plus) subsidiaries with California (discussed below) are imputed to Z Holdings because such subsidiaries are Z Holdings' agents. If Z Holdings did not have these subsidiaries helping it operate the LINE Messenger app, helping it promote the LINE Messenger app in the United States and California, and helping it unlawfully collect and transmit private United States and California user data through the LINE Messenger app, Z Holdings would have had to have undertaken such tasks on its own for the sake of advancing its business and profitability.

68.     Z Holdings – and each of the Z-LINE Defendants and the Naver Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for Z Holdings' role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. Z Holdings – and each of the Z-LINE Defendants and the Naver Defendants – continuously and deliberately exploited the United States and California for commercial gain.

69.     Because Z Holdings maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that it lacks California-specific jurisdiction over Z Holdings, it nonetheless has personal jurisdiction over Z Holdings under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, Z Holdings has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 2.    LINE Corporation

70.    This Court has personal jurisdiction over LINE Corp., and venue is proper in this District.

71.    LINE Corp. owns and operates and, at all relevant times, owned and operated the LINE Messenger app, and LINE Corp.'s tortious conduct through the LINE Messenger app (discussed below) is and, at all relevant times, was directed into this District. Such operations include but are not limited to, and at all relevant times included but were not limited to, the unlawful collection and transmission of LINE Messenger user data (discussed below). At least as of 2021, LINE Corp.'s website further confirmed LINE Corp's involvement in LINE Messenger operations: "With the LINE messaging app as the cornerstone, LINE Corporation's business encompasses development and operation of a wide range of mobile-first services – including communication, content, and entertainment – and advertising, as well as new businesses in Fintech, AI, and other domains." LINE Corp. explicitly admitted in its motion to dismiss the original complaint, ECF 52, that it "operate[s] and distribute[s]" LINE Messenger.

72.    Until May 2017, LINE Corp. owned and operated the B612 app at all relevant times.  At all relevant times since then, LINE Corp.'s tortious conduct continued through the B612 app and was directed into this District (discussed below). Such conduct included but was not limited to the unlawful collection and transmission of B612 user data (discussed below). Consistent with its continued exploitation of the B612 app, LINE Corp. promotes the B612 app as a member of the "LINE Family" of apps, as shown in this excerpt from LINE Corp.'s  website (https://linecorp.com/en/business/service) as of October 25, 2022.

*///*

*///*

*///*

*///*

*///*

*///*



**LINE Family Apps**

Everything you would ever need on your smartphone.

LINE family apps include a web comic app, a security app, and many more that will make your everyday life more fun! Use LINE Deco to decorate your phone however you want, and LINE Camera to take the best pics. There's something for every aspect of your smartphone life in the LINE family.

More Details

73.    LINE Corp. is and, at all relevant times, was physically present and doing business in California. At least as of 2021, LINE Corp. stated on its corporate website and on its LinkedIn page that it has offices in Palo Alto, California. LINE Corp. also represented on its LinkedIn page that it and certain affiliated and/or subsidiary corporations have employees in California, including LINE Corp.'s Chief Executive Officer (Los Angeles, California), Chief Compliance Officer (San Francisco, California), and at least one of its engineers (San Francisco, California).

74.    LINE Corp. is and, at all relevant times, was the registrant of key domains directly involved in the unlawful collection and transmission of private United States and California user data (discussed below), including data from users in this District.

75.    LINE Corp. uses its own devices to host certain domains directly involved in the unlawful collection and transmission of private United States and California user data by the LINE Messenger app (discussed below).

76.    LINE Corp. also serves as an ISP for the aforementioned domains (discussed below). By doing so, rather than having an independent third party serve as ISP, LINE Corp. and the rest of the Naver Defendants and Z-LINE Defendants make the unlawful collection and transmission of the private United States and California user data less detectable to independent third parties.

77.    Until recently, LINE Corp. had United States-listed shares that traded on the New York Stock Exchange.

78.    LINE Corp. has and, at all relevant times, had a California-based subsidiary: LINE

Euro-Americas (Palo Alto, California and Los Angeles, California). The contacts of LINE Corp.'s California-based (LINE Euro-Americas) and foreign (LINE Plus) subsidiaries with California (discussed below) are imputed to LINE Corp. because such subsidiaries are LINE Corp.'s agents. Additionally, LINE Corp. promotes the expansion of LINE Messenger's user base in California through LINE Friends Inc., a U.S. subsidiary of LINE Corp., that sells LINE Messenger merchandise online and at a brick and mortar store located in Los Angeles, California, which opened in 2019. Press coverage of the opening of the store describes LINE Friends as a global character brand featuring characters originally created for use as "stickers" for LINE Messenger and its user base. The LINE Friends webpage has a similar description.  Indeed, the LINE Corp. webpage devotes a page to the LINE Friends business.  Critically, Defendants market the LINE Messenger characters, including through LINE Friends, "primarily to promote our brand and appeal, as well as further expand our user base."  If LINE Corp. did not have these subsidiaries helping it operate the LINE Messenger and B612 apps, helping it promote the LINE Messenger and B612 apps in the United States and California, and helping it unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps, LINE Corp. would have had to have undertaken such tasks on its own for the sake of advancing its business and profitability.

79.     LINE Corp. – and each of the Z-LINE Defendants and the Naver Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for LINE Corp.'s role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. LINE Corp. – and each of the Z-LINE Defendants and the Naver Defendants – continuously and deliberately exploited the United States and California for commercial gain.

80.     Because LINE Corp. maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that it lacks California-specific jurisdiction over LINE Corp., it nonetheless has personal jurisdiction over LINE Corp. under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, LINE Corp. has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 3.     LINE Plus Corporation

81.     This Court has personal jurisdiction over LINE Plus, and venue is proper in this District.

82.     LINE Plus operates and, at all relevant times, operated the LINE Messenger app, and LINE Plus' tortious conduct through the LINE Messenger app (discussed below) is and, at all relevant times, was directed into this District. Such operations include but are not limited to, and at all relevant times included but were not limited to, the unlawful collection and transmission of LINE Messenger user data (discussed below). At least as of 2021, LINE Corp.'s website stated that LINE Plus "supports LINE's global business development with programmers, designers, marketers, sales personnel, and PR managers of 50 different nationalities working together."

83.     Until May 2017, LINE Plus owned and operated the B612 app at all relevant times. Since then, at all relevant times, LINE Plus' tortious conduct continued through the B612 app and was directed into this District (discussed below). At all relevant times, such conduct included but was not limited to the unlawful collection and transmission of B612 user data (discussed below).

84.     LINE Plus is and, at all relevant times, was physically present and doing business in California. LINE Plus has had seven employees in the United States, at least two of which were in California as of April 2021, at which time two of LINE Plus' officers served on LINE Euro-Americas' board of directors and one LINE Euro-Americas employee also held a position at LINE Plus.

85.     From inception, LINE Plus' corporate purpose was to expand the LINE Messenger app outside of Japan and into other markets, including California. It has done so through the

provision of marketing and technical services. As described in LINE Corp.'s 2020 Form 20-F, LINE Plus was established in March 2013 "[i]n order to more effectively pursue global expansion [of LINE Messenger] outside of Japan."  LINE Plus "provide[d] marketing and sales services for the LINE platform outside of Japan."  As part of that global expansion, LINE Plus assisted in the operation of B612 at least until May 2017: "In May 2017, we transferred our camera application business, including B612 . . . , which was operated by our wholly-owned subsidiary LINE Plus Corporation, to Snow Corporation to pursue further synergies."  And as described in LINE Plus's motion to dismiss the original complaint, ECF 52, LINE Plus currently "provides technological support to LINE Corp. for LINE Messenger."

86.     LINE Plus has and, at all relevant times, had a California-based subsidiary: LINE Euro-Americas (Palo Alto, California and Los Angeles, California). The contacts of LINE Plus' California-based subsidiary (LINE Euro-Americas) with California (discussed below) are imputed to LINE Plus because LINE Euro-Americas is LINE Plus' agent. If LINE Plus did not have this subsidiary helping it promote the LINE Messenger and B612 apps in the United States and California, LINE Plus would have had to have undertaken such tasks on its own for the sake of advancing its business and profitability.

87.     LINE Plus – and each of the Z-LINE Defendants and the Naver Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for LINE Plus' role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. LINE Plus – and each of the Z-LINE Defendants and the Naver Defendants – continuously and deliberately exploited the United States and California for commercial gain.

88.     Because LINE Plus maintains sufficient minimum contacts with the forum so as

not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that it lacks California-specific jurisdiction over LINE Plus, it nonetheless has personal jurisdiction over LINE Plus under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, LINE Plus has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 4. LINE Euro-Americas Corp.

89.     This Court has personal jurisdiction over LINE Euro-Americas, and venue is proper in this District.

90.     LINE Euro-Americas is and, at all relevant times, was physically present and doing business in California. LINE Euro-Americas' Chief Executive Officer, Secretary, and Chief Financial Officer are all located in LINE Euro-Americas' Palo Alto, California offices. Earlier, when originally formed in 2013, LINE Euro-Americas was located in Los Angeles, California. LINE Euro-America's March 9, 2021 Statement of Information filed with the California Secretary of State identifies its business as "mobile software."

91.     At all relevant times, LINE Euro-Americas promoted the LINE Messenger app in California. LINE Euro-Americas, while physically located in California, "promoted LINE Messenger in North and South America" (including California) and, according to LINE Euro-Americas, currently "supports business-to-business activities and partnerships for LINE Plus and LINE Corp." At least as of 2021, LINE Euro-Americas' LinkedIn page promoted the LINE Messenger app, noting that it "offers free one-to-one and group messaging, as well as free domestic and international voice and video calls," and "includes a wide array of social elements such as fun and expressive stickers, a personal Home, a Timeline, and numerous LINE family apps."  Through the page, LINE Euro-Americas directed users to the LINE Messenger homepage in English.

92.     LINE Euro-Americas has a California agent for service of process – Yeong-Sae Kim at 1700 Wyatt Dr., Suite 9, Santa Clara, California 95054 – and this individual is the same agent for service of process for Naver Cloud America, Snow Inc., and LINE Friends.

93.     LINE Euro-Americas – and each of the Z-LINE Defendants and the Naver Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for LINE Euro-Americas' role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. LINE Euro-Americas – and each of the Z-LINE Defendants and the Naver Defendants – continuously and deliberately exploited the United States and California for commercial gain.

94.     Because LINE Euro-Americas is headquartered in California and is "at home" here, it is subject to general jurisdiction in this Court. Alternatively, because LINE Euro-Americas maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

## 5.     Common Enterprise Summary

95.     Based on the facts alleged above and below, the Z-LINE Defendants are engaged in a single, common enterprise with each other and with the Naver Defendants, such that personal jurisdiction over one of the named defendants establishes personal jurisdiction over all of the others. The Z-LINE Defendants exhibit vertical commonality among themselves and horizontal commonality with the Naver Defendants because their economic interests are interdependent and they pool assets (the LINE Messenger app, the B612 app, the IT infrastructure and devices, and the domains involved in the unlawful collection and transmission of private United States and California user data) to siphon private United States and California user data and generate advertising revenues. This commingling of assets is illustrated by the fact that the B612 app was transferred from LINE Corp. and LINE Plus to Snow Corp. and Snow Inc. in 2017, and the LINE

Messenger app was transferred from Naver to the Z-LINE Defendants in 2021. Moreover, until early 2021, the Naver Defendants, LINE Corp., LINE Plus, and LINE Euro-Americas were under the common control of Naver. After early 2021, the Naver Defendants and the Z-LINE Defendants remain under the common control of Naver as well as Z Holdings, with Naver owning 50% of the entity that owns over 65% of Z Holdings. Additionally, as indicated above and below, certain Naver Defendants and Z-LINE Defendants share offices, employees, and an agent for service of process. The Naver Defendants and the Z-LINE Defendants transact business, including that centered on the LINE Messenger and B612 apps, through a maze of interrelated companies, which is further highlighted by their unified branding on their websites that often fails to distinguish among the Naver Defendants and the Z-LINE Defendants.

### E.   Venue

96.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because: (i) a substantial part of the conduct giving rise to Plaintiffs' claims occurred in and/or emanated from this District; (ii) Defendants transact business in this District; (iii) at least one Defendant has offices in this District; and (iv) Plaintiff Sydney Ji resides in this District.

## IV.   GENERAL ALLEGATIONS

### A.   LINE Messenger Is A Popular Messenger App

97.     LINE Messenger began as a messenger app in June 2011, but later grew into a global communication platform. In a strategy presentation to analysts, Z Holdings described how LINE Messenger has 167 million users in just four countries with 27.4 billion average daily messages exchanged of as of September 30, 2020. LINE Messenger is one of the fastest growing mobile messenger apps in the world, and is currently available on smartphones, including iPhones and Android devices, and also on PCs and Macs.

98.     LINE Messenger allows users to send written messages, make voice calls, and send videos. It also has a timeline feature through which users can share their photos and/or videos with friends and the public.

### B.   B612 Is A Popular Photo And Video Editing App

99.     B612 is a photo and video editing app popular among younger consumers,

including minors. Indeed, as Naver boasts in its 2019 annual report, Snow is "leading communication trends for teens around the world" and has the leading "global avatar service for Generation Z, with 92% of overseas users being aged 13 to 18."[1]

100.    B612 allows users to take photos in various styles, record videos, and create digital graffiti. It allows users to edit photos and videos, create collages, and pair videos with music.

101.    B612 also features a wide range of built-in augmented reality ("AR") applications. AR allows users to utilize filters to alter their image, including, for example, making their skin appear smoother or changing their image into an animated display like a stuffed animal.

102.    According to download data from Google's Google Play metrics, B612 has been downloaded more than 500 million times.[2] As Naver acknowledges, as of the end of 2019, the number of global monthly active users (MAUs) of B612 exceeded 260 million, with a high proportion of overseas users. Those overseas users include users throughout the United States.

### C.    Naver Has A History Of Committing Privacy Violations

103.    Naver is South Korea's largest web search engine and messenger service, with over 200 million users around the world.[3] Naver describes itself as a business that enables widespread access to advanced technologies.[4] As of 2017, Naver had over 2,700 employees and generated over $3.6 billion in revenue.[5]

104.    Naver's products are also used for developing artificial intelligence ("AI").

105.    Naver has collected sensitive private data without user consent for some time. For instance, the *Korea Times* reports Naver allegedly collected sensitive user information as far back as 2016, including social security numbers and Internet Personal Identification Numbers (IPINs),

---

[1] Dynamic Tech Cube, Naver Annual Report 2019, https://www.navercorp.com/navercorp_/ir/annualReport/2020/NAVER_2019AR_Design_TCG0604_ENG.pdf at 36.

[2] B612 – Best Free Camera & Photo/Video Editor, https://play.google.com/store/apps/details?id=com.linecorp.b612.android&hl=en_US&gl=US

[3] Naver Company, https://www.navercorp.com/en/naver/company (last accessed Jue 25, 2021).

[4] *Id.*

[5] *Id.*

without user consent.[6]

106.    The *Korea Times* also reported that Naver has been accused of collecting and storing children's information, including their nicknames, personal information, and family photos, in contravention of Korean law.[7]

107.    In addition to the unlawful collection and storage of such private information without user consent, the *location* of where such private data was stored is also troubling. Specifically, the data was sent to Hong Kong, where it is accessible by the Chinese Communist Party.[8]

108.    Naver admitted to destroying potentially inculpatory evidence of its misconduct: "Between July 6 and 10 [2020], we have physically destroyed the backup data server in Hong Kong, and are transferring all data to Singapore," a Naver official was quoted as saying.[9]

### D.    LINE Messenger and B612 Unlawfully Collect User Biometrics with the Aid of the Dangerous SenseTime SDK and Through Other Means

#### 1.    SenseTime Is a China-Based Technology Company Focused on AI, Which it Uses to Assist the Chinese Communist Party With Its Political, Military, and Policing Agenda.

