Jonathan M. Rotter – State Bar No. 234137
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067-2561
Tel.: (310) 201-9150
Fax.: (310) 201-9160
info@glancylaw.com

Amy E. Keller (admitted *pro hac vice*)
**DiCELLO LEVITT LLC**
Ten North Dearborn Street Sixth Floor
Chicago, Illinois 60602
Tel. (312) 214.7900
akeller@dicellolevitt.com

Marc E. Masters – State Bar No. 208375
**BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel.: (310) 201-2100
Fax.: (310) 201-2110
mmasters@birdmarella.com

Youngbin Son – State Bar No. 324547
**COHEN WILLIAMS LLP**
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Tel: 213-232-5162
Fax: 213-232-5167
yson@cohen-williams.com

Lesley E. Weaver – State Bar No. 191305
**BLEICHMAR FONTI & AULD LLP**
555 12th Street, Suite 1600
Oakland, California 94607
Tel. (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Attorneys for Plaintiffs and the Putative Class*
*Additional Counsel Appear on Signature Block*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sydney Ji, Lee Shubert, Kira Tomlinson, Ranela Sunga, and Stefanie Bonner, individually and on behalf of all others similarly situated,<br><br>   Plaintiff,<br><br>  vs.<br><br>NAVER CORPORATION, a corporation; NAVER CLOUD CORPORATION, a corporation; NAVER CLOUD AMERICA INC. f/k/a NAVER BUSINESS PLATFORM AMERICA INC., a corporation; SNOW CORPORATION, a corporation; SNOW INC., a corporation; Z HOLDINGS CORPORATION, a corporation; LINE CORPORATION, a corporation; LINE PLUS CORPORATION, a corporation; and LINE EURO-AMERICAS CORPORATION, a corporation.<br><br>   Defendants. | CASE NO. 4:21-cv-05143-HSG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS Z HOLDINGS CORPORATION, LINE CORPORATION, LINE PLUS CORPORATION, AND LINE EURO-AMERICAS CORPORATION'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT (ECF 112)**<br><br>Date: April 20, 2023<br>Time: 2:00 p.m.<br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Courtroom: 2 |

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................. 1

II.   ARGUMENT ................................................................................................... 2

    A.    This Court has specific jurisdiction over the foreign LINE Defendants .................. 2

        1.    The stream of commerce theory of purposeful availment ............................ 2

        2.    LINE Corp. purposefully directed its activities towards California .............. 3

            a.    The regular and substantial flow of App downloads in California satisfies the purposeful availment standard ...................................... 3

            b.    There is no "small percentage of sales" exception ............................ 5

            c.    Intent to serve California is also shown by failure to geo-block ....... 5

            d.    The App's special appeal to California residents satisfies the "something more" standard as well .................................................. 6

            e.    LINE Corp.'s knowledge that its business clients targeted California users also shows purposeful availment ........................... 9

                (i)     LINE E-A's conduct subjects LINE Corp. to specific jurisdiction under a direct availment theory ......................... 9

                (ii)    The agency theory of availment also applies ..................... 12

             f.    The alter ego doctrine applies because LINE Corp. used LINE E-A as a "marketing conduit" ................................................ 13

            g.    The LINE Friends store in Los Angeles is used as a marketing tool for promoting the App in California ....................................... 14

        3.    Z Holdings purposefully directed its activities towards California .............. 14

            a.    A holding company that plays an active role in a subsidiary's claim-related operations is subject to jurisdiction under direct availment and agency theories ....................................................... 14

            b.    Z Holdings plays an active role in the App's operations to benefit both the App and Z Holdings' other business interests ................... 15

        4.    LINE Plus purposefully directed its activities towards California .............. 16

        5.    Defendants knew that targeting the forum would harm App users .............. 17

        6.    Plaintiffs' claims "arise out of" or are "related to" the California forum in which the Apps were downloaded and the injury occurred .................... 18

        7.    Defendants have not shown that jurisdiction would be unreasonable ......... 19

        8.    Alternatively, Defendants are subject to jurisdiction under Rule 4(k)(2) .... 20

    B.    Plaintiffs adequately allege Article III standing .................................................. 20

1.      Plaintiffs adequately allege concrete injury in fact ...................................... 20

     a.      Plaintiffs adequately allege invasion of privacy harm ................... 20

     b.      Plaintiffs adequately allege harm to their property ........................ 21

     c.      Plaintiffs allege a material risk of future harm ............................... 21

2.      Plaintiffs' injuries are traceable to Defendants' conduct ............................ 22

C.      Plaintiffs adequately plead their claims ................................................ 23

1.      Plaintiffs properly plead group conduct under Rules 8 and 9(b) ................ 23

2.      The FAC alleges intrusion upon seclusion and invasion of privacy ........... 25

     a.      Plaintiffs had a reasonable expectation of privacy ......................... 25

     b.      Defendants' conduct was "highly offensive" .................................. 27

3.      Plaintiffs state a claim for violation of the UCL and FAL ........................... 27

     a.      Plaintiffs have standing to bring UCL and FAL claims ................. 27

     b.      Plaintiffs state claims under the unlawful and unfair prongs ......... 29

     c.      Plaintiffs plead reliance .................................................................. 30

4.      Plaintiffs state claims for violation of CIPA and ECPA ............................. 30

5.      Plaintiffs state a claim for violation of the CFAA ...................................... 32

6.      Plaintiffs state a claim for violation of the Illinois BIPA ............................ 33

7.      Plaintiffs state a claim for larceny ............................................................ 33

8.      Plaintiffs state a claim for conversion ....................................................... 35

9.      Plaintiffs state a claim for unjust enrichment ............................................ 35

10.      Plaintiffs are entitled to equitable relief, including an injunction ............... 36

III.      CONCLUSION ............................................................................................ 37

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

CASES

*Adler v. Community.com, Inc.*,
2021 WL 4805435 (C.D. Cal.) ................................................................................................ 31

*Ainsworth v. Moffett Eng'g, Ltd.*,
716 F.3d 174 (5th Cir. 2013) ........................................................................................... 2, 4, 7

*Asahi Metal Indus. Co. v. Sup. Ct.*,
480 U.S. 102 (1987) ........................................................................................................ 2, 3, 9

*Astiana v. Hain Celestial Group, Inc.*,
783 F.3d 753 (9th Cir. 2015) ................................................................................................. 36

*Ayla, LLC v. Alya Skin Pty. Ltd.*,
11 F.4th 972 (9th Cir. 2021) ................................................................................................... 5

*Bass v. Facebook, Inc.*,
394 F.Supp.3d 1024 (N.D. Cal. 2019) ................................................................................... 28

*Blizzard Ent., Inc. v. Joyfun Inc. Co.*,
2020 WL 1972284 (C.D. Cal.) ......................................................................................... 12, 14

*Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cnty.*,
137 S. Ct. 1773 (2017) ............................................................................................................ 3

*Brodsky v. Apple Inc.*,
445 F.Supp.3d 110 (N.D. Cal. 2020) ............................................................................... 31, 32

*Brown v. Google LLC*,
2021 WL 6064009 (N.D. Cal.) ......................................................................................... 28, 29

*Brown v. Google LLC*,
2022 WL 17961497 (N.D. Cal.) ............................................................................................. 36

*Brown v. Google LLC*,
525 F.Supp.3d 1049 (N.D. Cal. 2021) ................................................................................... 35

*Bruton v. Gerber Prods. Co.*,
703 F.App'x 468 (9th Cir. 2017) ............................................................................................ 35

*Burger King v. Rudzewicz*,
471 U.S. 462 (1985) ............................................................................................................... 19

*Calder v. Jones*,
465 U.S. 783 (1984) ............................................................................................................... 17

*Calhoun v. Google LLC*,
526 F.Supp.3d 605 (N.D. Cal. 2021) ............................................................................. passim

*Cambridge Literary Props. v. W. Goebel Porzellanfabrik G.m.b.H & Co. Kg.*,
295 F.3d 59 (1st Cir. 2002) .................................................................................................... 19

*Campbell v. Facebook, Inc.*,
  77 F. Supp. 3d 836 (N.D. Cal. 2014) .......................................................... 28

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018) ........................................................................ 12

*Chien v. Bumble Inc.*,
  2022 WL 17069842 (S.D. Cal.) ................................................. 6, 14, 15, 16

*Cohodes v. Mimedx Grp., Inc.*,
  2022 WL 15523079 (N.D. Cal.) ................................................................ 13

*Cothron v. White Castle Sys., Inc.*,
  467 F.Supp.3d 604, 617 (N.D. Ill. 2020) ................................................... 33

*CTC Real Est. Servs. v. Lepe*,
  140 Cal.App.4th 856 (2006) ...................................................................... 33

*D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*,
  566 F.3d 94 (3d Cir. 2009) ........................................................................ 12

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ................................................................................ 3, 12

*Doe v. Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001) ..................................................................... 13

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ................................................................................... 37

*Elgindy v. AGA Serv. Co.*,
  2021 WL 1176535 (N.D. Cal.) ................................................................... 37

*Estate of Saunders v. Comm'r*,
  745 F.3d 953 (9th Cir. 2014) ..................................................................... 18

*Fondren v. Schmidt*,
  626 F.Supp. 892 (D. Nev. 1986) ................................................................ 25

*Ford Motor Co. v. Mont. Eighth Jud. Distr. Ct.*,
  141 S. Ct. 1017 (2021) ............................................................................... 18

*Fremont Indem. Co. v. Fremont Gen. Corp.*,
  148 Cal.App.4th 97, 119 (2007) ................................................................ 35

*Friedman v. AARP, Inc.*,
  855 F.3d 1047 (9th Cir. 2017) ................................................................... 30

*G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*,
  958 F.2d 896 (9th Cir. 1992) ..................................................................... 33

*Gevorkyan v. Bitmain Technologies Ltd.*,
  2022 WL 3702093 (N.D. Cal.) ..................................................................... 4

*Gourdine v. Karl Storz Endoscopy-Am., Inc.*,
  223 F.Supp.3d 475 (D.S.C. 2016) ............................................................... 9

*Griffey v. Magellan Health Inc.*,
　2022 WL 1811165 (D. Ariz.) ......................................................................... 28

*Heard v. Becton, Dickinson & Co.*,
　524 F.Supp.3d 831 (N.D. Ill. 2021) .............................................................. 33

*hiQ Labs, Inc. v. LinkedIn Corp.*,
　31 F.4th 1180 (9th Cir. 2022) ........................................................................ 32

*Holley v. Gilead Scis., Inc.*,
　379 F.Supp.3d 809 (N.D. Cal. 2019) ............................................................ 18

*In re Adobe Sys., Inc. Priv. Litig.*,
　66 F.Supp.3d 1197 (N.D. Cal. 2014) ............................................................ 30

*In re Carrier IQ, Inc.*,
　78 F.Supp.3d 1051 (N.D. Cal. 2015) ............................................................ 31

*In re Facebook Priv. Litig.*,
　572 Fed.App'x 494 (9th Cir. 2014) .............................................................. 36

*In re Facebook, Inc. Internet Tracking Litig.*,
　956 F.3d 589 (9th Cir. 2020)................................................................... *passim*

*In re Facebook, Inc., Cons. Priv. User Profile Litig.*,
　402 F.Supp.3d 767 (N.D. Cal. 2019) ..................................................... 20, 25

*In re Google Android Cons. Priv. Litig.*,
　2013 WL 1283236 (N.D. Cal.) ...................................................................... 21

*In re Google Assistant Priv. Litig.*,
　457 F.Supp.3d 797 (N.D. Cal. 2020) ............................................................ 29

*In re Google Inc. Cookie Placement Cons. Priv. Litig.*,
　806 F.3d 125 (3d Cir. 2015) ................................................................ 26, 27, 31

*In re Google Inc. Gmail Litig.*,
　2013 WL 5423918 (N.D. Cal.) ...................................................................... 32

*In re Google RTB Cons. Priv. Litig.*,
　2022 WL 2165489 (N.D. Cal.) ...................................................................... 27

*In re Google, Inc. Priv. Pol'y Litig.*,
　58 F.Supp.3d 968 (N.D. Cal. 2014) ..................................................... 21, 23, 28

*In re iPhone Application Litig.*,
　6 F.Supp.3d 1004 (N.D. Cal. 2013) ...................................................... 21, 28

*In re Meta Pixel Healthcare Litig.*,
　2022 WL 17869218 (N.D. Cal.)........................................................... 26, 36, 37

*In re Pac. Fertility Ctr. Litig.*,
　2019 WL 3753456 (N.D. Cal.)....................................................................... 23

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
　996 F.Supp.2d 942 (S.D. Cal. 2014) ............................................................ 30

*In re Testosterone Replacement Therapy Prods. Liab. Litig. Coord. Pretrial Proc.*,
   136 F.Supp.3d 968 (N.D. Ill. 2015) ................................................................. 5

*In re Vizio, Inc., Cons. Priv. Litig.*,
   238 F.Supp.3d 1204 (C.D. Cal. 2017) ............................................................ 23

*In re Zappos.com, Inc.*,
   888 F.3d 1020 (9th Cir. 2018) ................................................................. 20, 22

*In re Zoom Video Commc'n Inc. Priv. Litig.*,
   525 F.Supp.3d 1017 (N.D. Cal. 2021) ............................................................ 29

*In re Zynga Priv. Litig.*,
   750 F.3d 1098 (9th Cir. 2014) ................................................................. 26, 31

*In re: Qualcomm Antitrust Litig.*,
   2023 WL 121983 (N.D. Cal.) ........................................................................ 28

*J. McIntyre Machinery, Ltd. v. Nicastro*,
   564 U.S. 873 (2011) ............................................................................. *passim*

*Jacobs v. Hanwha Techwin Am., Inc.*,
   2021 WL 3172967 (N.D. Ill.) ........................................................................ 33

*Johal v. FedEx Corp.*,
   2022 WL 10075380 (S.D. Ind.) ................................................................. 12, 15

*Keeton v. Hustler Magazine*,
   465 U.S. 770 (1984) ................................................................................ 4, 5