109.    SenseTime is a highly sophisticated global technology company in China that focuses on AI applications.[10] It has the largest deep learning center in mainland China and is the largest algorithm provider in China.[11]

---

[6] Kim Hyun-bin, *Naver collects sensitive private data without user consent*, The Korea Times (July 24, 2020),  https://www.koreatimes.co.kr/www/tech/2020/07/133_293187.html

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] SenseTime, AI for a Better Tomorrow, https://www.sensetime.com/en/about-index (last accessed June 25, 2021).

[11] Zheng Zhiyu Olivia, *China's "Sky Eye" face recognition technology comes from Hong Kong Shentang Technology CEO Xu Li: Monitor tens of thousands of people in one second* (Apr. 9, 2018) (translated from its original Chinese), https://medium.com/@tszyucheng/%E4%B8%AD%E5%9C%8B-%Zheng E5%A4%A9%E7%9C%BC-%E4%BA%BA%E8%87%89%E8%BE%A8%E8%AA%8D%E6%8A%80%E8%A1%93%E4%B

110.     SenseTime claims its AI technology is so sophisticated that it can detect a person's face out of a crowd better than a person can.[12] SenseTime boasts of having an internal "training database" that includes over 2 billion faces, which is greater than the number of living persons in China, the United States, Japan, Korea, and Australia combined.[13]

111.     SenseTime monetizes its massive database through, among other means, deals with the Chinese government, including for military and police applications.[14]

112.     The Chinese government has consolidated that database with intelligence gathered from other Chinese technology companies to identify and/or verify a person from a digital image or a video frame from a video source. Facial recognition systems offer something that fingerprint recognition and iris recognition cannot – they do not require contact with the subject. "Biometric surveillance powered by artificial intelligence is categorically different than any surveillance we have seen before. It enables real-time location tracking and behavior policing of an entire population at a previously impossible scale."[15]

113.     The Chinese government is seizing on its broad information database. The *New York Times* published a July 2018 article entitled "Inside China's Dystopian Dreams: A.I., Shame and Lots of Cameras" in which it reported that: "Beijing is embracing technologies like facial recognition and artificial intelligence to identify and track 1.4 billion people. It wants to assemble a vast and unprecedented national surveillance system, with crucial help from its thriving

---

E%86%E8%87%AA%E9%A6%99%E6%B8%AF-
%E5%95%86%E6%B9%AF%E7%A7%91%E6%8A%80ceo%E5%BE%90%E7%AB%8B-
%E4%B8%80%E7%A7%92%E7%9B%A3%E8%A6%96%E5%B9%BE%E8%90%AC%E4%B
A%BA-a57ebc737a36.

[12] *Id.*

[13] Shu-Ching Jean Chen, *SenseTime: The Faces Behind China's Artificial Intelligence Unicorn*, Forbes (Mar. 30, 2018) https://www.forbes.com/sites/shuchingjeanchen/2018/03/07/the-faces-behind-chinas-omniscient-video-surveillance-technology/?sh=67b1e7e04afc.

[14] *Id.*

[15] Evan Greer, *Opinion: Don't Regulate Facial Recognition.  Ban It.*, BuzzFeed News (July 18, 2019), https://www.buzzfeednews.com/article/evangreer/dont-regulate-facial-recognition-ban-it.

---

technology industry."[16]

114.    Baidu, Alibaba, and Tencent are "China's original tech titans",[17] and historically dominated the fields of artificial intelligence, social media, and the internet in China. On April 9, 2018, SenseTime announced it had received $600 million from Alibaba. The effect of this transaction, according to the Harvard Business School Digital Initiative ("*HBSDI*"), was to "underscore[] the gravity of the Chinese government's national policy announcement just a year prior to become the world's leader in the research."[18]

115.    In November 2017, the *Wall Street Journal* published a disturbing article about the strong ties between various technology giants and the Chinese government entitled "China's Tech Giants Have a Second Job: Helping Beijing Spy on its People." This article reported on the Chinese government's use of these tech giants in investigations of purported criminal activity and political dissent, as well as surveillance activities:

> The Chinese police "request data from Alibaba for their own investigations, …
> tapping into the trove of information the tech giant collects through its e-commerce
> and financial payment networks. … Companies including Alibaba [], Tencent [],
> and Baidu [] are required to help China's government hunt down criminal suspects
> and silence political dissent. Their technology is also being used to create cities
> wired for surveillance. … Apple disclosed that more than 35,000 user accounts
> were affected by 24 Chinese law-enforcement requests in the first half of this year
> [2017], many in connection with fraud investigations. It said it provided
> information on about 90% of them. Chinese companies don't release any
> information on the number of requests from the government, the nature of the

---

[16] Paul Monzur, *Inside China's Dystopian Dreams: A.I., Shame and Lots of Cameras*, The New York Times (July 8, 2018), https://www.nytimes.com/2018/07/08/business/china-surveillance-technology.html.

[17] Rebecca Fannin, *Baidu, Alibaba, Tencent Clash to Lead China's Tech Future While A New 'B' Arises*, Forbes (Apr. 23, 2019), https://www.forbes.com/sites/rebeccafannin/2019/08/23/baidu-alibaba-tencent-clash-to-lead-chinas-tech-future-while-a-new-b-arises/#18cc42e414d0.

[18] Toni Campbell & Oliver Badenhorst, *SenseTime and Public Safety*, Digital Initiative (Nov. 14, 2018), https://digital.hbs.edu/platform-rctom/submission/sensetime-and-public-safety.

1    requests or the compliance rate."[19]

2       116.    This *Wall Street Journal* article also documented another frightening aspect of the

3    Chinese government's use of for-profit technology companies to sort and analyze information,

4    including information gathered from smartphones:

5           Along with access to online data, China's government wants something else from

6           tech companies – the cloud computing prowess to sort and analyze information.

7           China wants to crunch data from surveillance cameras, smartphones, government

8           databases and other sources to create so-called smart cities and safe cities. … Police

9           now work with Alibaba to use surveillance footage and data processing to identify

10          'persons of interest' and keep them out, local police official Dai Jinming said at a

11          recent conference sponsored by Alibaba. Tencent is working with police in the

12          southern city of Guangzhou to build a cloud-based 'early-warning system' that can

13          track and forecast the size and movement of crowds, according to a statement from

14          the Guangzhou police bureau.[20]

15       117.    In a subsequent March 2018 article entitled "The Uncomfortable Marriage Between

16   China and Its Tech Giants," the *Wall Street Journal* reported on the significant patronage that

17   large Chinese technology companies receive from the Chinese government, the growing number

18   of tech entrepreneurs who have become members of the legislature under President Xi Jinping

19   (including, for example, Tencent's Tony Ma), and certain technology companies that have made

20   pledges of loyalty to the Chinese government.[21] "The government is always the boss and the tech

21   firms are there to serve the goals of the Chinese government."[22]

22

23   [19] Liza Lin and Josh Chin, *China's Tech Giants Have a Second Job: Helping Beijing Spy on Its
     People*, The Wall Street Journal (Nov. 30, 2017), https://www.wsj.com/articles/chinas-tech-giants-
24   have-a-second-job-helping-the-government-see-everything-1512056284.

25   [20] *Id.*

26   [21] Li Yuan, *The Unformattable Marriage Between China and Its Tech Giants*, The Wall Street
     Journal (Mar. 8, 2018), https://www.wsj.com/articles/the-godfathers-of-chinese-tech-get-an-offer-
27   they-cant-refuse-1520510404.

28   [22] *Id.*

118.    SenseTime is deeply involved in this public/private partnership between China-based for-profit entities and the Chinese Communist Party.[23] Indeed, as noted by *HBSDI*, SenseTime deals directly with the Chinese government as a customer to "help police officers identify suspects and root out potential [purported] criminals by matching faces identified in video with corresponding faces on government-issued IDs." The *HBSDI* article also noted: "Questions of privacy and the potential for government and corporate misuse have consistently dogged the company since its early days of product development and commercialization."

119.    SenseTime technology has been used by the Chinese government for policing and controlling the flow of demonstrations in Hong Kong[24] and for various internet censoring activities.[25]

120.    As Senators Schumer and Cotton wrote in an October 23, 2019 letter to the Acting Director of National Intelligence "[s]ecurity experts have voiced concerns that China's vague patchwork of intelligence, national security, and cybersecurity laws compel Chinese companies to support and cooperate with intelligence work controlled by the Chinese Communist Party. Without an independent judiciary to review requests made by the Chinese government for data or other actions, there is no legal mechanism for Chinese companies to appeal if they disagree with a request."[26]

121.    The United States Department of Treasury's Office of Foreign Assets Control designated SenseTime as a Non-SDN Chinese Military-Industrial Complex Company pursuant to Executive Order of June 3, 2021, "Addressing the Threat from Securities Investments that Finance Certain Companies of the People's Republic of China."[27]  In that Order, President Biden found

---

[23] Campbell and Badenhorst, *supra* n. 28.

[24] *Id.*

[25] Shu-Ching Jean Chen, *supra* n. 23.

[26] Ben Kochman, *Sens. Want TikTok Investigated for National Security Threats*, Law360 (Oct. 24, 2019), https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats.

[27] https://home.treasury.gov/news/press-releases/jy0526; https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20211210

"that the use of Chinese surveillance technology outside the PRC and the development or use of Chinese surveillance technology to facilitate repression or serious human rights abuse constitute unusual and extraordinary threats, which have their source in whole or substantial part outside the United States, to the national security, foreign policy, and economy of the United States."[28]  The previous administration had prohibited certain technology exports to SenseTime by placing it on the U.S. Entity List in 2019.[29]

122.    Despite this, the LINE Messenger app uses SenseTime SDKs, and transmits to SenseTime U.S. user data including but not limited to unique device identifiers and IP addresses.

**2.    Defendants Use the SenseTime SDK Embedded in LINE Messenger and B612 to Unlawfully Collect Users' Face Geometry Scans.**

123.    SenseAR, an SDK produced by SenseTime, is embedded within LINE Messenger and B612. An SDK like SenseAR is a set of software development tools in one installable package that helps developers create and implement specific functionality in apps such as LINE Messenger and B612.

124.    LINE Messenger and B612 utilize SenseAR for its facial "key-point tracking" and "eye contour tracking" features,[30] which allows for "a precise extraction of the user's facial features and contour."[31] LINE Messenger and B612 also rely on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements."[32] Most or all of these SenseAR functions involve examinations and/or

---

[28] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/06/03/executive-order-on-addressing-the-threat-from-securities-investments-that-finance-certain-companies-of-the-peoples-republic-of-china/

[29] 84 FR 54002, 85 FR 44159.

[30] SenseTime, B612 app Introduction, https://www.sensetime.com/en/case-detail?categoryId=1631 (last accessed June 25, 2021).

[31] SenseTime, Sense AR Augmented Reality Platform Product Description, https://www.sensetime.com/en/product-detail?categoryId=1162 (last accessed June 25, 2021).

[32] *Id.*

---

AMENDED CLASS ACTION COMPLAINT

37

observations of the relative arrangement of parts of the face and thus constitute face geometry scans within the meaning of the Illinois Biometric Information Privacy Act.

125.     Each LINE Messenger and B612 user who uses and, at all relevant times, used the AR features of the apps for photos or videos of their faces has and, at all relevant times, had their face geometry scans executed by SenseAR and collected by LINE Messenger and B612 without user consent.

126.     B612 also transmits and, at all relevant times, transmitted the face geometry scans performed by SenseAR along with the registered user's Android ID and TMID to the domain log.snow.me without user consent. And, for unregistered users who are not signed into B612, B612 transmits and, at all relevant times, transmitted the face geometry scans performed by SenseAR along with the unregistered user's Android ID to the domain log.snow.me without user consent.

127.     A domain name such as log.snow.me "identifies a network domain, or it represents an Internet Protocol (IP) resource, such as a personal computer used to access the Internet, a server computer hosting a website, or the website itself or any other service communicated via the Internet."[33]

128.     The Internet Protocol ("IP") addresses for log.snow.me are and, at all relevant times, were 210.89.168.190 and 210.89.168.191. The IP "is the principal communications protocol in the Internet protocol suite for relaying datagrams across network boundaries. Its routing function enables internetworking, and essentially establishes the Internet. IP has the task of delivering packets from the source host to the destination host solely based on the IP addresses in the packet headers."[34] Moreover, an IP address like 210.89.168.190 and 210.89.168.191 "is a numerical label assigned to each device connected to a computer network that uses the Internet

---

[33] Wikipedia Entry for "Domain Name," https://en.wikipedia.org/wiki/Domain_name; *see also* Domain Name, https://zerotechit.com/domain-name/ (last modified Mar. 24, 2021).

[34] Wikipedia Entry for "Internet Protocol," https://en.wikipedia.org/wiki/Internet_Protocol

Protocol for communication."[35] The devices linked to IP addresses 210.89.168.190 and 210.89.168.191 are and, at all relevant times, were located in South Korea.

129.     The domain log.snow.me is and, at all relevant times, was registered to Snow Corp.

130.     The ISPs for the domain log.snow.me include and, at all relevant times, included Naver Cloud and Naver Cloud America. An ISP like Naver Cloud and Naver Cloud America "is an organization that provides a myriad of services for accessing, using, or participating in the Internet. … Internet services typically provided by ISPs can include Internet access, Internet transit, domain name registration, web hosting, Usenet service, and colocation."[36] "Internet transit is the service of allowing network traffic to cross or 'transit' a computer network, usually used to connect a smaller [] ISP to the larger Internet."[37] "A web hosting service (often shortened to web host) is a type of Internet hosting service that allows individuals and organizations to make their website accessible via the World Wide Web. Web hosts are companies that provide space on a server owned or leased for use by clients, as well as providing Internet connectivity, typically in a data center. Web hosts can also provide data center space and connectivity to the Internet for other servers located in their data center, called colocation, also known as *housing* in Latin America or France."[38] On information and belief, Naver Cloud and Naver Cloud America provide and, at all relevant times, provided these various services, including internet transit, web hosting, and colocation services, for the domain log.snow.me.

131.     Naver Cloud supports the IT infrastructure of Naver and its affiliates. Naver Cloud America supports Naver and its affiliates' IT infrastructure within the United States. IT "is the use of computers to store or retrieve data and information. … An information technology system (IT system) is generally an information system, a communications system, or, more specifically speaking, a computer system – including all hardware, software, and peripheral equipment –

---

[35] Wikipedia Entry for "IP address," https://en.wikipedia.org/wiki/IP_address

[36] Wikipedia Entry for "Internet service provider," https://en.wikipedia.org/wiki/Internet_service_provider

[37] Wikipedia Entry for "Internet transit," https://en.wikipedia.org/wiki/Internet_transit

[38] Wikipedia Entry, "Web hosting service," https://en.wikipedia.org/wiki/Web_hosting_service.

operated by a limited group of IT users."[39] Moreover, IT infrastructure is "a set of information technology (IT) components that are the foundation of an IT service; typically physical components (computer and networking hardware and facilities), but also various software and network components."[40] On information and belief, Naver's IT infrastructure supported by Naver Cloud and Naver Cloud America is involved in the transmission of the face geometry scans by B612 from B612 user devices to the domain log.snow.me.

132.    Snow Inc. owns and operates and, at all relevant times, owned and operated B612. In fact, the Google Play Store identifies Snow Inc. as the publisher of B612.

133.    Thus, through the B612 app, the domain log.snow.me, the provision of internet services for the domain log.snow.me, and the management of Naver's IT infrastructure, the Naver Defendants collect and transmit the face geometry scans performed by SenseAR on B612 users without user consent.

**3.    Defendants, on Information and Belief, Also Unlawfully Conduct Face Geometry Scans from LINE Messenger and B612 User Videos They Have Collected.**

134.    Defendants upload LINE Messenger and B612 user videos from user devices and, on information and belief, conduct face geometry scans on such videos.