*Kellman v. Spokeo, Inc.*,
   2022 WL 1157500 (N.D. Cal.) ....................................................................... 37

*Klein v. Facebook, Inc.*,
   580 F.Supp.3d 743 (N.D. Cal. 2022) ............................................................ 28

*Kwikset Corp. v. Sup. Ct.*,
   51 Cal.4th 310 (2011) ................................................................................ 27

*Lang Van, Inc. v. VNG Corp.*,
   40 F.4th 1034 (9th Cir. 2022) ..................................................................... 3, 6

*Lectrodryer v. SeoulBank*,
   77 Cal.App.4th 723 (2000) .......................................................................... 35

*Lewis v. Mercedez-Benz USA, LLC*,
   530 F.Supp.3d 1183 (S.D. Fla. 2021) ........................................................... 10

*Low v. LinkedIn Corp.*,
   900 F.Supp.2d 1010 (N.D. Cal. 2012) ...................................................... 26, 28

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................................. 22

*Marek v. Molson Coors Beverage Co.*,
   580 F.Supp.3d 848 (N.D. Cal. 2022) ............................................................ 36

*Marks v. United States*,
430 U.S. 188 (1977) ..................................................................................................... 2

*Mavrix Photo, Inc. v. Brand Technologies, Inc.*,
647 F.3d 1218 (9th Cir. 2011) .............................................................................. 7, 9, 11

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) ................................................................................... 12

*Maxim v. Guangzhou NetEase Comput. Sys. Co., Ltd.*,
2021 WL 4839579 (C.D. Cal.) .................................................................................... 13

*Meyer v. Portfolio Recovery Assocs., LLC*,
707 F.3d 1036 (9th Cir. 2012) .................................................................................... 37

*Michael Grecco Prod., Inc. v. Netease, Inc.*,
2019 WL 3245872 (N.D. Cal.) .................................................................................... 12

*Michigan Motor Tech. LLC v. Volkswagen Aktiengeselischaft*,
2020 WL 3893038 (E.D. Mich.) .................................................................................. 10

*Munning v. Gap, Inc.*,
2016 WL 6393550 (N.D. Cal.) ........................................................................ 23, 24, 25

*Naftzger v. Am. Numismatic Soc'y*,
42 Cal.App.4th 421 (1996), *as modified on denial of reh'g* (Mar. 4, 1996) ........................... 34

*Orshan v. Apple Inc.*,
2018 WL 1510202 (N.D. Cal.) .................................................................................... 29

*Padilla v. Nevada Dep't of Corr.*,
510 F.App'x 629 (9th Cir. 2013) ................................................................................. 23

*Patel v. Facebook, Inc.*,
932 F.3d 1264 (9th Cir. 2019) .............................................................................. 20, 25

*People v. Allen*,
21 Cal.4th 846 (1999) ................................................................................................. 34

*People v. Gould*,
111 Cal.App.2d 1 (1952) ............................................................................................. 34

*Plixer Int'l, Inc. v. Scrutinizer GmbH*,
905 F.3d 1 (1st Cir. 2018) ..................................................................................... 2, 4, 6

*Quarmby v. Rexon Indus. Corp. Ltd.*,
2022 WL 17812965 (S.D.N.Y.) ..................................................................................... 3

*Rickman v. BMW of N. Am. LLC*,
538 F.Supp.3d 429 (D.N.J. 2021) ................................................................................. 9

*Rutherford Holdings, LLC v. Plaza Del Rey*,
223 Cal.App.4th 221 (2014) ....................................................................................... 36

*Shin v. BMW of N. Am.*,
2009 WL 2163509 (C.D. Cal.) ..................................................................................... 30

*Siry Inv., L.P. v. Farkhondehpour,*
   13 Cal.5th 333 (2022) .................................................................................................. 34

*SK Trading Int'l Co., Ltd. v. Sup. Ct.,*
   77 Cal.App.5th 378 (2022), *review denied* (July 13, 2022) ...................................... 14

*Sloan v. General Motors LLC,*
   287 F.Supp.3d 840 (2018) .......................................................................................... 19

*Sonner v. Premier Nutrition Corp.,*
   971 F.3d 834 (9th Cir. 2020) ...................................................................................... 37

*Sussex Fin. Enterprises, Inc. v. Bayerische Hypo-und Vereinsbank AG,*
   2010 WL 94272 (N.D. Cal.) .......................................................................... 23, 24, 25

*Svenson v. Google, Inc.,*
   2015 WL 1503429 (N.D. Cal.) .................................................................................... 29

*Taylor v. Forte Hotels Int'l,*
   235 Cal.App.3d 1119 (1991) ...................................................................................... 35

*Theriot v. Louis Vuitton N. Am., Inc.,*
   2022 WL 17417261 (S.D.N.Y.) .................................................................................. 33

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ................................................................................................ 21

*United States v. Toyota Motor Corp.,*
   561 F.Supp. 354 (C.D. Cal. 1983) .............................................................................. 13

*Walden v. Fiore,*
   571 U.S. 277 (2014) .................................................................................................... 12

*Will Co., Ltd. v. Lee,*
   47 F.4th 917 (9th Cir. 2022) ........................................................................ 4, 5, 17, 20

*Williams v. Facebook, Inc.,*
   384 F.Supp.3d 1043 (N.D. Cal. 2018) ........................................................... 35, 36, 38

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
   433 F.3d 1199 (9th Cir. 2006) .............................................................................. 2, 17

*Yoon v. Lululemon USA, Inc.,*
   549 F.Supp.3d 1073 (C.D. Cal. 2021) ........................................................................ 31

*Zeiger v. WellPet LLC,*
   526 F.Supp.3d 652 (N.D. Cal. 2021) .......................................................................... 37

**STATUTES**

18 U.S.C. § 1030(a)(2)(C) .............................................................................................. 32

Cal. Civ. Code § 1798.140(v)(1) .................................................................................... 27

Cal. Penal Code § 496 ............................................................................................. 33, 34

Cal. Penal Code § 632.7(a) ............................................................................................ 30

1

**RULES**

Fed. R. Civ. P. 4(k)(2) ................................................................................................ 20

Fed. R. Civ. P. 8 ................................................................................................... 23, 25

Fed. R. Civ. P. 9(b) ......................................................................................... 23, 25, 29

**OTHER AUTHORITIES**

Rest. (3d) of Agency § 1.01 (2006) ............................................................................ 12

Plaintiffs Sydney Ji, Lee Shubert, Kira Tomlinson, Ranela Sunga, and Stefanie Bonner ("Plaintiffs"), submit this Opposition to the Motion to Dismiss ("Mot.") filed by Z Holdings Corp., LINE Corp., LINE Plus Corp., and LINE Euro-Americas Corp. ("Defendants") (ECF 112).

## I.  **INTRODUCTION**

This case concerns the privacy rights of millions of Californians and other Americans. The Defendants, acting in concert with SenseTime, a China-based company, took private data to which they were not entitled. In addition, they also exposed other information to China-based hackers. Various governments have taken notice of this illicit conduct, with the Biden Administration sanctioning SenseTime for being a Non-SDN Chinese Military-Industrial Complex Company and the Japanese government barring its employees from using one of the two Apps at issue here.

This lawsuit raises serious privacy issues involving the unlawful collection of face geometry scans and the videos, URLs, and key words in personal messages that users intended to keep private. Plaintiffs have invested significant resources to uncovering this illegal conduct, having conducted an in-depth technical investigation to illuminate Defendants' data practices, and an international factual investigation, including from Japanese and Korean language sources, to establish Defendants' direct connection to the alleged misconduct—these connections are far deeper and more consequential than Defendants' declarations portray—and to confirm how Defendants purposefully targeted the California market.

Plaintiffs likewise have taken seriously the Court's Order dismissing with leave to amend the original complaint, ECF 99 (the "Order"), and conducted additional research and amplified the allegations in an attempt to satisfy the Court's concerns. Certain details will remain in the exclusive province of Defendants until discovery, but Plaintiffs have exhaustively mined the publicly available record and carefully delineated each Defendant's role in the misconduct in the body of the First Amended Complaint (the "FAC") as well as in each of the causes of action to clarify which Defendant committed which violation and how.

The resulting 102-page FAC presents the results of Plaintiffs' comprehensive investigation to date. In this brief, Plaintiffs have directed this Court to key allegations in the FAC to respond to the multitude of meritless arguments raised in the Motion, but the FAC—when read in its entirety—

1   rebuts each of those arguments and presents this Court with the full range of facts necessary to deny

2   Defendants' Motion. Plaintiffs respectfully believe that they have satisfied their burden at this pre-

3   discovery pleading stage such that they can move forward to address in discovery the important

4   privacy issues alleged in detail in the FAC.

5   **II.    ARGUMENT**

6      **A.    This Court has specific jurisdiction over the foreign LINE Defendants**

7         Specific jurisdiction is analyzed under a three-prong test: "(1) The non-resident defendant

8   must purposefully direct his activities … [at] the forum or resident thereof; or perform some act by

9   which he purposefully avails himself of the privilege of conducting activities within the forum,

10  thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out

11  of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must

12  comport with fair play and substantial justice, i.e., it must be reasonable." *Yahoo! Inc. v. La Ligue*

13  *Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). The first prong may be

14  satisfied by either purposeful direction or availment, or some combination of both. *Id.*

15         **1.    The stream of commerce theory of purposeful availment**

16         The controlling "stream of commerce" test for specific jurisdiction is set forth in Justice

17  Breyer's *precedential* concurrence in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011).[1]

18  Justice Breyer first rejected the "stream of commerce plus" theory, which was applied in the non-

19  precedential plurality opinion in *Asahi Metal Indus. Co. v. Sup. Ct.*, 480 U.S. 102, 112 (1987): that a

20  foreign defendant causing its product to be placed in the U.S. stream of commerce could *only* be sued

21  in those states—if any—that the defendant can "be said to have targeted." *McIntyre*, 564 U.S. at 890

22  (Breyer, J., concurring). Justice Breyer, joined by Justice Alito and the three dissenters, rejected the

23  plurality's position that the stream of commerce plus theory was the *sole basis* for specific

24  jurisdiction. Justices Breyer and Alito, joined by the plurality, also rejected a broad standard that

25  would have subjected a foreign defendant to jurisdiction in any state where its product happens to

---

[1] Justice Breyer's concurrence, joined by Justice Alito, is controlling under the rule of *Marks v. United States*, 430 U.S. 188, 193 (1977), as the position taken by justices who concurred in the judgment on the narrowest grounds. *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 10 (1st Cir. 2018); *accord Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013).

1   land. *Id.* at 890–91.

2       Justice Breyer then articulated the *two separate paths* to specific jurisdiction over a foreign

3   defendant who causes its product to be placed in the national stream of commerce. *First*, a defendant

4   whose product is distributed on a nationwide basis *without targeting any particular state* is subject

5   to jurisdiction in *any state* where there is a "'regular … flow' or 'regular course of sales.'" *Id.* at 889.

6   *Second*, absent a regular flow or course of sales in the forum state, "something more" than the

7   product's appearance in the forum state is required to show purposeful availment, which is

8   substantially similar to the *Asahi* plurality's stream of commerce plus standard. *Id.* This two-path

9   standard remains binding precedent. *See Quarmby v. Rexon Indus. Corp. Ltd*., 2022 WL 17812965,

10  \*6 n.12 (S.D.N.Y.) ("Justice Breyer's concurrence in *McIntyre* appears unchanged by more recent

11  decisions of the Supreme Court.") (citing *Daimler AG v. Bauman*, 571 U.S. 117, 129 (2014) and

12  *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1783 (2017)).

13                  **2.    LINE Corp. purposefully directed its activities towards California**

14      LINE Corp. states that it owned and operated the LINE Messenger App at all relevant times.

15  Irie Decl. ¶4, ECF 112-3; FAC ¶71.[2] LINE Corp. also states that it owned and operated the B612

16  App until 2017. Irie Decl. ¶5; ¶72. The B612 App is still promoted as part of the "LINE Family

17  Apps" and remains accessible for download *within* the LINE Messenger App. ¶72. Because access

18  to the B612 App is included in the LINE Messenger App and promoted as one of the "Line Family

19  Apps," references to the LINE Messenger App below encompass the bundled B612 App.

20              **a.    The regular and substantial flow of App downloads in California**
               **satisfies the purposeful availment standard**

21      LINE Corp., which claims to be the "sole operator" of the LINE Messenger App (Irie Decl.

22  ¶4), placed its App in the Google Play Store and Apple App Store (¶26) where it has been downloaded

23  by at least *25 million* registered users in the United States. Declaration of Ron Berman ("Berman

24  Decl.") ¶¶5–7. By distributing its App "on platforms such as the Google Play store and Microsoft

25  App store," LINE Corp. has "purposefully availed itself of the privilege of conducting business in

26  the United States." *Lang Van, Inc. v. VNG Corp*., 40 F.4th 1034, 1042 (9th Cir. 2022). Given LINE

27

28  ─────────────────────
    [2] All following ¶ and Ex. references are to the FAC unless another source is specifically identified.

PLAINTIFFS' OPP. TO LINE DEFENDANTS' MOT.                           No. 4:21-cv-05143-HSG
TO DISMISS FAC

Corp.'s volitional entry of the App into the national stream of commerce, the question under the first *McIntyre* standard is whether there is a regular and substantial flow of downloads in California.

The First Circuit applied the "regular flow or regular course of sales" standard in *Plixer*. 905 F.3d at 10. After ruling that Justice Breyer's concurrence was binding precedent, the Circuit observed that the regular flow or course of sales rule is consistent with *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984). In *Keeton*, the Supreme Court upheld the exercise of jurisdiction because the defendant magazine publisher had "continuously and deliberately exploited the [forum] market." *Plixer*, 905 F.3d at 11 (quoting *Keeton*, 465 U.S. at 781). "The magazine publisher had a nationwide market—it had not targeted the forum particularly—but the court held it should reasonably anticipate suit based on its 'substantial number of' sales." *Id.* (quoting *Keeton*, 465 U.S. at 781). The defendant in *Plixer* operated an interactive website providing cloud-based software services and had ***156 customers*** in the forum state over a ***three-year*** period. This satisfied the regular flow or course of sales standard. *Id.* at 4–5.