135.    Defendants' use of face geometry scans is reflected in their patents and patent applications. For example, United States Patent Application US20190005309A1, assigned to LINE Corp., describes extracting facial geometry such as the height at which an eye is open, the height at which a mouth is open, the distance between an eyebrow and an eye, and the angle of an eyebrow. Similarly, Japanese Patent Application JP2016201144A, assigned to Naver, discusses a face recognition module that automatically recommends the name of a friend in a photo. Another Japanese Patent Application, JP2021068455A, assigned to LINE Plus, describes a method of recognizing a user's face from an image by analyzing the dialogue content of messages shared via

---

[39] Wikipedia Entry, "Information technology," https://en.wikipedia.org/wiki/Information_technology.

[40] Wikipedia Entry, "IT infrastructure," https://en.wikipedia.org/wiki/IT_infrastructure

an instant messaging service. United States Patent Application US20210127239A1, assigned to LINE Plus, also discusses performing facial recognition and using the facial information to identify a participant in a video call as part of a method of fair billing based on the duration of the call.

136.     Defendants' use of face geometry scans is also reflected in their commercial product offerings. Naver Cloud offers a "CLOVA"-branded face recognition technology that was developed "based on the abundant data we have collected over the years," and notes that its CLOVA systems were "built from Naver and LINE's AI research."[41] CLOVA is an AI platform that incorporates speech, image recognition and artificial neural network translation into one interactive engine. CLOVA will be built into various NAVER and LINE products, NAVER's smart speaker WAVE, Friends, and other third-party devices and services.[42] The CLOVA API "service is useful to recognize faces with input vision data or to create applications using face detection. It detects faces in images to find a look-alike celebrity or to get information including contours, positions of eyes, noses and mouths, and expressions."[43] Similarly, LINE Messenger features a "face recognition filter and effects from other standalone Line camera apps — namely its B612 app, which offers 'beautification adjustments' for selfies."[44]

### E.      LINE Messenger Promises Users End-to-End Encryption of Their Chat Messages, but Instead, User Videos, URLs, and Certain Keywords from Those Chat Messages Are Unlawfully Intercepted.

137.     The Z-LINE Defendants appeal and, at all relevant times, appealed to consumers who value privacy by claiming LINE Messenger uses end-to-end-encryption ("E2EE") to encrypt

---

[41] Introducing NAVER Cloud Platform's AI services and technology (Sept. 23, 2020), https://www.youtube.com/watch?v=CvkVIfx_ViQ.

[42] Naver, Featured Services, https://www.navercorp.com/en/service/featured (last accessed June 25, 2021).

[43] Naver Cloud Platform, CLOVA Face Recognition (CFR) Overview, https://api.ncloud-docs.com/docs/en/ai-naver-clovafacerecognition (last accessed June 25, 2021).

[44] Natasha Lomas, *Messaging app Line adds livestreaming for group chats*, Tech Crunch (Aug. 16, 2017), https://techcrunch.com/2017/08/16/messaging-app-line-adds-livestreaming-for-group-chats.

all messages between users such that *only* the sender and recipient can view the content of messages transmitted between them via LINE Messenger. But this claim is and, at all relevant times, was false. Certain content within the encrypted messages – videos, URLs, and particular keywords – is and, at all relevant times, was intercepted and obtained without encryption while in transit without user consent. Such interception of nonencrypted information is not and, at all relevant times, was not necessary for the transmission of the encrypted messages.

138.   The transmission pathway for the encrypted messages runs from the sender's device through the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) to the recipient's device. But Defendants utilize other devices separate from devices tied to domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) to intercept videos, URLs, and particular keywords located within the encrypted messages while such messages are in transit between sender and recipient.[45]

### 1.   Interception of Videos.

139.   Naver, Naver Cloud, Naver Cloud America, and the Z-LINE Defendants use and, at all relevant times, used one or more devices linked to the domain obs-us.line-apps.com to intercept and obtain videos contained within otherwise encrypted messages while such messages are and, at all relevant times, were in transit via the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) from one LINE Messenger user to another.

140.   The domain obs-us.line-apps.com is and, at all relevant times, was registered to LINE Corp. The ISPs for the domain obs-us.line.apps.com are and, at all relevant times, were Naver Cloud, Naver Cloud America, and Naver Business Platform Asia Pacific Pte., Ltd. ("NBPAP"). On information and belief, NBPAP is and, at all relevant times, was a subsidiary of Naver Cloud. Moreover, on information and belief, Naver Cloud, Naver Cloud America, and NBPAP provide and, at all relevant times, provided ISP services, such as internet transit, web hosting, and colocation services, for the domain obs-us.line-app.com.

141.   The IP addresses for the domain obs-us.line-apps.com are and, at all relevant times,

---

[45] At certain times, Defendants used the domain ga2g.line.naver.jp.

were 203.104.160.13 and 203.104.160.14, and these IP addresses are and, at all relevant times,

were distinct from the IP addresses for the domain ga2u.line.naver.jp. Devices linked to the IP

addresses 203.104.160.13 and 203.104.160.14 are and, at all relevant times, were located in Los

Angeles, California, New York, New York, Newark, New Jersey, and South Korea. The devices

linked to the domain obs-us.line-apps.com and IP addresses 203.104.160.13 and 203.104.160.14

are and, at all relevant times, were distinct from the devices linked to the domain

ga2u.line.naver.jp and its distinct IP addresses.

## 2.      Interception of URLs.

142.    The Z-LINE Defendants use and, at all relevant times, used one or more devices

linked to IP addresses 147.92.179.111, 147.92.179.108, and 147.92.179.106 (the "Three

147.92.179 IP Addresses") to intercept and obtain unencrypted URLs contained within otherwise

encrypted messages while such messages are and, at all relevant times, were in transit via the

domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) from one LINE

Messenger user to another.

143.    The ISP for the Three 147.92.179 IP Addresses is and, at all relevant times, was

LINE Corp. On information and belief, LINE Corp. provides and, at all relevant times, provided

the services typically provided by ISPs, such as internet transit, web hosting, and colocation

services, for the Three 147.92.179 IP Addresses.

144.    The Three 147.92.179 IP Addresses are and, at all relevant times, were distinct

from the IP addresses for the domain ga2u.line.naver.jp. Devices linked to the Three 147.92.179

IP Addresses are and, at all relevant times, were located in Japan. The devices linked to the Three

147.92.179 IP Addresses are and, at all relevant times, were distinct from the devices linked to the

domain ga2u.line.naver.jp and its distinct IP addresses.

## 3.      Interception of Keywords.

145.    Embedded within LINE Messenger is a dictionary file that contains various single

words and phrases, and LINE Messenger uses this dictionary file to identify particular keywords

in user messages matching such single words and phrases. Such single words and phrases within

user messages are taken letter-by-letter prior to transmission and also in completed form *during*

transmission of the messages.

146. The Z-LINE Defendants use and, at all relevant times, used one or more devices linked to the domain uts-front.line-apps.com to intercept and obtain particular keywords identified by the dictionary file and contained within otherwise encrypted messages while such messages are and, at all relevant times, were in transit via the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) from one LINE Messenger user to another.

147. The domain uts-front.line-apps.com is and, at all relevant times, was registered to LINE Corp. The ISP for the domain uts-front.line-apps.com is and, at all relevant times, was LINE Corp. On information and belief, LINE Corp. provides and, at all relevant times, provided the services typically provided by ISPs, such as internet transit, web hosting, and colocation services, for the domain uts-front.line-apps.com.

148. The IP address for the domain uts-front.line-apps.com is and, at all relevant times, was 147.92.146.179, and this IP address is and, at all relevant times, was distinct from the IP addresses for the domain ga2u.line.naver.jp. Devices linked to the IP address 147.92.146.179 are and, at all relevant times, were located in Japan. Devices linked to the domain uts-front.line-apps.com and IP address 147.92.146.179 are and, at all relevant times, were distinct from the devices linked to the domain ga2u.line.naver.jp and its distinct IP addresses.

### F.    LINE Messenger Has Been Banned By the Japanese Government Due to Data Privacy and Security Concerns.

149. On March 19, 2021, the Japanese government prohibited its government employees from using LINE Messenger following a data breach suspected of originating in China.[46] Given the widespread ban the Japanese government placed on LINE Messenger, the strong and compelling inference is the Japanese government believed the Chinese Communist Party was behind the data breach.

150. LINE Corp. issued a statement immediately denying the breach and stating that

---

[46] Zaini Majeed, *Japan Halts Use of Line App for Government Officials Over Chinese Data Breach*, RepublicWorld (Mar. 19, 2021), https://www.republicworld.com/world-news/rest-of-the-world-news/japan-halts-use-of-line-app-for-government-officials-over-chinese-data-breach.html.

LINE Messenger App users' "[t]alk texts on 'LINE' and highly private personal information (name, phone number, email address, LINE ID, talk text, etc.,) is confidential." The company also claimed that the contents of messages sent between users on LINE Messenger were encrypted, stating: "it is not possible to check the contents of the data just by accessing the database" and that it "developed internal tools" to monitor the security of messages shared by users on its platform.[47]

151.     In response to the data breach, it was reported the Japanese government found at least 32 LINE server links were registered with Beijing.[48] The report also found China could trace telephone numbers, home addresses, and email addresses of LINE Messenger users without their consent as far back as 2018.

152.     Only after this was reported did LINE Corp. admit, in part, its fault. "We are very sorry for causing anxiety and concerns due to our inadequate explanations," the company said in a statement as quoted by *Kyodo News*.[49]

153.     Z-Holdings shared a detailed report that it mishandled Japanese user data from overseas servers.[50]

154.     Unauthorized access to private communications increases the risk that such information could be exposed to third parties; indeed, LINE's own website acknowledged that happened to overseas users.

**G.     B612 Collects Personally Identifiable User Data and Unlawfully Transmits It to China Where It Is Accessible By the Chinese Communist Party.**

155.     B612 transmits and, at all relevant times, transmitted personally identifiable user data to the domain adg-data.kajicam.com and the domain adg.kajicam.com (the "Kajicam

---

[47] *Id.*

[48] *Id.*

[49] *Japan halts govt use of Line app*, Big New Network (March 19, 2021), https://www.bignewsnetwork.com/news/268160696/japan-halts-govt-use-of-line-app.

[50] *See* Some media reports regarding users' personal information, LINE (Mar. 17, 2021), https://linecorp.com/ja/pr/news/ja/2021/3675; Report on the handling of personal information from the Personal Information Protection Commission and the Company's future policy (Mar. 23, 2021), https://linecorp.com/ja/pr/news/ja/2021/3682.

Domains") without user consent. Such information includes and, at all relevant times, included: the Android Device ID (sometimes referred to as the DUID), which is essentially a hardware serial number; the WiFi MAC address, which is unique to the WiFi hardware in use; the make and model of the user's device; the version of Android the user is using; the City code for where the device is being used; the IP address; and the identity of the features of B612 the user has been using and on what days and at what times of day such features have been used (collectively, the "Kajicam Data").

156.    B612 also transmits and, at all relevant times, transmitted a YRK ID along with the Kajicam Data to the Kajicam Domains. YRK is an acronym for the China-based company that developed and operates the Kajicam app in China. This YRK ID is identical to the user's Android Device ID. Both the YRK ID and the Android Device ID are and, at all relevant times, were transmitted by B612 to the Kajicam Domains with each packet of information transmitted by B612 from B612 users' devices to the Kajicam Domains. Consequently, the Kajicam Domains tie and, at all relevant times, tied the information received from B612 to the specific, individual B612 user.

157.    B612 transmits and, at all relevant times, transmitted the Kajicam Data (along with the user's Android ID and YRK ID) to the Kajicam Domains for both registered B612 users and unregistered B612 users who were not signed on.  The code in B612 that directs the transmission of the Kajicam Data and the user's Android ID and YRK ID to the Kajicam domains is referred to hereinafter as the "Kajicam Code."

158.    The Kajicam Domains are and, at all relevant times, were registered to an entity in China, and the registrar is and, at all relevant times, was Alibaba Cloud Computing (Beijing) Co., Ltd. The Kajicam Domains have and, at all relevant times, had IP addresses of 162.62.82.90 and 162.62.82.193, which on information and belief are and, at all relevant times, were located in Hong Kong. Moreover, on information and belief, in addition to transmitting the Kajicam Data to the Kajicam Domains, B612 also transmits or "tunnels" the Kajicam Data to mainland China in a surreptitious manner not directly observable by usual tracing methods.

159.    The following are and, at all relevant times, were the ISPs for the Kajicam

Domains: 16 Collyer Quay; Tencent Building, Kejizhongyi Avenue ("Tencent Building"); Tencent Cloud Computing (Beijing) Co.; and Shenzhen Tencent Computer Systems Company Limited. On information and belief, these four ISPs provide and, at all relevant times, provided the services typically provided by ISPs, such as internet transit, web hosting, and colocation services, for the Kajicam Domains.

160.     Tencent Building is located in China and has numerous IP addresses located in China and Hong Kong. It also has related networks that, on information and belief, are and, at all relevant times, were owned and/or operated in part or in whole by the Chinese Communist Party, including: CHINATELECOM Hunan Province Xiangxi 5G Network (AS140375), Guizhou Provincial Radio and Television Information Network Inc. (AS63704), Shanghai MBN Telecommunication Technology Co., Ltd. (AS139091), CHINANET Guongdong Province Network (AS134764), and CHINANET Sichuan Province Suining MAN Network (AS59302).

161.     Accordingly, the Naver Defendants transmit and, at all relevant times, transmitted the Kajicam Data to China, where it is and, at all relevant times, was accessible by the Chinese Communist Party, without user consent.

**H.     The LINE Messenger App Collects Other Personally Identifiable User Data.**

162.     LINE Messenger collects other personally identifiable information from its users during the registration process – such as the device ID, the client ID, the Google advertising ID, the phone number, and the model of the phone – and transmits this data to the domain ga2u.line.naver.jp.

163.     LINE Messenger also tracks videos watched, created, "liked", and/or commented on by users. When a LINE Messenger user is operating within the LINE Messenger timeline feature, the app tracks each time the user likes another user's post, and each time the user cancels a like on a post. Also, each time a user watches another user's video, the app tracks the video watched, the time spent watching such video, and each comment made on such video.

**I.     Plaintiffs' Personal Information Has Economic Value and There is a Market for this Information**

164.     The value of personal data is well understood and generally accepted as a form of

currency.

165.   It is by now incontrovertible that a robust market for this data undergirds the tech economy.

166.   The robust market for user data has been analogized to the "oil" of the tech industry.[51] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[52] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

167.   The Organization for Economic Cooperation and Development ("OECD") itself has published numerous volumes discussing how to value data such as that which is the subject matter of this Complaint, including as early as 2013, with its publication "Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value".[53] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[54]

168.   In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers

---

[51]   *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017). https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[52]   Pauline Glickman and Nicolas Glady, *What's the Value of Your Data?* TechCrunch (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[53]   *Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Paper No. 220 at 7 (Apr. 2, 2013), http://dx.doi.org/10.1787/5k486qtxldmq-en.

[54]   *Supporting Investment in Knowledge Capital, Growth and Innovation*, OECD, at 319 (Oct. 13, 2013), https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en.

to as "behavioral surplus."[55] In essence, Professor Zuboff explains that revenue from user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a *market* for this data; data generated by users on the LINE Messenger and B612 apps has economic value.

169.    Professor Paul M. Schwartz writing in the Harvard Law Review, notes:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.

170.    This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay users for their data.[56] Likewise, apps such as Zynn, a TikTok competitor, pay users to sign up and interact with the app.[57]

171.    There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

172.    As Professors Acquisti, Taylor and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*:

> Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as

---

[55]  Shoshana Zuboff, The Age of Surveillance Capitalism 166 (2019).

[56]  Kevin Mercandante, *Ten Apps for Selling Your Data for Cash*, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[57]  Jacob Kastrenakes, *A New TikTok Clone hit the top of the App Store by Paying users to watch videos*, The Verge (May 29, 2020), https://www.theverge.com/2020/5/29/21274994/zynn-tiktok-clone-pay-watch-videos-kuaishou-bytedance-rival.

---

business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties.[58]

173.    There is also a private market for users' personal information. One study by content marketing agency Fractl has found that an individual's online identity, including hacked financial accounts, can be sold for $1,200 on the dark web.[59] These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other users' content, surely users can sell their own.