Similarly, the Fifth Circuit in *Ainsworth*, held that the foreign-manufacturer defendant was subject to jurisdiction in Mississippi because the manufacturer's independent U.S. distributor sold ***203*** of the manufacturer's forklifts in the state over a ***ten-year*** period of time, which was "a far cry from the single sale in *McIntyre*." 716 F.3d at 178; *accord Gevorkyan v. Bitmain Technologies Ltd.*, 2022 WL 3702093, *2 (N.D. Cal.) (relying on *Keeton* in holding that a Chinese manufacturer that sold 66,000 cryptocurrency mining devices to customers in California must reasonably anticipate being hauled into court in California).

Plaintiffs lack access to data establishing the precise number of registered LINE Messenger users in California. LINE Corp. has failed to submit that data, which is accessible to it. Berman Decl. ¶23. However, expert analysis reveals that there are somewhere between *3 to 8.5 million* registered users in California. Berman Decl. ¶¶15, 19, 20. This is more than enough to meet the regular flow or course of sales standard. *Will Co., Ltd. v. Lee*, 47 F.4th 917, 927 (9th Cir. 2022) (reversing dismissal for lack of personal jurisdiction, noting 1.3 million website visits is "an undeniably 'substantial' number"). This alone establishes specific jurisdiction.

Alternatively, jurisdictional discovery should be granted if the Court nevertheless requires

more specific data, which is only accessible to Defendants. *See In re Testosterone Replacement Therapy Prods. Liab. Litig. Coord. Pretrial Proc.*, 136 F.Supp.3d 968, 976 (N.D. Ill. 2015) (showing of national sales figures sufficient to trigger jurisdictional discovery on sales within the forum states).

### b. There is no "small percentage of sales" exception

LINE Corp. contends that no matter how many registered LINE Messenger users reside in California, it cannot be deemed to have purposefully availed itself of the California forum—or any forum in the United States—because "99.2% of [the App's] daily users are located outside of the United States." Mot. at 5.

First, Plaintiffs' claims are not limited to "daily users" because the alleged misconduct subjects all App users to privacy injury, not just frequent users. Berman Decl. ¶4. And there are somewhere between 3 to 6 million registered LINE Messenger users in California and more than twice as many users in California than in any other state. *Id.* ¶¶14–15, 19–21. While the number of B612 users in California cannot be estimated given the lack of publicly available information, the number is unquestionably substantial given that 400,000 U.S. residents have downloaded B612 from the Apple App Store *alone* and a large share of Google searches for B612 are from California residents. *Id.* ¶¶12, 13(c).

Second, and more fundamentally, the Ninth Circuit has twice held that the *percentage* of users located outside of the forum state is *immaterial* to the purposeful availment analysis: "As *Keeton* demonstrates, there is no 'small percentage of sales' exception to the purposeful availment principles" and therefore a defendant's "sales to the forum are no less substantial simply because the company sold more products elsewhere." *Ayla, LLC v. Alya Skin Pty. Ltd*., 11 F.4th 972, 981 (9th Cir. 2021). The Ninth Circuit made the same point again in *Will Co.*, 47 F.4th at 927: "While just 4.6% of [website] views occurred in the United States during the relevant period, that amounted to over 1.3 million visits, an undeniably 'substantial' number."

### c. Intent to serve California is also shown by failure to geo-block

In the absence of a regular flow into the forum state, purposeful availment may be shown by "something more" than placing the product in the national stream of commerce. *McIntyre*, 564 U.S. at 889. That standard is satisfied here due to LINE Corp.'s volitional acts of (1) placing the App in

the national stream of commerce through the Apple and Google stores, and (2) choosing not to use geo-blocking tools to prevent Californians from registering for, or using it.

The Ninth Circuit recently held that where geo-blocking technology is available, a defendant's decision not to geo-block viewers of a website who reside in the forum state reflects an intent to serve residents of the forum state. In doing so, it relied on *Plixer*: "The First Circuit has stated that '[i]f a defendant tries to limit U.S. users' ability to access its website ... that is surely relevant to its intent not to serve the United States' and that the 'converse is [also] true,' such that the defendant's 'failure to implement such restrictions, coupled with its substantial U.S. business, provides an objective measure of its intent to serve customers in the U.S. market.'" *Lang Van*, 40 F.4th at 1042–43 (quoting *Plixer*, 905 F.3d at 9). Thus, the *Lang Van* defendant's failure to use available geo-blocking technology to prevent website access in the relevant forum—there, the United States—subjected it to personal jurisdiction in that forum. *Id.*

The same rationale applies to mobile apps because geo-blocking technology is available to prevent residents in select states (or even area codes) from using Apps. Berman Decl. ¶24. Indeed, the Apple App Store's guidelines for businesses warn operators of cannabis, gaming, gambling, and lottery Apps that they *must* use geo-blocking technology to ensure that their Apps are not used in states where such activities are not permitted.[3] Thus, LINE Corp.'s decision to make the App available in California by not using geo-blocking technology reflects its intent to serve the California market and thereby establishes purposeful availment. *Lang Van*, 40 F.3d at 1042–43; *see also Chien v. Bumble Inc.*, 2022 WL 17069842, *8 n.7 (S.D. Cal.) ("the App's availability for download in California was not mere happenstance but requires some permissive action by [defendant] for it to be available in this forum").

### d. The App's special appeal to California residents satisfies the "something more" standard as well

The "something more" standard is also met by "special state-related design, advertising, advice, marketing, or *anything else*" that may indicate the foreign defendant's intent or purpose to

---

[3] Apple Developers for Apple App Store, *App Store Review Guidelines*, §§ 5.1.1(ix), 5.3.4, https://developer.apple.com/app-store/review/guidelines/#business (last updated Oct. 24, 2022).

serve the forum state. *McIntyre*, 564 U.S. at 889 (emphasis added). As Justice Breyer implied in *McIntyre*, the defendant manufacturer of a metal-shearing machine would likely have been subject to "something more" jurisdiction had the plaintiff presented evidence that the forum state was home to the largest scrap-metal market in the country. *Id.* at 889–90.

The "something more" standard is therefore met where there are special characteristics of the forum state that make it a predictably fertile market for the defendant's product—thereby making it foreseeable that the product will inevitably (not just possibly) find its way to the forum state. This standard was met in *Ainsworth*, where the foreign defendant manufactured a forklift designed for poultry-related uses. Because the plaintiff showed that Mississippi, the forum state, is the fourth largest poultry-producing state, the foreign manufacturer could reasonably have expected that its independent U.S. distributor would inevitably sell forklifts in Mississippi. *Id.* at 179.

Similarly, in *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218 (9th Cir. 2011), an Ohio-based defendant operated a celebrity-gossip website accessed by millions across the United States. *Id.* at 1222. The record did not reflect (1) the number of website visitors who reside in California or (2) whether the defendant marketed the website in California. *Id.* at 1222, 1230. The content of the website, however, was particularly appealing to Californians due to its "special focus on the California-centered celebrity and entertainment industries." *Id.* at 1230. Thus, "[b]ased on the website's subject matter, as well as the size and commercial value of the California market, [the Ninth Circuit] conclude[d] that [defendant] anticipated, desired, and achieved a substantial California viewer base." *Id.*

The "something more" standard is satisfied here due to special characteristics of the California market. The App is the most popular Messaging App in Japan, "where it boasts over 85 million monthly users [in a country with a population of 125 million] and is so prevalent the nation's government relies on it as a channel for digital services."[4] It is also the most popular Messaging App

---

[4] Simon Sharwood, *Japanese messaging giant Line admits it mishandled user data, promises to do better*, THE REGISTER (Oct. 19, 2021),
https://www.theregister.com/2021/10/19/line_data_governance_report/.

in Thailand and Taiwan, and the second most popular App in Indonesia.[5] California's status as the state with the greatest number of residents who carry full or partial ancestry from each of those countries makes it a ready-made market for the App. Berman Decl. ¶16. And from a content perspective, the App has a strong appeal to Japanese anime culture,[6] which is extremely popular in Los Angeles, which hosts the largest anime convention in North America.[7] The App's connection to Japanese anime is attributable to its popular "stickers," which are "giant emojis" that "live within the app" and are used for expressing emotions and thoughts while texting.[8] The stickers depict LINE's "hyperlovable" anime characters,[9] including the "Brown & Friends" characters who now have their own series on Netflix.[10] As Netflix's director of original animation explained, "[t]he band of adorable Brown & Friends characters has been a part of many fans' daily lives since they [were] created as stickers on Line mobile messengers."[11] This too makes the App predictably more popular in California than in other states. Berman Decl. ¶18.

Indeed, expert analysis shows that the LINE Messenger App is *more than twice as popular* in California than in any of the forty-nine other states. *Id.* ¶14.

---

[5] Thailand Redcat, *The 3 Most Popular Messenger Apps in Thailand* (Jan. 30, 2020), https://www.thailandredcat.com/the-most-popular-messenger-apps-in-thailand/;
Leads to Success, *Taiwan Social Media: How to use LINE app for Business* (Oct. 13, 2020), https://leadstosuccess.me/2020/10/13/taiwan-social-media-how-to-use-line-app-for-business/;
Umar Rahaded, Erna Puspitasari, Dian Hidayati, *The most popular mobile instant messaging in Indonesia (Population Review and Census, 2019) Chart*, (Jan. 2020), https://www.researchgate.net/figure/The-most-popular-mobile-instant-messaging-in-IndonesiaPopulation-Review-and-Census_fig1_338942189.

[6] Angelica Soroka, *Exploring Anime — a Global Entertainment Phenomenon from Japanese Culture*, SKETCHAR MEDIA, https://blog.sketchar.io/exploring-anime-a-global-entertainment-phenomenon-from-japanese-culture/ (last visited Feb. 3, 2023).

[7] ANIME EXPO, https://www.anime-expo.org/ (last visited Feb. 3, 2023).

[8] Carley Garcia, *LINE: How Japan Communicates*, OTAQUEST (Mar. 24, 2021, 6:54 AM), https://www.otaquest.com/line-how-japan-communicates/.

[9] Harry McCracken, *How Japan's Line App Became A Culture-Changing, Revenue-Generating Phenomenon*, FAST COMPANY (Feb. 19, 2015), https://www.fastcompany.com/3041578/how-japans-line-app-became-a-culture-changing-revenue-generat.

[10] Garcia, *supra* note 8.

[11] Jake Kanter, *Netflix Orders Animated Series Based On Characters From A Japanese Messaging App*, DEADLINE (Dec. 11, 2019), https://deadline.com/2019/12/netflix-animated-series-line-friends-1202806424/.

Just as the celebrity-gossip website in *Mavrix* was particularly appealing to Californians due to the state's "California-centered celebrity and entertainment industries" (*Mavrix*, 647 F.3d at 1230), LINE Messenger's extraordinary popularity in Japan, Taiwan, Thailand, and Indonesia, together with appeal to fans of Japanese anime, make the App uniquely and therefore predictably appealing in the California market. Thus, "consumption" of the celebrity-culture website by Californians in *Mavrix* and the downloading of LINE's App by Californians here "are a predictable consequence of the [defendant's] business models" and therefore cannot be characterized as "'random,' 'fortuitous,' or 'attenuated.'" *Id.* And the fact that LINE Corp. *continues* to make the App available in California—with knowledge of the App's now-established success in the state—further demonstrates its purposeful availment.

### e. LINE Corp.'s knowledge that its business clients targeted California users also shows purposeful availment

In addition to LINE Corp.'s purposeful availment as shown above, LINE Corp. targeted California through California-based subsidiary LINE Euro-Americas Corp.'s ("LINE E-A") successful marketing of California businesses and App subscribers under direct availment, agency, and alter ego theories of jurisdiction.

### (i) LINE E-A's conduct subjects LINE Corp. to specific jurisdiction under a direct availment theory

Direct purposeful availment is shown where, as here, a foreign defendant that makes its product available on a nationwide basis knows that Californians are being *targeted* by the foreign defendant's marketers. *Mavrix*, 647 F.3d at 1230. "Under a direct availment theory, rather than an agency theory, a manufacturer's use of a 'sales agent in the forum State' gives rise to personal jurisdiction, not because the agent's acts are imputed to the principal, but because the very act of 'marketing the product through a distributor who has agreed to serve as the sales agent in the forum State' is in itself an act purposefully directed toward the forum." *Gourdine v. Karl Storz Endoscopy-Am., Inc.*, 223 F.Supp.3d 475, 487 (D.S.C. 2016) (quoting *Asahi*, 480 U.S. at 112); *accord Rickman v. BMW of N. Am. LLC*, 538 F.Supp.3d 429, 437 (D.N.J. 2021). "Many courts have held that a foreign manufacturer that utilizes an American subsidiary to target distribution of its product to the forum state is appropriately subject to those states' jurisdiction." *Lewis v. Mercedes-Benz USA, LLC*, 530

1  F.Supp.3d 1183, 1239 (S.D. Fla. 2021) (citing cases); *see also Michigan Motor Tech. LLC v.*

2  *Volkswagen Aktiengeselischaft*, 2020 WL 3893038, *6 (E.D. Mich.) (specific jurisdiction lies over a

3  foreign manufacturer using a subsidiary to market or sell the product in the forum state; describing

4  parent and subsidiary as acting "in concert" to sell the parent's cars in the forum state).

5      Here, LINE Corp. placed its App into the stream of commerce through the App stores (¶26)

6  with knowledge that LINE E-A, a wholly owned subsidiary of LINE Plus Corporation ("LINE Plus"),

7  which is itself a wholly owned subsidiary of LINE Corp. (¶¶21–22, 25; Exs. 1–5), marketed the App

8  to California businesses seeking to promote themselves to App subscribers. ¶¶90–91; Kim Decl.