174.    In short, there is economic value to users' data that is greater than zero. The exact number will be a matter for experts to determine.

### J.    Plaintiffs Suffered an Economic Injury

175.    Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things such as data or communications.

176.    California courts have recognized the lost "property value" of personal information. Recent changes in California law have also confirmed that individuals have a property interest in their information. In 2018, California enacted the California Consumer Privacy Act ("CCPA"). Among other things, the CCPA permits businesses to purchase consumer information from consumers themselves (CAL. CIV. CODE § 1798.125(b)(1)) and permits businesses to assess and appraise – *i.e.*, to place a monetary value on – consumer data (*id.* § 1798.125(a)(2)).

177.    Accordingly, Plaintiffs' and Class members' personal information—including biometric identifier and biometric information; user identifiers; and videos, URLs, and particular keywords shared in private messages—is property under California law.

178.    Defendants' collection and use of Plaintiffs' and Class members' personal information without authorization is a taking of their property.  Plaintiffs and class members have

---

[58]  Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf.

[59]  Maria LaMagna, *The sad truth about how much your Google data is worth on the dark web*, MarketWatch (June 6, 2018), https://www.marketwatch.com/story/spooked-by-the-Google-privacy-violations-this-is-how-much-your-personal-data-is-worth-on-the-dark-web-2018-03-20.

a right to disgorgement and/or restitution damages for the value of taken information.

179.     Plaintiffs have suffered benefit of the bargain damages, in that Defendants took more data than they agreed would be exchanged. Those benefit of the bargain damages also include, but are not limited to, (i) loss of the promised benefits of their experience in the LINE Messenger and B612 apps; (ii) out-of-pocket costs; and (iii) loss of control over property which has marketable value.

180.     In order to preserve their privacy, Plaintiffs who now understand at least some of Defendants' violations are presented with the choice of: (i) reducing or ending their participation with the LINE Messenger and B612 apps; or (ii) knowingly accepting less privacy than they were promised. Each of these options deprives Plaintiffs and Class members of the benefits of their original bargain. There is no option which recovers the property improperly collected and shared by Defendants.

181.     Further, Plaintiffs and Class members were denied the benefit of knowledge that their personal information was being collected and shared by Defendants. Therefore, they were unable to mitigate harms they incurred because of Defendants' actions. That is, Defendants' lack of transparency prevented and still prevents Plaintiffs' and Class members' ability to mitigate.

182.     Defendants avoided costs it should have incurred because of its own actions— particularly the loss of user engagement which would have resulted from transparent disclosure of Defendants' actions—and transferred those costs to Plaintiffs and Class members. Warning users would have chilled engagement on the LINE Messenger and B612 apps as well as discouraged potential new users from joining.

183.     Defendants thus were not only able to evade or defer these costs, but to continue accruing value and further benefitting from the delay due to the time value of money. Defendants have thus transferred all the costs imposed by the unauthorized collection and disclosure of users' personal information onto Plaintiffs and Class members. Defendants increased the cost to Plaintiffs and Class members of mitigating such unauthorized disclosures by failing to notify them that their personal information had been collected and disclosed so that they could take steps to minimize their exposure on the LINE Messenger and B612 apps.

184. In addition, Plaintiffs and Class members have suffered from the diminished loss of use of their own personal information, property which has both personal and economic value to them.

185. Plaintiffs' personal information has value. First, there is transactional, or barter, value to user content and personal information. Indeed, Defendants have traded the ability to use the LINE Messenger and B612 apps for the collection of users' personal information—all while concealing that this information would be collected and in the case of LINE Messenger, promising users that their data would remain encrypted.

186. Second, Plaintiffs' property, which has economic value, was taken from them without their consent and in the case of LINE Messenger, in contradiction of the promise that users' data would remain encrypted. There is a market for this data, and it has at minimum a value greater than zero. Plaintiffs cannot bring their improperly collected data to market because Defendants' use of that data for particular advertising purposes means that Plaintiffs' data is no longer needed or marketable for that purpose.

187. Users were harmed when Defendants took their property and exerted exclusive control over it, collecting it without users' knowledge and for still undisclosed purposes.

188. Further, Defendants' control over these ever-expanding dossiers make tracking and profiling users, and targeting them with advertising, much more efficient and effective. Defendants unjustly earn substantial profits from such targeted advertising and/or from the sale of user data and/or information or services derived from such data outright.

**K.**      **Plaintiffs Also Were Injured Because Their Devices' Battery Life Was Significantly Impacted by the LINE Messenger and B612 Apps**

189. Plaintiffs and members of the Class and Subclasses suffered injuries in the form of damage to their devices because the battery, memory, CPU, and bandwidth of Plaintiffs' devices and the Class and Subclass members' devices have been compromised as a result of Defendants' clandestine and unlawful activities.

190. That Plaintiffs' batteries have been damaged by Defendants' software is supported by various consumer reports that the LINE Messenger and B612 apps damage consumers' battery

life, as well as testing showing the manner in which the LINE Messenger and B612 apps affect device batteries.

191.   For instance, a March 12, 2020 Apple user noted in the App Store comments that the B612 is "Absolutely stunning! ***But my battery goes quickly down the drain using this app*** . . . ."

192.   Moreover a 2022 Tech Grapple analysis confirmed such consumer reports:

> **What makes B612 the worst camera app?**
> Along with all the great feature we mentioned above, there is one bug that may force you to remove the app. The bug is not related to slowing down the device or making the device crash, but it's about power consumption. ***B612 is too heavy on battery life***. We tried the app on Android as well as iPhone, and found that it makes the battery drain very fast. ***Each snap captured by B612 consumed 2-3% of battery on iPhone 6s Plus and Xiaomi Mi 4i***. It may consume even more battery if your smartphone has a smaller battery. 30 to 35 snapshots captured with B612 bring 100% battery to 1%.
>
> B612 has released many updates, but couldn't fix this bug. I removed the app from my device and tried many application, but couldn't find any app as useful and effective as B612. So I reinstalled it. If b612 can fix this bug, there is no app that can beat its filters and effects.

193.   Similarly, a Reddit forum titled "Why is the Line app draining my battery so hard? (Android 10) Any way to avoid this?" demonstrates that LINE Messenger also damages battery life following its installation.

194.   These user complaints are consistent with testing showing very high battery usage by the LINE Messenger and B612 apps:







## V.    **FRAUDULENT CONCEALMENT AND TOLLING**

195.    The applicable statutes of limitations are tolled as a result of Defendants' knowing and active concealment of their conduct alleged above – through, among other things, their misleading public statements about, among other things, user data being encrypted when it was not, and their hidden and inadequate privacy policies and terms of use.

196.    In the case of the LINE Messenger app, such representations were reiterated as recently as March 19, 2021 when the Company, in response to a data breach made public by the Japanese government, reiterated that its messenger service was purportedly encrypted "end-to-

end" and that "it is not possible to check the contents of the data just by accessing the database."[60] Plaintiffs and the Class and Subclass members were ignorant of the information essential to pursue their claims, with no fault or lack of diligence on their own part.

197.   And when the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiffs and the Class and Subclass members. Defendants are therefore estopped from relying on any statute of limitations.

198.   Defendants' fraudulent concealment is common to the Class and Subclass.

## VI.   INAPPLICABILITY OF PURPORTED POLICIES AND TERMS OF USE

199.   Plaintiffs and Class members were able to download the LINE Messenger and B612 apps without being placed on notice of, reviewing, or understanding any Terms of Use, Privacy Policies, or other purported agreements. Thus, Plaintiffs and Class members never consented.

200.   Plaintiffs and Class members had no opportunity to negotiate the parameters of Defendants' collection and use of their personally identifiable data. There is unequal bargaining power between Defendants and the Plaintiffs and Class members such that Defendants benefit from an asymmetry of information in the bargaining process.  This is particularly acute given that Defendants are aware of their data practices, but Plaintiffs and Class members are not. As a result, any purported agreements are void or voidable, and any provisions in those agreements purporting to limit the rights of the Plaintiffs or Class members are inoperable.

## VII.   NAMED PLAINTIFF ALLEGATIONS

### Plaintiff Ji

201.    Plaintiff Ji used the mobile and desktop versions of LINE Messenger since at least 2015 to, among other things, send text messages, photographs, and memes. Plaintiff Ji continued using LINE Messenger regularly until approximately the summer of 2020.

202.   During the time that LINE Messenger was installed on Plaintiff Ji's mobile device and desktop computer, Defendants tracked Plaintiff Ji via a TMID (a user ID created by and

---

[60] Majeed, *supra* n. 51.

1   shared among Defendants) and a TAID (the Android Advertising ID).

2   203.   Embedded within LINE Messenger is a dictionary file that contains various single

3   words and phrases. When Plaintiff Ji sent text communications through LINE Messenger,

4   Defendants used this dictionary file to identify particular keywords in their messages matching

5   such single words and phrases, which were taken letter-by-letter prior to Plaintiff Ji's transmission

6   and also in completed form during transmission of the messages. Defendants used one or more of

7   the devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular

8   keywords identified by the dictionary file and contained within encrypted messages in transit from

9   Plaintiff Ji to another LINE Messenger via the domain ga2u.line.naver.jp.

10   204.   Some or all of the above information stolen by Defendants was transferred to

11   servers located in China – including to servers under the control of third-parties who cooperate

12   with the Chinese government. Defendants performed all these acts without Plaintiff Ji's

13   knowledge or consent. Further, Defendants have used the above data for, among other things,

14   developing and patenting certain commercially valuable technologies as well as to secure

15   corporate transactions between Defendants. Defendants and others now have access to a living and

16   information-laden dossier on Plaintiff Ji that can be used for further commercial advantage and

17   other harmful purposes. Defendants have profited, and will continue to profit, from all their

18   activities discussed above.

19   205.   Plaintiff Ji has incurred harm as a result of Defendants' invasion of their privacy,

20   taking their data in which Plaintiff Ji has a property right, and diminishing the value of their data.

21   Further, Plaintiff Ji suffered injury as damage to their mobile device. The battery, memory, CPU,

22   and bandwidth of Plaintiff Ji's mobile device have been compromised as a result of Defendants'

23   clandestine and unlawful activities.

24   **Plaintiff Abe**

25   206.   Plaintiff Abe has used LINE Messenger on her mobile device since at least 2018.

26   Plaintiff Abe use LINE Messenger to, among other things, send text messages, photographs, and

27   URLs.

28   207.   During the time that LINE Messenger was installed on Plaintiff Abe's mobile

1   device, Defendants tracked Plaintiff Abe via a TMID (a user ID created by and shared among

2   Defendants) and a TAID (the Android Advertising ID).

3        208.    Devices associated with IP addresses 147.92.179.111, 147.92.179.108, and

4   147.92.179.106 (the "three IP addresses") are and at all relevant times were located in Japan. The

5   devices associated with the three IP addresses are distinct from those associated with the domain

6   ga2u.line.naver.jp. The three IP addresses are and at all relevant times were hosted by Defendant

7   LINE Corp, which is and at all relevant times was the internet service provider for the three IP

8   addresses.

9        209.    Defendants used one or more of the devices associated with the three IP addresses

10  to intercept and decrypt URLs contained within encrypted messages in transit from Plaintiff Abe

11  to another LINE Messenger user via the domain ga2u.line.naver.jp.

12       210.    Embedded within LINE Messenger is a dictionary file that contains various single

13  words and phrases. When Plaintiff Abe sent text communications through LINE Messenger,

14  Defendants used this dictionary file to identify particular keywords in her messages matching such

15  single words and phrases, which were taken letter-by-letter prior to Plaintiff Abe's transmission

16  and also in completed form during transmission of the messages. Defendants use one or more of

17  the devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular

18  keywords identified by the dictionary file and contained within encrypted messages in transit from

19  Plaintiff Abe to another LINE Messenger via the domain ga2u.line.naver.jp.

20       211.    Some or all of the above information stolen by Defendants was transferred to

21  servers located in China – including to servers under the control of third-parties who cooperate

22  with the Chinese government. Defendants performed all these acts without Plaintiff Abe's

23  knowledge or consent. Further, Defendants have used the above data for, among other things,

24  developing and patenting certain commercially valuable technologies as well as to secure

25  corporate transactions between Defendants. Defendants and others now have access to a living and

26  information-laden dossier on Plaintiff Abe that can be used for further commercial advantage and

27  other harmful purposes. Defendants have profited, and will continue to profit, from all their

28  activities discussed above.

212.    Plaintiff Abe has incurred harm as a result Defendants' invasion of her privacy, taking her data in which she has a property right, and diminishing the value of her data. Further, Plaintiff Abe suffered injury as damage to her mobile device. The battery, memory, CPU and bandwidth of Plaintiff Abe's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

**Plaintiff Shubert**

213.    Around the middle of 2019, Plaintiff Shubert began using LINE Messenger and B612 on his mobile device. He used LINE Messenger to, among other things, send text messages, photographs, and URLs.

214.    Plaintiff Shubert used B612 on his mobile device to, among other things, take and send photographs, including photographs of real estate and various construction projects for business use. Plaintiff Shubert also used B612 for personal use, including to take and send photographs.

215.    Plaintiff Shubert continued using LINE Messenger and B612 regularly from the middle of 2019 until approximately late 2020.

216.    During the time that LINE Messenger was installed on Plaintiff Shubert's mobile device, Defendants surreptitiously took Content IDs (identifying the particular video viewed), Story IDs (identifying the "story" – i.e., a particular collection of videos in which the video viewed is located), a TMID (a user ID created by and shared among Defendants), and a TAID (the Android Advertising ID) to the domain ga2u.line.naver.jp. Plaintiff Shubert never consented to such information being taken. Moreover, Plaintiff Shubert's videos were also surreptitiously taken and transferred to the domain obs-us.line-apps.com.

217.    Defendants used one or more of the devices associated with the domain obs-us.line-apps.com, which are distinct from those associated with the domain ga2u.line.naver.jp, to intercept and decrypt videos contained within encrypted messages in transit from Plaintiff Shubert to another LINE Messenger user via the domain ga2u.line.naver.jp.

218.    Devices associated with IP addresses 147.92.179.111, 147.92.179.108, and 147.92.179.106 (the "three IP addresses") are and at all relevant times were located in Japan. The

devices associated with the three IP addresses are distinct from those associated with the domain ga2u.line.naver.jp. The three IP addresses are and at all relevant times were hosted by Defendant LINE Corp, which is and at all relevant times was the internet service provider for the three IP addresses.

219.     Defendants used one or more of the devices associated with the three IP addresses to intercept and decrypt URLs contained within encrypted messages in transit from Plaintiff Shubert to another LINE Messenger user via the domain ga2u.line.naver.jp.

220.     Embedded within LINE Messenger is a dictionary file that contains various single words and phrases. When Plaintiff Shubert sent text communications through LINE Messenger, Defendants used this dictionary file to identify particular keywords in his messages matching such single words and phrases and were taken letter-by-letter prior to Plaintiff Shubert's transmission and also in completed form during transmission of the messages. Defendants used one or more of the devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular keywords identified by the dictionary file and contained within encrypted messages in transit from Plaintiff Shubert to another LINE Messenger via the domain ga2u.line.naver.jp.

221.     Together with the identification information above, Plaintiff Shubert's biometric identifiers, as defined in 740 Ill. Comp. Stat. 14/10 ("biometric identifiers"), were also taken when he used the AR features of LINE Messenger and also, separately, when he used B612 to take and send pictures, including pictures of his face. An SDK produced by SenseTime – the SenseAR SDK – is embedded within LINE Messenger and B612.

222.     LINE Messenger and B612 utilized SenseAR for their facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour." LINE Messenger and B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

223.     Plaintiff Shubert used the AR features of the apps for photos or videos of his face and thus had his facial geometry scans performed by the SenseAR SDK and collected by LINE

Messenger and B612 without his consent.