9  ¶¶4–5, ECF 112-6 (conceding that LINE E-A ran "marketing campaigns" promoting LINE

10 Messenger and provided support for LINE Plus and LINE Corp.'s "business-to-business activities

11 and partnerships").

12     In marketing the App, LINE E-A targeted California businesses and touted App features

13 allowing businesses to target the App's California-residing subscribers with direct communications.

14 LINE Corp. knew—actually or constructively—that LINE E-A's marketing strategy was to target

15 Californians because LINE E-A *publicly disclosed* its marketing strategy in interviews, conferences,

16 and speeches published for mass consumption on YouTube and in various Internet publications.

17     Jeanie Han, former CEO of LINE E-A, was "the prime architect of Line's American

18 [marketing] strategy" when it focused on the U.S. market.[12] In her keynote speech at an industry

19 conference in 2015 (posted on YouTube), Ms. Han explained LINE E-A's successful strategy of

20 targeting California-based entertainment companies: "Our friends at Hollywood and the studios are

21 now coming to us (as well) and saying, 'How do we leverage your platform,' 'How do we leverage

22 your hundreds of millions of users to help us promote our films.'"[13] She provided this example of

23 LINE E-A's pitch to Hollywood studios: "If it's raining in LA and you want to (let's say) recommend

24 a movie that would go well on a rainy night," instead of sending an email that will probably not be

25 read that night, "you can target those people [referring to App subscribers] in LA and say, 'you know

26

27  [12] McCracken, *supra* note 9.

28  [13] Mobile World Live, *MWC15 Keynote: LINE Euro-Americas*, YOUTUBE (Apr. 6, 2015), https://www.youtube.com/watch?v=ds70PYEUhOw (at approximately 11 minutes).

1   what, you should buy an umbrella' or 'you should watch this movie.'"[14]

2      In an interview for Fast Company, which describes itself as "the world's leading business

3   media brand,[15] Ms. Han described the targeting of almost *750,000 San Diego App subscribers* for a

4   music industry client: "Han has extended [LINE Messenger's] connection with pop music via a

5   deal with IHeartMedia…. IHeartMedia first created Line official accounts for its broadcast

6   personalities in San Diego, then promoted them on the air. 'Within six months in San Diego, our

7   Line followers surpassed our followers that were connected with us through Facebook, Instagram,

8   and Twitter combined,' says Michael Preacher, iHeartMedia's VP of strategic partnerships. With

9   close to 750,000 San Diegans now following its Line accounts, the company has expanded the

10  program to its two biggest markets, New York and L.A."[16]

11     Further, as of 2021, LINE E-A described itself as being in the business of mobile software

12  and continued to market LINE Messenger through its LinkedIn page, from its California offices.

13  ¶¶90–91.

14     In *Mavrix*, the Ninth Circuit *inferred* that "a substantial number of hits to [Ohio-based

15  defendant's] website came from California residents" because "some of the third-party advertisers

16  on [defendant's] website had advertisements directed to Californians." *Mavrix*, 647 F.3d at 1230.

17  "The fact that the advertisements targeted California residents indicates that [defendant] knew—

18  either actually or constructively—about its California user base and that it exploits that base for

19  commercial gain by selling space on its website for advertisements." *Id.* Here, LINE Corp. knew—

20  "either actually or constructively"—that its wholly owned, California-based marketing agent,

21  LINE E-A, targeted California-based entertainment companies by promoting the opportunity to

22  exploit the California market by connecting with the App's California subscribers. This conduct

23  directly establishes that LINE Corp. "anticipated, desired and achieved a substantial California

24  [subscriber] base." *Id.* at 1230–31.[17]

25

26  [14] *Id.* (at approximately 14 minutes).

27  [15] FAST COMPANY, https://www.fastcompany.com/about-us (last visited Feb. 3, 2023).

28  [16] McCracken, *supra* note 9.

[17] LINE Corp.'s declarant states that "[t]hird-party advertisements are not delivered to users

**(ii)**      **The agency theory of availment also applies**

"It is well-established that a defendant can 'purposefully avail itself of the forum by directing its agents or distributors to take action there.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84–85 (2d Cir. 2018) (quoting *Daimler AG*, 571 U.S. at 135 n.13); *see also Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("a defendant's contacts with the forum state may be intertwined with his transactions or interactions with the plaintiff or other parties").

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act." *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (quoting Rest. (3d) of Agency § 1.01 (2006)). Where, as here, a domestic subsidiary is functioning as an "operating unit" of a foreign principal by doing the principal's business abroad, the contacts of the subsidiary are attributable to the principal for purposes of specific jurisdiction. *Johal v. FedEx Corp.*, 2022 WL 10075380, *2 (S.D. Ind.). An agency relationship exists where the subsidiary's activities "amount to doing [the] business of the parent." *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd*., 566 F.3d 94, 108–09 (3d Cir. 2009).

Notably, declarations describing related corporate entities as separate and independent are *not* sufficient to negate allegations of corporate "entanglement" for jurisdictional purposes where a subsidiary functions as an operating unit of the parent. *Johal*, 2022 WL 10075380, *2; *Michael Grecco Prod., Inc. v. Netease, Inc.*, 2019 WL 3245872, *1 (N.D. Cal.) (attributing the subsidiary's contacts to the parent website operator where the subsidiary conducted market research and curated content for the parent's website); *Blizzard Ent., Inc. v. Joyfun Inc. Co*., 2020 WL 1972284, *8–9 (C.D. Cal.) (allegations that defendant's corporate structure exists to "obscure the actual parties responsible" for the misconduct establish a prima facie case of jurisdiction over the corporate holding company).

---

registered with a United States account." Irie Decl. ¶10. As Ms. Han's public statements reveal, however, the business model is based on creating opportunities for LINE Corp.'s business accounts (now called "official accounts") to target App subscribers with direct communications, not traditional third-party advertisements.

The nature of LINE Corp.'s relationship to LINE E-A is inherently one of agency because LINE E-A, in marketing LINE Corp.'s App *for* LINE Corp., is doing the business of LINE Corp. in the U.S. ¶¶78, 91, 93; Kim Decl. ¶4; Irie Decl. ¶¶3–4. This is *not* a situation where a foreign company *sells* its product to an *independent* distributer for *resale* in the U.S. market. Rather, LINE E-A functions as a marketing agent providing *support* for LINE Corp.'s distribution of its App for LINE Corp.'s own benefit. ¶93.

But if the Court determines that Plaintiffs' allegations are insufficient, jurisdictional discovery is necessary to provide Plaintiffs with access to internal information necessary to determine whether LINE Corp. had the right to control LINE E-A's conduct in marketing the App. *Cohodes v. Mimedx Grp., Inc*., 2022 WL 15523079, *3 (N.D. Cal.).

### f.   The alter ego doctrine applies because LINE Corp. used LINE E-A as a "marketing conduit"

The Ninth Circuit has held that where, as here, "a parent corporation uses its subsidiary 'as a marketing conduit' and attempts to shield itself from liability based on its subsidiaries' activities, piercing the corporate veil is appropriate and the alter-ego test is satisfied" as necessary to avoid injustice. *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (citing *United States v. Toyota Motor Corp.*, 561 F.Supp. 354 (C.D. Cal. 1983)); *Maxim v. Guangzhou NetEase Comput. Sys. Co., Ltd*., 2021 WL 4839579, *7 (C.D. Cal.) (a "unity of interest and ownership" for alter ego purposes is satisfied by showing that the subsidiary functions as a "marketing conduit" under *Unocal*, *regardless* of whether the parent dictates every facet of the subsidiary's business).

The marketing conduit doctrine was applied in *Toyota*, where the district court found that a parent corporation in Japan was subject to personal jurisdiction in California because the parent's California subsidiary (1) was the exclusive importer of the parent's vehicles; (2) all sales were "FOB Japan" and the subsidiary handled all distribution in the United States; and (3) the parent derived "substantial economic benefit" from the subsidiary's activities. *Toyota*, 561 F.Supp. at 356. The court found there was "no obstacle to jurisdiction over the foreign parent" because the parent "uses its subsidiary as a marketing conduit." *Id*. at 359.

The marketing conduit doctrine applies here because (1) LINE Corp. used LINE E-A to

market LINE Corp.'s Messenger App in California, and (2) failure to pierce the corporate veil would unjustly shield the wrongdoing parent from jurisdiction. Indeed, this is an easier case fit for the doctrine because LINE Corp. itself placed the product (the App) in the U.S. stream of commerce, so LINE E-A's marketing activity was necessarily for LINE Corp.'s benefit. ¶79, 93.

### g. The LINE Friends store in Los Angeles is used as a marketing tool for promoting the App in California

LINE Corp. also had actual or constructive knowledge of the LINE Friends store in Los Angeles, California, which features the LINE Messenger characters. ¶78. The purpose of the characters, as stated by LINE Corp., is "primarily to promote our brand and appeal, as well as further expand our user base." *Id.* The purpose of the LINE Friends store is also to promote and further expand the brand and App, as explained by Jeanie Han in 2015, when LINE E-A opened a pop-up store in Times Square: "Opening even a temporary Line store in the U.S. is as much about making a statement as chasing an immediate business opportunity. 'I'm sure Asian tourists will recognize our characters, and they'll line up outside the door to buy our products,' Han says. (Subsequent visits to the Friends pop-up confirmed her hypothesis.) 'But through that, it will be very symbolic for Americans to see that our brand has arrived.'"[18] The LINE Friends store in Los Angeles—which is one of only six LINE Friends stores in the world—serves the same promotional function. Berman Decl. ¶18(iv).

### 3. Z Holdings purposefully directed its activities towards California

This Court has jurisdiction over Z Holdings under several theories of purposeful availment.

### a. A holding company that plays an active role in a subsidiary's claim-related operations is subject to jurisdiction under direct availment and agency theories

Courts have recognized that a foreign corporation has purposefully directed its activities toward a forum state by participating in making decisions to affect the forum state through the actions of a subsidiary or by facilitating a subsidiary's conduct to affect the forum state. *SK Trading Int'l Co., Ltd. v. Sup. Ct.*, 77 Cal.App.5th 378, 388–391 (2022), *review denied* (July 13, 2022). And in the context of a parent holding company, the courts in *Chien* and *Blizzard* ruled that a parent holding (or

---

[18] McCracken, *supra* note 9.

shell) corporation that plays an active role in a subsidiary's claim-related operations in the forum state is subject to jurisdiction under a direct availment theory.

In *Chien*, the putative class action plaintiff filed a complaint for privacy violations against Bumble Trading LLC, the operator of the Bumble dating App, and Bumble Inc., Bumble Trading's parent holding company. Bumble Inc. submitted declarations describing itself as a mere holding company and stating that it has never owned, operated, or controlled the App, or collected, stored, managed, or controlled App user information. *Chien*, 2022 WL 17069842, *1. Both defendants moved to dismiss for lack of jurisdiction based on the absence of minimum contacts to California.

The court first ruled that App-operator Bumble Trading had purposefully availed itself of the California forum by (among other things) distributing its App through the Apple App and Google Play stores and not blocking access to California users. *Id.*, *8 n.7. The court then ruled that it had jurisdiction over the parent holding company Bumble Inc. based on allegations that Bumble Inc. "plays an active role in operating, developing, marketing, and controlling the App." *Id.*, *9. While Bumble Inc. submitted a declaration denying it played any role whatsoever in the App's operation, development, or marketing, the district court denied the motion based on statements made by Bumble Inc. in other cases that it was "involved in marketing decisions for its subsidiaries" and an SEC filing describing it as "operating the Bumble App as well as leveraging 'machine and deep learning capabilities … to personalize the potential matches [they] display and to inform [their] product pipeline' and to 'target users who are likely to purchase a subscription package or in-app feature and tailor the experience for them.'" *Id.*

And as explained above, the same type of conduct supports an agency theory of purposeful availment by which the subsidiary's contacts are imputed to a parent entity with the power to control the subsidiary's conduct for the parent's benefit. *Johal*, 2022 WL 10075380, *2.

### b. Z Holdings plays an active role in the App's operations to benefit both the App and Z Holdings' other business interests

LINE Corp. became a wholly owned subsidiary of Z Holdings after a series of transactions between SoftBank and Naver Corp. (the former parent of LINE Corp.) in March 2021. ¶¶20, 66(a). "Z Holdings" is the rebranded name of SoftBank's internet business "Yahoo! Japan." ¶66(a). Despite

its name, Z Holdings does not operate as a merely passive holding company. Rather, Z Holdings has leveraged the LINE Messenger App to support its own business interests. ¶95.

From the outset, Z Holdings announced its intention to use Naver Corp.'s artificial intelligence technology and Yahoo! Japan's data collection system to target registered users of the LINE Messenger App. to facilitate Z Holdings' and its related entities' business interests. ¶66(b). Z Holdings' strategy is to use the "AI technology of NAVER Corporation and the assets of LINE Corporation" (*i.e.*, the LINE Messenger App) to "accumulate[] data" from LINE Messenger users that "will be utilized in combination with PayPay, LINE official accounts, etc., . . . [and we will] implement '1:1' marketing with suggestions [to LINE Messenger users] that are optimal for each individual person and thereby target increasing his/her use frequency." *Id*.

An April 23, 2021 Goldman Sachs analyst report describes Z Holdings' plan: "As a messaging app, LINE has difficulty acquiring user data that contributes to conversion (e.g., product purchase history). However, the Yahoo! Japan site operated by Z Holdings collects data that can contribute to conversion, including data on search history (to uncover potential customers) and purchased products systems, which we expect to enable more effective collection of customer data." ¶66(c). The report also describes Z Holdings' plan to use "team purchases, social gifts, and live commerce" on the App and improve advertising precision and increase operating profits by integrating the App and Yahoo! Japan IDs. *Id.*

This is the same type of conduct held as sufficient in *Chien* to establish the holding company's purposeful availment. *Chien*, 2022 WL 17069842, *9. The same facts are also sufficient to support jurisdiction under an agency theory. And as alleged in the FAC, these facts also establish specific jurisdiction because Z Holdings and the other LINE and Naver Defendants operated a common enterprise using a maze of interrelated corporate entities to target Californians. ¶¶25, 95.