224.     B612 also transmitted the face geometry scans performed by SenseAR to the domain log.snow.me and did so without Plaintiff Shubert's consent. Devices associated with the domain log.snow.me are and at all relevant times were located in South Korea. The domain log.snow.me is and at all relevant times was registered to Defendant Snow Corp., and the internet service providers for this domain are and at all relevant times were Naver Cloud and Naver Cloud Americas.

225.     Thus, through the B612 app and the domain log.snow.me, Defendants Naver, Naver Cloud America, Snow Corp., and Snow Inc. collected Plaintiff Shubert's facial geometry scans performed by SenseAR through B612.

226.     Some or all of the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Shubert's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Shubert that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

227.     Plaintiff Shubert has incurred harm as a result Defendants' invasion of his privacy, taking his data in which he has a property right, and diminishing the value of his data. Further, Plaintiff suffered injury as damage to his mobile device. The battery, memory, CPU, and bandwidth of Plaintiff Shubert's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

**Plaintiff Tomlinson**

228.     Plaintiff Tomlinson began using LINE Messenger on her mobile device beginning in 2016 and continued using it through 2021. Plaintiff Tomlinson used LINE Messenger to, among other things, send text messages, photographs, videos, URLs, and even sensitive personal

information such as banking information and personal information about children.

229.    During the time that LINE Messenger was installed on Plaintiff Tomlinson's mobile device, Defendants surreptitiously took Content IDs (identifying the particular video viewed), Story IDs (identifying the "story" – i.e., a particular collection of videos in which the video viewed is located), a TMID (a user ID created by and shared among Defendants), and a TAID (the Android Advertising ID) to the domain ga2u.line.naver.jp. Plaintiff Tomlinson never consented to such information being taken. Moreover, Plaintiff Tomlinson's videos were also surreptitiously taken and transferred to the domain obs-us.line-apps.com.

230.    Defendants used one or more of the devices associated with the domain obs-us.line-apps.com to intercept and decrypt videos contained within encrypted messages in transit from Plaintiff Tomlinson to another LINE Messenger user via the domain ga2u.line.naver.jp.

231.    Devices associated with IP addresses 147.92.179.111, 147.92.179.108, and 147.92.179.106 (the "three IP addresses") are and at all relevant times were located in Japan. The devices associated with the three IP addresses are distinct from those associated with the domain ga2u.line.naver.jp. The three IP addresses are and at all relevant times were hosted by Defendant LINE Corp, which is and at all relevant times was the internet service provider for the three IP addresses.

232.    Defendants used one or more of the devices associated with the three IP addresses to intercept and decrypt URLs contained within encrypted messages in transit from Plaintiff Tomlinson to another LINE Messenger user via the domain ga2u.line.naver.jp.

233.    Embedded within LINE Messenger is a dictionary file that contains various single words and phrases. When Plaintiff Tomlinson sent text communications through LINE Messenger, Defendants used this dictionary file to identify particular keywords in her messages matching such single words and phrases, which were taken letter-by-letter prior to Plaintiff Tomlinson's transmission and also in completed form during transmission of the messages. Defendants used one or more of the devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular keywords identified by the dictionary file and contained within encrypted messages in transit from Plaintiff Tomlinson to another LINE Messenger via the domain

ga2u.line.naver.jp.

234.    Together with the identification information above, Plaintiff Tomlinson's biometric identifiers were also taken when she used the AR features of LINE Messenger. An SDK produced by SenseTime – the SenseAR SDK – is embedded within LINE Messenger.

235.    LINE Messenger utilizes SenseAR for its facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour." LINE Messenger also relies on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

236.    Plaintiff Tomlinson used the AR features of the apps for photos or videos of her face and thus had her facial geometry scans performed by the SenseAR SDK and collected by LINE Messenger without her consent.

237.    Some or all of the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Tomlinson's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Tomlinson that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

238.    Plaintiff Tomlinson has incurred harm as a result Defendants' invasion of her privacy, taking her data in which she has a property right, and diminishing the value of her data. Further, Plaintiff Tomlinson suffered injury as damage to her mobile device. The battery, memory, CPU, and bandwidth of Plaintiff Tomlinson's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

**Plaintiff Sunga**

239.    Plaintiff Sunga began using B612 on her mobile device around 2017.

240.    Plaintiff Sunga used B612 for personal use including to take photographs of herself and others with the app.

241.    Plaintiff Sunga also used the AR features of B612 for photos of her face and thus had her facial geometry scans performed by the SenseAR SDK and collected by B612 without her consent.

242.    Unbeknownst to Plaintiff Sunga, an SDK produced by SenseTime – the SenseAR SDK – was embedded within B612. This SDK is utilized for facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour."

243.    B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

244.    B612 also transmitted the face geometry scans performed by SenseAR to the domain log.snow.me and did so without Plaintiff Sunga's consent. Devices associated with the domain log.snow.me are and, at all relevant times were, located in South Korea. The domain log.snow.me is and at all relevant times was registered to Defendant Snow Corp., and the internet service providers for this domain are and at all relevant times were Naver Cloud and Naver Cloud Americas.

245.    Thus, through the B612 app and the domain log.snow.me, Defendants Naver, Naver Cloud America, Snow Corp., and Snow Inc. collected Plaintiff Sunga's facial geometry scans performed by SenseAR through B612.

246.    Some or all of the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Sunga's knowledge or consent. Further, Defendants have used the above data for, among other things,

developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Sunga that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

247.    Plaintiff Sunga has also incurred harm as a result Defendants' invasion of her privacy, taking her data in which she has a property right, and diminishing the value of her data. Further, Plaintiff Sunga suffered injury as damage to her mobile device. The battery, memory, CPU, and bandwidth of Plaintiff Sunga's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

**Plaintiff Bonner**

248.    Plaintiff Bonner began using B612 on her mobile device around the middle of 2020.

249.    Plaintiff Bonner works in property management and used B612 for both personal and business use.  At times, Plaintiff Bonner also took photographs of her friends and family members using B612.

250.    Unbeknownst to Plaintiff Bonner, an SDK produced by SenseTime – the SenseAR SDK – was embedded within B612. This SDK is utilized for facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour."

251.    B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

252.    B612 also transmitted the face geometry scans performed by SenseAR to the domain log.snow.me and did so without Plaintiff Bonner's consent. Devices associated with the domain log.snow.me are and, at all relevant times were, located in South Korea. The domain log.snow.me is and at all relevant times was registered to Defendant Snow Corp., and the internet

service providers for this domain are and at all relevant times were Naver Cloud and Naver Cloud Americas.

253.    Thus, through the B612 app and the domain log.snow.me, Defendants Naver, Naver Cloud America, Snow Corp., and Snow Inc. collected Plaintiff Bonner's facial geometry scans performed by SenseAR through B612.

254.    Some or all of the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Bonner's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Bonner that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

255.    Plaintiff Bonner has also incurred harm as a result Defendants' invasion of her privacy, taking her data in which she has a property right, and diminishing the value of her data. Further, Plaintiff Bonner suffered injury as damage to her mobile device. The battery, memory, CPU, and bandwidth of Plaintiff Bonner's mobile device have been compromised as a result of Defendants' clandestine and unlawful activities.

## VIII.    CLASS ALLEGATIONS

256.    Plaintiffs seek class certification of the Class and Subclasses set forth herein under Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiffs seek class certification of all claims for relief herein on behalf of a Class and Subclasses defined as follows:

**Class:** All persons in the United States who used one or more of the Defendants' apps on their mobile device.

**Illinois Subclass:** All persons located in Illinois who used one of Defendants' apps on their mobile device in Illinois and had their biometric identifiers taken without consent while in Illinois.

**California Subclass:** All persons in California who used the Defendants' apps on their mobile device.

257.    Plaintiffs reserve the right to modify or refine the Class and Subclass definitions based on discovery of new information and to accommodate any of the Court's manageability concerns.

258.    Excluded from the Class and Subclasses are: (i) any judge or magistrate judge presiding over this action and members of their staff, as well as members of their families; (ii) Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims have been finally adjudicated on the merits or otherwise released; (v) counsel for Plaintiffs and Defendants; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

259.    **Numerosity (Rule 23(a)(1))**. The Class and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of Class and Subclass members, as herein identified and described, is not known, but download figures show that the Defendants' apps have been downloaded hundreds of millions of times throughout the world and billions of messages are sent and intercepted daily.

260.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

a.    Whether Defendants engaged in the activities and practices referenced above;

b.    Whether Defendants' activities and practices referenced above constitute an intrusion upon seclusion;

c.    Whether Defendants' activities and practices referenced above violate the Right to Privacy under the California Constitution;

d.    Whether Defendants' activities and practices referenced above violate the

California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et seq*.;

           e.      Whether Defendants' activities and practices referenced above violate the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq*.;

           f.      Whether Defendants' activities and practices referenced above violate the California Invasion of Privacy Act, Cal. Pen. C. § 630 *et seq.*;

           g.      Whether Defendants' activities and practices referenced above violate the Electronic Communications Privacy Act (ECPA) 18 U.S.C. §§ 2510–22;

           h.      Whether Defendants' activities and practices referenced above violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

           i.      Whether Defendants' activities and practices referenced above violate the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq.;

           j.      Whether Defendants' activities and practices referenced above violate Cal. Penal Code § 496 *et seq*;

           k.      Whether Defendants' activities and practices referenced above constitute conversion;

           l.      Whether Defendants' activities and practices referenced above constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

           m.      Whether Plaintiffs and members of the Class sustained damages as a result of Defendants' activities and practices referenced above, and, if so, in what amount;

           n.      Whether Defendants' profited from their activities and practices referenced above, and, if so, in what amount;

           o.      What is the appropriate injunctive relief to ensure that Defendants no longer unlawfully: (i) offer technology capable of surveillance within the United States; (ii) take private and personally-identifiable user data; (iii) profile and target users with advertisements; (iv) utilize private and personally-identifiable user data to develop and patent commercially-valuable technologies; (v) transfer such private and personally-identifiable user data to servers in China and to third parties; (vi) cause injury to users' devices; and (vii) retain the unlawfully assembled user dossiers. And what is the appropriate injunctive relief to ensure that Defendants take reasonable

measures to ensure that they and the relevant third parties destroy such private and personally-identifiable user data in their possession.

261.    **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of members of the Class and Subclasses because, among other things, Plaintiffs and members of the Class and Subclasses sustained similar injuries as a result of Defendants' uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Defendants.

262.    **Adequacy (Rule 23(a)(4))**. Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses. Plaintiffs' interests do not conflict with the interests of the Class and Subclass members, and  Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class and Subclass.

263.    **Predominance & Superiority (Rule 23(b)(3))**. Aside from satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class and Subclass members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available is insufficient to make litigation addressing Defendants' conduct economically feasible without the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

264.    **Final Declaratory or Injunctive Relief (Rule 23(b)(2))**. Plaintiffs also satisfies the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class and Subclasses, making final declaratory and/or injunctive relief appropriate with respect to the class and subclass as a whole.

265.    **Particular Issues (Rule 23(c)(4))**. Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues common

to all Class and Subclass members and are capable of class-wide resolution that will significantly advance the litigation.

## IX.   CAUSES OF ACTION

### First Cause of Action

**(Intrusion Upon Seclusion – By Plaintiffs Ji, Abe, Tomlinson, Sunga, and Bonner ("California Plaintiffs") Against All Defendants)**

266.   California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

267.   California follows the Restatement (2nd) of Torts approach to liability for intrusion upon seclusion. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

268.   California Plaintiffs and the California Subclass have a reasonable expectation of privacy in both their facial biometric information, and in their video viewing histories, user identifiers, device identifiers and contents of their chat messages.

269.   California Plaintiffs and the California Subclass reasonably expected their private and personal information to be protected on the LINE Messenger app. The reasonableness of that expectation is further established because that it what Defendants themselves said.  LINE Corp.'s privacy policy stated that it was taking "strict technical and organizational security measures" including "strict access control based on a need-to-know basis" and "external authentication for objectively evaluating our security measures." It further stated that "[w]e will not provide, disclose or share Personal Data to or with third parties" unless users consent or as permitted by law. Additionally, LINE Corp. made public statements assuring users that the contents of their messages on LINE Messenger were encrypted and that it was "not possible to check the contents of the data just by accessing the database."

270.   California Plaintiffs and the California Subclass reasonably expected that personally-identifiable facial geometry would not be taken by B612.  It is not necessary for the

operation of the app for facial geometry scans to be transmitted off of the devices on which B612 is installed.

271.    Defendants intentionally intruded—and continue to intrude—upon California Plaintiffs' and the California Subclass' solitude, seclusion and private affairs by intentionally and secretively collecting California Plaintiffs' and the California Subclass' private and personally-identifiable information and making them available to third parties, as addressed above.  Certain intrusions are shared within this claim as illustrative; however, not to the exclusion of all of the unlawful behavior as alleged against each defendant herein.

272.    **As it concerns the LINE Messenger app**:

a.    **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages, and personally identifiable information—such as the device ID, the client ID, the Defendants advertising ID, the phone number, and the model of the phone—through the LINE Messenger app. These Defendants transmitted this data to the domain ga2u.line.naver.jp.  These Defendants utilized and configured the SenseTime SDK to transmit to third-party SenseTime personally identifiable information.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.    **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept and obtain videos, URLs, and keywords contained within encrypted messages.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data.  Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so.  To the contrary, they had actively been involved in designing and implementing the data flows and data storage for LINE Messenger, including the unlawful interception alleged herein.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

1    c.    **LINE E-A** is liable for this conduct because it occurred pursuant to the

2 common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this

3 misconduct by promoting the use of the LINE Messenger app to California and U.S. residents,

4 knowing about the privacy violations alleged herein.

5    d.    **Snow Corp.**, and **Snow Inc.** are liable for this conduct because it occurred

6 pursuant to the common enterprise of which they are a part.

7    273.   **As it concerns the B612 app**:

8    a.    **LINE Corp., LINE Plus, Naver Corp., Snow Corp.,** and **Snow Inc.**

9 owned and operated the B612 app, which facilitated the collection of users' facial scans through

10 the use of the SenseAR SDK. These Defendants transferred the biometric identifiers and biometric

11 information to the domain log.snow.me, and facilitated the transfer of personally identifiable data

12 (such as device ID, WiFi MAC address, the make and model of a users' device, IP address, the

13 make and model of the user's device; the version of Android the user is using; the City code for

14 where the device is being used; the IP address; and the identity of the features of B612 the user has

15 been using and on what days and times the features have been used) to the Kajicam Domains.

16 These Defendants are also liable for this conduct because it occurred pursuant to the common

17 enterprise of which they are a part.

18    b.    **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection

19 and transfer of users' biometric identifiers and biometric information by providing hosting on their

20 own devices for the domains used to obtain the biometric identifiers and biometric information.

21 These Defendants also aided in the collection of users' information by acquiring, installing,

22 operating, and managing LINE Corp.'s, Snow Corp.'s and Snow Inc.'s server, data storage, and

23 data management with respect to California Plaintiffs' and the California Subclass' data.  These

24 Defendants are also liable for this conduct because it occurred pursuant to the common enterprise

25 of which they are a part.

26    c.    **Z Holdings** and **LINE E-A** are liable for this conduct because it occurred

27 pursuant to the common enterprise of which they are a part.

28    274.   Defendants' intrusions are highly offensive to a reasonable person, as evidenced by

substantial research, literature and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by their making California Plaintiffs' and the California Subclass' private and personally-identifiable information available to third parties, including a foreign governmental entity whose interests oppose those of United States citizens. The intentionality of Defendants' conduct, and the steps they have taken to disguise it—and in the case of Z-LINE Defendants, deny it—also reveal the highly offensive nature of their conduct.

275.    Further, Defendants' conduct targeted California Plaintiffs' and the California Subclass' mobile devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain California Plaintiffs' and the California Subclass' private and personally-identifiable information.

276.    California Plaintiffs and the California Subclass were all harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint. No proof of economic injury, beyond the theft of their private and personal information, is required for this claim.

277.    Defendants' conduct was a substantial factor in causing the harm suffered by California Plaintiffs and the California Subclass.