### 4.   LINE Plus purposefully directed its activities towards California

LINE Plus has purposefully availed itself of the California App market through (1) the marketing actions of its agent and U.S.-based subsidiary LINE E-A in California; and (2) its own provision of technical services in support of LINE Corp.'s Apps in the U.S. and California.

LINE Plus' function is set forth on parent LINE Corp.'s website: LINE Plus "supports LINE's

global business development with programmers, designers, marketers, sales personnel, and PR managers of 50 different nationalities working together." ¶82. Its corporate purpose is to expand the LINE Messenger App outside of Japan in foreign markets, including California. ¶85. LINE Corp. has conceded in public filings that LINE Plus (1) provides "marketing and sales services for the LINE platform outside of Japan;" (2) operated LINE Corp.'s "camera application business, including B612" until May 2017 when the App was transferred to Snow Corp.; and (3) "currently provides technological support to LINE Corp. for LINE Messenger." *Id.*

LINE Plus partially delegated its marketing responsibilities to its subsidiary LINE E-A (¶¶86, 91, 93), which marketed the LINE Messenger App in the U.S. and expressly targeted the California market (as shown above). LINE E-A was necessarily acting on LINE Plus' behalf, and therefore subject to its control, because it was performing LINE Plus' marketing responsibilities.

LINE Plus is also subject to specific jurisdiction based on its *operation of the B612 App* and its *provision of technical services* in support of the LINE Messenger App. For the same reasons that LINE Corp. must be deemed to have availed itself of the California market as the LINE Messenger operator, LINE Plus must be deemed to have likewise availed itself of the California market as the B612 App's operator. In terms of the "regular flow or course of sales" basis for jurisdiction, although publicly available data on the B612 App is sparser than for LINE Messenger, it has been downloaded in the U.S. more than 400,000 times on Apple devices alone. Berman Decl. ¶12. And LINE Plus' technological support for LINE Messenger "outside of Japan" and therefore within the U.S. also demonstrates purposeful availment. ¶85.

### 5.   Defendants knew that targeting the forum would harm App users

Under the *Calder v. Jones*, 465 U.S. 783 (1984) effects test, plaintiffs must allege that defendant's conduct caused "harm that the defendant knows is likely to be suffered in the forum state." *Yahoo!*, 433 F.3d at 1206. "A defendant causes harm in a particular forum when the 'bad acts' that form the basis of the plaintiff's complaint occur in that forum," regardless of whether it "amounts to only a small percentage of the overall harm caused." *Will Co.*, 47 F.3d at 926–27. Defendants' targeting of California App users and businesses allowed them to violate the privacy rights of App users by collecting their data, foreseeably causing harm in California.

1

### 6.   Plaintiffs' claims "arise out of" or are "related to" the California forum in which the Apps were downloaded and the injury occurred

2

3 Plaintiffs' claims must "arise out of or relate to the defendant's contacts with the forum."

4 *Ford Motor Co. v. Mont. Eighth Jud. Distr. Ct.*, 141 S. Ct. 1017, 1026 (2021). Defendants argue that

5 Plaintiffs' claims do not arise out of or relate to forum-related activities because "the bulk of the FAC

6 focuses on harm arising from surveillance and unauthorized access to date in China"—as opposed to

7 California—"by SenseTime and the Chinese government," instead of Defendants. Mot. at 8.

8 Defendants also argue that LINE Corp.'s alleged conduct occurred in Japan, where it is

"headquartered" and "makes decisions." *Id.*

9

10 The argument is similar to, but even more extreme than, the defendant's argument that was

11 rejected in *Ford*. *Ford* argued that there must be a *strict causal link* between the conduct giving rise

12 to the plaintiff's claim and the forum state, thereby limiting plaintiffs to forums in the state where the

13 car was sold or the state where it was manufactured and designed—not the state where the accident

14 occurred. *Ford*, 141 S. Ct. at 1026. The Supreme Court flatly rejected *Ford*'s "causation-only

15 approach" because the nexus requirement is also satisfied by claims that are "related to" the

16 defendant's contacts. *Id.* The Supreme Court held that the plaintiffs *easily* satisfied the "related to"

17 requirement because claims based on a product defect are "related to" the state in which plaintiffs

18 were injured given the defendant's exploitation of that state's automobile market, regardless of where

the plaintiffs acquired their vehicles. *Id.* at 1026–27.

19

20 Notably, Defendants would have this Court go even further than *Ford*'s rejected theory by

21 precluding jurisdiction *in the state where the product was acquired—i.e.*, where the App was

22 downloaded. But *Ford* dictates that Plaintiffs' claims are "related to" California because the App is

23 continuously being downloaded and used by California residents and it is the state where most of the

24 Plaintiffs suffered privacy injury.[19] Moreover, but-for causation exists as well because Plaintiffs

---

25 [19] Defendants assert in footnotes 5 and 6 that the Illinois Plaintiff, Shubert, falls outside the Court's

26 jurisdiction because he does not reside in California. But footnote arguments that a court lacks personal jurisdiction are waived. *Holley v. Gilead Scis., Inc.*, 379 F.Supp.3d 809, 834 (N.D. Cal.

27 2019) (quoting *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014)). Moreover, the waived assertion would fail because Shubert's claims arise out of the same nucleus of operative facts

28 and there is an independent connection between the nonresident's claims and Defendants' contacts

---

1  would not have been injured had the App not been made available in California.

2            **7.**     **<u>Defendants have not shown that jurisdiction would be unreasonable</u>**

3         Defendants that have purposefully directed their activities at the forum have the burden of

4  proving that the forum's exercise of jurisdiction would nevertheless be "unreasonable" as a matter of

5  due process. *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985). The First Circuit has observed

6  that the seven factors identified in *Burger King* "rarely seem to preclude jurisdiction where relevant

7  minimum contacts exist." *Cambridge Literary Props. v. W. Goebel Porzellanfabrik G.m.b.H & Co.*

8  *Kg.*, 295 F.3d 59, 66 (1st Cir. 2002). This is "not one of those few-and-far-between cases." *Id.*

9         The first factor—the extent of defendants' purposeful interjection into the forum state—is

10  established in the purposeful-availment analysis above. The second factor—the burden on defendants

11  in California litigation—is negligible given modern communications and transportation and

12  Defendants' status as leading technology companies with offices and subsidiaries in California. The

13  third factor—the extent of conflict with the sovereignty of the defendants' state—is non-existent, as

14  demonstrated by the fact *that Japanese law requires Japanese companies to litigate in the plaintiff-*

15  *consumers' forum regardless of any contractual forum-selection clause*. *See* Inoue Decl. ¶¶5–16,

16  ECF 68-1 (Japanese law expert). The fourth factor—the forum state's interest—is substantial because

17  the claims are based on Defendants' voluntary distribution of the App into the California market and

18  Defendants' use of that App to violate the privacy rights of California residents. The fifth factor—

19  the most efficient forum for resolving the controversy—favors California because three of the five

20  named Plaintiffs, as well as three Defendants, reside in California, and the evidence, some of which

21  is already in California, can be managed electronically and by video. ¶¶8, 12–13, 16, 18, 22. The

22  sixth factor—the importance of the forum to Plaintiffs' interest in convenience and effective relief—

23  weighs in favor of California, given three of the five named Plaintiffs reside in California and all

24  reside in the U.S. ¶¶8, 10–13. The seventh factor—the existence of an alternative forum—weighs in

25  favor of California because Japanese law requires the case to be litigated in the consumer plaintiffs'

26  home jurisdiction if they so choose. Inoue Decl. ¶¶5–16.

27  

28  with California. *Sloan v. General Motors LLC*, 287 F.Supp.3d 840, 860 (2018).

1       **8.**      **Alternatively, Defendants are subject to jurisdiction under Rule 4(k)(2)**

2       A federal court may exercise jurisdiction over a foreign defendant under Rule 4(k)(2), known

3 as the federal long-arm statute, if "(1) the claim arises under federal law, (2) the defendant is not

4 subject to jurisdiction in any state's courts of general jurisdiction, and (3) exercising jurisdiction

5 comports with due process." *Will Co*., 47 F.4th at 922. If this Court rules that any of the foreign

6 Defendants are not subject to jurisdiction in California because the Apps are distributed on a

7 nationwide basis without targeting any particular state, they are nevertheless subject to specific

8 jurisdiction on the federal claims. And for the reasons specified above, there are no due process

9 concerns because (1) Defendants purposefully directed the Apps at the U.S. market; (2) the claims

10 arise out of or are related to the forum-related conduct; and (3) the exercise of jurisdiction is

11 reasonable.

12       **B.**      **Plaintiffs adequately allege Article III standing**

13       **1.**      **Plaintiffs adequately allege concrete injury in fact**

14       Plaintiffs allege five theories of harm, which fall into three categories: (a) invasion of privacy;

15 (b) harm to their property (¶¶164–94); and (c) material risk of future harm (¶¶109–22,

16 149–63). Any one theory will suffice. *In re Zappos.com, Inc*., 888 F.3d 1020, 1030 n.15 (9th Cir.

17 2018).

18       **a.**      **Plaintiffs adequately allege invasion of privacy harm**

19       Plaintiffs allege violation of their privacy.[20] *See Patel v. Facebook, Inc*., 932 F.3d 1264, 1271

20 (9th Cir. 2019) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English

21 or American courts.'"). Plaintiffs allege a highly offensive privacy violation because Defendants take

22 Plaintiffs' face geometry scans, as well as videos, URLs, and keywords from private messages, which

23 is neither necessary nor expected. ¶¶123–48.[21] *Cf. Patel*, 932 F.3d at 1274; *In re Facebook, Inc.,*

24 *Cons. Priv. User Profile Litig.*, 402 F.Supp.3d 767, 784 (N.D. Cal. 2019) (finding allegations that

25 "plaintiffs' sensitive information was disseminated to third parties in violation of their privacy"

---

27 [20] ¶¶7, 122, 155–63, 177, 205, 227, 238, 247, 255, 266–97, 317–27.

28 [21] It is also unnecessary for B612 to transmit Plaintiffs' face geometry scans *from the device* for it to operate. ¶270. Further, LINE Corp. and LINE Plus owned or operated B612 until 2017. ¶63.

1  sufficient to confer standing).

2  **b.**   **Plaintiffs adequately allege harm to their property**

3  Even without the harm to privacy, this "lawsuit may of course proceed in federal court

4  because the plaintiff has suffered concrete harm to her property." *TransUnion LLC v. Ramirez*, 141

5  S. Ct. 2190, 2206 (2021). And courts in this district have recognized the "'growing trend . . . to

6  recognize the lost property value' of personal information." *Calhoun v. Google LLC*, 526 F.Supp.3d

7  605, 636 (N.D. Cal. 2021) (collecting cases).

8  Plaintiffs incurred three forms of harm to their property. ***First***, Plaintiffs incurred harm to

9  their *tangible* property—the batteries in their devices. ¶¶205, 227, 238, 247, 255. The Order noted

10  that "Plaintiffs do not allege facts sufficient to show that their cell phone batteries were drained

11  'frequently or systematically.'" Order at 14. The FAC now includes testing showing systematic

12  battery drain. ¶¶189–94. This confers standing. *In re Google, Inc. Priv. Pol'y Litig.*, 58 F.Supp.3d

13  968, 980 (N.D. Cal. 2014) (Article III and UCL standing present from battery depletion); *In re Google*

14  *Android Cons. Priv. Litig.*, 2013 WL 1283236, *5 (N.D. Cal.) (same).[22]

15  ***Second***, LINE interfered with Plaintiffs' *intangible* property by converting Plaintiffs'

16  personal information, including their private messages (videos, URLs, keywords) and identifiers,

17  biometric and otherwise for their own purposes. ¶¶164–88; *see Calhoun*, 526 F.Supp.3d at 636.

18  ***Third***, Plaintiffs adequately allege diminution in value of their property. In the Order, the

19  Court held that "privacy plaintiffs must allege the existence of a market for their data and the

20  impairment of the ability to participate in that market." Order at 15. The FAC does so. ¶¶164–74,

21  184–87 (detailing various markets and value estimates for consumer data). Thus, Plaintiffs now

22  adequately allege a concrete and particularized injury under a diminution of value theory as well.

23  **c.**   **Plaintiffs allege a material risk of future harm**

24  Defendants' possession of Plaintiffs' data carries material risk of imminent harm from further

25

---

26  [22] LINE's evidentiary argument on the reliability of Plaintiffs' evidence (Mot. at 21) is unsuitable for

27  resolution at the pleading stage. *In re iPhone Application Litig.*, 6 F.Supp.3d 1004, 1015 (N.D. Cal. 2013) (triable issue of fact as to the battery life depletion issue). Similarly, LINE's factual argument

28  disputing whether named Plaintiffs' phones were specifically damaged (Mot. at 21) is also premature. Plaintiffs alleged battery damage. ¶¶205, 227, 238, 247, 255.

dissemination. ¶¶109–22, 149–63. Indeed, the risk of imminent harm is demonstrated by the Japanese government's ban prohibiting government employees from using LINE Messenger due to a data breach suspected of originating in China. ¶149. The Japanese government found China could trace personal data of LINE Messenger users without consent as far back as 2018. ¶151. Z Holdings acknowledged the same. ¶153.[23] There is a real risk Plaintiffs may be imminently harmed: their property remains in the possession of an entity that shows reckless disregard for its safekeeping. *Cf. Zappos.com*, 888 F.3d at 1026–29.

## 2. Plaintiffs' injuries are traceable to Defendants' conduct

To satisfy traceability under Article III standing, "there must be a causal connection between the injury and the conduct complained of." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). No heightened pleading standard applies to allegations of traceability. *Zappos.com*, 888 F.3d at 1029 n.12 (cautioning that while standing requires evidence at *summary judgment*, it does ***not*** "heighten Plaintiffs' burden in opposing *the motion to dismiss*").[24] Plaintiffs alleged *many* forms of harm, yet LINE focuses on tracing of *future* harm from the Chinese government. As to that, the harm is traceable to Defendants because it is *their* decision to use the SenseTime SDK and send data to China, with full knowledge of the risks, and even after the Japanese government's ban on LINE Messenger use due to exposing data to China. ¶¶109–33, 149–61.