278.    California Plaintiffs and the California Subclass seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure California Plaintiffs and the California Subclass, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

279.    California Plaintiffs and the California Subclass seek injunctive relief to remedy Defendants' actions, including, but not limited to, requiring Defendants to stop taking private and biometric information from users' mobile devices; to make clear disclosures of the information that is reasonably necessary to operate LINE Messenger and B612; and to recall and destroy all information already taken in contravention of California Plaintiffs' and the California Subclass' privacy rights.

280.     California Plaintiffs and the California Subclass seek restitution and disgorgement for Defendants' intrusion upon seclusion. A person acting in conscious disregard of the rights of another must disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

**Second Cause of Action**

**(Violation of the Right to Privacy – California Constitution –**

**By California Plaintiffs Against All Defendants)**

281.     California Plaintiffs and the California Subclass incorporate by this reference each and every preceding paragraph.

282.     The California Constitution expressly provides for a right to privacy: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., art. I, § 1.

283.     California Plaintiffs and the California Subclass hold a legally protected privacy interest in their private and personally-identifiable information – including biometric information, video viewing histories, user identifiers, device identifiers and certain contents of their chat messages – that Defendants have taken.

284.     California Plaintiffs and the California Subclass have a reasonable expectation of privacy concerning that information under the circumstances.

285.     **As it concerns the LINE Messenger app**:

a.     **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.,** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages, and personally identifiable information—such as the device ID, the client ID, the Defendants advertising ID, the phone number, and the model of the phone—through the LINE Messenger app. These Defendants transmitted this data to the

1   domain ga2u.line.naver.jp.  These Defendants utilized and configured the SenseTime SDK to

2   transmit to third-party SenseTime personally identifiable information.  These Defendants are also

3   liable for this conduct because it occurred pursuant to the common enterprise of which they are a

4   part.

5         b.     **Naver Cloud** and **Naver Cloud America** provided hosting on their own

6   devices for the domains used to intercept and obtain videos, URLs, and keywords contained

7   within encrypted messages.  These Defendants also aided in the collection of users' information

8   by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data

9   management with respect to California Plaintiffs' and the California Subclass' data.  Naver Cloud

10  and Naver Cloud America were not merely acting as passive ISPs in doing so.  To the contrary,

11  they had actively been involved in designing and implementing the data flows and storage for

12  LINE Messenger, including the unlawful interception alleged herein.  These Defendants are also

13  liable for this conduct because it occurred pursuant to the common enterprise of which they are a

14  part.

15        c.     **LINE E-A** is liable for this conduct because it occurred pursuant to the

16  common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this

17  misconduct by promoting the use of the LINE Messenger app to California residents, knowing

18  about the privacy violations alleged herein.

19        d.     **Snow Corp.**, and **Snow Inc.** are liable for this conduct because it occurred

20  pursuant to the common enterprise of which they are a part.

21      286.   **As it concerns the B612 app**:

22        a.     **LINE Corp., LINE Plus, Naver Corp., Snow Corp., and Snow Inc.**

23  owned and operated the B612 application, facilitated the collection of users' facial scans through

24  the use of the SenseAR SDK. These Defendants transferred the biometric information to the

25  domain log.snow.me, and facilitated the transfer of personally identifiable data, such as device ID,

26  WiFi MAC address, the make and model of a users' device, IP address, the make and model of the

27  user's device; the version of Android the user is using; the City code for where the device is being

28  used; the IP address; and the identity of the features of B612 the use has been using and on what

1  days and times the features have been used, to the Kajicam Domains.  These Defendants are also

2  liable for this conduct because it occurred pursuant to the common enterprise of which they are a

3  part.

4             b.  **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection

5  and transfer of users' biometric information by providing provided hosting on their own devices

6  for the domains used to obtain biometric information.  These Defendants also aided in the

7  collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s,

8  Snow Corp.'s and Snow Inc.'s server, data storage, and data management with respect to

9  California Plaintiffs' and the California Subclass' data.  These Defendants are also liable for this

10  conduct because it occurred pursuant to the common enterprise of which they are a part.

11             c.  **LINE E-A** is liable for this conduct because it occurred pursuant to the

12  common enterprise of which it is a part as alleged above.

13      287.  The reasonableness of California Plaintiffs' and the California Subclass'

14  expectations of privacy is supported by the clandestine nature of Defendants' taking of California

15  Plaintiffs' and the California Subclass' private and personally-identifiable information from their

16  mobile devices and unauthorized disclosure of such information to third parties. Defendants acted

17  with deceit and disregard for California Plaintiffs' and the California Subclass' privacy.

18      288.  Defendants' conduct violated California Plaintiffs' and the California Subclass'

19  privacy interests, were highly offensive to a reasonable person, and constituted and continues to

20  constitute an egregious breach of social norms. Not only did Defendants take and use this

21  information, Defendants either did not disclose at all, or failed to make an effective disclosure, that

22  they would take and use California Plaintiffs' and the California Subclass' private and personally-

23  identifiable information. Defendants intentionally invaded California Plaintiffs' and the California

24  Subclass' privacy interests by intentionally designing their apps, including associated code, to

25  surreptitiously obtain, improperly gain knowledge of, review, and retain California Plaintiffs' and

26  the California Subclass' private and personally-identifiable information.

27      289.  These intrusions are highly offensive to a reasonable person, as evidenced by

28  substantial research, literature, and governmental enforcement and investigative efforts to protect

consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants'
intrusion is heightened by the representation that messages transmitted on LINE Messenger were
encrypted "end-to-end" such that only the sender and recipient can see the contents of messages.

290.     The offensiveness of Defendants' intrusion is further heightened by the fact that
they utilize a SDK produced by SenseTime – a China-based company that is known to use its
artificial intelligence technology to assist the Chinese government with its political, military, and
policing agenda – to collect California Plaintiffs' and the California Subclass' private and
personally-identifiable information and make available to third parties, including the Chinese
government.

291.     The intentionality of Defendants' conduct, and the steps they have taken to disguise
and deny it, also show the highly offensive nature of their conduct.

292.      Further, Defendants' conduct targeted California Plaintiffs' and the California
Subclass' mobile devices, which the United States Supreme Court has characterized as almost a
feature of human anatomy, and which contain California Plaintiffs' and the California Subclass'
private and personally-identifiable information.

293.     California Plaintiffs and the California Subclass were harmed by the intrusion as
detailed throughout this Complaint.

294.     Defendants' conduct was a substantial factor in causing the harm suffered by
California Plaintiffs and the California Subclass.

295.     California Plaintiffs and the California Subclass seek nominal and punitive
damages as a result of Defendants' actions. Punitive damages are warranted because Defendants'
malicious, oppressive, and willful actions were calculated to injure California Plaintiffs and the
California Subclass, and were made in conscious disregard of their rights. Punitive damages are
also warranted to deter Defendants from engaging in future misconduct.

296.     California Plaintiffs and the California Subclass seek injunctive relief to remedy
Defendants' actions, including, but not limited to, requiring Defendants to stop taking private and
biometric information from users' mobile devices; to make clear disclosures of the information
that is reasonably necessary to operate LINE Messenger and B612; and to recall and destroy all

1   information already taken in contravention of California Plaintiffs' and the California Subclass'
2   privacy rights.

3       297.    California Plaintiffs and the California Subclass seek restitution and disgorgement
4   for Defendants' violation of their privacy rights. A person acting in conscious disregard for the
5   rights of another must disgorge all profit because disgorgement both benefits the injured parties
6   and deters the perpetrator from committing the same unlawful actions again. Disgorgement is
7   available for conduct that constitutes "conscious interference with a claimant's legally protected
8   interests," including tortious conduct or conduct that violates another duty or prohibition.
9   Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

**Third Cause of Action**

**(Violation of the California Unfair Competition Law,**

**Bus. & Prof. Code §§ 17200, *et seq.* – By California Plaintiffs Against All Defendants)**

13      298.    California Plaintiffs and the California Subclass repeat and incorporate by reference
14  all preceding paragraphs as if fully set forth herein.

15      299.    The Unfair Competition Law, California Business & Professions Code §§ 17200, et
16  seq. ("UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which
17  can include false or misleading advertising.

18      300.    Each Defendant violated, and continue to violate, the "**unlawful**" prong of the UCL
19  through violation of statutes, Constitutional provisions and common law, as alleged in the
20  Complaint.

21      301.    Defendants violated, and continue to violate, the "**unfair**" prong of the UCL
22  because they took California Plaintiffs' and the California Subclass' private and personal
23  information, including their biometric information, video viewing histories, user identifiers, device
24  identifiers, and certain content of their chat messages, and shared this information with third
25  parties.  This information is property under the laws of California and common law. Defendants'
26  unlawful taking and use of this property was immoral, unethical, oppressive, unscrupulous and
27  substantially injurious to California Plaintiffs and the California Subclass. Defendants'
28  unauthorized collection and disclosure of private and personal information was made for their own

1  gain and at the expense of California Plaintiffs and the California Subclass:

2      302.   **As it concerns the LINE Messenger app**:

3          a.   **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.,** owned and

4  operated the app.  These Defendants intercepted and obtained videos, URLs, and keywords

5  contained within encrypted messages, and personally identifiable information—such as the device

6  ID, the client ID, the Defendants advertising ID, the phone number, and the model of the phone—

7  through the LINE Messenger app. These Defendants transmitted this data to the domain

8  ga2u.line.naver.jp.  These Defendants utilized and configured the SenseTime SDK to transmit to

9  third-party SenseTime personally identifiable information.  These Defendants are also liable for

10  this conduct because it occurred pursuant to the common enterprise of which they are a part.

11          b.   **Naver Cloud** and **Naver Cloud America** provided hosting on their own

12  devices for the domains used to intercept and obtain videos, URLs, and keywords contained

13  within encrypted messages.  These Defendants also aided in the collection of users' information

14  by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data

15  management with respect to California Plaintiffs' and the California Subclass' data.  Naver Cloud

16  and Naver Cloud America were not merely acting as passive ISPs in doing so.  To the contrary,

17  they had actively been involved in designing and implementing the data flows and data storage for

18  LINE Messenger, including the unlawful interception alleged herein.  These Defendants are also

19  liable for this conduct because it occurred pursuant to the common enterprise of which they are a

20  part.

21          c.   **LINE E-A** is liable for this conduct because it occurred pursuant to the

22  common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this

23  misconduct by promoting the use of the LINE Messenger app to California residents, knowing

24  about the privacy violations alleged herein.

25          d.   **Snow Corp.** and **Snow Inc.** are liable for this conduct because it occurred

26  pursuant to the common enterprise of which they are a part.

27      303.   **As it concerns the B612 app**:

28          a.   **LINE Corp., LINE Plus, Naver Corp., Snow Corp.,** and **Snow Inc.**

owned and operated the B612 app, which facilitated the collection of users' facial scans through the use of the SenseAR SDK. These Defendants transferred the biometric identifiers and biometric information to the domain log.snow.me, and facilitated the transfer of personally identifiable data (such as device ID, WiFi MAC address, the make and model of a users' device, IP address, the make and model of the user's device; the version of Android the user is using; the City code for where the device is being used; the IP address; and the identity of the features of B612 the use has been using and on what days and times the features have been used) to the Kajicam Domains. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

        b.    **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection and transfer of users' biometric identifiers and biometric information by providing hosting on their own devices for the domains used to obtain biometric identifiers and biometric information. These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s, Snow Corp.'s and Snow Inc.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

        c.    **Z Holdings** and **LINE E-A** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

    304.    **LINE Corp.** violated, and continues to violate, the "**fraudulent**" prong of the UCL because it represented to users and the public that messages shared on LINE Messenger were encrypted and secure. LINE Corp. repeatedly stated, in its privacy policy and in public statements made available on its websites, that LINE Messenger offer end-to-end encryption of all messages transmitted via the app so that only the sender and recipient can view the content of messages. In reality, LINE Corp. intercepts and transfers portions of California Plaintiffs' and the California Subclass' communications in an unencrypted form.  Reasonable consumers, like California Plaintiffs and the California Subclass, were likely to be misled by LINE Corp.'s misrepresentations. Reasonable consumers lack the means to verify LINE Corp.'s representations

about its data practices or to understand the fact or significance of its data practices.  **All Defendants other than LINE Corp.** are liable for the misrepresentations because they occurred pursuant to the common enterprise of which they are a part.  In addition and in the alternative, **LINE E-A** aided and abetted this misconduct by promoting the use of the LINE Messenger app to California and U.S. residents, knowing that the representations were false.

305.    California Plaintiffs and the California Subclass have been harmed by Defendants' UCL violations. California Plaintiffs and the California Subclass have a property interest in the personally identifiable information (including user identifiers and biometric information) and other personal information (including key words, URLs, and videos shared in private communications) taken by Defendants. The Defendants surreptitiously collected this property and therefore, Plaintiffs received less than they otherwise would have surrendered this property for. California Plaintiffs and the California Subclass have a suffered from the diminished loss of use of their own personal information, property which has both personal and economic value to them. California Plaintiffs and the California Subclass have also been deprived the money or property they would have received for the data improperly collected by Defendants.

306.    The battery, memory, CPU and bandwidth of their devices have been compromised as a result of Defendants' UCL violations in an amount that can only be calculated once the Defendants' conduct has been appraised. They also have incurred data usage and electricity costs greater than zero that they would not have incurred but for Defendants' unlawful, unfair, and fraudulent conduct.

307.    As a result of their conduct, Defendants have been able to reap unjust revenues and profits in violation of the UCL.

308.    California Plaintiffs and the California Subclass lack an adequate remedy at law and are thus entitled to seek equitable relief.  Unless restrained and enjoined, Defendants will continue to misrepresent their data practices and will not recall and destroy all wrongfully collected data. Due to the ongoing nature of the harm, damages will be insufficient to address it. Thus, injunctive relief is appropriate

309.    Further, California Plaintiffs and the California Subclass are entitled to restitution

as the available damages remedies are inadequate to return to California Plaintiffs and the California Subclass the value of the information taken by Defendants, including for use in developing their artificial intelligence systems. California Plaintiffs and the California Subclass are entitled to restitution for Defendants' unjust enrichment in a quanta that is not identical to the legal damages suffered.

**Fourth Cause of Action**

**(Violation of the California False Advertising Law,**

**Bus. & Prof. Code §§ 17500, *et seq.* – By California Plaintiffs Against All Defendants)**

310.     California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

311.     California's False Advertising Law ("FAL")—Cal. Bus. & Prof. Code §§ 17500, *et seq.*—prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services.

312.     **LINE Corp.'s** representations regarding the security of users' personal information on LINE Messenger are, and at all relevant times were, untrue. LINE Corp. repeatedly stated, in its privacy policy and in public statements made available on its websites, that LINE Messenger offer end-to-end encryption of all messages transmitted via the app so that only the sender and recipient can view the content of messages. In reality, LINE Corp. intercepts and shares certain private contents of the users' messages — including videos, URLs and particular keywords — that consumers seek to safeguard. **All Defendants other than LINE Corp.** are liable for the misrepresentations because they occurred pursuant to the common enterprise of which they are part.  In addition and in the alternative, **LINE E-A** aided and abetted this misconduct by promoting the use of the LINE Messenger app to California and U.S. residents, knowing about the falsity of LINE Corp.'s misrepresentations.

313.     Reasonable consumers, like California Plaintiffs and the California Subclass, were likely to be misled by LINE Corp.'s misrepresentations. Reasonable consumers lack the means to verify LINE Corp.'s representations about its data practices or to understand the fact or significance of its data practices.

314.    California Plaintiffs and the California Subclass suffered economic injury as a result of the misrepresentations. First, they have suffered harm in the form of diminution of the value of their private and personally-identifiable information. Second, they have suffered harm to their mobile devices. The battery, memory, CPU and bandwidth of their devices have been compromised, and as a result the functioning of such devices has been impaired and slowed in an amount that can only be calculated once the Defendants' conduct has been appraised. Third, they have incurred additional data usage and electricity costs greater than zero as a result of Defendants' misrepresented data practices. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally-identifiable information – including their face geometry scans, video viewing histories, user identifiers, device identifiers and certain contents of their chat messages.