More generally, Defendants absurdly claim that the FAC fails to trace *any* harms—without specifically addressing *any* of the privacy, tangible property, and intangible property harms detailed in the FAC and traced to each Defendant—to *any* of them. Defendants even make this argument as to LINE Corp., which they contend is the "sole operator" of LINE Messenger. Mot. at 2, 23. As demonstrated above, the FAC specifically delineates the role of each Defendant. ¶¶25–95, 123–48,

---

[23] Moreover, Defendants installed software into LINE Messenger that sends its data to SenseTime and Snow. ¶¶3, 122–33, 221, 234. SenseTime, in turn, has been sanctioned by the U.S. government as being a Non-SDN Chinese Military-Industrial Complex Company. ¶121. This injury, which is both an invasion of privacy (the data is already with the third party) as well as a risk of potential future harm from the Chinese Military-Industrial Complex, is traceable to Defendants' misconduct.

[24] Indeed, *Lujan* itself cautioned that "[a]t the pleading stage, *general factual allegations of injury resulting from the defendant's conduct may suffice*, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" 504 U.S. at 561.

272–73, 285–86, 302–04, 312, 322, 332, 345–48, 360–61, 379–81. The causal connection is simple: Plaintiffs installed Apps that they would not have but for Defendants' conduct. The Apps invaded their privacy, damaged their batteries, injured their tangible and intangible property interests, and created an imminent risk of future harm. ¶¶123–94.

For the traceability analysis at the pleading stage, that is enough. *In re Vizio, Inc., Cons. Priv. Litig.*, 238 F.Supp.3d 1204, 1216 (C.D. Cal. 2017) (rejecting, in a privacy case, a standing argument that "improperly conflates the merits of Plaintiffs' claims with their standing to bring suit"); *Google Priv. Pol'y Litig.*, 58 F.Supp.3d at 980 ("the causal nexus between [] alleged conduct and the Plaintiffs' [] injury—requires a heavily and inherently fact-bound inquiry that the court may not reach at this stage").

### C.   Plaintiffs adequately plead their claims

#### 1.   Plaintiffs properly plead group conduct under Rules 8 and 9(b)

Defendants continue to complain about "group pleading." First, the 102-page FAC is replete with specific allegations about the actions of individual defendants, and the causes of action specify which Defendants are liable, and under which theories. ¶¶25–95, 123–48, 272–73, 285–86, 302–04, 312, 322, 332, 345–48, 360–61, 379–81. Second, where it is appropriate to allege joint conduct of multiple Defendants, Defendants incorrectly characterize that as "improper group pleading." *See Padilla v. Nevada Dep't of Corr.*, 510 F.App'x 629, 630 (9th Cir. 2013) ("We are unaware of any case that requires a plaintiff to 'link' each specific defendant to a particular action when the allegations against a group of defendants are adequate."); *In re Pac. Fertility Ctr. Litig.*, 2019 WL 3753456, *3 (N.D. Cal.) (denying Rule 8 and 9(b) motions to dismiss, noting "where the defendants are alleged to be 'related entities' who acted in concert 'it is entirely possible that the allegations of wrongdoing are intended to include each and every entity defendant'"); *Munning v. Gap, Inc.*, 2016 WL 6393550, *3 (N.D. Cal.) (similar); *Sussex Fin. Enterprises, Inc. v. Bayerische Hypo-und Vereinsbank AG*, 2010 WL 94272, *3 (N.D. Cal.).

Contrary to Defendants' suggestions, the FAC clarifies that a common enterprise—with a commingled corporate structure and shifting ownership over time—acted in concert. ¶¶25–95; Exs. 1–5. At a minimum, the FAC alleges "related entities" with shifting "parent-subsidiary relationships"

1   of the sort present in *Munning* and *Sussex*, where no pleading deficiency was found for bona fide

2   group conduct. *Munning*, 2016 WL 6393550, *3; *Sussex*, 2010 WL 94272, *3.

3         Here, group conduct and overlapping entities permeate Defendants' unlawful data collection

4   practices. For example, in 2017, Snow Corp., owned by Naver, obtained formal ownership of LINE

5   Corp.'s Camera Business, which operated B612. Ex. 1. So, both LINE Corp. and Snow Corp. had an

6   operational and formal ownership relationship with B612 during 2017. The next year, in 2018,

7   SoftBank, which became the majority owner of another LINE Corp. subsidiary, invested one billion

8   dollars into SenseTime, which Defendants then embedded into B612 *and* LINE Messenger. Ex. 2.

9   One year later, in 2019, SoftBank became the parent company of Z Holdings and also increased its

10  ownership of SenseTime (owning 14% by year-end 2019). Ex. 3. Then, in 2020, Naver and SoftBank

11  reached an agreement to form the parent company of Z Holdings, which at the time had an operational

12  relationship with Snow Inc., LINE Messenger, *and* B612. Ex. 4. In 2021, the re-arrangement of

13  Defendants' corporate structure pursuant to the Naver-SoftBank agreement was completed. By 2021,

14  Naver Corp. and LINE Corp. ***both*** had operational relationships with ***both*** LINE Messenger and

15  B612. Ex. 5. Indeed, Naver admitted in securities filings that it had control of the LINE Messenger

16  App before March 1, 2021. ¶29(b).[25] And Z Holdings confirmed that LINE Corp. depended on Naver

17  for "significant human resource support related to the business of LINE Corp." ¶29(d). And the

18  entities were intertwined at the data level: *inter alia*, B612 and LINE Messenger shared data with

19  each other via a common user identifier called a TMID to identify shared users and track them across

20  the two Apps and elsewhere. ¶¶25, 126. B612 and LINE Messenger also shared this data with

21  SenseTime. ¶¶122–33; Exs. 2–5. And LINE Messenger data continues to go to Naver. ¶¶66(b), 137–

22  42, 144, 146–48, 162, 203, 216, 220, 233.

23        In sum, as alleged in the FAC, from 2017 through the present, ***both*** the Naver Defendants and

24  the LINE Defendants have owned, operated, and/or supported ***both*** Apps. ¶25; Exs. 1–5. The shifting

25  ownership described above, which occurred from 2017 through 2021, coincided with the time when

---

[25] LINE argues the FAC contains inconsistencies about the ownership structure or are contradicted by their cherry-picked declarations. But the snippets of allegations they cite refer to different points in time—which supports Plaintiffs' argument of a common enterprise—depending on the time, different Defendants owned and/or operated both Apps.

PLAINTIFFS' OPP. TO LINE DEFENDANTS' MOT.                                    No. 4:21-cv-05143-HSG
TO DISMISS FAC

the unlawful data collection practices alleged in the FAC took place. *Id.* Given the bona fide group conduct here, Rule 8 does not require more specificity than what is alleged. *See Fondren v. Schmidt*, 626 F.Supp. 892, 898 (D. Nev. 1986) ("In cases involving multiple defendants, a plaintiff should specify the role of each defendant in the fraudulent activity. Where a category of defendants is allegedly responsible for a continuing course of conduct, however, group conduct may be pleaded.") (internal citations omitted).[26]

## 2.   The FAC alleges intrusion upon seclusion and invasion of privacy

Plaintiffs plead intrusion upon seclusion and invasion of privacy because (1) Plaintiffs had a reasonable expectation of privacy over their personal information, and (2) Defendants' taking and sharing of that information was highly offensive. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 605 (9th Cir. 2020) ("*Facebook Tracking*").

### a.   Plaintiffs had a reasonable expectation of privacy

As this Court already decided, Plaintiffs allege a "cognizable privacy interest in their facial biometric information." Order at 18; *see also Patel*, 932 F.3d at 1273 ("[T]he capture and use of a person's biometric information invades concrete interests."). Contrary to Defendants' assertions that Plaintiffs "voluntarily shared" this information, Plaintiffs allege they did not expect or consent to the taking of their biometric information on the Apps by the Defendants. ¶¶123–33, 204, 216, 223–26, 229, 236–37, 241–46, 268, 283. Nor did Plaintiffs expect these Defendants to share biometric information taken from the B612 App with Defendants Naver Corp. and Naver Cloud America. ¶¶130–31, 272–73, 285–86. Just as before, Plaintiffs continue to allege a reasonable expectation of privacy in their biometric information.

Similarly, Plaintiffs have alleged a reasonable expectation of privacy in the content of their private messages and personal identifiers. ¶¶268, 283; *see Facebook User Profile*, 402 F.Supp.3d at 797 (upholding invasion of privacy claim based on allegations that defendant shared plaintiffs'

---

[26] Even for the few claims subject to Rule 9(b), Plaintiffs allege enough specificity given the overlapping ownership. ¶25; *Munning*, 2016 WL 6393550, *3 ("[G]iven the circumstances of this case, this Court finds Plaintiff's allegations are sufficiently detailed to put each Defendant on notice of the claims against it, and to allow each Defendant to prepare its defense."); *Sussex*, 2010 WL 94272, *2.

sensitive information on a widespread basis). Defendants mischaracterize the FAC and the Court's reasoning regarding the applicability of *Zynga* and *Facebook Tracking* to this case. In *Zynga*, the Ninth Circuit held that Facebook URLs did not constitute "contents of any communication" for the purposes of a wiretap claim because they merely revealed the name of a Facebook user or group (*i.e.*, the party to a communication). *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107–09 (9th Cir. 2014). In *Facebook Tracking*, the Ninth Circuit distinguished *Zynga*'s holding that Plaintiffs had a reasonable expectation of privacy in the "full-string detailed URL," which "could emanate from search terms inputted into a third-party search engine" and which Facebook could use to correlate to additional information about the user. 956 F.3d at 605.[27] It further held plaintiffs adequately alleged a reasonable expectation of privacy where the defendant allegedly collected and created "highly personalized profiles from sensitive browsing histories and habits" about users. *Id.* at 604.

Here, Defendants collected and disclosed highly sensitive information akin to the information at issue in *Facebook Tracking*, including the content of users' private messages (*i.e.*, videos, URLs, and keywords) and other highly private and personally identifiable information (*i.e.*, device ID, client ID, advertising ID, phone number, and the model of the phone). ¶¶5, 66, 150, 155, 177, 228, 268, 270, 272, 275, 285–86. Unlike the mere address of a Facebook URL at issue in *Zynga*, this information included highly detailed and staggering amounts of data, which Plaintiffs reasonably expected would remain private. ¶¶1, 177.[28] Defendants controlled this information in "ever-expanding dossiers" for purposes of targeting them with advertisements. ¶188. And like *Facebook Tracking*, Plaintiffs' expectation that their user data would not be collected was reasonable given LINE Corp.'s public statements that messages on LINE Messenger were end-to-end encrypted. ¶¶5, 137–38, 150, 185–86, 195–96, 269, 289, 304, 312; *see Facebook Tracking*, 956 F.3d at 603 (finding

---

[27] *See also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, *15 (N.D. Cal.) ("Case law also supports plaintiffs' position that individuals maintain a reasonable expectation of privacy in detailed URLs."); *See also In re Google Inc. Cookie Placement Cons. Priv. Litig.*, 806 F.3d 125, 150–51 (3d Cir. 2015) (finding reasonable expectation of privacy in browsing histories).

[28] *Compare Facebook Tracking*, 956 F.3d at 604–05 (reasonable expectation informed by amount of data collected); and *Calhoun*, 526 F.Supp.3d at 636 ("[T]he amount of data collected, the sensitivity of the data collected, and the nature of the data collection demonstrate that Plaintiffs have a reasonable expectation of privacy."); *with Low v. LinkedIn Corp.*, 900 F.Supp.2d 1010 (N.D. Cal. 2012) (no expectation of privacy in the browsing history of professional profiles on a single website).

PLAINTIFFS' OPP. TO LINE DEFENDANTS' MOT.                    No. 4:21-cv-05143-HSG
TO DISMISS FAC

plaintiffs adequately alleged a reasonable expectation of privacy where challenged conduct was not disclosed); *In re Google RTB Cons. Priv. Litig.*, 2022 WL 2165489, *8 (N.D. Cal.) (finding plaintiffs alleged a reasonable expectation of privacy where defendant represented that plaintiffs' information would not be sold, but then proceeded to sell it anyways). Consistent with these representations, Plaintiffs reasonably expected that none of the Defendants would access or share their data. For these same reasons, Plaintiffs did not—as Defendants argue—consent to having their sensitive data be intercepted and shared.

### b.   Defendants' conduct was "highly offensive"

Plaintiffs have met the "highly offensive" prong because Defendants "surreptitious[ly]" collected and shared Plaintiffs' highly sensitive information. *Facebook Tracking*, 956 F.3d at 606 (holding allegations of "surreptitious data collection" were sufficient to survive the pleading stage); *Calhoun*, 526 F.Supp.3d at 631 (same). Moreover, Defendants' intrusions were highly offensive as evidenced by the substantial research and government efforts to protect such data (¶274) and their continued use of SenseTime's SDK despite warnings from privacy advocates, public news sources, and the Japanese government regarding its security risks (¶¶113–33, 149–53). *Google Cookie Placement*, 806 F.3d at 151 (offensiveness of conduct shown by federal executive agencies seeking to penalize Google's tracking of users' data).