315.    Defendant, as a result of their misrepresentations, was able to reap unjust profits and revenues, including from their targeted advertising, sale of California Plaintiffs' and the California Subclass' private and personally-identifiable information, and services and products derived from such information.

316.    Unless restrained and enjoined, Defendants will continue to misrepresent their practices regarding the collection and use of private and personally-identifiable information, and will not recall and destroy California Plaintiffs' and the California Subclass' wrongfully collected private and personally-identifiable information. Accordingly, injunctive relief is appropriate.

## Fifth Cause of Action

### (Violation of California Invasion of Privacy Act,

### California Penal Code §§ 630, *et seq.* – California Plaintiffs Against All Defendants)

317.    California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

318.    California Plaintiffs and the California Subclass assert this claim for relief explicitly as it relates to Defendants' actions concerning the LINE Messenger application, only.

319.    California's Invasion of Privacy Act ("CIPA") prohibits the interception or receipt and intentional recording of communications transmitted between cellular phones without the

consent of all parties to the communication. California Penal Code ("CPC") § 632.7(a).

320.    The LINE Messenger allows users to create and send written messages, make voice calls, and send videos.  Its timeline feature provides the ability for users to share videos, the creation of which requires recording those videos, a feature which the LINE Messenger has enabled users to do.

321.    California Plaintiffs and the California Subclass have an expectation of privacy in messages, videos, and recordings, and they exercised a reasonable expectation of privacy concerning the transmission of those messages.

322.    However, without the consent of either the sender or recipient, Defendants intercepted and recorded videos, URLs, and keystrokes contained in communications and messages transmitted via the LINE Messenger without California Plaintiffs' and the California Subclass' consent or knowledge:

a.    **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages through the LINE Messenger app. These Defendants transmitted this private message content to their domains where they recorded and stored them, separate from the process of transmitting the message to the intended recipient. These Defendants designed the LINE Messenger app in a way that they knew California Plaintiffs' and the California Subclass' privacy rights would be violated, in that their messages would be unlawfully intercepted and recorded. The defective and unlawful design of the LINE Messenger app directly facilitates these Defendants' unlawful conduct. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.    **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept, obtain, and record videos, URLs, and keywords contained within encrypted messages.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data. Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so.  To

the contrary, they had actively been involved in designing and implementing the data flows and data storage for LINE Messenger, including the unlawful interception alleged herein. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c. **LINE E-A** is liable for this conduct because it occurred pursuant to the common enterprise of which it is a part. In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to California residents, knowing about the privacy violations alleged herein.

d. **Snow Corp.**, and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

323. The unauthorized interceptions described herein are not covered by any business exception because the interceptions were not required to facilitate the communications between users.

324. Chat participants could not provide consent to the interception because they did not know that their messages were being intercepted and reasonably anticipated that their private messages would remain private.

325. California Plaintiffs and the California Subclass have a property right an interest in their private communications, videos, and messages such that the interception of those messages is violative of those rights and therefore causes them injury and damages.

326. California Plaintiffs and the California Subclass suffered further economic injury as a result of Defendants' unlawful and unauthorized interceptions and recordings of communications. The battery, memory, CPU and bandwidth of their cellular devices have been compromised and thus incurred additional data and electricity costs that they otherwise would not have.

327. California Plaintiffs and the California Subclass seek $5,000 or three times the amount of actual damages, whichever is greater, for each violation of the CIPA by Defendants.

**Sixth Cause of Action**

**(Violation of the Electronic Communications Privacy Act,**

**18 U.S.C. § 2510, *et seq.* – All Plaintiffs Against All Defendants)**

328.    Plaintiffs and the Class incorporate herein by this reference each and every preceding paragraph.

329.    Plaintiffs and the Class assert this claim for relief explicitly as it relates to Defendants' actions concerning the LINE Messenger application, only.

330.    The LINE Messenger allows users to create and send written messages, make voice calls, and send videos.  Its timeline feature provides the ability for users to share videos, the creation of which requires recording those videos, a feature which the LINE Messenger has enabled users to do.

331.    Plaintiffs and the Class have an expectation of privacy in messages, videos, and recordings, and they exercised a reasonable expectation of privacy concerning the transmission of those messages.

332.    However, without the consent of either the sender or recipient, Defendants intercepted and recorded videos, URLs, and keystrokes contained in communications and messages transmitted via the LINE Messenger without Plaintiffs' or Class members' consent or knowledge:

a.    **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages through the LINE Messenger app. These Defendants transmitted this private message content to their domains where they recorded and stored them, separate from the process of transmitting the message to the intended recipient. These Defendants designed the LINE Messenger app in a way that they knew Plaintiffs' and Class members' privacy rights would be violated, in that their messages would be unlawfully intercepted and recorded. The defective and unlawful design of LINE Messenger directly facilitates these Defendants' unlawful conduct. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.      **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept, obtain, and record videos, URLs, and keywords contained within encrypted messages.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to Plaintiffs' and Class members' data.  Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so.  To the contrary, they had actively been involved in designing and implementing the data flows and data storage for LINE Messenger, including the unlawful interception alleged herein.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c.      **LINE E-A** is liable for this conduct because it occurred pursuant to the common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to California, Illinois, and other United States residents, knowing about the privacy violations alleged herein.

d.      **Snow Corp.** and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

333.    The unauthorized interceptions described herein are not covered by any business exception because the interceptions were not required to facilitate the communications between users.

334.    Chat participants could not provide consent to the interception because they did not know that their messages were being intercepted and reasonably anticipated that their private messages would remain private.

335.    The interception and search of Plaintiffs' and Class members' messages requires Defendants to record—or store—Plaintiffs' and Class members' messages on their servers.

336.    These acts violate § 2511(1)(a) of the Electronic Communications Privacy Act ("ECPA") because Defendants intentionally endeavored to intercept, and did in fact intercept, electronic messages transmitted by Plaintiffs and the Class using LINE Messenger.

337.    Defendants intercept videos, URLs and certain keywords contained in Plaintiffs'

1   and the Class's chat messages on LINE Messenger by using devices that are distinct from the

2   devices associated with the transmission of the messages between sender and recipient.

3       338.    The videos, URLs, and keywords contained in Plaintiffs' and the Class's chat

4   messages that Defendants intercept are substantive communication that senders intended to

5   convey to recipients.

6       339.    Defendants' acts further violate § 2511(1)(d) because the information intercepted

7   from Plaintiffs' and Class members' communications were intentionally used for gain, including

8   for advertising, as alleged above.

9       340.    Plaintiffs and Class members were also damaged when the Defendants used their

10  information, intentionally, despite knowing that such interception was unauthorized, for corporate

11  gain and profit such that the Z-LINE Defendants were unjustly enriched.

12      341.    Plaintiffs and the Class seek: (i) injunctive relief to correct Defendants' actions,

13  including, but not limited to, requiring Defendants to stop intercepting any portion of Plaintiffs'

14  and the Class's chat messages on LINE Messenger; (ii) the sum of actual damages suffered by

15  them and any profits Defendants made as a result of their violations of the ECPA, but in no event

16  less than $1,000; and (iii) reasonable attorneys' fees and costs under 18 U.S.C. § 2707(c).

17                      **<u>Seventh Cause of Action</u>**

18                **(Violation of the Computer Fraud and Abuse Act,**

19            **18 U.S.C. § 1030 – All Plaintiffs Against All Defendants)**

20      342.    Plaintiffs and the Class repeat and incorporate by reference all preceding

21  paragraphs as if fully set forth herein.

22      343.    Plaintiffs' and the Class's mobile devices are, and at all relevant times were, used

23  for interstate communication and commerce and are therefore "protected computers" under 18

24  U.S.C. § 1030(e)(2)(B).

25      344.    Defendants intentionally accessed Plaintiffs' and the Class's protected computers

26  and obtained information thereby, and in doing so exceeded authority granted by Plaintiffs and the

27  Class to access the protected computers in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).

28  Plaintiffs and the Class have a civil cause of action for violation of the CFAA under 18 U.S.C. §

1030(g) and have suffered damage or loss as follows.

345.   **As it concerns the LINE Messenger app**:

a.   **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages, and personally identifiable information—such as the device ID, the client ID, the Defendants' advertising ID, the phone number, and the model of the phone—through the LINE Messenger app. These Defendants transmitted this data to the domain ga2u.line.naver.jp.  These Defendants utilized and configured the SenseTime SDK to transmit to third-party SenseTime personally identifiable information.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.   **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept and obtain videos, URLs, and keywords contained within encrypted messages.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to Plaintiffs' and Class members' data.  Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so.  To the contrary, they had actively been involved in designing and implementing the data flows and data storage for LINE Messenger, including the unlawful interception alleged herein.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c.   **LINE E-A** is liable for this conduct because it occurred pursuant to the common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to California, Illinois, and other United States residents, knowing about the privacy violations alleged herein.

d.   **Snow Corp.** and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

e.   Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I) because the

unauthorized access and collection of data (i) frequently and systematically drained the Plaintiffs' and Class members' devices' batteries, and (ii) caused a diminution in value of Plaintiffs' and Class members' personal information, both of which occurred to millions of Class members, easily aggregating at least $5,000 in value.

346.   **As it concerns the B612 app:**

a.   **LINE Corp., LINE Plus, Naver Corp., Snow Corp.,** and **Snow Inc.** owned and operated the B612 app, which facilitated the collection of users' facial scans through the use of the SenseAR SDK. These Defendants transferred the biometric identifiers and biometric information to the domain log.snow.me, and facilitated the transfer of personally identifiable data (such as device ID, WiFi MAC address, the make and model of a users' device, IP address, the make and model of the user's device; the version of Android the user is using; the City code for where the device is being used; the IP address; and the identity of the features of B612 the use has been using and on what days and times the features have been used) to the Kajicam Domains. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.   **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection and transfer of users' biometric identifiers and biometric information by providing hosting on their own devices for the domains used to obtain the biometric identifiers and biometric information. These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s, Snow Corp.'s and Snow Inc.'s server, data storage, and data management with respect to Plaintiffs' and Class members' data.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c.   **Z Holdings** and **LINE E-A** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

d.   Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I) because the unauthorized access and collection of data (i) frequently and systematically drained the Plaintiffs'

and Class members' devices' batteries, and (ii) caused a diminution in value of Plaintiffs' and Class members personal information, both of which occurred to millions of Class members, easily aggregating at least $5,000 in value.

347. **<u>As it concerns data flow from the LINE Messenger app to SenseTime</u>**:

a. **Naver Corp., LINE Corp.,** and **LINE Plus** aided and abetted SenseTime's violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C). These Defendants inserted the SenseTime SDK into the LINE Messenger app in or about 2018, and configured the LINE Messenger app to send personally identifiable user data to SenseTime. These Defendants are also liable for SenseTime's conduct because other Defendants within the common enterprise aided and abetted SenseTime's violation in furtherance of the operations of the common enterprise.

b. **Z Holdings** aided and abetted SenseTime's misconduct by continuing the inclusion of the SenseTime SDK and the configuration of the LINE Messenger app to send personally identifiable user data to SenseTime once Z Holdings assumed ownership and operational control of the LINE Messenger app and responsibility for data governance at LINE Corp. and LINE Plus. Z Holdings is also liable for SenseTime's conduct because other Defendants within the common enterprise aided and abetted SenseTime's violation in furtherance of the operations of the common enterprise.

c. **LINE E-A** aided and abetted SenseTime's violation by promoting the use of the LINE Messenger app to California, Illinois and other United States residents, knowing about the use of the SenseTime SDK and transmission of data to SenseTime. LINE E-A is also liable for SenseTime's conduct because other Defendants within the common enterprise aided and abetted SenseTime's violation in furtherance of the operations of the common enterprise.

d. **Naver Cloud**, **Naver Cloud America, Snow Corp.,** and **Snow Inc.** are liable for SenseTime's conduct because other Defendants within the common enterprise aided and abetted SenseTime's violation in furtherance of the operations of the common enterprise.

e. Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I) because the unauthorized access and collection of data (i) frequently and systematically drained the Plaintiffs'

devices' batteries, and (ii) caused a diminution in value of Plaintiffs' personal information, both of which occurred to millions of Class members, easily aggregating at least $5,000 in value.

       f.     The collection and transmission of information to SenseTime constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV).

348.   **<u>As it concerns data flow from the B612 app to Kajicam</u>**:

       a.     **Naver Corp., Snow Corp.**, and **Snow Inc.** aided and abetted Kajicam's violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).  These Defendants inserted the Kajicam Code into the B612 app, and configured the B612 app to send personally identifiable user data to Kajicam. These Defendants are also liable for Kajicam's conduct because other Defendants within the common enterprise aided and abetted Kajicam's violation in furtherance of the operations of the common enterprise.

       b.     **Naver Cloud, Naver Cloud America, Z Holdings, LINE Corp., LINE Plus,** and **LINE E-A** are liable for Kajicam's conduct because other Defendants within the common enterprise aided and abetted Kajicam's violation in furtherance of the operations of the common enterprise.

       c.     Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I) because the unauthorized access and collection of data (i) frequently and systematically drained the Plaintiffs' and Class members' devices' batteries, and (ii) caused a diminution in value of Plaintiffs' and Class members' personal information, both of which occurred to millions of Class members, easily aggregating at least $5,000 in value.

       d.     The collection and transmission of information to Kajicam constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV).

349.   The public safety threat to Plaintiffs and Class members of the collection of user data cannot be overstated; the parent company behind the LINE Messenger, Z-Holdings, recently shared a detailed report that it mishandled Japanese user data from overseas servers.[61]

---

[61] *See* Some media reports regarding users' personal information, LINE (Mar. 17, 2021),

350.     For these reasons, and those discussed in this Complaint, Plaintiffs and the Class are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

**Eighth Cause of Action**

**(Violation of the Illinois Biometric Information Privacy Act,**

**740 ILCS 14/1, *et seq.* – Plaintiff Shubert Against All Defendants)**

351.     Plaintiff Shubert and the Illinois Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

352.     Plaintiff Shubert and the Illinois Subclass bring this cause of action on behalf of Class members residing in Illinois.

353.     The Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA") makes it unlawful for any private entity to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier . . . unless it first: (1) informs the subject . . . in writing that a biometric identifier . . . is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier . . . is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier . . . ." 740 ILCS 14/15(b) (emphasis added).

354.     Plaintiff Shubert is, and at all relevant times was, an adult and resident and citizen of Illinois, and thus is, and at all relevant times was, a "person" and/or a "customer" within the meaning of BIPA. 740 ILCS 14/15(b).

355.     All Defendants are, and at all relevant times were, "private entities" under BIPA. 740 ILCS 14/10.

356.     As described herein, Plaintiff Shubert began using LINE and B612 on his mobile device, in Illinois, in the middle of 2019.

357.     Plaintiff Shubert's and Illinois Subclass members' biometric identifiers were taken

---

https://linecorp.com/ja/pr/news/ja/2021/3675; Report on the handling of personal information from the Personal Information Protection Commission and the Company's future policy (Mar. 23, 2021), https://linecorp.com/ja/pr/news/ja/2021/3682.

from their phones in Illinois when they used the AR features of LINE Messenger and also, separately, when they used B612 in Illinois to take and send pictures, including pictures of their faces. An SDK produced by SenseTime—the SenseAR SDK—is embedded within LINE Messenger and B612.  The biometric scanning occurred on the Plaintiff Shubert and the Illinois Subclasses' devices in Illinois.  Defendants knew that this conduct was occurring in Illinois, because (1) Illinois is the sixth most populous state in the United States, and the apps have millions of U.S. users, a significant number would be in Illinois, and (2) because Defendants simultaneously recorded the IP addresses of the devices being used, which identify the location of the devices down to the sub-city level with sufficient precision to tell whether the devices were in Illinois.

358.    LINE Messenger and B612 utilized SenseAR for their facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour." LINE Messenger and B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

359.    Plaintiff Shubert and Illinois Subclass members used the AR features of the apps for photos or videos of their faces and thus had their facial geometry scans performed by the SenseAR SDK and collected by LINE Messenger and B612 without their consent.