### 3.   Plaintiffs state a claim for violation of the UCL and FAL

### a.   Plaintiffs have standing to bring UCL and FAL claims

Defendants argue that Plaintiffs lack standing because they "do not allege that they lost money or property, and their conclusory allegations regarding wear and tear on their batteries, memory, CPU, and bandwidth of their devices, and their data usage and electricity costs . . . are still too speculative to confer standing." Not so. Plaintiffs suffered a cognizable "economic injury" resulting from Defendants' improper collection and use of their personal information. *Kwikset Corp. v. Sup. Ct.*, 51 Cal.4th 310, 321 (2011). Plaintiffs have alleged the existence of a market for their data (¶¶164–74); that they suffered because of the bargain damages from the loss of their personal information (¶179); that the value of their data—which is property under the California Consumer Privacy Act (*see* Cal. Civ. Code § 1798.140(v)(1))—was diminished due to Defendants' conduct

1   (¶184); and impairment of their ability to participate in that market (¶186). Such allegations suffice

2   to confer standing under the UCL and FAL. Order at 15 (citing *Bass v. Facebook, Inc.*, 394 F.Supp.3d

3   1024, 1040 (N.D. Cal. 2019)); *see also Brown v. Google LLC*, 2021 WL 6064009, *16 (N.D. Cal.)

4   (same) (collecting cases); *Calhoun*, 526 F.Supp.3d at 636 ("plaintiffs who suffered a loss of their

5   personal information suffered economic injury").

6       Defendants' continued reliance on *Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836 (N.D. Cal.

7   2014), and *Low v. LinkedIn* is still inapt. Those decisions predate *Facebook Tracking*, which held

8   that plaintiffs have suffered an economic injury for standing purposes from the improper collection

9   of their personal information. 956 F.3d at 600–01. Since *Facebook Tracking*, many courts have found

10  similar allegations regarding the loss of users' personal information, for which there is a market,

11  enough to confer UCL and FAL standing. *E.g.*, *Klein v. Facebook, Inc.*, 580 F.Supp.3d 743, 803

12  (N.D. Cal. 2022) ("by providing [defendant] with their information and attention," plaintiffs had

13  alleged they "lost money or property") (citation omitted); *Griffey v. Magellan Health Inc.*, 2022 WL

14  1811165, *10 (D. Ariz.) (same).

15      In addition, Plaintiffs have alleged an injury by compromised battery depletion, memory,

16  CPU, and bandwidth—which resulted in increased data usage and electricity costs. ¶¶189–93, 205,

17  227, 238, 247, 255, 306, 314. Such allegations are also sufficient to confer standing, as described

18  above. *Google Priv. Pol'y Litig.*, 58 F.Supp.3d at 980 (battery depletion confers standing); *iPhone*

19  *Application*, 6 F.Supp.3d at 1014 (battery depletion, increased bandwidth, and storage space usage

20  supports standing under the UCL).

21      Defendants also argue that Plaintiffs lack standing because they fail to allege fraudulent

22  conduct with specificity. As a preliminary matter, this requirement does not apply to the unfair and

23  unlawful prongs of the UCL because those claims arise from Defendants' (1) violation of "statutes,

24  Constitutional provisions and common law" (¶300); and (2) improper collection and sharing of LINE

25  users' personal information (¶301). *In re: Qualcomm Antitrust Litig.*, 2023 WL 121983, *22 (N.D.

26  Cal.) (sustaining UCL claims under unfair and unlawful prongs but finding plaintiffs failed to "plead

27  specific instances of fraudulent representations" under the fraudulent prong). Because Plaintiffs'

28  claims under these prongs do not rely on omissions or misrepresentations, they must be analyzed

separately.[29] Further, as stated below, Plaintiffs have adequately alleged concealment and misrepresentation under the FAL and the fraud prong of the UCL.

### b.    Plaintiffs state claims under the unlawful and unfair prongs

**Unlawful.** Defendants agree that the "unlawful" prong of the UCL prohibits conduct forbidden by law. Mot. at 28 (citing *In re Google Assistant Priv. Litig.*, 457 F.Supp.3d 797, 841 (N.D. Cal. 2020)). Plaintiffs adequately plead unlawful conduct based on statutory and common law violations. ¶¶266–97, 317–94; *see also Calhoun*, 526 F.Supp.3d at 636 (upholding UCL claim where plaintiffs pled CIPA and statutory larceny claims); *Brown*, 2021 WL 6064009, *16 (similar).

**Unfair.** Defendants' conduct violates the UCL under any one of the three tests that California courts have adopted for the "unfairness" prong of the UCL. *In re Zoom Video Commc'n Inc. Priv. Litig.*, 525 F.Supp.3d 1017, 1047 (N.D. Cal. 2021) (noting violations of any one of these tests suffice). First, Defendants' conduct resulted in a loss of Plaintiffs' personal information, diminution of the value of such information, and compromised battery, memory, CPU, and bandwidth of their devices. ¶¶189–93, 205, 227, 238, 247, 255, 305–06, 314. These harms are not outweighed by any utility from LINE Messenger or B612—indeed, the collection of users' sensitive information, including their face geometry scans, was not needed to make the Apps function. Nor was it necessary for that sensitive information to be transferred or made available to servers in China and Hong Kong. ¶6. Second, Plaintiffs allege that they were "unable to mitigate harms they incurred because of Defendants' actions." ¶181. Third, Defendants' conduct violated LINE Corp.'s express privacy promises regarding the security of users' messages. ¶¶5, 137–38, 150, 185–86, 195–96, 269, 304, 312. Finally, LINE Corp. violated privacy, data, and consumer protections established by constitutional and statutory authority, including Article I of the California Constitution, CIPA, CFAA, BIPA, Larceny, and Conversion. ¶¶266–97, 317–94. These allegations establish a violation of the UCL unfair prong under all three tests. *Svenson v. Google, Inc.*, 2015 WL 1503429, *10 (N.D. Cal.) (finding plaintiffs sufficiently alleged violation of the UCL's unfair prong where plaintiffs

---

[29] *Compare Brown*, 2021 WL 6064009, *18 (finding plaintiffs were not "required to allege reliance" where their UCL claim was based on violations of federal and state statutes and common law); *with Orshan v. Apple Inc.*, 2018 WL 1510202, *5 (N.D. Cal.) (applying Rule 9(b) where "all" of plaintiffs' claims were "grounded in fraud").

1    alleged that "Google violated its own privacy policies" by failing to safeguard the plaintiffs' data).

2                              c.    **Plaintiffs plead reliance**

3           Contrary to Defendants' argument, Plaintiffs have alleged "specific statements" by LINE

4    Corp. regarding "end-to-end encryption of all messages." ¶¶137, 304. Specifically, Plaintiffs allege

5    LINE Corp. made public statements assuring users that the contents of their messages on LINE

6    Messenger were encrypted and that it was "not possible to check the contents of the data just by

7    accessing the database." ¶¶5, 137–38, 150, 185–86, 195–96, 269, 289, 304, 312. Far from

8    "conclusory allegations," Plaintiffs specify the who (*i.e.*, LINE Corp.), the what (*i.e.*,

9    misrepresentations regarding messaging encryption), and the when/where/how (*i.e.*, in LINE Corp.'s

10   public statements).[30]

11          Plaintiffs allege reliance on these misrepresentations because they were "likely to be misled

12   by" these statements. ¶¶304, 313. Moreover, LINE Corp.'s representations are material because they

13   concern the security of Plaintiffs' personal information. Thus, Plaintiffs' reliance can be assumed for

14   purposes of a motion to dismiss. *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1055 (9th Cir. 2017) ("[T]he

15   question of whether any given misrepresentation is material enough to infer actual reliance is judged

16   under a reasonable consumer standard, and as such materiality is generally a question of fact.")

17   (citations and quotations omitted); *Shin v. BMW of N. Am.*, 2009 WL 2163509, *4 (C.D. Cal.)

18   ("Plaintiffs are not required to plead 'reliance' . . . with particularity."). Further, Plaintiffs allege that

19   they have suffered an economic injury resulting from this fraudulent conduct. ¶¶305, 313.

20                 **4.    Plaintiffs state claims for violation of CIPA and ECPA**

21          California's Invasion of Privacy Act prohibits (1) the interception, or (2) receipt and

22   intentional recording, of communications transmitted between cellular phones without the consent of

23   all parties to the communication, as well as assistance with (1) or (2). Cal. Penal Code § 632.7(a).

24   Plaintiffs pleaded with particularity that Defendants intercepted and transmitted private message

25

26   ─────────────────────
     [30] At the very least, these statements are "partial representations" that give rise to a fraudulent
27   omission. *In re Adobe Sys., Inc. Priv. Litig.*, 66 F.Supp.3d 1197, 1229 (N.D. Cal. 2014) (finding
     omissions about the security of users' information actionable); *In re Sony Gaming Networks &*
28   *Customer Data Sec. Breach Litig.*, 996 F.Supp.2d 942, 991 (S.D. Cal. 2014) (omission that defendant
     lacked reasonable and adequate safeguards is actionable).

content—videos, URLs, and keywords—captured via the Apps on Plaintiffs' phones to the Defendants' domains, where they recorded and stored user data, and Plaintiffs pleaded that this interception and recording are separate from the actual process of transmitting the message to the intended recipient. ¶¶137–48. The LINE Messenger App is specifically designed to identify and capture keywords in users' messages matching single words or phrases, which are taken letter-by-letter before and during the transmission of the message to its intended recipient. ¶¶145, 203, 220, 233, 322. Without the user's consent to the Defendants' eavesdropping on and recording their messages, this is a violation of CIPA. *Adler v. Community.com, Inc.*, 2021 WL 4805435, *5 (C.D. Cal.).

Defendants conflate the Plaintiffs' intercepted 'videos, URLs, and keywords' with the 'keystrokes, mouse clicks, and pages viewed' identified in *Yoon v. Lululemon USA, Inc.*, 549 F.Supp.3d 1073 (C.D. Cal. 2021), as not constituting content. Defendants also ignore Plaintiffs' allegations that their messages are scanned, and certain identified keywords are intercepted letter-by-letter. ¶145. Nor do Defendants address the allegations that URLs and videos are also intercepted. ¶¶134, 139, 142. The Court in *Yoon* collected a series of cases that define content consistent with Plaintiffs' allegations here. Unlike in *Yoon*, Plaintiffs do not claim that Defendants are simply capturing keystrokes or mouse clicks; this case concerns the capture, interception, and monetization of the ***substance*** of the communications Defendants claim to encrypt and secure on behalf of their users. ¶¶5, 137–48, 150, 185–86, 195–96, 269, 289, 304, 312.

Defendants further misread *Zynga*, where the Ninth Circuit held that "record information regarding the characteristics of the message that is generated in the course of communication […] does not qualify as contents." 750 F.3d at 1106. But "record information" only "includes the name, address, and subscriber number or identity of a subscriber or customer." *Id*. (quotation marks omitted). It is the opposite of the actual content of the messages alleged here—the videos, URLs, and keywords—which qualify as content. *In re Carrier IQ, Inc.*, 78 F.Supp.3d 1051, 1083 (N.D. Cal. 2015); *see also Brodsky v. Apple Inc.*, 445 F.Supp.3d 110 (N.D. Cal. 2020); *Google Cookie Placement*, 806 F.3d at 150–51 (holding that URLs qualify as content).

Finally, Defendants imply that their interception falls under the "ordinary course of business"

exception to the Wiretap Act. But this exception is narrow in scope and requires that the electronic communication service provider demonstrate that "the interception facilitated the communication service or was incidental to the functioning of the provided communication service." *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, *8 (N.D. Cal.). Defendants have demonstrated no such necessity, and as specifically alleged (¶323), there is none.

### 5.   Plaintiffs state a claim for violation of the CFAA

The CFAA prohibits exceeding authorized access to a computer. 18 U.S.C. § 1030(a)(2)(C). Defendants rely on the inapposite *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022), where hiQ Labs scraped publicly available information from LinkedIn's website. *hiQ* explains that the CFAA contemplated three types of protections: 1) computers for which access is open to the general public and permission is not required, 2) computers for which authorization is required and has been given, or 3) computers for which authorization is required but has not been given (or, in the case of the prohibition on exceeding authorized access, had not been given for the part of the system accessed). *Id.* Because LinkedIn's website was available to anyone with a web browser, it fell under the first category: permission is not required. *Id.* at 1197–98.

Conversely, in this case, not only are the subject communications private, Defendants said that they were end-to-end-encrypted, meaning that nobody besides the sender and recipient should have been able to see them. ¶¶5, 137–38, 150, 185–86, 195–96, 269, 289, 304, 312. But Defendants nonetheless accessed users' messages (¶¶145, 203, 220, 233, 322), clearly exceeding the scope of the authority Plaintiffs granted to the Defendants by installing the App on their devices. Plaintiffs were never notified of, and never consented to, this surreptitious access. ¶¶5–6, 345(e), 346(d), 347(e). Defendants are liable under the CFAA when they hide the fact that they are engaging in the "unauthorized procurement or alteration of information." *Brodsky*, 445 F.Supp.3d at 128.

Finally, Defendants' argument that Plaintiffs have failed to allege any actual damage or loss simply ignores the FAC's allegations regarding loss of their privacy rights and deprivation of the property interest in one's personal information, which constitutes an economic injury. ¶¶164–88, 345(e), 346(d), 347(e); *Facebook Tracking*, 956 F.3d at 599. And Defendants ignore Plaintiffs' particularized allegations that their devices' batteries, memory, CPU, and bandwidth were

1  significantly depleted by the operation of the Apps. ¶¶189–94.

2  ### 6.  <u>Plaintiffs state a claim for violation of the Illinois BIPA</u>

3  Defendants argue that Plaintiff Shubert cannot establish that Defendants possessed his face

4  geometry scans because, although LINE Messenger employed software to run the scans, Plaintiff

5  Shubert cannot prove, at the pleading stage, that Defendants possess them. But the FAC alleges that

6  both Apps, using the SenseTime SDK, collected face geometry scans. ¶¶122–36, 221, 234, 242, 250.

7  And Defendants ignore that the B612 App, for which Defendants are also responsible, was observed

8  to transmit the face geometry scans to Snow, Naver, Naver Cloud, and Naver Cloud Americas. ¶¶133,

9  224, 244, 252. This suffices. *Heard v. Becton, Dickinson & Co.*, 524 F.Supp.3d 831, 843 (N.D. Ill.