360.    **As it concerns the LINE Messenger app**:

a.    **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.,** owned and operated the LINE Messenger app.  These Defendants unlawfully collected, stored and used biometric identifiers of Plaintiff Shubert and the Illinois Subclass who used the AR function of the LINE Messenger app with the aid of SenseAR, the SenseTime SDK, to perform face geometry scans. The LINE Messenger app includes code such as "sTMobileFaceInfo," "getFaceAction" and "StMobileFaceInfo.face106.getID," evidence that SenseAR is embedded within the LINE Messenger app and performs face geometry scans. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.      **LINE E-A** is liable for this conduct because it occurred pursuant to the common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to Illinois residents, knowing about the biometric violations alleged herein.

c.      **Naver Cloud**, **Naver Cloud America, Snow Corp.**, and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

361.    **As it concerns the B612 app**:

a.      **LINE Corp., LINE Plus, Naver Corp., Snow Corp.,** and **Snow Inc.** owned and operated the B612 app, which facilitated the collection of users' facial scans through the use of the SenseAR SDK.  The B612 app includes codes such as "public STMobileFaceInfo[] faces" and "public float hairScore," which reveal that the app collects its users' face geometry data. The B612 app transmits these biometric identifiers and biometric information, along with the users' identifiers, to the domain log.snow.me without user consent. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.      **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection and transfer of users' biometric identifiers and biometric information by providing hosting on their own devices for the domains used to obtain the biometric identifiers and biometric information. These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s, Snow Corp.'s and Snow Inc.'s server, data storage, and data management with respect to Plaintiff Shubert's and the Illinois Subclass' biometric identifiers and biometric information.  Naver Cloud and Naver Cloud America are, and at all relevant times were, the ISPs for the domain log.snow.me. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c.      **Z Holdings** and **LINE E-A** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

362.    Further, Defendants have used the above data for, among other things, developing

and patenting certain commercially-valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Shubert and the Illinois Subclass members that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

363.    By making features that generate and collect biometric identifiers a prominent part of the LINE Messenger and B612 apps, attracting Illinois users to the apps on that basis, and selling advertising based on the resulting app usage, Defendants profit from Plaintiff Shubert and the Illinois Subclass's biometric identifiers.  The profitability of the use of biometric identifiers is further confirmed by Defendants' own continuing development and sale of facial recognition software.

364.    As alleged above, Plaintiff Shubert's and the Illinois Subclass's faceprints and scans of face geometry are "biometric identifiers" and all information derived therefrom constitute "biometric information" under 740 ILCS 14/10.

365.    Defendants systematically collected, used, and stored Plaintiff Shubert's and the Illinois Subclass's biometric identifiers without first (1) properly informing Plaintiff Shubert and the Illinois Subclass in writing that their biometric identifiers were being collected and stored, as required by 740 ILCS 14/15(b)(1); (2) properly informing Plaintiff Shubert or the Illinois Subclass in writing of the specific purpose and length of term for which a biometric identifier is being collected, stored, and used, as required by 740 ILCS 14/15(b)(2); and (3) without obtaining from Plaintiff Shubert or the Illinois Subclass the specific written release required by 740 ILCS 14/15(b)(3).

366.    In fact, Defendants failed to properly inform the Plaintiff Shubert and the Illinois Subclass in writing (or in any other way) that their "biometric identifiers" and "biometric information" were being "collected or stored" by Defendants. Nor did Defendants inform Shubert or the Illinois Subclass in writing of the specific purpose and length of term for which their "biometric identifiers" and "biometric information" were being "collected, stored and used" as required by 740 ILCS 14/15(b)(1)-(2).

367.    Instead, in documentation concerning B612 not adequately disclosed to users, Defendants have made vague references to biometric information, withholding important information on uses and all of the purposes for its collection.  Defendants did not adequately present any policies or disclosures, nor did they require a user to read or understand any policies or disclosures prior to using the app.  Plaintiff Shubert and the Illinois Subclass members did not provide consent to the collection and use of biometric identifiers and biometric information.

368.    Defendants did not properly inform Plaintiff Shubert and the Illinois Subclass in writing of this collection, the specific purpose and length of term for which these biometric identifiers were collected, stored or used, and without obtaining the specific written release as required by BIPA.

369.    BIPA also makes it unlawful for a private entity "in possession of a biometric identifier or biometric information" to "sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

370.    Defendants are, and at all relevant times were, "in possession of" Plaintiff Shubert's and the Illinois Subclass' "biometric identifiers," including but not limited to their face geometry scans, and "biometric information." Defendants profited from such "biometric identifiers" and "biometric information" by using them for targeted advertising, improvements to their artificial intelligence technologies, their patent applications, and the generation of increased demand for and use of their other products. 740 ILCS 14/15(c).

371.    By collecting, storing and using Plaintiff Shubert's and the Illinois Subclass's biometric identifiers as described herein, Defendants violated Plaintiff Shubert's and the Illinois Subclass' rights to privacy in their biometric identifiers under the BIPA, 740 ILCS 14/1, *et seq*.

372.    BIPA mandates that a private entity "in possession of biometric identifiers or biometric information" "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a).

373.     But Defendants do not publicly provide any written policy establishing any retention schedule or guidelines for permanently destroying Plaintiff Shubert's or the Illinois Subclass' "biometric identifiers" and "biometric information." 740 ILCS 14/15(a).

374.     BIPA also commands private entities "in possession of a biometric identifier or biometric information" to: (1) store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and (2) store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits and protects other confidential and sensitive information. 740 ILCS 14/15(e). Defendants fail to adequately protect via encryption the biometric identifiers and biometric information they took from Plaintiff Shubert and the Illinois Class members.  Further, their data processing and storage practices have made that data available to third parties, including third parties based in China, which is below the reasonable standard of care within Defendants' industry, as demonstrated by the actions of the Government of Japan and Defendants' own statements apologizing for such conduct.

375.     Defendants recklessly or intentionally violated each of BIPA's requirements and infringed Plaintiff Shubert's and the Illinois Subclass' rights to keep their immutable and uniquely identifying biometric identifiers and biometric information private. As individuals subjected to each of Defendants' BIPA violations described above, Plaintiff Shubert and the members of the Illinois Subclass are and have been aggrieved. 740 ILCS 14/20.

376.     On behalf of himself and the Illinois Subclass, Plaintiff Shubert seeks: (i) injunctive and equitable relief as is necessary to protect the interests of Plaintiff Shubert and the Illinois Subclass by requiring Defendants to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information; (ii) statutory damages of $5,000 per intentional or reckless violation of BIPA under 740 ILCS 14/20(2) and statutory damages of $1,000 per negligent violation of the BIPA under 740 ILCS 14/20(1); and (iii) reasonable attorneys' fees and costs and other litigation expenses under 740 ILCS 14/20(3).

**Ninth Cause of Action**

**(Larceny / Receipt of Stolen Property, Cal. Penal Code § 496(a) and (c) – California Plaintiffs Against All Defendants)**

377.    California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

378.    California Plaintiffs and the California Subclass have a property interest in their personal information. *Calhoun v. Google LLC*, 526 F. Supp. 3d 605 (N.D. Cal. 2021).

379.    **As it concerns the LINE Messenger app**:

a.    **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages, and personally identifiable information—such as the device ID, the client ID, the Defendants' advertising ID, the phone number, and the model of the phone—through the LINE Messenger app. These Defendants transmitted this data to the domain ga2u.line.naver.jp.  These Defendants knew that this data was obtained through false pretenses and in a manner constituting theft.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.    **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept and obtain videos, URLs, and keywords contained within encrypted messages.  These Defendants knew that this data was obtained through false pretenses and in a manner constituting theft.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data.  Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so.  To the contrary, they had actively been involved in designing and implementing the data flows and data storage for LINE Messenger, including the unlawful interception alleged herein.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c.    **LINE E-A is** liable for this conduct because it occurred pursuant to the

common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to California residents, knowing that it was taking data from users through false pretenses and in a manner constituting theft.

          d.      **Snow Corp.** and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

380.    **As it concerns the B612 app**:

          a.      **LINE Corp., LINE Plus, Naver Corp., Snow Corp.,** and **Snow Inc.** owned and operated the B612 app, which facilitated the collection of users' facial scans through the use of the SenseAR SDK. These Defendants transferred these biometric identifiers and biometric information to the domain log.snow.me.  These Defendants knew that this data was obtained through false pretenses and in a manner constituting theft.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

          b.      **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection and transfer of users' biometric identifiers and biometric information by providing hosting on their own devices for the domains used to obtain the biometric identifiers and biometric information. These Defendants knew that this data was obtained through false pretenses and in a manner constituting theft.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s, Snow Corp.'s and Snow Inc.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

381.    **Z Holdings** and **LINE E-A** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

### Tenth Cause of Action

**(Conversion – California Plaintiffs Against All Defendants)**

382.    California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

383.     Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things such as data or communications. California Plaintiffs' and the California Subclass' personal information is their property. *Calhoun v. Google LLC,* 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021).

384.     As described in the cause of action for Larceny / Receipt of Stolen Property, Cal. Penal Code § 496(a) and (c), Defendants unlawfully collected, used, and exercised dominion and control over California Plaintiffs' and the California Subclass' personal information without authorization.

385.     Defendants also copied California Plaintiffs' and the California Subclass' personal information when they shared it with one another, and they did so without authorization, which is another unlawful taking of Plaintiffs' property.

386.     Defendants wrongfully exercised control over California Plaintiffs' and the California Subclass' information and have not returned it.

387.     California Plaintiffs and the California Subclass have been damaged as a result of Defendants' unlawful conversion of their property.

## Eleventh Cause of Action

### (Restitution / Unjust Enrichment – California Plaintiffs Against All Defendants)

388.     California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

389.     California Plaintiffs and the California Subclass have conferred substantial benefits on Defendants by downloading and using Defendants' apps. These benefits include Defendants' collection and use of the California Plaintiffs' and the California Subclass' private and personally-identifiable information and the revenues and profits resulting from targeted advertising and other uses of the information Defendants have taken from California Plaintiffs and the California Subclass.

390.     Defendants have knowingly and willingly accepted and enjoyed these benefits.

391.     Defendants either knew or should have known that the benefits rendered by California Plaintiffs and the California Subclass were given and received with the expectation that

they would not take and use the private and personally-identifiable information that they have taken without permission. For Defendants to retain those benefits under these circumstances is inequitable.

392.    Through deliberate violation of California Plaintiffs' and the California Subclass' privacy interests and statutory and constitutional rights, Defendants reaped benefits that led to each Defendant wrongfully receiving profits.

393.    Equity demands disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of California Plaintiffs and the California Subclass.

394.    As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, California Plaintiffs and the California Subclass are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits and other compensation obtained by Defendants through this inequitable conduct

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request relief against Defendants as set forth below:

A.    Entry of an order certifying the proposed Class and Subclasses pursuant to Federal Rule of Civil Procedure 23;

B.    Entry of an Order appointing Plaintiffs as representatives of the Class and Subclasses;

C.    Entry of an Order appointing Plaintiffs' counsel as co-lead counsel of the Class and Subclasses;

D.     Entry of an Order for injunctive and declaratory relief as described herein, including but not limited to:

(i) enjoining Defendants from transmitting user data from the United States to China or to other locations where such data can be accessed from within China;

(ii) enjoining Defendants from collecting facial recognition data such as face geometries, including via the SenseTime SDK embedded into the Apps, contrary to user expectations;

(iii) enjoining Defendants from intercepting keywords, URLs, and videos, contrary to user expectations, sent in LINE Messenger chats that supposedly are encrypted end-to-end;

(iv) enjoining Defendants from taking and transmitting more private and personally-identifiable data than is reasonably necessary for operation of the Defendants' apps;

(v) enjoining Defendants from tracking users between the LINE Messenger and B612 apps, contrary to user expectations;

(vi) enjoining Defendants from taking and transmitting to anyone else the above-described user data;

(vii) requiring Defendants to re move from their apps all third party analytic libraries and SDKs that take and/or transmit user data;

(viii) requiring Defendants to destroy the user data taken pursuant to the above practices, including that user data in the possession of third parties;

(ix) requiring Defendants to provide confirmation that the above steps have been implemented;

E.      Entry of judgment in favor of each Class and Subclass member for damages suffered as a result of the conduct alleged herein, punitive damages, restitution, and disgorgement, to include interest and prejudgment interest;

F.      Award Plaintiffs reasonable attorneys' fees and costs; and

G.      Grant such other and further legal and equitable relief as the court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  October 28, 2022

By: */s/ Jonathan M. Rotter*

Kara M. Wolke - State Bar No. 241521
Marc L. Godino - State Bar No. 182689
Jonathan M. Rotter - State Bar No. 234137
Raymond D. Sulentic - State Bar No. 316913
Pavithra Rajesh - State Bar No. 323055
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067-2561
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Plaintiff Lee Shubert*

DATED:  October 28, 2022

By: */s/ Amy E. Keller*

Amy E. Keller (to apply pro hac vice)
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel. (312) 214.7900
akeller@dicellolevitt.com

*Attorneys for Plaintiff Lee Shubert*

DATED:  October 28, 2022

By: */s/ Marc E. Masters*

Ekwan E. Rhow - State Bar No. 174604
  erhow@birdmarella.com
Thomas R. Freeman - State Bar No. 135392
  tfreeman@birdmarella.com
Marc E. Masters - State Bar No 208375
  mmasters@birdmarella.com
**BIRD MARELLA BOXER WOLPERT NESSIM
DROOKS LINCENBERG & RHOW P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

*Attorneys for Plaintiffs Sydney Ji, June Abe, Kira
Tomlinson, Ranela Sunga, and Stefanie Bonner*

1   DATED:  October 28, 2022          By: */s/ Marc S. Williams*
_____

2
                                        Marc S. Williams – State Bar No. 198913
3                                         mwilliams@cohen-williams.com
                                        Youngbin Son – State Bar No. 324547
4                                         yson@cohen-williams.com
                                        **COHEN WILLIAMS LLP**
5                                       724 South Spring Street, 9th Floor
                                        Los Angeles, CA 90014
6                                       Tel: 213-232-5162
                                        Fax: 213-232-5167
7

8                                       *Attorneys for Plaintiffs Sydney Ji, June Abe, Kira*
                                        *Tomlinson, Ranela Sunga, and Stefanie Bonner*
9

10  DATED:  October 28, 2022          By: */s/ Lesley E. Weaver*
_____

11                                      Lesley E. Weaver – State Bar No. 191305
                                        Joshua Samra – State Bar No. 313050
12                                      **BLEICHMAR FONTI & AULD LLP**
                                        555 12th Street, Suite 1600
13                                      Oakland, California 94607
                                        Tel. (415) 445-4003
14                                      lweaver@bfalaw.com
                                        jsamra@bfalaw.com
15

16                                      *Attorneys for Plaintiffs Sydney Ji, June Abe, Kira*
                                        *Tomlinson, Ranela Sunga, and Stefanie Bonner*
17

18

19

20

21

22

23

24

25

26

27

28

**<u>ATTESTATION</u>**

I, Jonathan Rotter, am the ECF user whose identification and password are being used to file this document. In compliance with Local Rule 5-1(i)(3), I hereby attest that each of the Signatories herein concur in this filing.

DATED:  October 28, 2022

By: */s/ Jonathan M. Rotter*
Jonathan M. Rotter

## __PROOF OF SERVICE BY ELECTRONIC POSTING__

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On October 28, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 28, 2022, at Los Angeles, California.


_s/ Jonathan M. Rotter_
Jonathan M. Rotter

# EXHIBIT 1



**Figure 1**
(As of December 31, 2017)

EXHIBIT 2

# Figure 2

**(As of December 31, 2018)**



EXHIBIT 3



# Figure 3
**(As of December 31, 2019)**

# EXHIBIT 4

# Figure 4
**(As of December 31, 2020)**



EXHIBIT 5



**Figure 5**
**(Since March 2021)**