10  2021) (denying motion to dismiss BIPA claim); *see also Cothron v. White Castle Sys., Inc.*, 467

11  F.Supp.3d 604 (N.D. Ill. 2020) (denying motion to dismiss BIPA "transmission" claim when

12  defendant relied upon third-party software to collect biometric information). And unlike *Jacobs v.*

13  *Hanwha Techwin Am., Inc.*, 2021 WL 3172967, *2 (N.D. Ill.), where the plaintiff could not assert

14  how defendant was connected to collection of biometric information beyond manufacture of security

15  cameras, the FAC details the specific SenseTime SDK Defendants use to collect face geometry scans

16  in the Apps. ¶361; *Theriot v. Louis Vuitton N. Am., Inc.*, 2022 WL 17417261, *4 (S.D.N.Y.)

17  (allegations that defendant collected information via third-party software are sufficient).

18  ### 7.  <u>Plaintiffs state a claim for larceny</u>

19  Plaintiffs state a claim for larceny under Cal. Penal Code § 496. Plaintiffs have a property

20  interest in their data. *Calhoun*, 526 F.Supp.3d at 635. A property "interest need not be one that was

21  considered property at common law and, of course, need not be tangible." *G.S. Rasmussen & Assocs.,*

22  *Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 902 (9th Cir. 1992); *Cf. CTC Real Est. Servs. v. Lepe*,

23  140 Cal.App.4th 856, 860 (2006) ("A person's identifying information is a valuable asset.").

24  Defendants assert that they obtained nothing via false pretenses, but the FAC alleges

25  otherwise. *E.g.*, ¶¶137–38, 185, 195, 304–06, 379. LINE Corp. stated that LINE Messenger was end-

26  to-end encrypted, but it was not, and Defendants point to no effective disclosure that they were taking

27  the complained-of information. *Id*. Plaintiffs used the Apps and placed their property into them,

28  expecting that it would be private, but the LINE Defendants took it, and shared it with each other and

1    the Naver Defendants. ¶¶25, 304, 385. And under Cal. Penal Code § 496, mere *copying* of Plaintiffs'

2    data—even without a false pretense—is actionable. *Calhoun*, 526 F.Supp.3d at 635 ("California

3    courts have held that copying is theft because 'although the owner may retain possession of the

4    original property, there has been nevertheless a deprivation of property when a copy is made.'").

5    Plaintiffs allege copying (¶385) and theft of keywords and URLs. ¶¶137–38.

6         *Receipt* of stolen property is also actionable. Cal. Penal Code § 496(a); *People v. Allen*, 21

7    Cal.4th 846, 858 (1999) ("[T]he thief may now be convicted under section 496 whether he bought,

8    *received*, concealed, withheld, ***or*** sold the property.") (emphasis added). As is "*aid[ing]* in

9    concealing, selling, or withholding any property from the owner." Cal. Penal Code § 496(a); *Siry*

10   *Inv., L.P. v. Farkhondehpour*, 13 Cal.5th 333, 361 (2022) ("Defendants also concealed or withheld

11   those funds and/or ***aided in*** concealing or withholding them from plaintiff.") (cleaned up). The FAC

12   alleges that Defendants *aided* SenseTime and the common enterprise by concealing, withholding, or

13   monetizing/selling Plaintiffs' property. ¶¶3, 76, 111, 124, 126, 155–63, 185. And Defendants are

14   *holding* Plaintiffs' property. ¶¶379–80, 386. Thus, Defendants cannot credibly argue that they did

15   not, at least, aid in the receipt of Plaintiffs' property — not to mention they received it, concealed it,

16   withheld it, and monetized it. *Id.*

17        Defendants argue that they did not know Plaintiffs' property was stolen. Yet they had

18   knowledge they were taking, aiding, or receiving Plaintiffs' property as soon as Defendants enabled

19   their software to do so, including by deliberately placing the SenseTime SDK into LINE Messenger

20   and B612. ¶¶3, 111, 122–33, 221, 234, 242, 250. More evidence that LINE Corp. knowingly received

21   Plaintiffs' face geometry scans is that its patented technology is designed to do just that.[31] ¶¶134–35.

22   Indeed, even a year and a half after the formal notice via this lawsuit in July 2021, LINE *still*

23   withholds Plaintiffs' property. The "law imposes a ***continuing*** affirmative duty to restore stolen

24   property to its rightful owner." *Naftzger v. Am. Numismatic Soc'y*, 42 Cal.App.4th 421, 432 (1996),

25   *as modified on denial of reh'g* (Mar. 4, 1996) (collecting cases). Even "an innocent purchaser cannot

---

[31] Knowledge cannot be resolved on a motion to dismiss. *People v. Gould*, 111 Cal.App.2d 1, 6
(1952) ("It was for the trial court to determine whether defendant's denial of any knowledge of the
hidden jewelry, and his and Pressler's explanation of the source of the plastic sacks, was
satisfactory.").

withhold or sell the stolen property after learning of the theft without risk of violating Penal Code section 496." *Id.*[32]

As discussed above, Plaintiffs' property was damaged as well. *E.g.*, ¶387.

### 8. Plaintiffs state a claim for conversion

"Conversion is the wrongful exercise of dominion over the personal property of another." *Taylor v. Forte Hotels Int'l*, 235 Cal.App.3d 1119, 1124 (1991). Conversion deals with control over personal property. *See id.*; *Facebook Tracking*, 956 F.3d at 598 (A "right to privacy encompasses the individual's control of information concerning his or her person.") (cleaned up). Under California law, to plead conversion, a Plaintiff need only allege "(1) the plaintiff's ownership or right to possession of personal property; (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages." *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal.App.4th 97, 119 (2007). "[M]istake, good faith, and due care are ordinarily immaterial," and not defenses for conversion. *Taylor*, 235 Cal.App.3d at 1124.

Here, Plaintiffs alleged a right to possess control over their personal information—their property (¶¶175–77, 205, 227, 238, 247, 255, 378); Defendants' interference with their right to control their property and/or the outright taking of it (¶¶178–80, 186–87, 379–80, 383–86); and resulting damages (¶387). Thus, Plaintiffs adequately state a claim for conversion. *Cf. Facebook Tracking*, 956 F.3d 589 (reversing dismissal for lack of standing for conversion claim).

### 9. Plaintiffs state a claim for unjust enrichment

Contrary to Defendants' argument, under California law, unjust enrichment *is* an independent cause of action. *Bruton v. Gerber Prods. Co.*, 703 F.App'x 468, 470 (9th Cir. 2017) (recognizing that the California Supreme Court allowed an independent claim for unjust enrichment); *Williams v. Facebook, Inc.*, 384 F.Supp.3d 1043, 1057 (N.D. Cal. 2018). "An unjust enrichment claim requires the 'receipt of a benefit and [the] unjust retention of the benefit at the expense of another.'" *Williams*, 384 F.Supp.3d at 1057 (quoting *Lectrodryer v. SeoulBank*, 77 Cal.App.4th 723, 726 (2000)).

---

[32] Defendants' argument that their theft was consented to is specifically refuted by the FAC. ¶¶1, 5, 125–26, 204, 216, 223–26, 229, 236–37, 241–46, 268, 283. *Cf. Calhoun*, 526 F.Supp.3d at 623 (denying purported consent defense). Consent is yet another factual issue in any event. *Brown v. Google LLC*, 525 F.Supp.3d 1049, 1068 (N.D. Cal. 2021) (consent is a highly fact-specific inquiry).

Alternatively, as Defendants admit, "[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citing *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal.App.4th 221, 231 (2014)). And Defendants admit that such a claim lies where there is mistake or fraud and the defendant has unjustly retained a benefit. Mot. at 36. Defendants also argue that an express contract bars Plaintiffs' claim, but an unjust enrichment case can co-exist with an express contract. *Williams*, 384 F.Supp.3d at 1057.

The FAC adequately alleges unjust enrichment because: 1) Plaintiffs downloaded and used Defendants' Apps (¶¶201, 213, 228, 239, 248); 2) Defendants collected Plaintiffs' private and personally-identifiable information without consent (¶¶204, 216–26, 229–37, 241–46, 252–54); 3) Defendants profited from that stolen information, while the value of Plaintiffs' information to Plaintiffs was thereby diminished (¶¶182–88, 389–94); 4) Plaintiffs were able to download the Apps without being placed on notice of, reviewing, or understanding any of the terms which Defendants assert as governing their relationship (¶199); and 5) the terms were deceptive and did not provide accurate information. (¶200). *See Marek v. Molson Coors Beverage Co.*, 580 F.Supp.3d 848, 862–63 (N.D. Cal. 2022) (allowing unjust enrichment claim based on false and deceptive claims).

The nature of the benefits that each Defendant acquired are specified, and it is not "group pleading" to allege they all profited. ¶¶26, 29, 32–33, 36, 40, 43, 46, 54, 61, 63, 68, 79, 87, 93, 95. That Plaintiffs cannot prove the precise value at the pleading stage is unremarkable and immaterial, since doing so requires discovery. *Cf. In re Facebook Priv. Litig.*, 572 Fed.App'x 494 (9th Cir. 2014) (recognizing that personal information has value); *Brown v. Google LLC*, 2022 WL 17961497, *5–6 (N.D. Cal.) (expert testimony proper on value of personal information on restitution theory).

### 10.     Plaintiffs are entitled to equitable relief, including an injunction

Plaintiffs seek an injunction because other remedies will ***not*** resolve the ongoing harm, and will not return or destroy Plaintiffs' data. ¶¶308, 316, Prayer for Relief ¶D. *See Meta Pixel Healthcare*, 2022 WL 17869218, *17 ("The invasion of privacy triggered by the [Defendants'] allegedly ongoing disclosure of plaintiffs' [] information is precisely the kind of intangible injury that cannot be remedied by damages.") (collecting cases); *eBay Inc. v. MercExchange, L.L.C.*, 547

1  U.S. 388, 391 (2006).[33] "Because intangible injuries generally lack an adequate legal remedy,

2  intangible injuries may qualify as irreparable harm." *Meta Pixel Healthcare*, 2022 WL 17869218,

3  \*17 (cleaned up).

4         The threat of ongoing privacy violations supports the granting an injunction to stop the

5  ongoing irreparable harm. *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir.

6  2012) ("We have little difficulty concluding the record supports the district court's finding that

7  [defendant] would have continued to violate [...] if an injunction had not been issued."); *see also*

8  *Kellman v. Spokeo, Inc*., 2022 WL 1157500, \*12 (N.D. Cal.) ("[W]e are at the earliest stage of this

9  case, it is not clear what the extent of legal remedies will be, and there is every possibility that the

10 equitable relief will go beyond them.") (citing *Zeiger v. WellPet LLC*, 526 F.Supp.3d 652, 687 (N.D.

11 Cal. 2021) (holding that retrospective legal remedies can be an inadequate to redress prospective

12 violations)). And unless Defendants have the ability, which the United States Government itself

13 lacks, to get the Chinese Communist Party to destroy data it has taken, Plaintiffs' injuries are

14 irreparable. *E.g*., ¶¶180–81, 279, 296–97.

15 **III.    CONCLUSION**

16        Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety. In the

17 alternative, Plaintiffs respectfully request leave to amend.

18

19 DATED: February 3, 2023                      By: */s/ Jonathan M. Rotter*

20                                               Jonathan M. Rotter – State Bar No. 234137
                                                 Raymond D. Sulentic – State Bar No. 316913
21                                               **GLANCY PRONGAY & MURRAY LLP**
                                                 1925 Century Park East, Suite 2100
22                                               Los Angeles, California 90067-2561
                                                 Telephone: (310) 201-9150
23                                               Facsimile: (310) 201-9160
                                                 Email: info@glancylaw.com
24

25 _____

26 [33] Defendants cannot rely on *Sonner v. Premier Nutrition Corp*. Unlike Plaintiffs here, "Sonner
   concede[d] that she seeks the same sum in equitable restitution . . . as she requested in damages to
27 compensate her for the same past harm." 971 F.3d 834, 844 (9th Cir. 2020). Not so here. Moreover,
   Plaintiffs may pursue equitable claims where, they are "rooted in a different theory," than their legal
28 claims. *Elgindy v. AGA Serv. Co.*, 2021 WL 1176535, \*15 (N.D. Cal.). That is the case here due to
   the conferral of a benefit theory, which is not an element of the legal claims.

1

2   Amy E. Keller (admitted *pro hac vice*)
     akeller@dicellolevitt.com
3   Sharon D. Cruz (admitted *pro hac vice*)
     scruz@dicellolevitt.com
4   **DiCELLO LEVITT LLC**
    Ten North Dearborn Street, Sixth Floor
5   Chicago, Illinois 60602
    Tel. (312) 214.7900
6

7   *Attorneys for Plaintiff Lee Shubert*

8   Ekwan E. Rhow – State Bar No. 174604
     erhow@birdmarella.com
9   Marc E. Masters – State Bar No. 208375
     mmasters@birdmarella.com
10  **BIRD MARELLA BOXER WOLPERT NESSIM**
    **DROOKS LINCENBERG & RHOW P.C.**
11  1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
12  Telephone: (310) 201-2100
    Facsimile: (310) 201-2110
13

14  Youngbin Son – State Bar No. 324547
     yson@cohen-williams.com
15  **COHEN WILLIAMS LLP**
    724 South Spring Street, 9th Floor
16  Los Angeles, CA 90014
    Tel: 213-232-5162
17  Fax: 213-232-5167
18

19  Lesley E. Weaver – State Bar No. 191305
     lweaver@bfalaw.com
20  Joshua D. Samra – State Bar No. 313050
     jsamra@bfalaw.com
21  **BLEICHMAR FONTI & AULD LLP**
    555 12th Street, Suite 1600
22  Oakland, California 94607
    Tel. (415) 445-4003
23

24  *Attorneys for Plaintiffs Sydney Ji, Kira Tomlinson,*
    *Ranela Sunga, and Stefanie Bonner*

25

26

27

28

1

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)**

2

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained

3

from the signatory. I declare under penalty of perjury that the foregoing is true and correct.

4

Executed this 3rd day of February, 2023, at Oakland, California.

5

*/s/ Lesley E. Weaver*
Lesley E. Weaver

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28