Jonathan M. Rotter - State Bar No. 234137
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067-2561
Tel.: (310) 201-9150
Fax.: (310) 201-9160
info@glancylaw.com

Marc E. Masters – State Bar No. 208375
**BIRD MARELLA RHOW LINCENBERG
DROOKS & NESSIM LLP**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel.: (310) 201-2100
Fax.: (310) 201-2110
mmasters@birdmarella.com

Lesley E. Weaver – State Bar No. 191305
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, California 94612
Tel. (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Attorneys for Plaintiffs and the Putative Class*
[Additional Counsel Appear on Signature Block]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ranela Sunga, Stefanie Bonner, Senna Chen, and Justin Bologna individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NAVER CORPORATION, a corporation; NAVER CLOUD CORPORATION, a corporation; NAVER CLOUD AMERICA INC. f/k/a NAVER BUSINESS PLATFORM AMERICA INC., a corporation; SNOW CORPORATION, a corporation; SNOW INC., a corporation; LY CORPORATION. f/k/a Z HOLDINGS CORPORATION, a corporation; LINE CORPORATION/LY CORPORATION, a corporation; LINE PLUS CORPORATION, a corporation; and LINE EURO-AMERICAS CORPORATION, a corporation.<br><br>Defendants. | CASE NO.  4:21-cv-05143-HSG<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**(1) Intrusion upon Seclusion**<br>**(2) Violation of the Right to Privacy - California Constitution**<br>**(3) Violation of the California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et seq.***<br>**(4) Violation of the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq.***<br>**(5) Violation of the California Invasion of Privacy Act, Cal. Pen. C. § 630 *et seq.***<br>**(6) Violation of the Electronic Communications Privacy Act. 18 U.S.C. §§ 2510 *et seq.***<br>**(7) Larceny, Cal. Pen. C. § 496**<br>**(8) Conversion**<br>**(9) Restitution / Unjust Enrichment** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

1

<u>**TABLE OF CONTENTS**</u>

2

I.      INTRODUCTION .................................................................................................. 1

3

II.     THE PARTIES ...................................................................................................... 2

4

III.    JURISDICTION AND VENUE ............................................................................ 4

5

        A.      Subject Matter Jurisdiction ....................................................................... 4

6

        B.      Personal Jurisdiction: Common Enterprise - Defendants' Shifting Maze of

7               Interrelated Corporate Entities .................................................................. 4

8

        C.      Personal Jurisdiction: The Naver Defendants .......................................... 9

9

                1.      Naver Corporation ........................................................................ 10

10

                2.      Naver Cloud Corporation ............................................................. 14

11

                3.      Naver Cloud America Inc. ............................................................ 20

12

                4.      Snow Corporation ........................................................................ 23

13

                5.      Snow Inc. ...................................................................................... 24

14

                6.      Common Enterprise Summary ..................................................... 26

15

        D.      Personal Jurisdiction: The Z-LINE Defendants ..................................... 27

16

                7.      LY Corp. (formerly Z Holdings Corp.) ....................................... 27

17

                8.      LINE Corporation ........................................................................ 34

18

                9.      LINE Plus Corporation ................................................................ 45

19

                10.     LINE Euro-Americas Corp. ......................................................... 49

20

                11.     Common Enterprise Summary ..................................................... 50

21

        E.      Venue ....................................................................................................... 51

22

IV.     GENERAL ALLEGATIONS .............................................................................. 51

23

        A.      LINE Messenger Is A Popular Messenger App ...................................... 51

24

        B.      B612 Is A Popular Photo And Video Editing App .................................. 51

25

        C.      Naver Has A History Of Committing Privacy Violations........................ 52

26

        D.      LINE Messenger and B612 Unlawfully Collect User Biometrics with the Aid of the

27              Dangerous SenseTime SDK and Through Other Means ......................... 53

28

1. SenseTime Is a China-Based Technology Company Focused on AI, Which it Uses to Assist the Chinese Communist Party With Its Political, Military, and Policing Agenda. ................................................................. 53

2. Defendants Use the SenseTime SDK Embedded in LINE Messenger and B612 to Unlawfully Collect Users' Face Geometry Scans. ........................ 58

3. Defendants, on Information and Belief, Also Unlawfully Conduct Face Geometry Scans from LINE Messenger and B612 User Videos They Have Collected. ................................................................................................... 61

E. LINE Messenger Promises Users End-to-End Encryption of Their Chat Messages, but Instead, User Videos, URLs, and Certain Keywords from Those Chat Messages Are Unlawfully Intercepted. ................................................................................. 63

1. Interception of Videos. ........................................................................... 63

2. Interception of URLs. ............................................................................. 64

3. Interception of Keywords. ...................................................................... 65

F. LINE Messenger Has Been Banned By the Japanese Government Due to Data Privacy and Security Concerns. ............................................................................... 65

G. B612 Collects Personally Identifiable User Data and Unlawfully Transmits It to China Where It Is Accessible By the Chinese Communist Party. ........................... 67

H. The LINE Messenger App Collects Other Personally Identifiable User Data........ 68

I. Plaintiffs' Personal Information Has Economic Value and There is a Market for this Information ....................................................................................................... 69

J. Plaintiffs Suffered an Economic Injury ................................................................. 72

V. FRAUDULENT CONCEALMENT AND TOLLING ........................................................ 74

VI. INAPPLICABILITY OF PURPORTED POLICIES AND TERMS OF USE .................. 75

VII. NAMED PLAINTIFF ALLEGATIONS .......................................................................... 75

VIII. CLASS ALLEGATIONS ................................................................................................... 81

IX. CAUSES OF ACTION ...................................................................................................... 84

First Cause of Action ....................................................................................................... 84

(Intrusion Upon Seclusion – By Plaintiffs Sunga, Bonner, and Chen ("California Plaintiffs") Against All Defendants) ................................................................................. 84

Second Cause of Action ................................................................................................... 89

(Violation of the Right to Privacy – California Constitution – ..................................... 89

Third Cause of Action ............................................................................. 93

 (Violation of the California Unfair Competition Law, ............................... 93

Fourth Cause of Action.......................................................................... 96

 (Violation of the California False Advertising Law, .................................... 96

Fifth Cause of Action ............................................................................ 98

 (Violation of California Invasion of Privacy Act,....................................... 98

Sixth Cause of Action ........................................................................... 100

 (Violation of the Electronic Communications Privacy Act,  18 U.S.C. § 2510, *et seq.* –
 All Plaintiffs Against All Defendants)....................................................... 100

Seventh Cause of Action ....................................................................... 102

(Larceny / Receipt of Stolen Property, Cal. Penal Code § 496(a) and (c) – California
Plaintiffs Against All Defendants) .............................................................. 102

Eighth Cause of Action.......................................................................... 106

(Conversion – California Plaintiffs Against All Defendants) ....................... 106

Ninth Cause of Action ........................................................................... 108

 (Restitution / Unjust Enrichment – California Plaintiffs Against All Defendants) .... 108

X. PRAYER FOR RELIEF ....................................................................... 109

XI. DEMAND FOR JURY TRIAL ............................................................... 110

**I.      INTRODUCTION**

1.      This is a data privacy case involving two widely popular and interconnected mobile applications ("apps").   Through these apps, Defendants surreptitiously collect vast troves of personally identifiable user data without user consent – including unique biometric information and private message content.

2.      Defendants are a group of interrelated companies.   Their formal ownership and operational reporting lines have shifted continuously during the relevant period (see Figures 1-7 below), but throughout, they have acted as a common enterprise with regard to the ownership, operation, IT infrastructure, and promotion of the apps, and specifically, with regard to the misconduct alleged below.   Acting through this interrelated web of companies, Defendants unlawfully collect, use, and share personal data from users of the apps for their own commercial purposes.

3.      The first app, LINE Messenger, is a mobile messenger app.   The second app, B612, is a photo and video altering app targeted at younger consumers which allows users to change their appearance with various beautification filters.   Defendants embedded within both apps the China-based SenseTime software development kit ("SDK") which collects users' unique biometric identifiers and biometric information.   SenseTime is deeply enmeshed in China's intelligence and surveillance apparatus.   The United States Department of Treasury's Office of Foreign Assets Control designated SenseTime as a Non-SDN Chinese Military-Industrial Complex Company pursuant to Executive Order of June 3, 2021, "Addressing the Threat from Securities Investments that Finance Certain Companies of the People's Republic of China."   In that Order, President Biden found "that the use of Chinese surveillance technology outside the PRC and the development or use of Chinese surveillance technology to facilitate repression or serious human rights abuse constitute unusual and extraordinary threats, which have their source in whole or substantial part outside the United States, to the national security, foreign policy, and economy of the United States."   The previous administration prohibited certain technology exports to SenseTime by placing it on the U.S. Entity List in 2019.

4.      No company should be using the SenseTime SDK in an app offered to U.S.

consumers.  But not only do the Defendants embed the SenseTime SDK in the two apps, one of the companies (SoftBank) involved in the ownership of several Defendants also owns a significant stake in SenseTime.  See Figures 3-5, below.

5.      When using LINE Messenger, users are subject not only to the Defendants' collection of biometric identifiers and biometric information, but also to Defendants' interception in transit of material portions of user messages – *i.e.*, videos, URLs, and certain keywords – in unencrypted form.  That is so even though Defendants promise "end-to-end" encryption for user chats on LINE Messenger such that user messages cannot be read except by the sender and recipient. Defendants also transmit personally identifiable user data to SenseTime.  LINE Messenger users have not consented to these activities.

6.      When using B612, users are subject not only to the Defendants' collection of biometric identifiers and biometric information, which Defendants transmit to their servers, but also to Defendants transmitting personally identifiable user data to non-secure servers in China and Hong Kong, where, pursuant to Chinese law and corporate practice, it is available to the Chinese Communist Party for retention in a database used for intelligence gathering and other purposes. B612 users have not consented to these activities.

7.      Plaintiffs seek redress for Defendants' conduct, which violates privacy, data, and consumer protections established by constitutional and statutory authority as well as the common law.

## II.    **THE PARTIES**

8.      Plaintiff Ranela Sunga, an individual, is a resident of Garden Grove, California, and a citizen of the State of California.

9.      Plaintiff Stefanie Bonner, an individual, is a resident of Palm Springs, California, and a citizen of the State of California.

10.     Plaintiff Senna Chen is and, at all relevant times, was a United States citizen and resident of California, or a resident of Japan, on a student or work visa.  Plaintiff Chen currently resides in Los Angeles, California.  With respect to the allegations set forth herein, Plaintiff Chen brings these claims specifically as to the time, throughout the relevant period, in which she was

located in California.

11.     Plaintiff Justin Bologna, an individual, is a resident of Chicago, Illinois and a citizen of the State of Illinois.

12.     Defendant Naver Corporation ("Naver") is a South Korean corporation originally founded in 1999 and located at 6, Buljeong-ro, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea (13561).

13.     Defendant Naver Cloud Corporation ("Naver Cloud") is a South Korean corporation located at 117, Bundangnaegok-ro, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea (13529). Naver Cloud is a wholly owned subsidiary of Naver.

14.     Defendant Naver Cloud America Inc. f/k/a Naver Business Platform America Inc. ("Naver Cloud America") is a U.S. company located at 2033 Gateway Place, Ste. 500, San Jose, CA 95110.  Naver Cloud America is a wholly-owned subsidiary of Naver Cloud.

15.     Defendant Snow Corporation ("Snow Corp.") is a South Korean company located on the 8th Floor of Krafton Tower, 117, Bundangnaegok-ro, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea 13529.  Snow Corp. is a wholly owned subsidiary of Naver.

16.     Defendant Snow Inc. ("Snow Inc.") is a Delaware corporation located at 5750 Wilshire Blvd., Ste. 640, Los Angeles California 90036.  Snow Inc. is a wholly owned subsidiary of Snow Corp.

17.     Defendant LY Corp. f/k/a Z Holdings ("LY Corp." or "Z Holdings") is a Japanese company located at Kioi Tower 1-3 Kioicho, Chiyoda-ku, Tokyo 102-8282, Japan.  LY Corp. is a subsidiary of a joint venture between Naver and third-party SoftBank Group Corporation ("SoftBank").

18.     Defendant LINE Corporation, predecessor-in-interest to LY Corp., the entity that has since taken over the operations of LINE Corporation, (as referred to herein, "LINE Corp." shall refer to both LY Corp. and LINE Corp., where applicable, following the transfer) is a Japanese company located at JR Shinjuku Miraina Tower, 23rd Floor, 4-1-6 Shinjuku, Shinjuku-ku, Tokyo, 160-0022, Japan.  LINE Corp. is a wholly owned subsidiary of LY Corp., which during the pendency of this case has also taken on LINE Corp.'s operation of the LINE Messenger App from LINE Corp.

19.     Defendant LINE Plus Corporation ("LINE Plus") is a South Korean company located at 42, Hwangsaeul-ro 360 Beon-gil, Bundang-gu, Seongnam-si, Gyeonggi-do, South Korea.  LINE Plus is a wholly owned subsidiary of LINE Corp.

20.     Defendant LINE Euro-Americas Corp. ("LINE Euro-Americas" or "LINE E-A") is a Delaware corporation located in Palo Alto, California and Los Angeles, California.  LINE Euro-Americas is a wholly owned subsidiary of LINE Plus.

**III.     JURISDICTION AND VENUE**

**A.     Subject Matter Jurisdiction**

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States, and supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims.

22.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) and 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants, and also because some Defendants are citizens or subjects of a foreign state.

**B.     Personal Jurisdiction: Common Enterprise - Defendants' Shifting Maze of Interrelated Corporate Entities**

23.     As described above, the Naver Defendants and the Z-LINE Defendants operate a common enterprise using a maze of interrelated corporate entities, some of which are located in California and all of which target California (as discussed below).  Defendants' overlapping ownership and formal corporate relationships have continually shifted throughout the relevant period.  Figures 1-5 below, attached in enlarged form as Exhibits 1-5, provide a graphical representation of the ownership and operational entwinements between the Naver Defendants and the Z-LINE Defendants, as Defendants have reconfigured them from 2017 to the present.  As described above and illustrated below, throughout this period, both the Naver Defendants and the Z-LINE Defendants have owned, operated, and supported both the LINE Messenger and B612 apps.  Further, even in the current corporate configuration and nominal ownership structure for the LINE

Messenger and B612 apps, there continues to be significant operational overlap with regard to the operation of the apps, including data sharing and the use of a common user identifier, called a "TMID," to identify their shared users and track them across the two apps and elsewhere on the internet. Common user identifiers allow participating entities to aggregate user data and correctly associate several discrete pieces of information to a common user. As explained by one legal scholar, supposedly "anonymized" data such as unique identifier numbers still present a grave privacy risk, and "[t]he most powerful tool for re-identifying scrubbed data is combing two datasets that contain the same individual(s) in both sets[,]" such that information can be cross-referenced and associated with individuals.



**Figure 1**
(As of December 31, 2017)



**Figure 2**
(As of December 31, 2018)











**Figure 6**

(October 1, 2023 Reorganization)



**Figure 7**

(Since October 2023)

C.    **Personal Jurisdiction: The Naver Defendants**

24.    Naver, Naver Cloud, Naver Cloud America, Snow Corp., and Snow Inc. (collectively, the "Naver Defendants") – in collaboration among themselves and with the Z-LINE Defendants (defined below) – rely on the United States and California markets to promote and

advertise various mobile applications and products targeted at consumers in the United States and California through, among others, the Google Play Store and the Apple App Store.  Specifically, the Naver Defendants collaborated among themselves and with the Z-LINE Defendants to create a common enterprise that: developed, operated, and maintained the LINE Messenger and B612 apps within the United States and California; marketed the LINE Messenger and B612 apps to United States and California consumers; unlawfully collected and transmitted private United States and California user data through the LINE Messenger and B612 apps; and generated advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps.

25.    There were approximately 3,150,000 users of LINE Messenger in the United States as of September 2019.

### 1.    Naver Corporation

26.    This Court has personal jurisdiction over Naver, and venue is proper in this District.

27.    Naver owned and operated the LINE Messenger app at all relevant times prior to the completion of the March 2021 Z Holdings transaction, and Naver's tortious conduct through the LINE Messenger app (discussed below) was directed into this District.  At all relevant times, such operations included but were not limited to the unlawful collection and transmission of LINE Messenger user data (discussed below).

a.    According to Naver's website, "NAVER Corp. is a global [information communication technology] company, providing South Korea's number one search portal 'NAVER' and its subsidiaries and affiliates provide services, including LINE messenger, SNOW camera app . . . ."

b.    Naver admitted in a public securities filing in South Korea that it had "control" of the LINE Messenger app until "its business integration with Z Holdings, which was completed on March 1, 2021."  Likewise, in multiple earlier public filings, Naver admitted that it "services" LINE Messenger and "generates revenue" from the app "through ads business, contents business (sale of mobile games and 'stickers' through LINE), and sale of character goods."  Naver also has identified LINE Messenger in multiple public filings as the second "key service" that Naver

offers.

        c.     Naver has generated substantial revenue from the operation of the LINE Messenger app by selling various types of advertisements that run on the app, as well as content on mobile games and "stickers" within the app. Naver was a party to a Service Partnership Agreement, agreeing to provide advertising tools, marketing planning, operational activities, content, and APIs for the LINE Messenger app – all for the express purpose of "increas[ing] . . . [the] number of new subscribers" (including American subscribers) for the LINE Messenger app.

        d.     Z Holdings confirmed that LINE Corp. – an operator and distributor of the LINE Messenger app – was dependent on Naver for many aspects of the LINE Messenger app business: "LINE Corporation had received significant human resource support related to the business of LINE Corporation up to this point from NAVER which used to be the parent company; there is cooperation in specific fields through joint development or development consignment, and there are many cases that requests for development are being made to the Development Division of NAVER (LINE Corporation especially were dependent on NAVER's high technical strength in AI and search fields)."

28.     Naver owns and operates and, at all relevant times, owned and operated the B612 app, and Naver's tortious conduct through the B612 app (discussed below) is and, at all relevant times, was directed into this District. Such operations include but are not limited to, and at all relevant times included but were not limited to, the unlawful collection and transmission of B612 user data (discussed below).

29.     Naver is and, at all relevant times, was physically present and doing business in California. At least as of 2021: its corporate website stated it has an overseas office in the United States and its "Contact Us" page listed two California addresses in Palo Alto and Los Angeles; it expressly admitted that it has four employees in the United States, one of which – a member of Naver's finance team – provides support to Naver's United States subsidiaries; its LinkedIn page connected to a LinkedIn page for its "Chief Business Officer, North America," whose LinkedIn profile stated he is located in Palo Alto, California; it represented on its LinkedIn page that it and certain affiliated and/or subsidiary corporations have numerous employees in the San Francisco Bay

1    Area, including in San Jose, Mountain View, Santa Clara, and Palo Alto.

2        30.    Naver has and, at all relevant times, had two California-based subsidiaries: Naver

3    Cloud America (San Jose, California) and Snow Inc. (Palo Alto, California and Los Angeles,

4    California). The contacts of Naver's California-based subsidiaries and foreign subsidiaries with

5    California (discussed below) are imputed to Naver because such subsidiaries are Naver's agents.

6    ████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████

20       31.    ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████

24   ██████████████████████████████████████████    Naver offers consumers access to the

25   LINE Messenger and B612 apps for no monetary fee.  Naver's business – and the success and

26   _____

27   [1] Plaintiffs have provided source citations for certain allegations that are supported by jurisdictional

28   discovery in order to assist the parties with evaluating the need to seek under seal treatment of that
     material.

profitability of its advertising sales – depend on expanding the user base of its platforms, including the LINE Messenger and B612 apps.  Naver profits by offering its advertising clients valuable information (data) about the users of the apps, which help these advertisers more effectively target their goods and services to the right audience.  Naver's advertising tracking efforts are revealed within B612's source code, which uses two Naver coding analytics—NAVER_CLICK and NAVER_EXPOSURE—to track advertising clicks and impressions, respectively.  These codes are used within Naver's advertising ecosystem to monitor key metrics such as click-through-rates, impressions, and clicks.  NAVER_CLICK collects data on click events, including the number of clicks, associated keywords, and the landing page URL, which helps an advertiser measure engagement.  NAVER_EXPOSURE collects data on impression events such as the number of times an ad is displayed, the device type, and the user's location, which helps an advertiser assess reach and visibility.  These portions of B612's code also point to Miaozhen Systems' ("Miaozhen") domains (e.cn.miaozhen.com and g.cn.miaozhen.com).  Miaozhen is a Chinese company specializing in marketing effectiveness.  By integrating Miaozhen's ad optimization tools, Naver is able to utilize the data collected and transmitted to Miaozhen in order to leverage Miaozhen's expertise in the enhanced data analytics industry, particularly for international or specialized campaigns.

32.    Similarly, every time a user makes a video call on LINE Messenger, that user's IP address, along with other user identifiable information, is transmitted to an IP address, 123.209.252.206.  That IP address falls within a range of IP addresses allocated to Naver.  That range of IP addresses appears to serve Naver.com domains, including mail.naver.com and download.mail.naver.com, which suggests that Naver receives LINE Messenger user data.

33.    If Naver did not have subsidiaries, including Snow Corp., Snow Inc., Naver Cloud, Naver Cloud America, and (at least until March 2021) LINE Corp., helping Naver operate the LINE Messenger and B612 apps, helping Naver unlawfully collect and transmit private United States and California user data through these apps, and helping Naver expand these apps into markets such as California, Naver would have had to undertake such tasks on its own for the sake of advancing its business and profitability.

34.     Naver – and each of the Naver Defendants and the Z-LINE Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps.  But for Naver's role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps.  Naver – and each of the Naver Defendants and the Z-LINE Defendants – continuously and deliberately exploited the United States and California for commercial gain.

35.     Because Naver maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that it lacks California-specific jurisdiction over Naver, it nonetheless has personal jurisdiction over Naver under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, Naver has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

## 2.     Naver Cloud Corporation

36.     This Court has personal jurisdiction over Naver Cloud, and venue is proper in this District.

37.     Naver Cloud and Naver Cloud America are the alter egos of each other, and Naver Cloud America is incorporated in, and headquartered in, California.  Naver Cloud is also the alter ego of Naver.  Alternatively, Naver Cloud America is, at a minimum, the agent of Naver Cloud and/or Naver and/or LINE Corp./LY Corp. given the facts below.

38.     Naver Cloud's 30(b)(6) corporate representative, Sang Il-Seo ("Seo"), was put forward as an authorized representative of *Naver Cloud* but is, and all relevant times was, employed by *Naver Cloud America* as Naver Cloud America's General manager or director (his Korean title

does not have a precise English translation) and his primary responsibilities include "managing [Naver Cloud America's] equipment located in the United States." Seo Tr. 16:19-25; 78:20-79:4.

a. When asked about his job responsibilities at *Naver Cloud*, Seo testified that he manages *Naver Cloud America* equipment in the United States. When asked what else he does, he responded, "Well that's all I do." *Id.* at 16:20-25. In other words, the full scope of *Naver Cloud*'s corporate representative's job responsibilities relate to *Naver Cloud America*'s activities *in the United States*.

b. Seo is not the only Naver Cloud employee who works for Naver Cloud America. Seo's direct supervisor, Sang Joon Lee, like Seo, works for both Naver Cloud and Naver Cloud America. *Id.* at 83:18-24.

c. The CEO of Naver Cloud, Weongi Park ("Weongi"), was also the CEO of Naver Cloud America—at the same time—between 2015 and 2021. *Id.* at 91:8-21; 85:17-23. Weongi, on several occasions, executed contracts between Naver Cloud America and Naver Cloud, ***as CEO of both entities***. For example, the transaction document titled, ████████████ ████████████████████ between Naver Cloud and Naver Cloud America was executed by Weongi on both sides: as CEO of Naver Cloud on one side and as CEO of Naver Cloud America on the other. In other words, Weongi was essentially executing a contract with himself, yet purporting to bind two entities that he controls. *Id.* at 91:23-92:1. When Seo was asked what would happen in a situation where Naver Cloud or Naver Cloud America breached an agreement in which Weongi represented both sides of the transaction, Seo did not know. *Id.* at 92:3-12.

d. Weongi also acted on behalf of both Naver Cloud and Naver Cloud America on opposing sides of the same transaction (again at the same time) when he signed the ████ ████████████████████████ between Naver Cloud and Naver Cloud America. NCC-0000109-116.

e. Weongi again acted on behalf of both Naver Cloud and Naver Cloud America on opposing sides of the same transaction (again at the same time) when he signed the ████████ ████████████████████ between Naver Cloud and Naver Cloud America. In that agreement, Weongi signed on behalf of Naver Cloud (purportedly in Korea) while simultaneously

signing on behalf of Naver Cloud America in San Jose, California. NCC-0000019.

f. According to filings with the California Secretary of State, Weongi was a California resident as of 2015, and he represented under penalty of perjury that he executed documents in California as CEO of Naver Cloud America in 2018 and 2020.

39. Defendants share common Information Technology ("IT") systems. Seo's email address ends in "navercorp.com," not "Navercloud.com," nor "Naver Cloud America.com," showing entwinement with Naver Cloud, Naver Cloud America, and defendant Naver as well. Seo does not have separate email accounts for his work at Naver Cloud America and Naver Cloud, respectively. Seo Tr. 80:5-21.

40. Naver Cloud America and Naver Cloud employees can access an internal Naver employee database that gives them access to contact information for both "Naver and Naver affiliated entities." *Id.* at 60:23-25. Thus, there are shared systems between at least Naver Cloud, Naver Cloud America, and Naver. Seo testified that he also thought such systems would provide access to LINE entities as well.

41. Naver Cloud's 2023 corporate profile (English download) represents that "NAVER Cloud was originally spun off to provide IT operation services to NAVER, and it has since expanded to provide IT infrastructure and a wide range of technology solutions to NAVER's affiliates."

42. Seo testified that between 2015 and 2021, Naver made purchases of infrastructure, ████████████████████████████████████████████████████. Seo Tr. 25:5-26:2.

43. Seo also testified that "████████████████████████████████████ ]." *Id.* at 24:7-9.

44. Naver Cloud and Naver Cloud America are agents of one another because, among other reasons, between 2015 and 2021 the CEO of Naver Cloud had authority to, and did, bind Naver Cloud America to contracts between Naver Cloud America and Naver Cloud, further establishing a complete lack of separation between Naver Cloud and Naver Cloud America because the same person had control over both entities.

45. Naver Cloud America's ████████████████████████. *Id.* at 83:4-5.

1    46.    Naver Cloud also █████████████████████████████████

2    █████. *Id.* at 89:14-16.  So if Seo refused any direction that Naver Cloud gave him, Naver Cloud

3    has the ability to █████████████████████████████.  That in turn gave Naver Cloud additional

4    control over Naver Cloud America.

5    47.    Naver Cloud supports and, at all relevant times, supported the operation and

6    maintenance of the LINE Messenger app.   LINE is a customer of Naver Cloud and utilizes

7    equipment operated by Naver Cloud America. *Id.* at 73:1-6.

8    48.    LINE Corp. reported Naver Cloud's (f/k/a Naver Business Platform Corporation)

9    revenues for servicing the LINE Messenger app as follows: "NAVER Business Platform

10    Corporation provides data hosting services to us . . . [under the] information technology service

11    agreement . . . dated April 1, 2013.  For such services, we recognized expenses payable to NAVER

12    Business Platform Corporation of ¥8,490 million in 2019 [approximately US $74 million] . . . ."

13    LINE Corp. separately reported Naver Cloud (f/k/a "Naver Business Platform") as a related party

14    in LINE Corp.'s Form 6-K for the nine-month period ending September 30, 2020.

15    49.    According to ██████████████████████████████████

16    ████████████████████████████████████████████████████████

17    ██████.  Seo Tr. 42:1-2.  Thus, as two sophisticated entities that purposefully used a term of art

18    in a contract about data collection, and because partners are, by operation of law, each other's agents,

19    Naver Cloud is thus LINE Corp.'s agent in connection with LINE Corp.'s collection of data.

20    50.    Seo further testified that he thought LINE employees would █████████████

21    ████████████████████████████████████████████████████████

22    █████.  *Id.* at 61:2-5.

23    51.    Together with the above allegations, Naver Cloud supports the IT infrastructure for

24    the Naver Defendants and the Z-LINE Defendants, and also uses its own devices to host certain

25    domains registered to Snow Corp. and LINE Corp. (discussed below), such as log.snow.me, that are

26    directly involved in the unlawful collection and transmission of private United States and California

27    user data by the LINE Messenger app (including data from users in this District).  Naver Cloud

28    knew the location of California and United States users because, among other reasons, log.snow.me

SECOND AMENDED CLASS ACTION COMPLAINT

17

receives the personal information of U.S. based users, including IP addresses of such users.  Such receipt of California users' IP addresses establishes Naver Cloud's knowledge.

52.     Naver Cloud devices linked to the IP addresses for at least one of these domains are and, at all relevant times, were located in Los Angeles, California (discussed below).

53.     Naver Cloud previously admitted that it "provides global IT infrastructure management and enterprise solutions for NAVER Corporation, its parent, and NAVER Corp.'s subsidiaries, including SNOW Corporation."  At all relevant times, Naver Cloud operated under a contract to provide LINE Corp. "a service of establishing, operating and managing [LINE Corp.'s] Information System," which is defined as "all operating system and computer facilities" including "all hardware, software and network."  Under this contract, Naver Cloud acquired, installed, operated, and managed LINE Corp.'s server, data storage, and data management with respect to user data.  This included user data from the United States and California, as Naver Cloud provided a network for "domestic and foreign users" and procured facilities and networks to deliver internet content to "users" on behalf of LINE Corp.

54.     Naver Cloud also serves as an Internet Service Provider ("ISP") for the aforementioned domains registered to Snow Corp. and LINE Corp. (discussed below) that are directly involved in the unlawful collection and transmission of private United States and California user data by the LINE Messenger app (including data from users in this District).  By having a related entity (Naver Cloud) under common control serve as ISP, rather than having an independent third party serve as ISP, Snow Corp., LINE Corp., and the rest of the Naver Defendants and Z-LINE Defendants make the unlawful collection and transmission of the private United States and California user data less detectable to independent third parties.

55.     Naver Cloud is and, at all relevant times, was physically present and doing business in the United States and California because, among other reasons, Naver Cloud is effectively Naver Cloud America, and Naver Cloud America has been present here since 2015.  Thus, the contacts of Naver Cloud America with California are imputed to Naver Cloud because Naver Cloud America is Naver Cloud's agent.  Moreover, if Naver Cloud did not have Naver Cloud America helping it support the LINE Messenger app, and helping it unlawfully collect and transmit the private United

States and California user data through the LINE Messenger app, Naver and/or Naver Cloud would have had to undertake such tasks on their own for the sake of advancing their business and profitability.

56.     Seo, a California resident who resides in this District since 2015, was dispatched to the United States in anticipation of Naver Cloud's customers' continued growth in the United States. Seo Tr. 75:1-9.  Seo was dispatched " █████████████████████████████████ ██████████████ ." *Id.* at 71:21-22.  Thus, Naver Cloud's direction and control over Seo to establish such United States' presence in California was not random isolated or fortuitous.  Rather, Naver Cloud knowingly interacts with California residents, including Seo.

57.     Naver Cloud's 2023 corporate profile further represents that Naver Cloud has data centers in "US East/West."  Thus, there can be no doubt that Naver Cloud knows about Naver Cloud's California contacts.  Seo also testified that the reason that data centers are typically located near users is to reduce latency issues.  Latency issues arise when delays between messages occur because such messages must travel long distances (*e.g.*, from the United States to Korea and back). In other words, if there was no data center in California, and two LINE Messenger users were messaging in California, their service quality would be diminished because of those latency issues. Accordingly, upon information and belief, Naver Cloud's San Jose data center was intended in part to reduce latency issues between California users of the LINE Messenger App.

58.     During the Class Period, Naver Cloud owned two data centers in the United States, one in San Jose, California, and the other in New Jersey.  Seo testified that Naver Cloud sold its data centers to Naver Cloud America.  Seo Tr. 19:6-22.[2]  Before changing his testimony, Seo testified that Naver Cloud owned the San Jose Data center until December 2019, and the New Jersey data center until March of 2021 before they were sold to Naver Cloud America.  *Id.* at 19:8-22.

59.     Seo testified that the San Jose data center stored data from United States users of the

---

[2] After a 21-minute break with counsel, during which Seo spoke to nobody other than counsel, Seo changed his testimony and said that he meant the servers had been "borrowed" rather than sold.  Seo Tr. 28:16-23.

1    LINE Messenger App between 2015 and 2021.[3]

2    60.     Naver Cloud – and each of the Naver Defendants and the Z-LINE Defendants – acted

3    as part of a global enterprise of affiliated companies working together to: develop, operate, and

4    maintain the LINE Messenger and B612 apps within the United States and California; market the

5    LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and

6    transmit private United States and California user data through the LINE Messenger and B612 apps;

7    and generate revenue from the LINE Messenger and B612 apps and the unlawfully collected United

8    States and California user data from these apps.  But for Naver Cloud's role in this common

9    enterprise, the United States and California users would not have used the LINE Messenger and

10   B612 apps and had their data unlawfully collected and transmitted by these apps.  Naver Cloud –

11   and each of the Naver Defendants and the Z-LINE Defendants – continuously and deliberately

12   exploited the United States and California for commercial gain.

13   61.     Because Naver Cloud maintains sufficient minimum contacts with the forum so as

14   not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or

15   unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that

16   it lacks California-specific jurisdiction over Naver Cloud, it nonetheless has personal jurisdiction

17   over Naver Cloud under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal

18   claims, Naver Cloud has no greater contacts with any other state, and exercising jurisdiction is

19   consistent with the United States Constitution and laws.

20                    **3.     Naver Cloud America Inc.**

21   62.     This Court has personal jurisdiction over Naver Cloud America, and venue is proper

22   in this District.

23   63.     Naver Cloud America supports and, at all relevant times, supported the operation and

24   maintenance of the LINE Messenger and B612 apps, and Naver Cloud America's tortious conduct

25   through these apps (discussed below) is and, at all relevant times, was directed into this District.

26   ───────────────
27   [3] Seo also changed his testimony on this issue after the 21-minute break with counsel.  Following
     this break, Seo testified that "at the San Jose data center, LINE users' data are not stored."  Judge
28   Tse ruled that "Seo's turnabout could conceivably be used to impeach him . . . ."  Discovery
     Order, ECF 242 at 1.

─────────────────────────────
SECOND AMENDED CLASS ACTION COMPLAINT
20

64.     Naver Cloud America supports the IT infrastructure for the Naver Defendants and the Z-LINE Defendants within the United States and California, and also uses its own devices to host certain domains registered to Snow Corp. and LINE Corp. (discussed below) that are directly involved in the unlawful collection and transmission of private United States and California user data by the LINE Messenger and B612 apps (including data from users in this District).  Naver Cloud America devices linked to the IP addresses for at least one of these domains are and, at all relevant times, were located in Los Angeles, California (discussed below).

a.     Naver Cloud America also serves as an ISP for the aforementioned domains registered to Snow Corp. and LINE Corp. (discussed below) that are directly involved in the unlawful collection and transmission of private United States and California user data by the LINE Messenger and B612 apps (including data from users in this District).  By having a related entity (Naver Cloud America) under common control serve as ISP, rather than having an independent third party serve as ISP, Snow Corp., LINE Corp., and the rest of the Naver Defendants and Z-LINE Defendants make the unlawful collection and transmission of the private United States and California user data less detectable to independent third parties.

65.     Naver Cloud America is and, at all relevant times, was physically present and doing business in California.  Naver Cloud America is and, at all relevant times, was headquartered in San Jose, California.  Naver Cloud America's Chief Executive Officer, Secretary, and Chief Financial Officer are and, at all relevant times, were located at Naver Cloud America's San Jose, California offices.  In Naver Cloud America's filing of its Articles of Incorporation with the California Secretary of State, on February 11, 2015, within the Service of Process field of such filing, Naver Cloud America was asked to list "a California resident or a California registered corporate agent." It further advises that if a California agent is listed that no address should be listed.  In response to that direction, Naver Cloud America listed Weongi Park, who was, at the time, also CEO of Naver Cloud.  Moreover, Naver Cloud America's February 11, 2015 filing also provided an address in Palo Alto, California, thus confirming by inference that Weongi Park was a California resident (because if he were instead signing as a registered California agent, no address would have been provided).  Thus, according Naver Cloud America's filings with the state of California, Weongi

1   Park was a California resident in 2015.

2       66.     On or around June 6, 2018, Weongi Park executed a First Amended and Restated

3   Articles of Incorporation for Naver Cloud America (then Naver Business Platform America, Inc.).

4   The Restated Articles of Incorporation represented, under penalty of perjury, that they were signed

5   by Park in Palo Alto, California on April 27, 2018.  Further, in another amended and restated Articles

6   of Incorporation filed with the California Secretary of State on October 29, 2020, Naver Cloud

7   America (then Naver Business Platform America Inc), sought to "eliminate[] to the fullest extent

8   permissible under California law" the liability of directors of Naver Cloud America.  The same

9   Restated Articles authorized Naver Cloud America to "provide indemnification of agents", also

10  under California law, specifically, §§ 204 and 317 of the California Corporations Code.  The

11  Restated Articles were signed, under penalty of perjury, by Weongi Park in San Jose, California on

12  October 20, 2020.

13      67.     Naver Cloud America has and, at all relevant times, had a California agent for service

14  of process.  From February 2015 through April, 2024, Naver Cloud America's agent was Weongi –

15  at 5575 High Street in Palo Alto, California.  By April 8, 2024, the agent for service of process for

16  Naver Cloud America was changed to Paul Kim – at 2033 Gateway Place, Suite 500, San Jose,

17  California, 95110.

18      68.     Naver Cloud America – and each of the Naver Defendants and the Z-LINE

19  Defendants – acted as part of a global enterprise of affiliated companies working together to:

20  develop, operate, and maintain the LINE Messenger and B612 apps within the United States and

21  California; market the LINE Messenger and B612 apps to United States and California consumers;

22  unlawfully collect and transmit private United States and California user data through the LINE

23  Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612

24  apps and the unlawfully collected United States and California user data from these apps.  But for

25  Naver Cloud America's role in this common enterprise, the United States and California users would

26  not have used the LINE Messenger and B612 apps and had their data unlawfully collected and

27  transmitted by these apps.  Naver Cloud America – and each of the Naver Defendants and the Z-

28  LINE Defendants – continuously and deliberately exploited the United States and California for

commercial gain.

69.     Because Naver Cloud America is headquartered in California and is "at home" here, it is subject to general jurisdiction in this Court.  Alternatively, because Naver Cloud America maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

### 4.     Snow Corporation

70.     This Court has personal jurisdiction over Snow Corp., and venue is proper in this District. Snow Corp. owns and operates and, at all relevant times since 2017, owned and operated the B612 app, and Snow Corp.'s tortious conduct through the B612 app (discussed below) is and, at all relevant times, was directed into this District.  The Google Play Store identifies Snow Corp. as the publisher of the B612 app.  In its June 2019 Consolidated Financial Statements, Snow Corp. explicitly states that it "acquired camera application business from LINE Plus Corporation as of May 1, 2017.  The camera application business includes services such as B612 …."  Snow Corp.'s operation of the B612 app includes but is not limited to, and at all relevant times included but was not limited to, the unlawful collection and transmission of B612 user data (discussed below).

71.     Snow Corp. is and, at all relevant times, was the registrant of a key domain directly involved in the unlawful collection and transmission of private United States and California user data (discussed below), including data from users in this District.

72.     On August 19, 2022, Snow Corp. published a Privacy Policy for the B612 app in which Snow Corp. specifically addresses California users in the "California Consumer Privacy Rights" section, which states: "If you are a California resident, you have rights under the California Consumer Privacy Act of 2018 (CCPA), as applicable, to exercise free of charge."  Even though B612 users are not on notice of this Privacy Policy and do not consent to its terms, this provision of the Privacy Policy indicates Snow Corp.'s intent to direct the B612 app to California residents.

73.     Snow Corp. is and, at all relevant times, was physically present and doing business in the United States.  At least as of 2021, Snow Corp. represented on its LinkedIn page that it has employees in the United States, including its "US General Manager."

74.     Snow Corp. has and, at all relevant times, had a California-based subsidiary: Snow Inc. (Palo Alto, California and Los Angeles, California).  The contacts of Snow Inc. with California (discussed below) are imputed to Snow Corp. because Snow Inc. is Snow Corp's agent.  If Snow Corp. did not have Snow Inc. helping it operate the B612 app, and helping it unlawfully collect and transmit the private United States and California user data through the B612 app, Snow Corp. would have had to undertake such tasks on its own for the sake of advancing its business and profitability.

75.     Snow Corp. – and each of the Naver Defendants and the Z-LINE Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps.  But for Snow Corp.'s role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps.  Snow Corp. – and each of the Naver Defendants and the Z-LINE Defendants – continuously and deliberately exploited the United States and California users for commercial gain.

76.     Because Snow Corp. maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that it lacks California-specific jurisdiction over Snow Corp., it nonetheless has personal jurisdiction over Snow Corp. under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, Snow Corp. has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 5.    Snow Inc.

77.     This Court has personal jurisdiction over Snow Inc., and venue is proper in this District.

78.     Snow Inc. owns and operates and, at all relevant times since May 2017, owned and

operated the B612 app, and Snow Inc.'s tortious conduct through the B612 app (discussed below) is and, at all relevant times, was directed into this District. The Google Play Store has previously identified Snow Inc. as the publisher of the B612 app. Snow Inc.'s operation of the B612 app includes but is not limited to, and at all relevant times included but was not limited to, the unlawful collection and transmission of B612 user data (discussed below).

79. Snow Inc. published a Terms of Use and a Privacy Policy for the B612 app that are directed at California users, apply California law, and require user disputes to be resolved in California. The Terms of Use dated September 1, 2017, state: (1) "you agree to be bound by the laws of California"; and (2) "[a]ny dispute you have with SNOW must be resolved by you in a court located in Santa Clara County, California, unless otherwise agreed in writing. You agree to the personal jurisdiction of the federal and state courts located in Orange County, California." The Privacy Policy dated February 4, 2021, like that of Snow Corp. (discussed above), states: "If you are a California resident, you have the right under the California Consumer Privacy Act of 2018 (CCPA), as applicable, to exercise free of charge." It also references California law under a separate section on personal information. Even though B612 users are not on notice of this Privacy Policy or these Terms of Use, and do not consent to the terms of either document, these provisions of the Privacy Policy and Terms of Use indicate Snow Inc.'s intent to direct the B612 app to California residents.

80. Snow Inc. is and, at all relevant times, was physically present and doing business in California. Snow Inc.'s Chief Executive Officer, Secretary, and Chief Financial Officer are all located at Snow Inc.'s Los Angeles, California offices. At least as of 2021, Snow Inc. also represented on the Google Play Store that it has offices at 575 High Street, Suite 110, Palo Alto, California 94301.

81. Snow Inc. has a California agent for service of process – Yeong-Sae Kim at 1700 Wyatt Dr., Suite 9, Santa Clara, California 95054 – and this individual is the same agent for service of process for Naver Cloud America, LINE Euro-Americas, and LINE Friends.

82. Snow Inc. – and each of the Naver Defendants and the Z-LINE Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and

maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for Snow Inc.'s role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. Snow Inc. – and each of the Naver Defendants and the Z-LINE Defendants – continuously and deliberately exploited the United States and California for commercial gain.

83. Because Snow Inc. is headquartered in California and is "at home" here, it is subject to general jurisdiction in this Court. Alternatively, because Snow Inc. maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

### 6.    Common Enterprise Summary

84. Based on the facts alleged above and below, the Naver Defendants are engaged in a single, common enterprise with each other and with the Z-LINE Defendants, such that personal jurisdiction over one of the named defendants establishes personal jurisdiction over all of the others. The Naver Defendants exhibit vertical commonality among themselves and horizontal commonality with the Z-LINE Defendants because their economic interests are interdependent and they pool assets (the LINE Messenger app, the B612 app, the IT infrastructure and devices, and the domains involved in the unlawful collection and transmission of private United States and California user data) to siphon private United States and California user data and generate advertising revenues. This commingling of assets is illustrated by the fact that the B612 app was transferred from LINE Corp. and LINE Plus to Snow Corp. and Snow Inc. in 2017, and the LINE Messenger app was transferred from Naver to the Z-LINE Defendants in 2021. Moreover, until early 2021, the Naver Defendants, LINE Corp., LINE Plus, and LINE Euro-Americas were under the common control of Naver. After early 2021, the Naver Defendants and the Z-LINE Defendants remain under the common control of Naver as well as Z Holdings, with Naver owning 50% of the entity that owns

over 65% of Z Holdings. Additionally, as indicated above and below, certain Naver Defendants and Z-LINE Defendants share offices, employees, and an agent for service of process. The Naver Defendants and the Z-LINE Defendants transact business, including that centered on the LINE Messenger and B612 apps, through a maze of interrelated companies, which is further highlighted by their unified branding on their websites that often fails to distinguish among the Naver Defendants and the Z-LINE Defendants. Figures 1-7 above, attached in enlarged form as Exhibits 1-7, provide a graphical representation of the ownership and operational entwinements between the Naver Defendants and the Z-LINE Defendants.

### D.    Personal Jurisdiction: The Z-LINE Defendants

85.    Z Holdings, LINE Corp., LINE Plus, and LINE Euro-Americas (collectively, the "Z-LINE Defendants") – in collaboration among themselves and with the Naver Defendants – rely on the United States and California markets to promote and advertise various mobile applications and products targeted at consumers in the United States and California through, among others, the Google Play Store and the Apple App Store. Specifically, the Z-LINE Defendants collaborated among themselves and with the Naver Defendants to create a common enterprise that: developed, operated, and maintained the LINE Messenger and B612 apps within the United States and California; marketed the LINE Messenger and B612 apps to United States and California consumers; unlawfully collected and transmitted private United States and California user data through the LINE Messenger and B612 apps; and generated advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps.

### 7.    LY Corp. (formerly Z Holdings Corp.)

86.    This Court has personal jurisdiction over LY Corp., previously known as Z Holdings, based on its conduct as the parent corporation of LINE Corp. from March 1, 2021 to October 1, 2023, during which time LY Corp. directed activity relating to LINE Messenger and exerted control over LINE Corp. This Court also has personal jurisdiction over LY Corp. pursuant to its absorption of LINE Corp. on October 1, 2023, when it assumed responsibility for LINE Messenger and became the successor-in-interest to LINE Corp. In addition, this Court has personal jurisdiction pursuant to

an agency theory, given LY Corp.'s common enterprise with the LINE and Naver Defendants. Accordingly, venue is proper in this District.

*a.  From March 1, 2021 to October 1, 2023:*

87.     From March 1, 2021 to October 1, 2023, Z Holdings, now LY Corp., directed conduct through LINE Corp. and LINE Plus relating to the LINE Messenger app (discussed below) into this District.

88.     During this time period, Z Holdings was the sole owner of LINE Corp.  Seno Tr. at 24:3-5.  Three Z Holdings directors also served as directors of LINE Corp., and five officers served in positions at LINE Corp.  ECF No. 112-2 at ¶ 11.  In addition, one director and one officer of Z Holdings are directors for LINE Plus.  *Id.*  Z Holdings also had one Outside Director, Mr. Hatoyama, who was located in California. ECF No.  *Id.* at ¶ 9.  As the full owner and operator of LINE Corp., ███████████████████████████████████████████████.    Seno Tr. 30:18-24.  Specifically, █████████████████████████████████████████████████ ███████████████████████████.  *Id.* at 35:24-36:13.

89.     Z Holdings also participated in and directed conduct related to the claims of unlawful collection and transmission of LINE Messenger user data. For example:

a.     One published description of Z Holdings and its ownership and operation of the LINE Messenger app states: "SoftBank's internet business Yahoo Japan has completed its merger with Japanese chat app Line, the affiliate firm of South Korean internet portal Naver. … Following the completion of the deal, Z Holdings – the rebranded name of Yahoo Japan – will take on the operations of the merged entity.  A Holdings, [the joint venture] which was created by SoftBank and Naver, controls 65.3% of publicly traded Z Holdings shares.  Both companies each own an equal stake in A Holdings."

b.     Z Holdings' strategy in acquiring the LINE Messenger app was to leverage the app's business to expand Z Holdings' other businesses and create synergy across various services.  In a strategy presentation given by Z Holdings on March 1, 2021, it boasted of its plan to "create a unique ecosystem through deeper collaborations" between its products and those of LINE

Corp.[4]  The presentation also notes as a business goal the need to "[s]trengthen customer attraction and social commerce using LINE; our new growth driver."  *Id.* at 10, 26.  The same presentation also admitted to using artificial intelligence ("AI") to link IDs and members of LINE Corp. and Z Holdings, and "share know-how, form [an] alliance."  *Id.* at 43.  And the presentation makes clear that integration with LINE Corp. is key to driving success:



c.     An April 23, 2021 Goldman Sachs analyst report further evidences Z Holdings' involvement in the LINE Messenger app operations, describing the integration of the LINE Messenger app and Yahoo! Japan data collection systems as follows: "As a messaging app, LINE has difficulty acquiring user data that contributes to conversion (*e.g.*, product purchase history).  However, the Yahoo! Japan site operated by Z Holdings collects data that can contribute to conversion, including data on search history (to uncover potential customers) and purchased products systems, which we expect to enable more effective collection of customer data."  This report also indicates that Z Holdings plans to introduce "team purchases, social gifts, and live commerce" on the LINE Messenger app and improve advertising precision and increase operating profits by integrating the LINE Messenger app and Yahoo! Japan IDs.

---

[4] *Z Business Integration with LINE Corporation: Strategy Briefing,* Z Holdings Corp. (Mar. 1, 2021),
https://www.lycorp.co.jp/en/ir/20210301bisb/main/02/teaserItems1/01/linkList/0/link/en2021business_integration.pdf.

d.      On October 18, 2021, Z Holdings again confirmed that it was more than just a "holding company" when it published a report of the Special Committee for Global Data Governance.  Z Holdings established that committee and tasked it with verification and evaluation of data handling at Z Holdings through external experts after media outlets reported mishandling of LINE Messenger users' personal information in China and abroad (*i.e.*, outside of Japan).  The report confirmed that Z Holdings governs the handling of user data by the LINE Messenger app and its other portfolio businesses.  According to the report, "data utilization," "research/development," "privacy protection," "security," and "risk management" are all functions of Z Holdings.[5]

e.      Z Holdings' 30(b)(6) representative has confirmed that Z Holdings' role ██ ███████████████████████████████████████████████████████████ Seno Tr. 118:23-25.  As part of this support, for example, Z Holdings negotiated an enterprise level contract with Open AI LLC for LINE Corp. and its other subsidiaries to use Open AI's API services, as well as AI assistance service that is conversation chat service.[6]

f.      Further acknowledging its involvement in the LINE Messenger app operations, Z Holdings listed LINE Corp. (its wholly owned subsidiary) and LINE Plus (LINE Corp.'s wholly owned subsidiary) – both of which are involved in the operation of the LINE Messenger app (discussed below) – as two of its "Major Group Companies" on its website.

90.     From March 2021 to October 2023, Z Holdings had a California-based subsidiary: LINE Euro-Americas (Palo Alto, California and Los Angeles, California).  The contacts of Z Holdings' California-based (LINE Euro-Americas) and foreign (LINE Corp. and LINE Plus) subsidiaries with California (discussed below) are imputed to Z Holdings because such subsidiaries are Z Holdings' agents.  If Z Holdings did not have these subsidiaries helping it operate the LINE Messenger app, helping it promote the LINE Messenger app in the United States and California, and helping it unlawfully collect and transmit private United States and California user data through

---

[5] *Final Report Received from the Special Advisory Committee on Global Data Governance, and Future Efforts to Strengthen Group Governance*, Z Holdings Corp. (Oct. 21, 2018), https://www.lycorp.co.jp/news/archive/Z/en/en20211018.pdf.
[6] *Z Holdings Concludes Enterprise Agreement with OpenAI, on the Use of All APIs, Including GPT-4*, Z Holdings Corp. (July 27, 2023), https://www.lycorp.co.jp/news/archive/Z/en/en20230727.pdf.

1    the LINE Messenger app, Z Holdings would have had to undertake such tasks on its own for the

2    sake of advancing its business and profitability.

3        91.    Z Holdings – and each of the Z-LINE Defendants and the Naver Defendants – acted

4    as part of a global enterprise of affiliated companies working together to: develop, operate, and

5    maintain the LINE Messenger and B612 apps within the United States and California; market the

6    LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and

7    transmit private United States and California user data through the LINE Messenger and B612 apps;

8    and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully

9    collected United States and California user data from these apps.  But for Z Holdings' role in this

10   common enterprise, the United States and California users would not have used the LINE Messenger

11   and B612 apps and had their data unlawfully collected and transmitted by these apps.  Z Holdings

12   – and each of the Z-LINE Defendants and the Naver Defendants – continuously and deliberately

13   exploited the United States and California for commercial gain.

14       92.    Because from March 2021 to October 2023, Z Holdings maintained sufficient

15   minimum contacts with the forum so as not to offend traditional notions of fair play and substantial

16   justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over

17   it.

18           *b.  From October 1, 2023 to Present*

19       93.    On October 1, 2023, Defendants Z Holdings Corporation ("Z Holdings") and LINE

20   Corporation ("LINE") underwent corporate reorganization.  Before the reorganization, LINE

21   Messenger was owned and operated by LINE.  LY Corporation acting as the successor company

22   and absorbing the LINE Messenger business, while the rest of LINE Corporation was split off to be

23   renamed Z Intermediate Global and become a holding company for shares in some overseas

24   subsidiaries.[7]

25   _____

26   [7] *Decisions on Intra-Group Reorganization (Change of Second-Tier Subsidiaries Through
     Dividend Distributions in Kind by First-Tier Subsidiaries and Absorption-Type Mergers and*

27   *Absorption-Type Company Splits with Wholly Owned Subsidiaries) and Change of Trade Name of
     a Subsidiary*, Z Holdings Corp. (July 12, 2023), https://www.z-holdings.co.jp/en/ir/news/

28   auto_20230712521007/pdfFile.pdf ("July Announcement"); *(Update) Completion of Intra-Group*

94.     Per the July Announcement, the newly-renamed LY Corporation would "succeed to, or assume, all of the assets, and other rights and obligations of LINE except for certain shares in overseas companies held and managed by LINE and those stipulated in the absorption-type company split agreement."  July Announcement, pp. 2, 13.  Because LINE was a wholly owned subsidiary of LY, "no allotment of shares or other consideration, such as money, will be made upon the Absorption-Type Company Split[]."  *Id.* at 13.  The July Announcement later provides additional information about each corporation involved, confirming that LY Corporation is the successor corporation and that it succeeded to "All businesses of LINE (advertising services based on the mobile messaging application 'LINE'; core businesses, including the sale of LINE stickers and game services; and the development of strategic businesses, including Fintech, AI, and commerce services)."  *Id.* at 15, 17.

95.     LY Corp. published its anticipated absorption-type agreement along with other related documents with the Tokyo Stock Exchange in advance of the split.  That agreement contains provisions outlining that LY Corp. has assumed the liabilities of LINE Corp., including presumably all liabilities of LINE Corp. associated with or arising from claims brought in this litigation.[8]

96.     Further, in subsequent discussions with Plaintiffs' counsel, counsel for LY Corp. confirmed that LY Corp. is the successor-in-interest to the liabilities of Z Holdings and LINE Corp. concerning LINE Messenger.  **It is thus subject to this Court's jurisdiction as the successor-in-interest to LINE Corp.**

97.     In addition, since October 1, 2023, LY Corp. has been the owner and operator of LINE Messenger.  Shin Tr. 122:15-23:1 & Ex. 76.[9]

98.     Shortly after taking control of the LINE app, LY Corp. announced a major data

---

*Reorganization and Change in Trade Name*, LY Corporation (Oct. 2, 2023), https://www.lycorp.co.jp/en/ir/news/auto_20231002561164/pdfFile.pdf ("October Announcement").

[8] *Pre-Disclosure Document Related to Absorption-Type Company Split*, LINE Corp. & Z Holdings Corp. (Aug. 16, 2023), https://www2.jpx.co.jp/disc/46890/140120230816543259.pdf.
[9] *See also LINE: Calls & Messages*, Google Play, https://play.google.com/store/apps/details?id=jp.naver.line.android&hl=en_US (last visited May 12, 2025) (listing LY Corp. as the owner of the LINE app).

1    breach resulting in the exposure of hundreds of thousands of LINE users' data.  According to public

2    reporting, over 300,000 records from LINE app users, along with approximately 86,000 items of

3    business partner data and over 51,000 employee records were leaked.[10]  The exposed information

4    included users' age, gender, email address, names, and personal identifiers.  In subsequent reports

5    from LY Corp., it has made clear that the breach included thousands of non-Japanese users' data.[11]

6    ███████████████████████████████████████████████████

7    ██████████████████████████████████████.  Seno Tr. 100:22-101:1-5.

8         99.    According to LY Corp., the leakage came from an employee of a subcontractor used

9    by the company's South Korea-based affiliate, Naver Cloud Corp.[12]  In its statements made after

10   the breach, LY Corp. discussed the need to enhance security across its systems, including "the

11   authentication system handling employee and other personnel information from NAVER Cloud

12   Corporation, which is synchronized under the former LINE Corporation's in-house system."[13]  As

13   part of its remediation efforts, LY Corp. noted that it has reduced dependencies on NAVER and

14   Naver Cloud Corp.[14]  These remedial efforts further show that prior to this breach, LY Corp. had

15   integrated its systems with Naver's and Naver Cloud Corp.'s systems to store users' data.  In a

16   March 31, 2025 report to Japan's Personal Information Protection Commission, LY Corp. admitted

17   that it "handled a large amount of personal data, including users' personal data, without considering

18   and understanding the responsibility and means to take necessary and appropriate measures for its

19   security management."[15]

20

21   [10] *Japanese LY Corp exposes 519,000 personal records in data breach*, BeyondMachines.net
     (Nov. 27, 2023), https://beyondmachines.net/event_details/japanese-ly-corp-exposes-440000-

22   personal-records-in-data-breach-m-x-1-v-l.
     [11] *LINE: Details of the impact of this incident <information related to users>*, LY Corp. (Nov. 27,

23   2023), https://www.lycorp.co.jp/en/news/2023/20231127_appendix_en.pdf.
     [12] *Line operator says 440,000 personal records leaked in data breach*, Kyodo News (Nov. 27,

24   2023),    https://english.kyodonews.net/news/2023/11/0542908c40ad-line-operator-says-400000-
     personal-data-items-possibly-leaked.html.

25   [13] *Notice and apology regarding information leakage due to unauthorized access*, LY Corp. (Nov.
     27, 2023), https://www.lycorp.co.jp/en/news/announcements/001003/.

26   [14] Philip Lee, *LY Corp Submits Final Security Report After 2023 Data Breach*, Pickool (last updated
     Apr. 3, 2025), https://www.thepickool.com/ly-corp-submits-final-security-report-after-2023-data-

27   breach/.

28   [15] *Report Submitted on March 31, 2025, in Response to Request for Report and Recommendation*

---

SECOND AMENDED CLASS ACTION COMPLAINT

100.    Given LY Corp.'s continued operation of LINE Messenger in the U.S. and California, as well as its clear storage of U.S. users' data, this Court should find it has personal jurisdiction over LY Corp.  The Court may also find personal jurisdiction over LY Corp. pursuant to its common enterprise with the Naver and Z-LINE defendants to operate the LINE and B612 applications and to store U.S. and California users' data.

101.    Alternatively, if this Court holds that it lacks California-specific jurisdiction over LY Corp., it nonetheless has personal jurisdiction over LY Corp. under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, LY Corp. has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 8.    LINE Corporation

102.    This Court has personal jurisdiction over LINE Corp., and venue is proper in this District.

103.    LINE Corp. owns and operates and, at all relevant times, owned and operated the LINE Messenger app, and LINE Corp.'s tortious conduct through the LINE Messenger app (discussed below) is and, at all relevant times, was directed into this District.  Such operations include but are not limited to, and at all relevant times included but were not limited to, the unlawful collection and transmission of LINE Messenger user data (discussed below).  At least as of 2021, LINE Corp.'s website further confirmed LINE Corp.'s involvement in LINE Messenger operations: "With the LINE messaging app as the cornerstone, LINE Corporation's business encompasses development and operation of a wide range of mobile-first services – including communication, content, and entertainment – and advertising, as well as new businesses in Fintech, AI, and other domains." LINE Corp. explicitly admitted in its motion to dismiss the original complaint, ECF 52, that it "operate[s] and distribute[s]" LINE Messenger.

104.    Until May 2017, LINE Corp. owned and operated the B612 app at all relevant times. At all relevant times since then, LINE Corp.'s tortious conduct continued through the B612 app and

_Received from PPC dated March 28, 2024 (Summary)_, LY Corp. (Mar. 31, 2025), https://www.lycorp.co.jp/en/news/2025/20250331_2_appendix_en.pdf.

was directed into this District (discussed below).  Such conduct included but was not limited to the unlawful collection and transmission of B612 user data (discussed below).  Consistent with its continued exploitation of the B612 app, LINE Corp. promotes the B612 app as a member of the "LINE Family" of apps, as shown in this excerpt from LINE Corp.'s website (https://linecorp.com/en/business/service) as of October 25, 2022.

## LINE Family Apps

Everything you would ever need on your smartphone.

LINE family apps include a web comic app, a security app, and many more that will make your everyday life more fun! Use LINE Deco to decorate your phone however you want, and LINE Camera to take the best pics. There's something for every aspect of your smartphone life in the LINE family.

More Details



105.    Until recently, LINE Corp. had United States-listed shares that traded on the New York Stock Exchange.

106.    LINE Corp. is and, at all relevant times, was physically present and doing business in California.  At least as of 2021, LINE Corp. stated on its corporate website and on its LinkedIn page that it has offices in Palo Alto, California.  LINE Corp. also represented on its LinkedIn page that it and certain affiliated and/or subsidiary corporations have employees in California, including LINE Corp.'s Chief Executive Officer (Los Angeles, California), Chief Compliance Officer (San Francisco, California), and at least one of its engineers (San Francisco, California).

107.    LINE Corp. at all relevant times had a California-based subsidiary: LINE Euro-Americas ("LINE E-A") (Palo Alto, California and Los Angeles, California).  LINE E-A and another LINE Corp. subsidiary, LINE Plus, are responsible for marketing LINE Messenger to the U.S. and California.  The contacts of LINE Corp.'s California-based (LINE E-A) and LINE Plus subsidiaries with California (further discussed below) are imputed to LINE Corp. because such

subsidiaries are LINE Corp.'s agents for the promotion of the LINE Messenger app.

108.    LINE Corp. and its subsidiaries, LINE Plus and LINE E-A, at all relevant times, have had at least one overlapping employee and/or director employed by and working for both LINE Corp. and LINE Plus or LINE E-A, respectively, demonstrating that LINE Corp. shared officers, board members, and employees with each of its subsidiaries, such that LINE Corp. could exercise control over each entities' overlapping operations and day-to-day responsibilities.  Iida Decl. at ¶ 9.

109.    At all relevant times, LINE Corp., LINE Plus, and LINE E-A, used a single email address domain: linecorp.com.  In other words, no matter whether an individual is nominally employed by LINE Corp., LINE Plus, or LINE E-A, that person's email address will end in @linecorp.com, making all such employees appear to be employed by LINE Corp. ████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████. *See* Shin Tr. 28:12-21.

110.    Jurisdictional discovery has established that LINE Corp.'s intentional and purposeful contacts with the U.S. and California concerning LINE Messenger and B612 were expressly so aimed.  LINE Corp., at all relevant times, had and continues to have a number of contractual relationships with California-headquartered and/or otherwise U.S.-based businesses associated with LINE Messenger and/or B612.  These include, but are not limited to:

    a.    ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ Iida Tr. 96:17-98:13 & Ex. 33.

    b.    ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

1    ███████████████████████████████████████████.  Iida  Tr.

2    132:04-18 & Ex. 46.

3           c.   ████████████████████████████████████

4    ███████████████████████████████████████████████████

5    ███████████████████████████████████████████████████

6    ███████████████████████████████████████████████████

7    ███████████████████████████████████████████████████

8    ███████████████████████████████████████████████████

9    ████████████████████████████.  Hashimoto Tr. 10:06-11:11 & Ex. 44.

10          d.   ████████████████████████████████████

11   ███████████████████████████████████████████████████

12   ███████████████████████████████████████████████████

13   ███████████████████████████████████████████████████

14   ███████████████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   ███████████████████████████████████████████████████

17   ███████████████████████████████████████████████████

18   ███████████████████████████████████████████████████

19   ███████████████████████████████████████████████████

20   █████████████████████  Iida Tr. 127:11-21 & Ex. 45.

21          111.   LINE Corp. is also the owner and developer of a feature offered on the LINE

22   Messenger application, referred to as LINE "Official Account."  Official Accounts offer companies,

23   from large corporations to individual stores, the ability to create their own dedicated LINE Official

24   Accounts.  There are three types of Official Accounts offered, "Communication OAs" which are

25   free and grant up to 500 free messages, "Light OAs" which are $50.00 a month and grant up to

26   10,000 messages, and "Standard OAs" which are $150.00 a month, and grant up to 40,000 messages,

27   with an additional message fee of $0.05.  In the U.S., only free Communication OAs are available

28

to businesses.[16]

112.    When a user creates a LINE Official Account, they agree to **LINE Corp.'s** "LINE Official Account Terms of Use."  Per the LINE Official Account Terms of Use, all services related to LINE Official Accounts are provided by LINE Corp., who is responsible for determining the nature of services provided to LINE Official Account users, usage fees, payment dates, etc.  The LINE Official Account Terms of Use also provide that LINE Corp. is the owner of all user information collected through LINE Official Accounts, including but not limited to users' names, LINE IDs, status messages, and images.

113.    LINE Corp.'s Official Account service is available to California and U.S. LINE Messenger users and California and U.S.-based entities, and the creators of these accounts can distribute specific, targeted content to LINE Messenger users that interact with these accounts. LINE Corp. does not have regional restrictions on LINE Official Account creation.

114.    Also displayed on the LINE Messenger application is a U.S.-specific LINE Official Account, known as "LINE USA."  The LINE USA Official Account expressly aims to target California and U.S. users with specific content, and displays paid advertisements for a number of U.S. and California-based companies.  Together with its subsidiary, LINE E-A, LINE Corp. purposely targets U.S. and California LINE Messenger users with paid advertisements on this LINE USA Official Account.

115.    LINE USA displays paid advertisements, referred to as "Rich Messages" to LINE Messenger U.S. users and further targets specific users within that group by demographics.  Further demonstrating LINE Corp.'s known and intentional targeting of U.S. and California LINE Messenger users is that while LINE Corp.'s LINE Official Account Terms of Use restrict holders located in the U.S. to the "free" Official Account, or Communication OAs (which permit only 500 Rich Messages), LINE Corp. does not restrict these same users from **paying** to display certain Rich Messages on the LINE USA Official Account. ███████████████████████████

████████████████████████████████████████████████████████████

---

[16] S*ee LINE Official Account Overview*, LY Corp., https://www.linebiz.com/jp-en/other/ (last visited May 12, 2025).

1  ███████████████████████████████████████████████████

2  ██████████████████████████████. Iida Tr. 60:16-61:24 & Ex. 25, p. 13.

3      116.    Through the LINE USA Official Account, LINE Corp., and its subsidiary LINE E-

4  A, derive an economic benefit from business relationships with California and U.S.-based

5  businesses, including by charging these businesses fees for running advertisements on the LINE

6  USA Official Account.

7      117.    At all relevant times, LINE Corp. and subsidiary LINE Plus purposely directed

8  advertising to U.S. and California LINE Messenger users through LINE Messenger, and actively

9  appealed to and profited from that audience.  LINE Corp. and LINE Plus were each a party to a

10 profit-sharing agreement for revenues generated as a result of marketing activity conducted in the

11 U.S. ("Marketing Agreement") that provides:

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████ Iida Tr. at 80:03-

16 13 & Ex. 29.

17     118.    Although LINE Plus is responsible for marketing activities in the U.S., ████████

18 ███████████████████████████████████████████████████

19 ███████████████████████████████████████████████████

20 ██████████████████████████████████████████. *See* Shin Tr.

21 22:18-23:04.

22     119.    Documents produced in jurisdictional discovery provide that █████████████

23 ███████████████████████████████████████████████████

24 ████████████████████████ Iida Tr. 40:03-15 & Ex. 21 at 78.

25     120.    ████████████████████████████████████████████

26 ███████████████████████████████████████████████████

27 ███████████████████████████████████████████████████

28 ███████████████████████████████████████████████████

1  ████████████████████████████████████████████████████████████████

2  ████████████████████████. *See* Shin Tr. 40:5-8.

3         121.    LINE Corp. and LINE Plus each derive an economic benefit from LINE Messenger

4  and B612 marketing efforts in the U.S. and California.  Per the Marketing Agreement, LINE Plus

5  agreed that ████████████████████████████████████ LINE Official Accounts,

6  LINE Corp.-generated stickers, LINE Corp.-owned photo filters, among others, derived from

7  purchases made by U.S. users.

8         122.    At all relevant times, LINE Corp. also owned and developed its own "Official

9  Stickers" and unique LINE-themed emoticons that U.S. and California LINE Messenger users could

10 purchase on an app store.  ████████████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████. *See* Shin Tr. 31:15-33:3,

13 35:4-25.  Official Stickers are created by LINE Corp. directly or by third parties.  *See id.* at 31:18-

14 24.  At all relevant times, LINE Plus and LINE Corp. generated hundreds of thousands of dollars in

15 annual revenue from U.S. and California LINE Messenger users' purchases of these stickers.  *See*

16 *id.* at 31:25-19.  LINE Corp. further shared with LINE Plus revenues generated from the sale of

17 LINE Official Account-developed stickers, called "Creator Stickers," and themes, known as

18 "Creator Themes," that are available for purchase by California and U.S. LINE Messenger users.

19 At all relevant times, ████████████████████████████████████████

20 ████████████████████████████████████████████████████████████████

21 ████████████████████████████. *Id.* at 33:4-15.

22        123.    Before LINE Messenger users could purchase any stickers or themes on LINE

23 Messenger, and required for LINE Corp. and LINE Plus to generate revenue from these items, users

24 had to have something called "LINE Coins."[17]

25        124.    Contributing to these revenues, LINE Corp. and LINE Plus specifically target U.S.

26

27 _____

   [17]  *See    Paid    items    (e.g.    stickers,    emoji,    Coins)*,    LY    Corp.,

28 https://help.line.me/line/smartphone/categoryId/20007824/3/pc?lang=en  (last  visited  May  12,
   2025).

---

and California LINE Messenger users with LINE "Points" and LINE Coins. LINE Coins are a "virtual currency for purchasing stickers and other items in the LINE app. LINE Coins can only be purchased and used in the LINE app."[18] The LINE Points program, however, allows users to "earn Points for using various LINE services and joining promotions. LINE Points can be used when purchasing stickers and other items in the LINE app or on LINE STORE."

125.    According to an April 25, 2016 "LINE Official Blog," LINE Points and LINE Coins are available to U.S. users: "[f]or U.S. account holders, 1 Point is worth USD Cent 1.00 (1 Cent) … LINE Free Coins can be used internationally."[19] Further, U.S. users can "earn Points in the same way you collected Free Coins: by watching videos or adding official accounts as friends."[20] LINE Corp.'s documents reveal that ███████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████ Iida Tr. 108:1-12 & Ex. 40.

126.    Before 2016, only U.S. and California LINE Messenger users that participated in certain services, such as watching "promotional" videos or following "specific" Official Accounts, would receive "free" LINE Coins, and after 2016, receive "free" LINE Points that can be exchanged for LINE Coins, which can *only* be used on the LINE Messenger app to purchase stickers, themes, and other digital goods. LINE Corp. and LINE Plus knowingly and intentionally targeted the U.S. and California by motivating and incentivizing these users with "free" Points and Coins (LINE Messenger's currency), *if* they participated in these activities.

127.    ███████████████████████████████████████ ████████████████████████████████████████████ ███████████████ . Iida Tr. 96:17-98:13 & Ex. 33. ████████████████

---

18 *See    About    Line    Coins    and    Line    Points*,    LY    Corp.,    https://help.line.me/line/smartphone/?contentId=20003376&utm_source=help&utm_medium=messaging&utm_campaign=contentsId20004045_ipad_contentsId200000853_sp&utm_term=help (last visited May 12, 2025).

19 *Id.*

20 *See Line Free Coins has become LINE Points!*, LINE Plus Corp. (Apr. 25, 2016), https://line-en-official.weblog.to/archives/1056286076.html.

1  ███████████████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████████████

3  ████. Shin Tr. 31:20-24; 43:20-44:04; Iida Tr. 80:03-13 & Ex. 29; 96:17-98:13 & Ex. 33.

4       128.    Further demonstrating that LINE Corp.'s systematic contacts with U.S. and

5  California are known and intentional is LINE Corp.'s own disclosure that it collects vast amounts

6  of personal information from California and U.S. users through its in-app payment service, "LINE

7  Pay," which functions as an Apple Pay-equivalent in LINE Messenger, allowing users to connect

8  payment cards for in-app purchases without leaving the LINE Messenger application. LINE Pay is

9  available to all LINE Messenger users, except those located in mainland China, Indonesia, Korea,

10  and Singapore—these users are geographically blocked from using LINE Pay on the application.

11       129.    While LINE Pay Corporation, another wholly-owned subsidiary of LINE Corp., is

12  the operator of the LINE Pay payment service, at all relevant times, LINE Corp. both transmitted

13  user data *to* LINE Pay Corporation and *received* user data collected from the LINE Pay service on

14  LINE Messenger (including for the purpose of improving LINE Corp.'s services), creating a

15  continuous flow of user information between the entities.

16       130.    LINE Corp. maintains a record of location data for its U.S. and California LINE Pay

17  users, including a user's "customer profile information" (username, icon image, status message, and

18  internal user ID supplied by LINE), and a record of each user's friend information on LINE

19  Messenger, email address, telephone number, registration status and its registration dates, country

20  information, withdrawal dates, account status, LINE version in use, and device information.

21       131.    Regardless of where a LINE Pay account holder is, LINE Corp. and LINE Pay

22  knowingly and intentionally collect and share comprehensive location-identifying information from

23  U.S. and California LINE Messenger users, which includes, but is not limited to: (1) payment data

24  including credit card details, bank account information, billing addresses, and complete transaction

25  histories; (2) device-specific information including device model, LINE version, IP addresses, and

26  language preferences; (3) precise location data collected through multiple methods including GPS

27  coordinates, IP address geolocation, and physical address information; and (4) usage pattern analysis

28  including activity timing indicating time zones and interaction with region-specific features.

132.    Additionally, LINE Corp. is and, at all relevant times, was the registrant of key domains directly involved in the unlawful collection and transmission of private U.S. and California user data (discussed below), including data from users in this District.

133.    LINE Corp. also uses, and at all relevant times used, its own devices to host certain domains directly involved in the unlawful collection and transmission of private U.S. and California user data by the LINE Messenger app (discussed below).  LINE Corp. also serves as an ISP for the aforementioned domains (discussed below).  By doing so, rather than having an independent third party serve as ISP, LINE Corp. and the rest of the Naver Defendants and Z-LINE Defendants make the unlawful collection and transmission of the private U.S. and California user data less detectable to independent third parties.

134.    ████████████████████████████████████████████

████████████████████████████████████████████████

*See* Iida Tr. 85:17-88:07 & Ex. 31.

135.    ████████████████████████████████ (Iida Tr. I 85:17-88:07 & Ex. 31, at 12) ████████████████████████████████████

████████████████████████████████████████ *Id.*  CDNs are interconnected servers that rely on a process called "caching" to "store[] copies of files in data centers across the globe," allowing users to access content from a server geographically closer to their physical location.[21]  CDN servers are designed for placement in a region that is close to end users to speed up content delivery (*i.e.*, loading websites/apps faster).  LINE Corp. utilizes CDNs based in the U.S. to facilitate the quick delivery of LINE Messenger content to its U.S. customers, demonstrating their known and intentional aiming at the U.S. market.

136.    Deposition testimony of LINE Corp.'s 30(b)(6) representative, Rika Hashimoto, confirms that ████████████████████████████████████

████████████████████████████████████████████████

---

[21] *See    What    Is    a    CDN    (Content    Delivery    Network)?*,    Akamai, https://www.akamai.com/glossary/what-is-a-cdn (last visited May 12, 2025).

1    ██████████████████████████     *See* Hashimoto Tr. 28:19-29:19 & Ex. 31.   As Ms.

2    Hashimoto confirms, ████████████████████████████████████████████

3    ████████████     *Id*. at 29:7-9.   Thus, in order for LINE Corp. to intercept, collect, and store

4    California and U.S. LINE Messenger user data, ███████████████████████████

5    █████████████, which were necessary to transmit the unlawfully intercepted California and

6    U.S. LINE Messenger and B612 user data, and transmitted this data from those local servers to its

7    origin servers.

8            137.    Additionally, LINE Corp. promotes the expansion of LINE Messenger's user base in

9    California through LINE Friends Inc., a U.S. subsidiary of LINE Corp., that sells LINE Messenger

10   merchandise online and at a brick and mortar store located in Los Angeles, California, which opened

11   in 2019.  Press coverage of the opening of the store describes LINE Friends as a global character

12   brand featuring characters originally created for use as "stickers" for LINE Messenger and its user

13   base.   The LINE Friends webpage has a similar description.   Indeed, the LINE Corp. webpage

14   devotes a page to the LINE Friends business.   Critically, Defendants market the LINE Messenger

15   characters, including through LINE Friends, "primarily to promote our brand and appeal, as well as

16   further expand our user base."  If LINE Corp. did not have these subsidiaries helping it operate the

17   LINE Messenger and B612 apps, helping it promote the LINE Messenger and B612 apps in the

18   United States and California, and helping it unlawfully collect and transmit private United States

19   and California user data through the LINE Messenger and B612 apps, LINE Corp. would have had

20   to undertake such tasks on its own for the sake of advancing its business and profitability.

21           138.    LINE Corp. exercises dominion and control over LINE Friends, such that LINE

22   Friends functions as LINE Corp.'s mere instrumentality, alter ego, and agent rather than as an

23   independent corporate entity.  Documents obtained during jurisdictional discovery demonstrate that

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████

26   ██████.  *See* Iida Tr. I 52:12-21 & Ex. 23.  Through this comprehensive control, LINE Corp. has

27   purposefully availed itself of the privilege of conducting business in this forum through its alter ego

28   LINE Friends.

139.    LINE Corp. – and each of the Z-LINE Defendants and the Naver Defendants – acted as part of a global enterprise of affiliated companies working together to: develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps.  But for LINE Corp.'s role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps.  LINE Corp. – and each of the Z-LINE Defendants and the Naver Defendants – continuously and deliberately exploited the United States and California for commercial gain.

140.    Because LINE Corp. maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.  Alternatively, if this Court holds that it lacks California-specific jurisdiction over LINE Corp., it nonetheless has personal jurisdiction over LINE Corp. under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, LINE Corp. has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 9.    LINE Plus Corporation

141.    On October 3, 2023, the Court granted Plaintiffs' request to conduct jurisdictional discovery regarding Foreign LINE Defendants, including LINE Plus (ECF 128).  LINE Plus has subsequently participated in jurisdictional discovery pursuant to the Court's Order entered on February 6, 2024 (ECF 180).  On December 2, 2024, LINE Plus informed Plaintiffs that LINE Plus will no longer contest to personal jurisdiction in this case.  On March 11, 2025, Plaintiffs and LINE Plus, through their respective counsel, entered into a stipulation reflecting this representation.  Accordingly, this Court has personal jurisdiction over LINE Plus, and venue is proper in this District.

142.    Together with the other Z-LINE Defendants, LINE Plus operates and, at all relevant

times, operated the LINE Messenger app, and LINE Plus's tortious conduct through the LINE Messenger app (discussed below) is and, at all relevant times, was directed into this District. Such operations include, but are not limited to, the unlawful collection and transmission of LINE Messenger user data (discussed below).

143. Until May 2017, LINE Plus operated the B612 app. During this time, ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ At all relevant times, LINE Plus' tortious conduct continued through the B612 app and was directed into this District (discussed below). Such conduct includes, but is not limited to, the unlawful collection and transmission of B612 user data (discussed below).

144. LINE Plus is and, at all relevant times, was physically present and doing business in California. LINE Plus has had seven employees in the U.S., at least two of which were in California as of April 2021, at which time two of LINE Plus's officers served on LINE E-A's board of directors and one LINE E-A employee also held a position at LINE Plus.

145. From inception, ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████ *See* Shin Tr. 18:18-19:12. As described in LINE Corp.'s 2020 Form 20-F, LINE Plus was established in March 2013 "[i]n order to more effectively pursue global expansion [of LINE Messenger] outside of Japan." LINE Plus has fulfilled this purpose through the provision of technical and marketing services.

146. Further set forth in LINE Plus's motion to dismiss the original complaint, LINE Plus currently "provides technological support to LINE Corp. for LINE Messenger." (ECF 52 at 13.) At least as of 2021, LINE Corp.'s website states that LINE Plus "supports LINE's global business development with programmers, designers, marketers, sales personnel, and PR managers of 50 different nationalities working together." LINE Plus's Head of Finance, Jae Sung Shin, confirmed that, at all relevant times, ████████████████████████████████████████████ ████████████████████████████████████████ *See* Shin Tr. 26:10-16.

147. At all relevant times, ████████████████████████████████████████

1   █████████████████████████████████████████████████

2   ████████████████████████ *See* Shin Tr. 19:13-19:21. ████████████

3   █████████████████████████████████████████████████

4   ██████   *See id.* at 20:01-19.

5       148.   At all relevant times, LINE Plus, together with its parent, LINE Corp., purposely

6 targeted advertising to U.S. and California LINE Messenger users through LINE Messenger, and

7 actively appealed to and profited from that audience. With respect to LINE Messenger, at all

8 relevant times, ████████████████████████████████████████

9 ██████████████████████. *See* Shin Tr. 24:11-25:10. The scope of LINE

10 Plus's marketing responsibilities is outlined in the profit-sharing Marketing Agreement, which

11 includes advertising, online marketing, conference and exhibitions, and promotional partnerships in

12 the U.S.

13       149.   LINE Plus, along with LINE Corp., derives an economic benefit from LINE

14 Messenger and B612 marketing efforts in the U.S. ██████████████████████

15 █████████████████████████████████████████████████

16 ██████████████████████████████. Iida Tr. 80:3-13 & Ex. 29.

17       150.   At all relevant times, ████████████████████████████

18 █████████████████████████████████████████████████

19 ████████████████ (*see* Shin Tr. 31:25-33:3; 38:13-39:22) and ████████████

20 █████████████████████████████████████████████████

21 ██████████████ *See id.* at 33:04-35:02.

22       151.   Additionally, LINE Plus has and, at all relevant times, had a California-based

23 subsidiary: LINE E-A (Palo Alto, California and Los Angeles, California). The contacts of LINE

24 E-A with California (discussed below) are imputed to LINE Plus because LINE E-A is LINE Plus's

25 agent. If LINE Plus, and parent, LINE Corp., did not have this second-tier subsidiary helping

26 promote the LINE Messenger and B612 apps in the U.S. and California, LINE Plus would have had

27 to undertake such tasks on its own for the sake of advancing its business and profitability. LINE

28 Plus's 30(b)(6) representative confirmed as much while testifying: ████████████████

1  ████████████████████████████████████  Shin Tr. 101:20-24.  At all

2  relevant times, LINE Plus and LINE E-A also shared a single email address domain with LINE

3  Corp.: linecorp.com.  ████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████  *Id.* at 28:6-21.

6       152.     Also controlled and operated by LINE Plus and parent company LINE Corp., as well

7  as LINE Plus's subsidiary, LINE E-A, is the LINE USA Official Account.  The LINE USA Official

8  Account expressly aims to target California and U.S. users with specific content, and displays

9  advertisements for a number of U.S.-based companies.  Together with LINE Corp. and LINE E-A,

10  LINE Plus purposely targets U.S. and California LINE Messenger users that follow the LINE USA

11  Official Account.

12       153.     Through LINE USA, LINE Corp. and its subsidiary, LINE Plus, and LINE Plus's

13  subsidiary, LINE E-A, each derive an economic benefit from business relationships with California

14  and U.S.-based businesses, including by charging these businesses fees for running advertisements

15  on the LINE USA Official Account.

16       154.     LINE Plus – and each of the Z-LINE Defendants and the Naver Defendants – acted

17  as part of a global enterprise of affiliated companies working together to: develop, operate, and

18  maintain the LINE Messenger and B612 apps within the United States and California; market the

19  LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and

20  transmit private United States and California user data through the LINE Messenger and B612 apps;

21  and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully

22  collected United States and California user data from these apps.  But for LINE Plus's role in this

23  common enterprise, the United States and California users would not have used the LINE Messenger

24  and B612 apps and had their data unlawfully collected and transmitted by these apps.  LINE Plus –

25  and each of the Z-LINE Defendants and the Naver Defendants – continuously and deliberately

26  exploited the United States and California for commercial gain.

27       155.     Because LINE Plus maintains sufficient minimum contacts with the forum so as not

28  to offend traditional notions of fair play and substantial justice, it would not be unreasonable or

unfair for this Court to exercise personal jurisdiction over it. Alternatively, if this Court holds that it lacks California-specific jurisdiction over LINE Plus, it nonetheless has personal jurisdiction over LINE Plus under Federal Rule of Civil Procedure 4(k)(2) because the case involves federal claims, LINE Plus has no greater contacts with any other state, and exercising jurisdiction is consistent with the United States Constitution and laws.

### 10.    LINE Euro-Americas Corp.

156.    This Court has personal jurisdiction over LINE Euro-Americas, and venue is proper in this District.

157.    LINE Euro-Americas is and, at all relevant times, was physically present and doing business in California. LINE Euro-Americas' Chief Executive Officer, Secretary, and Chief Financial Officer are all located in LINE Euro-Americas' Palo Alto, California offices. Earlier, when originally formed in 2013, LINE Euro-Americas was located in Los Angeles, California. LINE Euro-America's March 9, 2021 Statement of Information filed with the California Secretary of State identifies its business as "mobile software."

158.    At all relevant times, LINE Euro-Americas promoted the LINE Messenger app in California. LINE Euro-Americas, while physically located in California, "promoted LINE Messenger in North and South America" (including California) and, according to LINE Euro-Americas, currently "supports business-to-business activities and partnerships for LINE Plus and LINE Corp." At least as of 2021, LINE Euro-Americas' LinkedIn page promoted the LINE Messenger app, noting that it "offers free one-to-one and group messaging, as well as free domestic and international voice and video calls," and "includes a wide array of social elements such as fun and expressive stickers, a personal Home, a Timeline, and numerous LINE family apps." Through the page, LINE Euro-Americas directed users to the LINE Messenger homepage in English.

159.    LINE Euro-Americas has a California agent for service of process – Yeong-Sae Kim at 1700 Wyatt Dr., Suite 9, Santa Clara, California 95054 – and this individual is the same agent for service of process for Naver Cloud America, Snow Inc., and LINE Friends.

160.    LINE Euro-Americas – and each of the Z-LINE Defendants and the Naver Defendants – acted as part of a global enterprise of affiliated companies working together to:

develop, operate, and maintain the LINE Messenger and B612 apps within the United States and California; market the LINE Messenger and B612 apps to United States and California consumers; unlawfully collect and transmit private United States and California user data through the LINE Messenger and B612 apps; and generate advertising revenues from the LINE Messenger and B612 apps and the unlawfully collected United States and California user data from these apps. But for LINE Euro-Americas' role in this common enterprise, the United States and California users would not have used the LINE Messenger and B612 apps and had their data unlawfully collected and transmitted by these apps. LINE Euro-Americas – and each of the Z-LINE Defendants and the Naver Defendants – continuously and deliberately exploited the United States and California for commercial gain.

161.    Because LINE Euro-Americas is headquartered in California and is "at home" here, it is subject to general jurisdiction in this Court. Alternatively, because LINE Euro-Americas maintains sufficient minimum contacts with the forum so as not to offend traditional notions of fair play and substantial justice, it would not be unreasonable or unfair for this Court to exercise personal jurisdiction over it.

### 11.    Common Enterprise Summary

162.    Based on the facts alleged above and below, the Z-LINE Defendants are engaged in a single, common enterprise with each other and with the Naver Defendants, such that personal jurisdiction over one of the named defendants establishes personal jurisdiction over all of the others. The Z-LINE Defendants exhibit vertical commonality among themselves and horizontal commonality with the Naver Defendants because their economic interests are interdependent and they pool assets (the LINE Messenger app, the B612 app, the IT infrastructure and devices, and the domains involved in the unlawful collection and transmission of private United States and California user data) to siphon private United States and California user data and generate advertising revenues. This commingling of assets is illustrated by the fact that the B612 app was transferred from LINE Corp. and LINE Plus to Snow Corp. and Snow Inc. in 2017, and the LINE Messenger app was transferred from Naver to the Z-LINE Defendants in 2021. Moreover, until early 2021, the Naver Defendants, LINE Corp., LINE Plus, and LINE Euro-Americas were under the common control of

Naver.  After early 2021, the Naver Defendants and the Z-LINE Defendants remain under the common control of Naver as well as Z Holdings, with Naver owning 50% of the entity that owns over 65% of Z Holdings.  Additionally, as indicated above and below, certain Naver Defendants and Z-LINE Defendants share offices, employees, and an agent for service of process.  The Naver Defendants and the Z-LINE Defendants transact business, including that centered on the LINE Messenger and B612 apps, through a maze of interrelated companies, which is further highlighted by their unified branding on their websites that often fails to distinguish among the Naver Defendants and the Z-LINE Defendants.

### E. Venue

163.    In accordance with 28 U.S.C. § 1391, venue is proper in this District because: (i) a substantial part of the conduct giving rise to Plaintiffs' claims occurred in and/or emanated from this District; (ii) Defendants transact business in this District; (iii) at least one Defendant has offices in this District; and (iv) Defendant Naver Cloud America is headquartered in this District.

## IV. GENERAL ALLEGATIONS

### A. LINE Messenger Is A Popular Messenger App

164.    LINE Messenger began as a messenger app in June 2011, but later grew into a global communication platform.  In a strategy presentation to analysts, Z Holdings described how LINE Messenger has 167 million users in just four countries with 27.4 billion average daily messages exchanged of as of September 30, 2020.  LINE Messenger is one of the fastest growing mobile messenger apps in the world, and is currently available on smartphones, including iPhones and Android devices, and also on PCs and Macs.

165.    LINE Messenger allows users to send written messages, make voice calls, and send videos.  It also has a timeline feature through which users can share their photos and/or videos with friends and the public.

### B. B612 Is A Popular Photo And Video Editing App

166.    B612 is a photo and video editing app popular among younger consumers, including minors.  Indeed, as Naver boasts in its 2019 annual report, Snow is "leading communication trends for teens around the world" and has the leading "global avatar service for Generation Z, with 92%

of overseas users being aged 13 to 18."[22]

167.    B612 allows users to take photos in various styles, record videos, and create digital graffiti.  It allows users to edit photos and videos, create collages, and pair videos with music.

168.    B612 also features a wide range of built-in augmented reality ("AR") applications. AR allows users to utilize filters to alter their image, including, for example, making their skin appear smoother or changing their image into an animated display like a stuffed animal.

169.    According to download data from Google's Google Play metrics, B612 has been downloaded more than 500 million times.[23]  As Naver acknowledges, as of the end of 2019, the number of global monthly active users (MAUs) of B612 exceeded 260 million, with a high proportion of overseas users.  Those overseas users include users throughout the United States.

## C.    Naver Has A History Of Committing Privacy Violations

170.    Naver is South Korea's largest web search engine and messenger service, with over 200 million users around the world.[24]  Naver describes itself as a business that enables widespread access to advanced technologies.[25]  As of 2017, Naver had over 2,700 employees and generated over $3.6 billion in revenue.[26]

171.    Naver's products are also used for developing artificial intelligence ("AI").

172.    Naver has collected sensitive private data without user consent for some time.  For instance, the *Korea Times* reports Naver allegedly collected sensitive user information as far back as 2016, including social security numbers and Internet Personal Identification Numbers (IPINs),

---

[22] Naver Corp., *Dynamic Tech Cube: Naver Annual Report 2019,* 36 (2020), https://www.navercorp.com/navercorp_/ir/annualReport/2020/NAVER_2019AR_Design_TCG0604_ENG.pdf.

[23] *B612 AI Photo & Video Editor*, Google Play, https://play.google.com/store/apps/details?id=com.linecorp.b612.android&hl=en_US&gl=US (last visited May 12, 2025).

[24] Naver Company, https://www.navercorp.com/navercorp_/ir/sustainabilityReport/NAVER_2020_ESG_ENG_V2.pdf (last accessed June 25, 2021).

[25] *Id.*

[26] *Id.*

without user consent.[27]

173.    The *Korea Times* also reported that Naver has been accused of collecting and storing children's information, including their nicknames, personal information, and family photos, in contravention of Korean law.[28]

174.    In addition to the unlawful collection and storage of such private information without user consent, the *location* of where such private data was stored is also troubling.  Specifically, the data was sent to Hong Kong, where it is accessible by the Chinese Communist Party.[29]

175.    Naver admitted to destroying potentially inculpatory evidence of its misconduct: "Between July 6 and 10 [2020], we have physically destroyed the backup data server in Hong Kong, and are transferring all data to Singapore," a Naver official was quoted as saying.[30]

**D.    LINE Messenger and B612 Unlawfully Collect User Biometrics with the Aid of the Dangerous SenseTime SDK and Through Other Means**

**1.    SenseTime Is a China-Based Technology Company Focused on AI, Which it Uses to Assist the Chinese Communist Party With Its Political, Military, and Policing Agenda.**

176.    SenseTime is a highly sophisticated global technology company in China that focuses on AI applications.[31]  It has the largest deep learning center in mainland China and is the largest algorithm provider in China.[32]

---

[27] Kim Hyun-bin, *Naver collects sensitive private data without user consent*, The Korea Times (July 24, 2020),  https://www.koreatimes.co.kr/www/tech/2020/07/133_293187.html.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] SenseTime, *About Us: AI for a Better Tomorrow*, https://www.sensetime.com/en/about-index (last visited May 12, 2025).

[32] Zheng Zhiyu Olivia, *China's "Sky Eye" face recognition technology comes from Hong Kong Shentang Technology CEO Xu Li: Monitor tens of thousands of people in one second* (Apr. 9, 2018) (translated from its original Chinese), https://medium.com/@tszyucheng/%E4%B8%AD%E5%9C%8B-%E5%A4%A9%E7%9C%BC-%E4%BA%BA%E8%87%89%E8%BE%A8%E8%AA%8D%E6%8A%80%E8%A1%93-%E4%BE%86%E8%87%AA%E9%A6%99%E6%B8%AF-

---

177.    SenseTime claims its AI technology is so sophisticated that it can detect a person's face out of a crowd better than a person can.[33] SenseTime boasts of having an internal "training database" that includes over 2 billion faces, which is greater than the number of living persons in China, the United States, Japan, Korea, and Australia combined.[34]

178.    SenseTime monetizes its massive database through, among other means, deals with the Chinese government, including for military and police applications.[35]

179.    The Chinese government has consolidated that database with intelligence gathered from other Chinese technology companies to identify and/or verify a person within a digital image or a video frame from a video source. Facial recognition systems offer something that fingerprint recognition and iris recognition cannot – they do not require contact with the subject. "Biometric surveillance powered by artificial intelligence is categorically different than any surveillance we have seen before. It enables real-time location tracking and behavior policing of an entire population at a previously impossible scale."[36]

180.    The Chinese government is seizing on its broad information database. The *New York Times* published a July 2018 article entitled "Inside China's Dystopian Dreams: A.I., Shame and Lots of Cameras" in which it reported that: "Beijing is embracing technologies like facial recognition and artificial intelligence to identify and track 1.4 billion people. It wants to assemble a vast and unprecedented national surveillance system, with crucial help from its thriving technology

---

%E5%95%86%E6%B9%AF%E7%A7%91%E6%8A%80ceo%E5%BE%90%E7%AB%8B-%E4%B8%80%E7%A7%92%E7%9B%A3%E8%A6%96%E5%B9%BE%E8%90%AC%E4%BA%BA-a57ebc737a36

[33] *Id.*

[34] Shu-Ching Jean Chen, *SenseTime: The Faces Behind China's Artificial Intelligence Unicorn*, Forbes (Mar. 30, 2018) https://www.forbes.com/sites/shuchingjeanchen/2018/03/07/the-faces-behind-chinas-omniscient-video-surveillance-technology/?sh=67b1e7e04afc.

[35] *Id.*

[36] Evan Greer, *Opinion: Don't Regulate Facial Recognition.  Ban It.*, BuzzFeed News (July 18, 2019), https://www.buzzfeednews.com/article/evangreer/dont-regulate-facial-recognition-ban-it.

industry."[37]

181.    Baidu, Alibaba, and Tencent are "China's original tech titans",[38] and historically dominated the fields of artificial intelligence, social media, and the internet in China. On April 9, 2018, SenseTime announced it had received $600 million from Alibaba. The effect of this transaction, according to the Harvard Business School Digital Initiative ("HBSDI"), was to "underscore[] the gravity of the Chinese government's national policy announcement just a year prior to become the world's leader in the research."[39]

182.    In November 2017, the *Wall Street Journal* published a disturbing article about the strong ties between various technology giants and the Chinese government entitled "China's Tech Giants Have a Second Job: Helping Beijing Spy on its People." This article reported on the Chinese government's use of these tech giants in investigations of purported criminal activity and political dissent, as well as surveillance activities:

> The Chinese police "request data from Alibaba for their own investigations, … tapping into the trove of information the tech giant collects through its e-commerce and financial payment networks. … Companies including Alibaba [], Tencent [], and Baidu [] are required to help China's government hunt down criminal suspects and silence political dissent. Their technology is also being used to create cities wired for surveillance. … Apple disclosed that more than 35,000 user accounts were affected by 24 Chinese law-enforcement requests in the first half of this year [2017], many in connection with fraud investigations. It said it provided information on about 90% of them. Chinese companies don't release any information on the number of requests

---

[37] Paul Monzur, *Inside China's Dystopian Dreams: A.I., Shame and Lots of Cameras*, N.Y. Times (July 8, 2018), https://www.nytimes.com/2018/07/08/business/china-surveillance-technology.html.

[38] Rebecca Fannin, *Baidu, Alibaba, Tencent Clash to Lead China's Tech Future While A New 'B' Arises*, Forbes (Apr. 23, 2019), https://www.forbes.com/sites/rebeccafannin/2019/08/23/baidu-alibaba-tencent-clash-to-lead-chinas-tech-future-while-a-new-b-arises/#18cc42e414d0.

[39] Toni Campbell & Oliver Badenhorst, *SenseTime and Public Safety*, Digital Initiative (Nov. 14, 2018), https://digital.hbs.edu/platform-rctom/submission/sensetime-and-public-safety.

from the government, the nature of the requests or the compliance rate."[40]

183.    This *Wall Street Journal* article also documented another frightening aspect of the Chinese government's use of for-profit technology companies to sort and analyze information, including information gathered from smartphones:

> Along with access to online data, China's government wants something else from tech companies – the cloud computing prowess to sort and analyze information. China wants to crunch data from surveillance cameras, smartphones, government databases and other sources to create so-called smart cities and safe cities. … Police now work with Alibaba to use surveillance footage and data processing to identify 'persons of interest' and keep them out, local police official Dai Jinming said at a recent conference sponsored by Alibaba. Tencent is working with police in the southern city of Guangzhou to build a cloud-based 'early-warning system' that can track and forecast the size and movement of crowds, according to a statement from the Guangzhou police bureau.[41]

184.    In a subsequent March 2018 article entitled "The Uncomfortable Marriage Between China and Its Tech Giants," the *Wall Street Journal* reported on the significant patronage that large Chinese technology companies receive from the Chinese government, the growing number of tech entrepreneurs who have become members of the legislature under President Xi Jinping (including, for example, Tencent's Tony Ma), and certain technology companies that have made pledges of loyalty to the Chinese government.[42] "The government is always the boss and the tech firms are there to serve the goals of the Chinese government."[43]

---

[40] Liza Lin and Josh Chin, *China's Tech Giants Have a Second Job: Helping Beijing Spy on Its People*, Wall St. J. (Nov. 30, 2017), https://www.wsj.com/articles/chinas-tech-giants-have-a-second-job-helping-the-government-see-everything-1512056284.

[41] *Id.*

[42] Li Yuan, *The Unformattable Marriage Between China and Its Tech Giants*, The Wall Street Journal (Mar. 8, 2018), https://www.wsj.com/articles/the-godfathers-of-chinese-tech-get-an-offer-they-cant-refuse-1520510404.

[43] *Id.*

185.    SenseTime is deeply involved in this public/private partnership between China-based for-profit entities and the Chinese Communist Party.[44] Indeed, as noted by *HBSDI*, SenseTime deals directly with the Chinese government as a customer to "help police officers identify suspects and root out potential [purported] criminals by matching faces identified in video with corresponding faces on government-issued IDs." The *HBSDI* article also noted: "Questions of privacy and the potential for government and corporate misuse have consistently dogged the company since its early days of product development and commercialization."

186.    SenseTime technology has been used by the Chinese government for policing and controlling the flow of demonstrations in Hong Kong[45] and for various internet censoring activities.[46]

187.    As Senators Schumer and Cotton wrote in an October 23, 2019 letter to the Acting Director of National Intelligence "[s]ecurity experts have voiced concerns that China's vague patchwork of intelligence, national security, and cybersecurity laws compel Chinese companies to support and cooperate with intelligence work controlled by the Chinese Communist Party. Without an independent judiciary to review requests made by the Chinese government for data or other actions, there is no legal mechanism for Chinese companies to appeal if they disagree with a request."[47]

188.    The United States Department of Treasury's Office of Foreign Assets Control designated SenseTime as a Non-SDN Chinese Military-Industrial Complex Company pursuant to Executive Order of June 3, 2021, "Addressing the Threat from Securities Investments that Finance Certain Companies of the People's Republic of China."[48]  In that Order, President Biden found "that

---

[44] Campbell and Badenhorst, *supra* n. 40.

[45] *Id.*

[46] Shu-Ching Jean Chen, *supra* n. 35.

[47] Ben Kochman, *Sens. Want TikTok Investigated for National Security Threats*, Law360 (Oct. 24, 2019),    https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats.

[48] U.S. Dep't of Treasury, *Treasury Sanctions Perpetrators of Serious Human Rights Abuse on International Human Rights Day* (Dec. 10,; U.S. Dep't of Treasury, Off. of Foreign Assets, *Global*

the use of Chinese surveillance technology outside the PRC and the development or use of Chinese surveillance technology to facilitate repression or serious human rights abuse constitute unusual and extraordinary threats, which have their source in whole or substantial part outside the United States, to the national security, foreign policy, and economy of the United States."[49]    The previous administration had prohibited certain technology exports to SenseTime by placing it on the U.S. Entity List in 2019.[50]

189.    Despite this, the LINE Messenger app uses SenseTime SDKs, and transmits to SenseTime U.S. user data including but not limited to unique device identifiers and IP addresses.

190.    Such device identifiers can be used to sort and compile other information by individual user.[51]

**2.    Defendants Use the SenseTime SDK Embedded in LINE Messenger and B612 to Unlawfully Collect Users' Face Geometry Scans.**

191.    SenseAR, an SDK produced by SenseTime, is embedded within LINE Messenger and B612. An SDK like SenseAR is a set of software development tools in one installable package that helps developers create and implement specific functionality in apps such as LINE Messenger and B612.

192.    LINE Messenger and B612 utilize SenseAR for its facial "key-point tracking" and

_Magnitsky Designations; North Korea Designations; Burma-related Designations; Non-SDN Chinese Military-Industrial Complex Companies (NS-CMIC) List Update_ (Dec. 10, 2021), https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20211210.
https://home.treasury.gov/news/press-releases/jy0526; U.S. Dep't of Treasury, Off. of Foreign Assets, _Global Magnitsky Designations; North Korea Designations; Burma-related Designations; Non-SDN Chinese Military-Industrial Complex Companies (NS-CMIC) List Update_ (Dec. 10, 2021), https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20211210.

[49] Exec. Order. No. 14032, 86 Fed. Reg. 30145 (June 3, 2021) ("Addressing the Threat From Securities Investments That Finance Certain Companies of the People's Republic of China").

[50] 15 C.F.R. § 744, 84 Fed. Reg. 54002 (2019); 85 Fed. Reg. 44159 (2020).

[51] Rich Keith, _What Is Device ID? Significance and Applications_ (Jan. 3, 2025), https://www.pingidentity.com/en/resources/blog/post/device-id.html ("Device IDs themselves don't contain personal information but can be linked with user data if improperly managed.")

"eye contour tracking" features,[52] which allows for "a precise extraction of the user's facial features and contour."[53] LINE Messenger and B612 also rely on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements."[54] Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face and thus constitute face geometry scans within the meaning of the Illinois Biometric Information Privacy Act.

193.    Each LINE Messenger and B612 user who uses and, at all relevant times, used the AR features of the apps for photos or videos of their faces has and, at all relevant times, had their face geometry scans executed by SenseAR and collected by LINE Messenger and B612 without user consent.

194.    B612 also transmits and, at all relevant times, transmitted the face geometry scans performed by SenseAR along with the registered user's Device ID and TMID to the domain log.snow.me without user consent. And, for unregistered users who are not signed into B612, B612 transmits and, at all relevant times, transmitted the face geometry scans performed by SenseAR along with the unregistered user's Device ID to the domain log.snow.me without user consent.

195.    By collecting and transmitting user and device identifiers such as Device ID and TMID, face geometry scans can be associated with individual users.[55]

196.    A domain name such as log.snow.me "identifies a network domain, or it represents an Internet Protocol (IP) resource, such as a personal computer used to access the Internet, a server computer hosting a website, or the website itself or any other service communicated via the Internet."[56]

---

[52] SenseTime, B612 app Introduction, https://web.archive.org/web/20210514063211/https://www.sensetime.com/en/case-detail?categoryId=1631 (archived May 14, 2021).

[53] SenseTime, Sense AR Augmented Reality Platform Product Description, https://www.sensetime.com/en/product-detail?categoryId=1162 (last accessed June 25, 2021).

[54] *Id.*

[55] *See* Rich Keith, supra, n. 52.

[56] Wikipedia Entry for "Domain Name," https://en.wikipedia.org/wiki/Domain_name; *see also* Domain Name, https://zerotechit.com/domain-name/ (last modified Mar. 24, 2021).

197.    The Internet Protocol ("IP") addresses for log.snow.me are and, at all relevant times, were 210.89.168.190 and 210.89.168.191. The IP "is the principal communications protocol in the Internet protocol suite for relaying datagrams across network boundaries. Its routing function enables internetworking, and essentially establishes the Internet. IP has the task of delivering packets from the source host to the destination host solely based on the IP addresses in the packet headers."[57] Moreover, an IP address like 210.89.168.190 and 210.89.168.191 "is a numerical label assigned to each device connected to a computer network that uses the Internet Protocol for communication."[58] The devices linked to IP addresses 210.89.168.190 and 210.89.168.191 are and, at all relevant times, were located in South Korea.

198.    The domain log.snow.me is and, at all relevant times, was registered to Snow Corp.

199.    The ISPs for the domain log.snow.me include and, at all relevant times, included Naver Cloud and Naver Cloud America. An ISP like Naver Cloud and Naver Cloud America "is an organization that provides a myriad of services for accessing, using, or participating in the Internet. … Internet services typically provided by ISPs can include Internet access, Internet transit, domain name registration, web hosting, Usenet service, and colocation."[59] "Internet transit is the service of allowing network traffic to cross or 'transit' a computer network, usually used to connect a smaller [] ISP to the larger Internet."[60] "A web hosting service (often shortened to web host) is a type of Internet hosting service that allows individuals and organizations to make their website accessible via the World Wide Web. Web hosts are companies that provide space on a server owned or leased for use by clients, as well as providing Internet connectivity, typically in a data center. Web hosts can also provide data center space and connectivity to the Internet for other servers located in their data center, called colocation, also known as *housing* in Latin America or France."[61] On information

---

[57] Wikipedia Entry for "Internet Protocol," https://en.wikipedia.org/wiki/Internet_Protocol

[58] Wikipedia Entry for "IP address," https://en.wikipedia.org/wiki/IP_address

[59] Wikipedia Entry for "Internet service provider," https://en.wikipedia.org/wiki/Internet_service_provider

[60] Wikipedia Entry for "Internet transit," https://en.wikipedia.org/wiki/Internet_transit

[61] Wikipedia Entry, "Web hosting service," https://en.wikipedia.org/wiki/Web_hosting_service

and belief, Naver Cloud and Naver Cloud America provide and, at all relevant times, provided these various services, including internet transit, web hosting, and colocation services, for the domain log.snow.me.

200.    Naver Cloud supports the IT infrastructure of Naver and its affiliates. Naver Cloud America supports Naver and its affiliates' IT infrastructure within the United States. IT "is the use of computers to store or retrieve data and information. … An information technology system (IT system) is generally an information system, a communications system, or, more specifically speaking, a computer system – including all hardware, software, and peripheral equipment – operated by a limited group of IT users."[62] Moreover, IT infrastructure is "a set of information technology (IT) components that are the foundation of an IT service; typically physical components (computer and networking hardware and facilities), but also various software and network components."[63] On information and belief, Naver's IT infrastructure supported by Naver Cloud and Naver Cloud America is involved in the transmission of the face geometry scans by B612 from B612 user devices to the domain log.snow.me.

201.    Snow Inc. owns and operates and, at all relevant times, owned and operated B612. In fact, the Google Play Store identifies Snow Inc. as the publisher of B612.

202.    Thus, through the B612 app, the domain log.snow.me, the provision of internet services for the domain log.snow.me, and the management of Naver's IT infrastructure, the Naver Defendants collect and transmit the face geometry scans performed by SenseAR on B612 users without user consent.

### 3.    Defendants, on Information and Belief, Also Unlawfully Conduct Face Geometry Scans from LINE Messenger and B612 User Videos They Have Collected.

203.    Defendants upload LINE Messenger and B612 user videos from user devices and, on information and belief, conduct face geometry scans on such videos.

204.    Defendants' use of face geometry scans is reflected in their patents and patent

---

[62] Wikipedia Entry, "Information technology," https://en.wikipedia.org/wiki/Information_technology.

[63] Wikipedia Entry, "IT infrastructure," https://en.wikipedia.org/wiki/IT_infrastructure.

applications. For example, United States Patent Application US20190005309A1, assigned to LINE Corp., describes extracting facial geometry such as the height at which an eye is open, the height at which a mouth is open, the distance between an eyebrow and an eye, and the angle of an eyebrow. Similarly, Japanese Patent Application JP2016201144A, assigned to Naver, discusses a face recognition module that automatically recommends the name of a friend in a photo. Another Japanese Patent Application, JP2021068455A, assigned to LINE Plus, describes a method of recognizing a user's face from an image by analyzing the dialogue content of messages shared via an instant messaging service. United States Patent Application US20210127239A1, assigned to LINE Plus, also discusses performing facial recognition and using the facial information to identify a participant in a video call as part of a method of fair billing based on the duration of the call.

205.    Defendants' use of face geometry scans is also reflected in their commercial product offerings. Naver Cloud offers a "CLOVA"-branded face recognition technology that was developed "based on the abundant data we have collected over the years," and notes that its CLOVA systems were "built from Naver and LINE's AI research."[64] CLOVA is an AI platform that incorporates speech, image recognition and artificial neural network translation into one interactive engine. CLOVA will be built into various NAVER and LINE products, NAVER's smart speaker WAVE, Friends, and other third-party devices and services.[65] The CLOVA API "service is useful to recognize faces with input vision data or to create applications using face detection. It detects faces in images to find a look-alike celebrity or to get information including contours, positions of eyes, noses and mouths, and expressions."[66] Similarly, LINE Messenger features a "face recognition filter and effects from other standalone Line camera apps — namely its B612 app, which offers

---

[64] Introducing NAVER Cloud Platform's AI services and technology (Sept. 23, 2020), https://www.youtube.com/watch?v=CvkVIfx_ViQ.

[65] Naver, Featured Services, https://www.navercorp.com/en/service/featured (last accessed June 25, 2021).

[66] Naver Cloud Platform, CLOVA Face Recognition (CFR) Overview, https://api.ncloud-docs.com/docs/en/ai-naver-clovafacerecognition (last accessed June 25, 2021).

1  'beautification adjustments' for selfies."[67]

2         **E.**       **LINE Messenger Promises Users End-to-End Encryption of Their Chat**
3                 **Messages, but Instead, User Videos, URLs, and Certain Keywords from**
               **Those Chat Messages Are Unlawfully Intercepted.**

4       206.    The Z-LINE Defendants appeal and, at all relevant times, appealed to consumers
5  who value privacy by claiming LINE Messenger uses end-to-end-encryption ("E2EE") to encrypt
6  all messages between users such that *only* the sender and recipient can view the content of messages
7  transmitted between them via LINE Messenger. But this claim is and, at all relevant times, was
8  false. Certain content within the encrypted messages – videos, URLs, and particular keywords – is
9  and, at all relevant times, was intercepted and obtained without encryption while in transit without
10  user consent. Such interception of nonencrypted information is not and, at all relevant times, was
11  not necessary for the transmission of the encrypted messages.

12       207.    The transmission pathway for the encrypted messages runs from the sender's device
13  through the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) to the
14  recipient's device. But Defendants utilize other devices separate from devices tied to domain
15  ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) to intercept videos,
16  URLs, and particular keywords located within the encrypted messages while such messages are in
17  transit between sender and recipient.[68]

18            **1.**       **Interception of Videos.**

19       208.    Naver, Naver Cloud, Naver Cloud America, and the Z-LINE Defendants use and, at
20  all relevant times, used one or more devices linked to the domain obs-us.line-apps.com to intercept
21  and obtain videos contained within otherwise encrypted messages while such messages are and, at
22  all relevant times, were in transit via the domain ga2u.line.naver.jp (and IP addresses
23  203.104.160.11 and 203.104.160.12) from one LINE Messenger user to another.

24       209.    The domain obs-us.line-apps.com is and, at all relevant times, was registered to LINE
25

26  _____
[67] Natasha Lomas, *Messaging app Line adds livestreaming for group chats*, Tech Crunch (Aug.
27  16, 2017), https://techcrunch.com/2017/08/16/messaging-app-line-adds-livestreaming-for-group-
chats.
28  [68] At certain times, Defendants used the domain ga2g.line.naver.jp.

Corp. The ISPs for the domain obs-us.line.apps.com are and, at all relevant times, were Naver Cloud, Naver Cloud America, and Naver Business Platform Asia Pacific Pte., Ltd. ("NBPAP"). On information and belief, NBPAP is and, at all relevant times, was a subsidiary of Naver Cloud. Moreover, on information and belief, Naver Cloud, Naver Cloud America, and NBPAP provide and, at all relevant times, provided ISP services, such as internet transit, web hosting, and colocation services, for the domain obs-us.line-app.com.

210.    The IP addresses for the domain obs-us.line-apps.com are and, at all relevant times, were 203.104.160.13 and 203.104.160.14, and these IP addresses are and, at all relevant times, were distinct from the IP addresses for the domain ga2u.line.naver.jp. Devices linked to the IP addresses 203.104.160.13 and 203.104.160.14 are and, at all relevant times, were located in Los Angeles, California, New York, New York, Newark, New Jersey, and South Korea. The devices linked to the domain obs-us.line-apps.com and IP addresses 203.104.160.13 and 203.104.160.14 are and, at all relevant times, were distinct from the devices linked to the domain ga2u.line.naver.jp and its distinct IP addresses.

## 2.    Interception of URLs.

211.    The Z-LINE Defendants use and, at all relevant times, used one or more devices linked to IP addresses 147.92.179.111, 147.92.179.108, and 147.92.179.106 (the "Three 147.92.179 IP Addresses") to intercept and obtain unencrypted URLs contained within otherwise encrypted messages while such messages are and, at all relevant times, were in transit via the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) from one LINE Messenger user to another.

212.    The ISP for the Three 147.92.179 IP Addresses is and, at all relevant times, was LINE Corp. On information and belief, LINE Corp. provides and, at all relevant times, provided the services typically provided by ISPs, such as internet transit, web hosting, and colocation services, for the Three 147.92.179 IP Addresses.

213.    The Three 147.92.179 IP Addresses are and, at all relevant times, were distinct from the IP addresses for the domain ga2u.line.naver.jp. Devices linked to the Three 147.92.179 IP Addresses are and, at all relevant times, were located in Japan. The devices linked to the Three

147.92.179 IP Addresses are and, at all relevant times, were distinct from the devices linked to the domain ga2u.line.naver.jp and its distinct IP addresses.

### 3.    Interception of Keywords.

214.    Embedded within LINE Messenger is a dictionary file that contains various single words and phrases, and LINE Messenger uses this dictionary file to identify particular keywords in user messages matching such single words and phrases. Such single words and phrases within user messages are taken letter-by-letter prior to transmission and also in completed form *during* transmission of the messages.

215.    The Z-LINE Defendants use and, at all relevant times, used one or more devices linked to the domain uts-front.line-apps.com to intercept and obtain particular keywords identified by the dictionary file and contained within otherwise encrypted messages while such messages are and, at all relevant times, were in transit via the domain ga2u.line.naver.jp (and IP addresses 203.104.160.11 and 203.104.160.12) from one LINE Messenger user to another.

216.    The domain uts-front.line-apps.com is and, at all relevant times, was registered to LINE Corp. The ISP for the domain uts-front.line-apps.com is and, at all relevant times, was LINE Corp. On information and belief, LINE Corp. provides and, at all relevant times, provided the services typically provided by ISPs, such as internet transit, web hosting, and colocation services, for the domain uts-front.line-apps.com.

217.    The IP address for the domain uts-front.line-apps.com is and, at all relevant times, was 147.92.146.179, and this IP address is and, at all relevant times, was distinct from the IP addresses for the domain ga2u.line.naver.jp. Devices linked to the IP address 147.92.146.179 are and, at all relevant times, were located in Japan. Devices linked to the domain uts-front.line-apps.com and IP address 147.92.146.179 are and, at all relevant times, were distinct from the devices linked to the domain ga2u.line.naver.jp and its distinct IP addresses.

### F.    <u>LINE Messenger Has Been Banned By the Japanese Government Due to Data Privacy and Security Concerns.</u>

218.    On March 19, 2021, the Japanese government prohibited its government employees

from using LINE Messenger following a data breach suspected of originating in China.[69] Given the widespread ban the Japanese government placed on LINE Messenger, the strong and compelling inference is the Japanese government believed the Chinese Communist Party was behind the data breach.

219.     LINE Corp. issued a statement immediately denying the breach and stating that LINE Messenger App users' "[t]alk texts on 'LINE' and highly private personal information (name, phone number, email address, LINE ID, talk text, etc.,) is confidential." The company also claimed that the contents of messages sent between users on LINE Messenger were encrypted, stating: "it is not possible to check the contents of the data just by accessing the database" and that it "developed internal tools" to monitor the security of messages shared by users on its platform.[70]

220.     In response to the data breach, it was reported the Japanese government found at least 32 LINE server links were registered with Beijing.[71] The report also found China could trace telephone numbers, home addresses, and email addresses of LINE Messenger users without their consent as far back as 2018.

221.     Only after this was reported did LINE Corp. admit, in part, its fault. "We are very sorry for causing anxiety and concerns due to our inadequate explanations," the company said in a statement as quoted by *Kyodo News*.[72]

222.     Z-Holdings shared a detailed report that it mishandled Japanese user data from overseas servers.[73]

---

[69] Zaini Majeed, *Japan Halts Use of Line App for Government Officials Over Chinese Data Breach*, RepublicWorld (Mar. 19, 2021), https://www.republicworld.com/world-news/rest-of-the-world-news/japan-halts-use-of-line-app-for-government-officials-over-chinese-data-breach.html.

[70] *Id.*

[71] *Id.*

[72] *Japan halts govt use of Line app*, Big New Network (March 19, 2021), https://www.bignewsnetwork.com/news/268160696/japan-halts-govt-use-of-line-app.

[73] *See Some media reports regarding users' personal information*, LINE Corp. (Mar. 17, 2021), https://linecorp.com/ja/pr/news/ja/2021/3675; *Report on the handling of personal information from the Personal Information Protection Commission and the Company's future policy*, LINE Corp. (Mar. 23, 2021), https://linecorp.com/ja/pr/news/ja/2021/3682.

223.    Unauthorized access to private communications increases the risk that such information could be exposed to third parties; indeed, LINE's own website acknowledged that happened to overseas users.

> **G.    B612 Collects Personally Identifiable User Data and Unlawfully Transmits It to China Where It Is Accessible By the Chinese Communist Party.**

224.    B612 transmits and, at all relevant times, transmitted personally identifiable user data to the domain adg-data.kajicam.com and the domain adg.kajicam.com (the "Kajicam Domains") without user consent. Such information includes and, at all relevant times, included: the Device ID (sometimes referred to as the DUID), which is essentially a hardware serial number; the WiFi MAC address, which is unique to the WiFi hardware in use; the make and model of the user's device; the OS software version of that device's the user is using; the City code for where the device is being used; the IP address; and the identity of the features of B612 the user has been using and on what days and at what times of day such features have been used (collectively, the "Kajicam Data").

225.    B612 also transmits and, at all relevant times, transmitted a YRK ID along with the Kajicam Data to the Kajicam Domains. YRK is an acronym for the China-based company that developed and operates the Kajicam app in China. This YRK ID is identical to the user's Device ID. Both the YRK ID and the Device ID are and, at all relevant times, were transmitted by B612 to the Kajicam Domains with each packet of information transmitted by B612 from B612 users' devices to the Kajicam Domains. Consequently, the Kajicam Domains tie and, at all relevant times, tied the information received from B612 to the specific, individual B612 user.

226.    B612 transmits and, at all relevant times, transmitted the Kajicam Data (along with the user's Device ID and YRK ID) to the Kajicam Domains for both registered B612 users and unregistered B612 users who were not signed on.  The code in B612 that directs the transmission of the Kajicam Data and the user's Device ID and YRK ID to the Kajicam domains is referred to hereinafter as the "Kajicam Code."

227.    The Kajicam Domains are and, at all relevant times, were registered to an entity in China, and the registrar is and, at all relevant times, was Alibaba Cloud Computing (Beijing) Co., Ltd. The Kajicam Domains have and, at all relevant times, had IP addresses of 162.62.82.90 and

162.62.82.193, which on information and belief are and, at all relevant times, were located in Hong Kong. Moreover, on information and belief, in addition to transmitting the Kajicam Data to the Kajicam Domains, B612 also transmits or "tunnels" the Kajicam Data to mainland China in a surreptitious manner not directly observable by usual tracing methods.

228.    The following are and, at all relevant times, were the ISPs for the Kajicam Domains: 16 Collyer Quay; Tencent Building, Kejizhongyi Avenue ("Tencent Building"); Tencent Cloud Computing (Beijing) Co.; and Shenzhen Tencent Computer Systems Company Limited. On information and belief, these four ISPs provide and, at all relevant times, provided the services typically provided by ISPs, such as internet transit, web hosting, and colocation services, for the Kajicam Domains.

229.    Tencent Building is located in China and has numerous IP addresses located in China and Hong Kong. It also has related networks that, on information and belief, are and, at all relevant times, were owned and/or operated in part or in whole by the Chinese Communist Party, including: CHINATELECOM Hunan Province Xiangxi 5G Network (AS140375), Guizhou Provincial Radio and Television Information Network Inc. (AS63704), Shanghai MBN Telecommunication Technology Co., Ltd. (AS139091), CHINANET Guongdong Province Network (AS134764), and CHINANET Sichuan Province Suining MAN Network (AS59302).

230.    Accordingly, the Naver Defendants transmit and, at all relevant times, transmitted the Kajicam Data to China, where it is and, at all relevant times, was accessible by the Chinese Communist Party, without user consent.

231.    By transmitting user and device identifiers to China in the Kajicam Data, other user information compiled by the Chinese Communist Party can be associated with individual users.

### H.    The LINE Messenger App Collects Other Personally Identifiable User Data.

232.    LINE Messenger collects other personally identifiable information from its users during the registration process – such as the device ID, the client ID, the Google advertising ID, the phone number, and the model of the phone – and transmits this data to the domain ga2u.line.naver.jp.

233.    LINE Messenger also tracks videos watched, created, "liked", and/or commented on

by users. When a LINE Messenger user is operating within the LINE Messenger timeline feature, the app tracks each time the user likes another user's post, and each time the user cancels a like on a post. Also, each time a user watches another user's video, the app tracks the video watched, the time spent watching such video, and each comment made on such video.

## I.      Plaintiffs' Personal Information Has Economic Value and There is a Market for this Information

234.    The value of personal data is well understood and generally accepted as a form of currency.

235.    It is by now incontrovertible that a robust market for this data undergirds the tech economy.

236.    The robust market for user data has been analogized to the "oil" of the tech industry.[74] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[75] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

237.    The Organization for Economic Cooperation and Development ("OECD") itself has published numerous volumes discussing how to value data such as that which is the subject matter of this Complaint, including as early as 2013, with its publication "Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value".[76] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[77]

---

[74] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[75] Pauline Glickman and Nicolas Glady, *What's the Value of Your Data?* TechCrunch (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[76] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Paper No. 220 at 7 (Apr. 2, 2013), http://dx.doi.org/10.1787/5k486qtxldmq-en.

[77] *Supporting Investment in Knowledge Capital, Growth and Innovation*, OECD, at 319 (Oct. 13,

238.   In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[78] In essence, Professor Zuboff explains that revenue from user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a **market** for this data; data generated by users on the LINE Messenger and B612 apps has economic value.

239.   Professor Paul M. Schwartz writing in the Harvard Law Review, notes:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.

240.   This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay users for their data.[79] Likewise, apps such as Zynn, a TikTok competitor, pay users to sign up and interact with the app.[80]

241.   There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

242.   As Professors Acquisti, Taylor and Wagman relayed in their 2016 article "The

---

2013), https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en.

[78]  Shoshanna Zuboff, The Age of Surveillance Capitalism 166 (2019).

[79]  Kevin Mercandante, *Ten Apps for Selling Your Data for Cash*, Best Wallet Hacks (June 10, 2020), https://walletthacks.com/apps-for-selling-your-data/.

[80]  Jacob Kastrenakes, *A New TikTok Clone hit the top of the App Store by Paying users to watch videos*, The Verge (May 29, 2020), https://www.theverge.com/2020/5/29/21274994/zynn-tiktok-clone-pay-watch-videos-kuaishou-bytedance-rival.

Economics of Privacy," published in the *Journal of Economic Literature*:

> Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties.[81]

243.    There is also a private market for users' personal information. One study by content marketing agency Fractl has found that an individual's online identity, including hacked financial accounts, can be sold for $1,200 on the dark web.[82] These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other users' content, surely users can sell their own.

244.    And here, LY Corp. reports in public filings that it aims to link the IDs of LINE with, among others, Yahoo! Japan and PayPay. LY explains that "[b]y using the data possessed by each service, the Group will aim to improve advertising effectiveness by fortifying the delivery of advertisements and content best-suited to users." "Through these efforts, we aim to raise ad unit process over the medium-to-long-term." In other words, LY admits that the ability to link users' data directly leads to higher advertising prices, thus establishing such value.

245.    In a corporate presentation for the year ended 2022, LY Corporation, LY Corporation depicted the manner in which it derives value from its "diverse touchpoints" including how it links its users' IDs to its advertising as follows:

//

//

//

//

---

[81]  Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf.

[82]  Maria LaMagna, *The sad truth about how much your Google data is worth on the dark web*, MarketWatch (June 6, 2018), https://www.marketwatch.com/story/spooked-by-the-Google-privacy-violations-this-is-how-much-your-personal-data-is-worth-on-the-dark-web-2018-03-20.



246.  In short, there is economic value to users' data that is greater than zero. The exact number will be a matter for experts to determine.

### J.  Plaintiffs Suffered an Economic Injury

247.  Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things such as data or communications.

248.  California courts have recognized the lost "property value" of personal information. Recent changes in California law have also confirmed that individuals have a property interest in their information. In 2018, California enacted the California Consumer Privacy Act ("CCPA"). Among other things, the CCPA permits businesses to purchase consumer information from consumers themselves (CAL. CIV. CODE § 1798.125(b)(1)) and permits businesses to assess and appraise – i.e., to place a monetary value on – consumer data (id. § 1798.125(a)(2)).

249.  Accordingly, Plaintiffs' and Class members' personal information—including biometric identifier and biometric information; user identifiers; and videos, URLs, and particular keywords shared in private messages—is property under California law.

250.  Even if user and device identifiers alone are not protected personal information under

1    California law, they can be used to associate protected personal information with individual users.[83]

2        251.    Defendants' collection and use of Plaintiffs' and Class members' personal

3    information without authorization is a taking of their property. Plaintiffs and class members have a

4    right to disgorgement and/or restitution damages for the value of taken information.

5        252.    Plaintiffs have suffered benefit of the bargain damages, in that Defendants took more

6    data than they agreed would be exchanged. Those benefit of the bargain damages also include, but

7    are not limited to, (i) loss of the promised benefits of their experience in the LINE Messenger and

8    B612 apps; and (ii) loss of control over property which has marketable value.

9        253.    In order to preserve their privacy, Plaintiffs who now understand at least some of

10   Defendants' violations are presented with the choice of: (i) reducing or ending their participation

11   with the LINE Messenger and B612 apps; or (ii) knowingly accepting less privacy than they were

12   promised. Each of these options deprives Plaintiffs and Class members of the benefits of their

13   original bargain. There is no option which recovers the property improperly collected and shared by

14   Defendants.

15       254.    Further, Plaintiffs and Class members were denied the benefit of knowledge that their

16   personal information was being collected and shared by Defendants. Therefore, they were unable to

17   mitigate harms they incurred because of Defendants' actions. That is, Defendants' lack of

18   transparency prevented and still prevents Plaintiffs' and Class members' ability to mitigate harm.

19       255.    Defendants avoided costs it should have incurred because of its own actions—

20   particularly the loss of user engagement which would have resulted from transparent disclosure of

21   Defendants' actions—and transferred those costs to Plaintiffs and Class members. Warning users

22   would have chilled engagement on the LINE Messenger and B612 apps as well as discouraged

23   potential new users from joining.

24       256.    Defendants thus were not only able to evade or defer these costs, but to continue

25   accruing value and further benefitting from the delay due to the time value of money. Defendants

26

27   ───────────────────
     [83]   Rich Keith, *What Is Device ID? Significance and Applications* (Jan. 3, 2025),
28   https://www.pingidentity.com/en/resources/blog/post/device-id.html ("Device IDs themselves
     don't contain personal information but can be linked with user data if improperly managed.")

have thus transferred all the costs imposed by the unauthorized collection and disclosure of users' personal information onto Plaintiffs and Class members. Defendants increased the cost to Plaintiffs and Class members of mitigating such unauthorized disclosures by failing to notify them that their personal information had been collected and disclosed so that they could take steps to minimize their exposure on the LINE Messenger and B612 apps.

257.    In addition, Plaintiffs and Class members have suffered from the diminished loss of use of their own personal information, property which has both personal and economic value to them.

258.    Plaintiffs' personal information has value. First, there is transactional, or barter, value to user content and personal information. Indeed, Defendants have traded the ability to use the LINE Messenger and B612 apps for the collection of users' personal information—all while concealing that this information would be collected and in the case of LINE Messenger, promising users that their data would remain encrypted.

259.    Second, Plaintiffs' property, which has economic value, was taken from them without their consent and in the case of LINE Messenger, in contradiction of the promise that users' data would remain encrypted. There is a market for this data, and it has at minimum a value greater than zero. Plaintiffs cannot bring their improperly collected data to market because Defendants' use of that data for particular advertising purposes means that Plaintiffs' data is no longer needed or marketable for that purpose.

260.    Users were harmed when Defendants took their property and exerted exclusive control over it, collecting it without users' knowledge and for still undisclosed purposes.

261.    Further, Defendants' control over these ever-expanding dossiers make tracking and profiling users, and targeting them with advertising, much more efficient and effective. Defendants unjustly earn substantial profits from such targeted advertising and/or from the sale of user data and/or information or services derived from such data outright.

## V.    FRAUDULENT CONCEALMENT AND TOLLING

262.    The applicable statutes of limitation are tolled as a result of Defendants' knowing

and active concealment of their conduct alleged above – through, among other things, their misleading public statements about, among other things, user data being encrypted when it was not, and their hidden and inadequate privacy policies and terms of use.

263.    In the case of the LINE Messenger app, such misrepresentations were reiterated as recently as March 19, 2021 when the Company, in response to a data breach made public by the Japanese government, reiterated that its messenger service was purportedly encrypted "end-to-end" and that "it is not possible to check the contents of the data just by accessing the database."[84] Plaintiffs and the Class and Subclass members were ignorant of the information essential to pursue their claims, with no fault or lack of diligence on their own part.

264.    And when the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiffs and the Class and Subclass members. Defendants are therefore estopped from relying on any statute of limitations.

265.    Defendants' fraudulent concealment is common to the Class and Subclass.

## VI.    INAPPLICABILITY OF PURPORTED POLICIES AND TERMS OF USE

266.    Plaintiffs and Class members were able to download the LINE Messenger and B612 apps without being placed on notice of, reviewing, or understanding any Terms of Use, Privacy Policies, or other purported agreements. Thus, Plaintiffs and Class members never consented.

267.    Plaintiffs and Class members had no opportunity to negotiate the parameters of Defendants' collection and use of their personally identifiable data. There is unequal bargaining power between Defendants and the Plaintiffs and Class members such that Defendants benefit from an asymmetry of information in the bargaining process.  This is particularly acute given that Defendants are aware of their data practices, but Plaintiffs and Class members are not. As a result, any purported agreements are void or voidable, and any provisions in those agreements purporting to limit the rights of the Plaintiffs or Class members are inoperable.

## VII.    NAMED PLAINTIFF ALLEGATIONS

### Plaintiff Sunga

---

[84] Majeed, *supra* n. 70.

268.     Plaintiff Sunga began using B612 on her mobile device around 2017.

269.     Plaintiff Sunga used B612 for personal use including to take photographs of herself and others with the app.

270.     Plaintiff Sunga also used the AR features of B612 for photos of her face and thus had her facial geometry scans performed by the SenseAR SDK and collected by B612 without her consent.

271.     Unbeknownst to Plaintiff Sunga, an SDK produced by SenseTime – the SenseAR SDK – was embedded within B612. This SDK is utilized for facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour."

272.     B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

273.     B612 also transmitted the face geometry scans performed by SenseAR to the domain log.snow.me and did so without Plaintiff Sunga's consent. Devices associated with the domain log.snow.me are and, at all relevant times were, located in South Korea. The domain log.snow.me is and at all relevant times was registered to Defendant Snow Corp., and the internet service providers for this domain are and at all relevant times were Naver Cloud and Naver Cloud Americas.

274.     Thus, through the B612 app and the domain log.snow.me, Defendants Naver, Naver Cloud America, Snow Corp., and Snow Inc. collected Plaintiff Sunga's facial geometry scans performed by SenseAR through B612.

275.     Some or all of the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Sunga's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden

dossier on Plaintiff Sunga that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

276.    Plaintiff Sunga has also incurred harm as a result Defendants' invasion of her privacy, taking her data in which she has a property right, and diminishing the value of her data.

**Plaintiff Bonner**

277.    Plaintiff Bonner began using B612 on her mobile device around the middle of 2020.

278.    Plaintiff Bonner works in property management and used B612 for both personal and business use.  At times, Plaintiff Bonner also took photographs of her friends and family members using B612.

279.    Unbeknownst to Plaintiff Bonner, an SDK produced by SenseTime – the SenseAR SDK – was embedded within B612. This SDK is utilized for facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour."

280.    B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

281.    B612 also transmitted the face geometry scans performed by SenseAR to the domain log.snow.me and did so without Plaintiff Bonner's consent. Devices associated with the domain log.snow.me are and, at all relevant times were, located in South Korea. The domain log.snow.me is and at all relevant times was registered to Defendant Snow Corp., and the internet service providers for this domain are and at all relevant times were Naver Cloud and Naver Cloud Americas.

282.    Thus, through the B612 app and the domain log.snow.me, Defendants Naver, Naver Cloud America, Snow Corp., and Snow Inc. collected Plaintiff Bonner's facial geometry scans performed by SenseAR through B612.

283.    Some or all of the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the

Chinese government. Defendants performed all these acts without Plaintiff Bonner's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Bonner that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

284.    Plaintiff Bonner has also incurred harm as a result Defendants' invasion of her privacy, taking her data in which she has a property right, and diminishing the value of her data.

**Plaintiff Bologna**

285.    Plaintiff Bologna used the mobile version of LINE Messenger to, among other things, send messages and make video calls. Plaintiff Bologna used the LINE Messenger regularly from June 2016 to July 2017, both in Japan and in the United States. Plaintiff Bologna was a minor while using the application.

286.    During the time that LINE Messenger was installed on Plaintiff Bologna's mobile device, he received messages from a LINE USA account promoting the use of stickers and engagement with brands, such as Toyota USA.

287.    During the time that LINE Messenger was installed on Plaintiff Bologna's mobile device, Defendants tracked Plaintiff Bologna via a TMID (a user ID created by and shared among Defendants), a TAID (the Unique Advertising ID), and Device ID.

288.    Embedded within LINE Messenger is a dictionary file that contains various single words and phrases. When Plaintiff Bologna sent text communications through LINE Messenger, Defendants used this dictionary file to identify particular keywords in his messages matching such single words and phrases, which were taken letter-by-letter prior to Plaintiff Bologna's transmission and also in completed form during transmission of the messages. Defendants used one or more of the devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular keywords identified by the dictionary file and contained within encrypted messages in transit from Plaintiff Bologna to another LINE Messenger via the domain ga2u.line.naver.jp.

289.    Plaintiff Bologna's user and device IDs may be used to aggregate information collected from him elsewhere on the internet.

290.    Some or all of the above information stolen by Defendants was transferred to servers located in China – including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Bologna's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Bologna that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above. Plaintiff Bologna has incurred harm as a result of Defendants' invasion of their privacy, taking his data in which Plaintiff Bologna has a property right, and diminishing the value of his data.

**Plaintiff Chen**

291.    Plaintiff Chen used the mobile and desktop versions of LINE Messenger beginning in or around 2011, while living in California, and continues to use the mobile version of LINE Messenger.

292.    Plaintiff Chen uses LINE Messenger for personal use including, but not limited to, making calls and sending messages, photographs, stickers, memes, gifs, videos, audio files, and URLs to friends and family. Plaintiff also uses LINE Messenger for professional use to, among other things, communicate with her colleagues, take and send photographs, including photographs of clients' intellectual property, artwork, logos, audio files, etc., related to her career. At all relevant times, Plaintiff Chen also used LINE Messenger to participate in ongoing promotions on the app to earn LINE "Points" that could be exchanged for LINE "Coins." Plaintiff Chen also purchased LINE Coins on the LINE Messenger app through the app store, and subsequently used her collected and purchased LINE Coins to purchase stickers and themes on LINE Messenger.

293.    Since at least [2018], Plaintiff Chen also maintained an account on LINE Messenger's digital wallet and payment service, "LINE Pay" or "LINE Wallet," that allows LINE Messenger users to make payments on- and offline. At all relevant times, Plaintiff Chen saved credit

and/or debit card details in her LINE Wallet and made several transactions through LINE Pay.

294. Plaintiff Chen also used the mobile application, B612, beginning in or around 2014, and continues to use the B612 application on her mobile device. Plaintiff Chen uses B612 for personal and professional use, including to take and send photographs of herself and others.

295. Plaintiff Chen used and continues to use both LINE Messenger and B612 regularly.

296. At all relevant times, while LINE Messenger has been installed on Plaintiff Chen's mobile device, Defendants surreptitiously took Content IDs (identifying a particular video viewed), Story IDs (identifying a "story" — i.e., a particular collection of videos in which a video viewed is located), a TMID (a user ID created by and shared among Defendants), a TAID (the Unique Advertising ID), and Device ID to the domain ga2u.line.naver.jp. Plaintiff Chen never consented to such information being taken. Moreover, Plaintiff Chen's videos were also surreptitiously taken and transferred to the domain obs-us.line-apps.com.

297. Embedded within LINE Messenger is a dictionary file that contains various single words and phrases. When Plaintiff Chen sent text communications through LINE Messenger, Defendants used this dictionary file to identify particular keywords in her messages matching such single words and phrases and were taken letter-by-letter prior to Plaintiff Chen's transmission and also in completed form during transmission of the messages. Defendants used one or more of Plaintiff Chen's devices associated with the domain uts-front.line-apps.com to intercept and decrypt particular keywords identified by the dictionary file and contained within encrypted messages in transit from Plaintiff Chen to another LINE Messenger user via the domain ga2u.line.naver.jp.

298. Plaintiff Chen's user and device IDs may be used to aggregate information collected from her elsewhere on the internet.

299. Unbeknownst to Plaintiff Chen, an SDK produced by SenseTime — the SenseAR SDK — is embedded within both LINE Messenger and B612. This SDK is utilized for facial "key-point tracking" and "eye contour tracking" features, which allows for "a precise extraction of the user's facial features and contour."

300. B612 also relied on SenseAR to "track a variety of gestures and customizable definitions for gesture" and to "detect and track limbs, and capture body movements." Most or all

of these SenseAR functions involve examinations and/or observations of the relative arrangement of parts of the face.

301.    B612 also transmitted the face geometry scans performed by SenseAR to the domain log.snow.me and did so without Plaintiff Chen's consent. Devices associated with the domain log.snow.me are and, at all relevant times were, located in South Korea. The domain log.snow.me is and at all relevant times was registered to Defendant Snow Corp., and the internet service providers for this domain are and at all relevant times were Naver Cloud and Naver Cloud Americas.

302.    Thus, through the B612 app and the domain log.snow.me, Defendants Naver, Naver Cloud America, Snow Corp., and Snow Inc. collected Plaintiff Chen's facial geometry scans performed by SenseAR through B612.

303.    Plaintiff Chen used the AR features of the apps for photos or videos of her face and thus had her facial geometry scans performed by the SenseAR SDK and collected by LINE Messenger and B612 without her consent.

304.    Some or all of the above information stolen by Defendants was transferred to servers located in China — including to servers under the control of third-parties who cooperate with the Chinese government. Defendants performed all these acts without Plaintiff Chen's knowledge or consent. Further, Defendants have used the above data for, among other things, developing and patenting certain commercially valuable technologies as well as to secure corporate transactions between Defendants. Defendants and others now have access to a living and information-laden dossier on Plaintiff Chen that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from all their activities discussed above.

305.    Plaintiff Chen has also incurred harm as a result Defendants' invasion of her privacy, taking her data in which she has a property right, and diminishing the value of her data.

## VIII.    <u>CLASS ALLEGATIONS</u>

306.    Plaintiffs seek class certification of the Class and Subclasses set forth herein under Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiffs seek class certification of all claims for relief herein on behalf of a Class and Subclasses defined as follows:

307.    **Class:** All persons in the United States who used one or more of the Defendants' apps on their mobile device.

308.    **California Subclass:** All persons in California who used the Defendants' apps on their mobile device.

309.    Plaintiffs reserve the right to modify or refine the Class and Subclass definitions based on discovery of new information and to accommodate any of the Court's manageability concerns.

310.    Excluded from the Class and Subclasses are: (i) any judge or magistrate judge presiding over this action and members of their staff, as well as members of their families; (ii) Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims have been finally adjudicated on the merits or otherwise released; (v) counsel for Plaintiffs and Defendants; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

311.    **Numerosity (Rule 23(a)(1))**. The Class and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of Class and Subclass members, as herein identified and described, is not known, but download figures show that the Defendants' apps have been downloaded hundreds of millions of times throughout the world and billions of messages are sent and intercepted daily.

312.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

        a.      Whether Defendants engaged in the activities and practices referenced above;

        b.      Whether Defendants' activities and practices referenced above constitute an intrusion upon seclusion;

        c.      Whether Defendants' activities and practices referenced above violate the Right to Privacy under the California Constitution;

d.      Whether Defendants' activities and practices referenced above violate the California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et seq.*;

e.      Whether Defendants' activities and practices referenced above violate the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq.*;

f.      Whether Defendants' activities and practices referenced above violate the California Invasion of Privacy Act, Cal. Pen. C. § 630 *et seq.*;

g.      Whether Defendants' activities and practices referenced above violate the Electronic Communications Privacy Act (ECPA) 18 U.S.C. §§ 2510–22;

h.      Whether Defendants' activities and practices referenced above violate Cal. Penal Code § 496 *et seq*;

i.      Whether Defendants' activities and practices referenced above constitute conversion;

j.      Whether Defendants' activities and practices referenced above constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

k.      Whether Plaintiffs and members of the Class sustained damages as a result of Defendants' activities and practices referenced above, and, if so, in what amount;

l.      Whether Defendants' profited from their activities and practices referenced above, and, if so, in what amount; and

m.      What is the appropriate injunctive relief to ensure that Defendants no longer unlawfully: (i) offer technology capable of surveillance within the United States; (ii) take private and personally-identifiable user data; (iii) profile and target users with advertisements; (iv) utilize private and personally-identifiable user data to develop and patent commercially-valuable technologies; (v) transfer such private and personally-identifiable user data to servers in China and to third parties; and (vi) retain the unlawfully assembled user dossiers. And what is the appropriate injunctive relief to ensure that Defendants take reasonable measures to ensure that they and the relevant third parties destroy such private and personally-identifiable user data in their possession.

313.    **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of members of the Class and Subclasses because, among other things, Plaintiffs and members of the Class and

Subclasses sustained similar injuries as a result of Defendants' uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Defendants.

314. **Adequacy (Rule 23(a)(4))**. Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses. Plaintiffs' interests do not conflict with the interests of the Class and Subclass members, and  Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class and Subclass.

315. **Predominance & Superiority (Rule 23(b)(3))**. Aside from satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class and Subclass members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available is insufficient to make litigation addressing Defendants' conduct economically feasible without the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

316. **Final Declaratory or Injunctive Relief (Rule 23(b)(2))**. Plaintiffs also satisfies the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class and Subclasses, making final declaratory and/or injunctive relief appropriate with respect to the class and subclass as a whole.

317. **Particular Issues (Rule 23(c)(4))**. Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues common to all Class and Subclass members and are capable of class-wide resolution that will significantly advance the litigation.

IX.    <u>**CAUSES OF ACTION**</u>

<u>**First Cause of Action**</u>

**(Intrusion Upon Seclusion – By Plaintiffs Sunga, Bonner, and Chen ("California Plaintiffs")**

**Against All Defendants)**

318.    California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

319.    California follows the Restatement (2nd) of Torts approach to liability for intrusion upon seclusion. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

320.    California Plaintiffs and the California Subclass have a reasonable expectation of privacy in both their facial biometric information, and in their video viewing histories, and contents of their chat messages.

321.    California Plaintiffs and the California Subclass reasonably expected their private and personal information to be protected on the LINE Messenger app. The reasonableness of that expectation is further established because that is what Defendants themselves said.  LINE Corp.'s privacy policy stated that it was taking "strict technical and organizational security measures" including "strict access control based on a need-to-know basis" and "external authentication for objectively evaluating our security measures." It further stated that "[w]e will not provide, disclose or share Personal Data to or with third parties" unless users consent or as permitted by law. Additionally, LINE Corp. made public statements assuring users that the contents of their messages on LINE Messenger were encrypted and that it was "not possible to check the contents of the data just by accessing the database."

322.    California Plaintiffs and the California Subclass reasonably expected that personally-identifiable facial geometry would not be taken by B612.  It is not necessary for the operation of the app for facial geometry scans to be transmitted off of the devices on which B612 is installed.

323.    Defendants collected and transmitted Plaintiffs' and the California Subclass' user and device identifiers along with their facial biometric information and video viewing histories.

324.    Defendants intentionally intruded—and continue to intrude—upon California Plaintiffs' and the California Subclass' solitude, seclusion and private affairs by intentionally and

secretively collecting California Plaintiffs' and the California Subclass' private and personally-identifiable information and making them available to third parties, as addressed above. Certain intrusions are shared within this claim as illustrative; however, not to the exclusion of all of the unlawful behavior as alleged against each defendant herein.

325. **As it concerns the LINE Messenger app**:

a. **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp** owned and operated the LINE Messenger app. These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages, and personally identifiable information—such as the device ID, the client ID, the Defendants advertising ID, the phone number, and the model of the phone—through the LINE Messenger app. These Defendants transmitted this data to the domain ga2u.line.naver.jp. These Defendants utilized and configured the SenseTime SDK to transmit to third-party SenseTime personally identifiable information. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b. **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept and obtain videos, URLs, and keywords contained within encrypted messages. These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data. Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so. To the contrary, they had actively been involved in designing and implementing the data flows and data storage for LINE Messenger, including the unlawful interception alleged herein. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c. **LINE E-A** is liable for this conduct because it occurred pursuant to the common enterprise of which it is a part. In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to California and U.S. residents, knowing about the privacy violations alleged herein.

d. **Snow Corp.**, and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

326.    **<u>As it concerns the B612 app</u>**:

    a.    **LINE Corp., LINE Plus, Naver Corp., Snow Corp.,** and **Snow Inc.** owned and operated the B612 app, which facilitated the collection of users' facial scans through the use of the SenseAR SDK. These Defendants transferred the biometric identifiers and biometric information to the domain log.snow.me, and facilitated the transfer of personally identifiable data (such as device ID, WiFi MAC address, the make and model of a users' device, IP address, the make and model of the user's device; the OS software version on the device the user is using; the City code for where the device is being used; the IP address; and the identity of the features of B612 the user has been using and on what days and times the features have been used) to the Kajicam Domains. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

    b.    **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection and transfer of users' biometric identifiers and biometric information by providing hosting on their own devices for the domains used to obtain the biometric identifiers and biometric information. These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s, Snow Corp.'s and Snow Inc.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

    c.    **Z Holdings** and **LINE E-A** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

327.    Defendants' intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by their making California Plaintiffs' and the California Subclass' private and personally-identifiable information available to third parties, including a foreign governmental entity whose interests oppose those of United States citizens. The intentionality of Defendants' conduct, and the steps they have taken to disguise it—and in the case of Z-LINE Defendants, deny

1   it—also reveal the highly offensive nature of their conduct.

2        328.    Further, Defendants' conduct targeted California Plaintiffs' and the California

3   Subclass' mobile devices, which the United States Supreme Court has characterized as almost a

4   feature of human anatomy, and which contain California Plaintiffs' and the California Subclass'

5   private and personally-identifiable information.

6        329.    California Plaintiffs and the California Subclass were all harmed by, and continue to

7   suffer harm as a result of, the intrusion as detailed throughout this Complaint. No proof of economic

8   injury, beyond the theft of their private and personal information, is required for this claim.

9        330.    Defendants' conduct was a substantial factor in causing the harm suffered by

10  California Plaintiffs and the California Subclass.

11       331.    California Plaintiffs and the California Subclass seek nominal and punitive damages

12  as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious,

13  oppressive, and willful actions were calculated to injure California Plaintiffs and the California

14  Subclass, and were made in conscious disregard of their rights. Punitive damages are also warranted

15  to deter Defendants from engaging in future misconduct.

16       332.    California Plaintiffs and the California Subclass seek injunctive relief to remedy

17  Defendants' actions, including, but not limited to, requiring Defendants to stop taking private and

18  biometric information from users' mobile devices; to make clear disclosures of the information that

19  is reasonably necessary to operate LINE Messenger and B612; and to recall and destroy all

20  information already taken in contravention of California Plaintiffs' and the California Subclass'

21  privacy rights.

22       333.    California Plaintiffs and the California Subclass seek restitution and disgorgement

23  for Defendants' intrusion upon seclusion. A person acting in conscious disregard of the rights of

24  another must disgorge all profit because disgorgement both benefits the injured parties and deters

25  the perpetrator from committing the same unlawful actions again. Disgorgement is available for

26  conduct that constitutes "conscious interference with a claimant's legally protected interests,"

27  including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of

28  Restitution and Unjust Enrichment, §§ 40, 44.

**Second Cause of Action**

**(Violation of the Right to Privacy – California Constitution –**

**By California Plaintiffs Against All Defendants)**

334.    California Plaintiffs and the California Subclass incorporate by this reference each and every preceding paragraph.

335.    The California Constitution expressly provides for a right to privacy: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., art. I, § 1.

336.    California Plaintiffs and the California Subclass hold a legally protected privacy interest in their private and personally-identifiable information – including biometric information, video viewing histories, and certain contents of their chat messages – that Defendants have taken.

337.    California Plaintiffs and the California Subclass have a reasonable expectation of privacy concerning that information under the circumstances.

338.    Defendants collected and transmitted Plaintiffs' and the California Subclass' user and device identifiers along with their personally-identifiable information.

339.    **As it concerns the LINE Messenger app**:

a.    **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.,** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages, and personally identifiable information—such as the device ID, the client ID, the Defendants advertising ID, the phone number, and the model of the phone—through the LINE Messenger app. These Defendants transmitted this data to the domain ga2u.line.naver.jp.  These Defendants utilized and configured the SenseTime SDK to transmit to third-party SenseTime personally identifiable information.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.    **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept and obtain videos, URLs, and keywords contained within encrypted messages.  These Defendants also aided in the collection of users' information by

acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data. Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so. To the contrary, they had actively been involved in designing and implementing the data flows and storage for LINE Messenger, including the unlawful interception alleged herein. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c. **LINE E-A** is liable for this conduct because it occurred pursuant to the common enterprise of which it is a part. In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to California residents, knowing about the privacy violations alleged herein.

d. **Snow Corp.**, and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

340. **As it concerns the B612 app**:

a. **LINE Corp., LINE Plus, Naver Corp., Snow Corp., and Snow Inc.** owned and operated the B612 application, facilitated the collection of users' facial scans through the use of the SenseAR SDK. These Defendants transferred the biometric information to the domain log.snow.me, and facilitated the transfer of personally identifiable data, such as device ID, WiFi MAC address, the make and model of a users' device, IP address, the make and model of the user's device; the OS software version on the device the user is using; the City code for where the device is being used; the IP address; and the identity of the features of B612 the use has been using and on what days and times the features have been used, to the Kajicam Domains. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b. **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection and transfer of users' biometric information by providing provided hosting on their own devices for the domains used to obtain biometric information. These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s, Snow Corp.'s and Snow Inc.'s server, data storage, and data management with respect to California Plaintiffs' and

1    the California Subclass' data. These Defendants are also liable for this conduct because it occurred

2    pursuant to the common enterprise of which they are a part.

3            c.    **LINE E-A** is liable for this conduct because it occurred pursuant to the

4    common enterprise of which it is a part as alleged above.

5        341.    The reasonableness of California Plaintiffs' and the California Subclass'

6    expectations of privacy is supported by the clandestine nature of Defendants' taking of California

7    Plaintiffs' and the California Subclass' private and personally-identifiable information from their

8    mobile devices and unauthorized disclosure of such information to third parties. Defendants acted

9    with deceit and disregard for California Plaintiffs' and the California Subclass' privacy.

10        342.    Defendants' conduct violated California Plaintiffs' and the California Subclass'

11    privacy interests, were highly offensive to a reasonable person, and constituted and continues to

12    constitute an egregious breach of social norms. Not only did Defendants take and use this

13    information, Defendants either did not disclose at all, or failed to make an effective disclosure, that

14    they would take and use California Plaintiffs' and the California Subclass' private and personally-

15    identifiable information. Defendants intentionally invaded California Plaintiffs' and the California

16    Subclass' privacy interests by intentionally designing their apps, including associated code, to

17    surreptitiously obtain, improperly gain knowledge of, review, and retain California Plaintiffs' and

18    the California Subclass' private and personally-identifiable information.

19        343.    These intrusions are highly offensive to a reasonable person, as evidenced by

20    substantial research, literature, and governmental enforcement and investigative efforts to protect

21    consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants'

22    intrusion is heightened by the representation that messages transmitted on LINE Messenger were

23    encrypted "end-to-end" such that only the sender and recipient can see the contents of messages.

24        344.    The offensiveness of Defendants' intrusion is further heightened by the fact that they

25    utilize a SDK produced by SenseTime – a China-based company that is known to use its artificial

26    intelligence technology to assist the Chinese government with its political, military, and policing

27    agenda – to collect California Plaintiffs' and the California Subclass' private and personally-

28    identifiable information and make available to third parties, including the Chinese government.

345.    The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also show the highly offensive nature of their conduct.

346.    Further, Defendants' conduct targeted California Plaintiffs' and the California Subclass' mobile devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain California Plaintiffs' and the California Subclass' private and personally-identifiable information.

347.    California Plaintiffs and the California Subclass were harmed by the intrusion as detailed throughout this Complaint.

348.    Defendants' conduct was a substantial factor in causing the harm suffered by California Plaintiffs and the California Subclass.

349.    California Plaintiffs and the California Subclass seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure California Plaintiffs and the California Subclass, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

350.    California Plaintiffs and the California Subclass seek injunctive relief to remedy Defendants' actions, including, but not limited to, requiring Defendants to stop taking private and biometric information from users' mobile devices; to make clear disclosures of the information that is reasonably necessary to operate LINE Messenger and B612; and to recall and destroy all information already taken in contravention of California Plaintiffs' and the California Subclass' privacy rights.

351.    California Plaintiffs and the California Subclass seek restitution and disgorgement for Defendants' violation of their privacy rights. A person acting in conscious disregard for the rights of another must disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

**Third Cause of Action**

**(Violation of the California Unfair Competition Law,**

**Bus. & Prof. Code §§ 17200,** *et seq.* **– By California Plaintiffs Against All Defendants)**

352.     California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

353.     The Unfair Competition Law, California Business & Professions Code §§ 17200, et seq. ("UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which can include false or misleading advertising.

354.     Each Defendant violated, and continue to violate, the "**unlawful**" prong of the UCL through violation of statutes, Constitutional provisions and common law, as alleged in the Complaint.

355.     Defendants violated, and continue to violate, the "**unfair**" prong of the UCL because they took California Plaintiffs' and the California Subclass' private and personal information, including their biometric information, video viewing histories, and certain content of their chat messages--in addition to user identifiers and device identifiers--and shared this information with third parties.   This information is property under the laws of California and common law. Defendants' unlawful taking and use of this property was immoral, unethical, oppressive, unscrupulous and substantially injurious to California Plaintiffs and the California Subclass. Defendants' unauthorized collection and disclosure of private and personal information was made for their own gain and at the expense of California Plaintiffs and the California Subclass:

356.     **As it concerns the LINE Messenger app**:

    a.     **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.,** owned and operated the app.   These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages, and personally identifiable information—such as the device ID, the client ID, the Defendants advertising ID, the phone number, and the model of the phone— through the LINE Messenger app. These Defendants transmitted this data to the domain ga2u.line.naver.jp.  These Defendants utilized and configured the SenseTime SDK to transmit to third-party SenseTime personally identifiable information.  These Defendants are also liable for this

conduct because it occurred pursuant to the common enterprise of which they are a part.

b.    **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept and obtain videos, URLs, and keywords contained within encrypted messages.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data.  Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so.  To the contrary, they had actively been involved in designing and implementing the data flows and data storage for LINE Messenger, including the unlawful interception alleged herein.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c.    **LINE E-A** is liable for this conduct because it occurred pursuant to the common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to California residents, knowing about the privacy violations alleged herein.

d.    **Snow Corp.** and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

357.    **As it concerns the B612 app:**

a.    **LINE Corp., LINE Plus, Naver Corp., Snow Corp.,** and **Snow Inc.** owned and operated the B612 app, which facilitated the collection of users' facial scans through the use of the SenseAR SDK. These Defendants transferred the biometric identifiers and biometric information to the domain log.snow.me, and facilitated the transfer of personally identifiable data (such as device ID, WiFi MAC address, the make and model of a users' device, IP address, the make and model of the user's device; the OS software version on the device the user is using; the City code for where the device is being used; the IP address; and the identity of the features of B612 the use has been using and on what days and times the features have been used) to the Kajicam Domains. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.    **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection and

transfer of users' biometric identifiers and biometric information by providing hosting on their own devices for the domains used to obtain biometric identifiers and biometric information. These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s, Snow Corp.'s and Snow Inc.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c.   **Z Holdings** and **LINE E-A** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

358.   **LINE Corp.** violated, and continues to violate, the "**fraudulent**" prong of the UCL because it represented to users and the public that messages shared on LINE Messenger were encrypted and secure. LINE Corp. repeatedly stated, in its privacy policy and in public statements made available on its websites, that LINE Messenger offer end-to-end encryption of all messages transmitted via the app so that only the sender and recipient can view the content of messages. In reality, LINE Corp. intercepts and transfers portions of California Plaintiffs' and the California Subclass' communications in an unencrypted form. Reasonable consumers, like California Plaintiffs and the California Subclass, were likely to be misled by LINE Corp.'s misrepresentations. Reasonable consumers lack the means to verify LINE Corp.'s representations about its data practices or to understand the fact or significance of its data practices. **All Defendants other than LINE Corp.** are liable for the misrepresentations because they occurred pursuant to the common enterprise of which they are a part. In addition and in the alternative, **LINE E-A** aided and abetted this misconduct by promoting the use of the LINE Messenger app to California and U.S. residents, knowing that the representations were false.

359.   California Plaintiffs and the California Subclass have been harmed by Defendants' UCL violations. California Plaintiffs and the California Subclass have a property interest in the personally identifiable information (including biometric information) and other personal information (including key words, URLs, and videos shared in private communications) taken by Defendants. The Defendants surreptitiously collected this property and therefore, Plaintiffs received

less than they otherwise would have surrendered this property for. California Plaintiffs and the California Subclass have a suffered from the diminished loss of use of their own personal information, property which has both personal and economic value to them. California Plaintiffs and the California Subclass have also been deprived the money or property they would have received for the data improperly collected by Defendants.

360.    As a result of their conduct, Defendants have been able to reap unjust revenues and profits in violation of the UCL.

361.    California Plaintiffs and the California Subclass lack an adequate remedy at law and are thus entitled to seek equitable relief.  Unless restrained and enjoined, Defendants will continue to misrepresent their data practices and will not recall and destroy all wrongfully collected data. Due to the ongoing nature of the harm, damages will be insufficient to address it.  Thus, injunctive relief is appropriate

362.    Further, California Plaintiffs and the California Subclass are entitled to restitution as the available damages remedies are inadequate to return to California Plaintiffs and the California Subclass the value of the information taken by Defendants, including for use in developing their artificial intelligence systems. California Plaintiffs and the California Subclass are entitled to restitution for Defendants' unjust enrichment in a quanta that is not identical to the legal damages suffered.

### Fourth Cause of Action

**(Violation of the California False Advertising Law,**

**Bus. & Prof. Code §§ 17500, *et seq.* – By California Plaintiffs Against All Defendants)**

363.    California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

364.    California's False Advertising Law ("FAL")—Cal. Bus. & Prof. Code §§ 17500, *et seq.*—prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services.

365.    **LINE Corp.'s** representations regarding the security of users' personal information on LINE Messenger are, and at all relevant times were, untrue. LINE Corp. repeatedly stated, in its

privacy policy and in public statements made available on its websites, that LINE Messenger offer end-to-end encryption of all messages transmitted via the app so that only the sender and recipient can view the content of messages. In reality, LINE Corp. intercepts and shares certain private contents of the users' messages — including videos, URLs and particular keywords — that consumers seek to safeguard. **All Defendants other than LINE Corp.** are liable for the misrepresentations because they occurred pursuant to the common enterprise of which they are part. In addition and in the alternative, **LINE E-A** aided and abetted this misconduct by promoting the use of the LINE Messenger app to California and U.S. residents, knowing about the falsity of LINE Corp.'s misrepresentations.

366.    Reasonable consumers, like California Plaintiffs and the California Subclass, were likely to be misled by LINE Corp.'s misrepresentations. Reasonable consumers lack the means to verify LINE Corp.'s representations about its data practices or to understand the fact or significance of its data practices.

367.    California Plaintiffs and the California Subclass suffered economic injury as a result of the misrepresentations. First, they have suffered harm in the form of diminution of the value of their private and personally-identifiable information. Second, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally-identifiable information – including their face geometry scans, video viewing histories, and certain contents of their chat messages, which was collected and along with user identifiers and device identifiers.

368.    Defendant, as a result of their misrepresentations, was able to reap unjust profits and revenues, including from their targeted advertising, sale of California Plaintiffs' and the California Subclass' private and personally-identifiable information, and services and products derived from such information.

369.    Unless restrained and enjoined, Defendants will continue to misrepresent their practices regarding the collection and use of private and personally-identifiable information, and will not recall and destroy California Plaintiffs' and the California Subclass' wrongfully collected private and personally-identifiable information. Accordingly, injunctive relief is appropriate.

**Fifth Cause of Action**

**(Violation of California Invasion of Privacy Act,**

**California Penal Code §§ 630, *et seq.* – California Plaintiffs Against All Defendants)**

370.     California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

371.     California Plaintiffs and the California Subclass assert this claim for relief explicitly as it relates to Defendants' actions concerning the LINE Messenger application, only.

372.     California's Invasion of Privacy Act ("CIPA") prohibits the interception or receipt and intentional recording of communications transmitted between cellular phones without the consent of all parties to the communication. California Penal Code ("CPC") § 632.7(a).

373.     The LINE Messenger allows users to create and send written messages, make voice calls, and send videos.  Its timeline feature provides the ability for users to share videos, the creation of which requires recording those videos, a feature which the LINE Messenger has enabled users to do.

374.     California Plaintiffs and the California Subclass have an expectation of privacy in messages, videos, and recordings, and they exercised a reasonable expectation of privacy concerning the transmission of those messages.

375.     However, without the consent of either the sender or recipient, Defendants intercepted and recorded videos, URLs, and keystrokes contained in communications and messages transmitted via the LINE Messenger without California Plaintiffs' and the California Subclass' consent or knowledge:

a.     **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages through the LINE Messenger app. These Defendants transmitted this private message content to their domains where they recorded and stored them, separate from the process of transmitting the message to the intended recipient.  These Defendants designed the LINE Messenger app in a way that they knew California Plaintiffs' and the California Subclass' privacy rights would be violated, in that their messages would be unlawfully intercepted

and recorded. The defective and unlawful design of the LINE Messenger app directly facilitates these Defendants' unlawful conduct. These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.     **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept, obtain, and record videos, URLs, and keywords contained within encrypted messages.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data.  Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so.  To the contrary, they had actively been involved in designing and implementing the data flows and data storage for LINE Messenger, including the unlawful interception alleged herein.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c.     **LINE E-A** is liable for this conduct because it occurred pursuant to the common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to California residents, knowing about the privacy violations alleged herein.

d.     **Snow Corp.**, and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

376.     The unauthorized interceptions described herein are not covered by any business exception because the interceptions were not required to facilitate the communications between users.

377.     Chat participants could not provide consent to the interception because they did not know that their messages were being intercepted and reasonably anticipated that their private messages would remain private.

378.     California Plaintiffs and the California Subclass have a property right an interest in their private communications, videos, and messages such that the interception of those messages is violative of those rights and therefore causes them injury and damages.

379.     California Plaintiffs and the California Subclass suffered further economic injury as

a result of Defendants' unlawful and unauthorized interceptions and recordings of communications.

380.    California Plaintiffs and the California Subclass seek $5,000 or three times the amount of actual damages, whichever is greater, for each violation of the CIPA by Defendants.

**Sixth Cause of Action**

**(Violation of the Electronic Communications Privacy Act,**

**18 U.S.C. § 2510, *et seq.* – All Plaintiffs Against All Defendants)**

381.    Plaintiffs and the Class incorporate herein by this reference each and every preceding paragraph.

382.    Plaintiffs and the Class assert this claim for relief explicitly as it relates to Defendants' actions concerning the LINE Messenger application, only.

383.    The LINE Messenger allows users to create and send written messages, make voice calls, and send videos.  Its timeline feature provides the ability for users to share videos, the creation of which requires recording those videos, a feature which the LINE Messenger has enabled users to do.

384.    Plaintiffs and the Class have an expectation of privacy in messages, videos, and recordings, and they exercised a reasonable expectation of privacy concerning the transmission of those messages.

385.    However, without the consent of either the sender or recipient, Defendants intercepted and recorded videos, URLs, and keystrokes contained in communications and messages transmitted via the LINE Messenger without Plaintiffs' or Class members' consent or knowledge:

a.    **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages through the LINE Messenger app. These Defendants transmitted this private message content to their domains where they recorded and stored them, separate from the process of transmitting the message to the intended recipient.  These Defendants designed the LINE Messenger app in a way that they knew Plaintiffs' and Class members' privacy rights would be violated, in that their messages would be unlawfully intercepted and recorded. The defective and unlawful design of LINE Messenger directly facilitates these Defendants' unlawful

1    conduct.  These Defendants are also liable for this conduct because it occurred pursuant to the

2    common enterprise of which they are a part.

3         b.    **Naver Cloud** and **Naver Cloud America** provided hosting on their own

4    devices for the domains used to intercept, obtain, and record videos, URLs, and keywords contained

5    within encrypted messages.  These Defendants also aided in the collection of users' information by

6    acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data

7    management with respect to Plaintiffs' and Class members' data.  Naver Cloud and Naver Cloud

8    America were not merely acting as passive ISPs in doing so.  To the contrary, they had actively been

9    involved in designing and implementing the data flows and data storage for LINE Messenger,

10   including the unlawful interception alleged herein.  These Defendants are also liable for this conduct

11   because it occurred pursuant to the common enterprise of which they are a part.

12        c.    **LINE E-A** is liable for this conduct because it occurred pursuant to the

13   common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this

14   misconduct by promoting the use of the LINE Messenger app to California, Illinois, and other

15   United States residents, knowing about the privacy violations alleged herein.

16        d.    **Snow Corp.** and **Snow Inc.** are liable for this conduct because it occurred

17   pursuant to the common enterprise of which they are a part.

18   386.   The unauthorized interceptions described herein are not covered by any business

19   exception because the interceptions were not required to facilitate the communications between

20   users.

21   387.    Chat participants could not provide consent to the interception because they did not

22   know that their messages were being intercepted and reasonably anticipated that their private

23   messages would remain private.

24   388.   The interception and search of Plaintiffs' and Class members' messages requires

25   Defendants to record—or store—Plaintiffs' and Class members' messages on their servers.

26   389.   These acts violate § 2511(1)(a) of the Electronic Communications Privacy Act

27   ("ECPA") because Defendants intentionally endeavored to intercept, and did in fact intercept,

28   electronic messages transmitted by Plaintiffs and the Class using LINE Messenger.

390.    Defendants intercept videos, URLs and certain keywords contained in Plaintiffs' and the Class's chat messages on LINE Messenger by using devices that are distinct from the devices associated with the transmission of the messages between sender and recipient.

391.    The videos, URLs, and keywords contained in Plaintiffs' and the Class's chat messages that Defendants intercept are substantive communication that senders intended to convey to recipients.

392.    Defendants' acts further violate § 2511(1)(d) because the information intercepted from Plaintiffs' and Class members' communications were intentionally used for gain, including for advertising, as alleged above.

393.    Plaintiffs and Class members were also damaged when the Defendants used their information, intentionally, despite knowing that such interception was unauthorized, for corporate gain and profit such that the Z-LINE Defendants were unjustly enriched.

394.    Plaintiffs and the Class seek: (i) injunctive relief to correct Defendants' actions, including, but not limited to, requiring Defendants to stop intercepting any portion of Plaintiffs' and the Class's chat messages on LINE Messenger; (ii) the sum of actual damages suffered by them and any profits Defendants made as a result of their violations of the ECPA, but in no event less than $1,000; and (iii) reasonable attorneys' fees and costs under 18 U.S.C. § 2707(c).

## **Seventh Cause of Action**

**(Larceny / Receipt of Stolen Property, Cal. Penal Code § 496(a) and (c) – California Plaintiffs Against All Defendants)**

395.    California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

396.    "California Penal Code Section 484 forbids theft, which includes obtaining property "by ... false . . . representation or pretense." *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 635 (N.D. Cal. 2021) (quoting Cal. Penal Code § 484).

397.    Unauthorized copying of another's property is actionable theft under California Penal Code § 496. *Calhoun*, 526 F.Supp.3d at 635 ("California courts have held that copying is theft because 'although the owner may retain possession of the original property, there has been

1    nevertheless a deprivation of property when a copy is made.'").

2    398.    Receipt of stolen property, including property obtained through false pretenses or

3    through unauthorized copying, is actionable theft under California Penal Code § 496. *People v.*

4    *Allen*, 21 Cal.4th 846, 858 (1999).

5    399.    Aiding and abetting the concealment, sale, or withholding of property from the owner

6    of the property is actionable under California Penal Code § 496(a). *Siry Inv., L.P. v.*

7    *Farkhondehpour*, 13 Cal.5th 333, 361 (2022).

8    400.    California Plaintiffs and the California Subclass have a property interest in their

9    personal information. *Calhoun*, 526 F. Supp. 3d at 635. Property is the right of any person to possess,

10    use, enjoy, or dispose of a thing, including intangible things such as data or communications.

11    401.    Defendants knowingly obtained; copied; received; and/or aided and abetted in the

12    concealment, sale, or withholding of California Plaintiffs' and the California Subclass' personal

13    information without authorization and under false pretenses. *See, e.g.,* ¶¶ 210-221, 262-265 above.

14    402.    Defendants entice consumers to download and use LINE Messenger in part by

15    promising "end-to-end" encryption for user chats on LINE Messenger such that user messages

16    cannot be read except by the sender and recipient.  But the pretense of privacy and security in the

17    LINE Messenger was and is at all relevant times hereto false. Defendants intercept and copy material

18    portions of LINE Messenger user messages – *i.e.*, videos, URLs, and certain keywords – in

19    unencrypted form.  This interception and copying is unauthorized and concealed from LINE

20    Messenger users.

21    403.    Defendants also take and collect facial geometry scans from LINE Messenger and

22    B612 users when they use the AR features of LINE Messenger and B612 for photos and videos.

23    These scans are taken and collected without the authorization or consent of the LINE Messenger

24    and B612 users. *See, e.g.,* ¶¶ 3-6, 193-207.

25    404.    Defendants also transmit personally identifiable user data from LINE Messenger

26    messages and from B612 to SenseTime.  This transmission is unauthorized and concealed from

27    LINE Messenger and B612 users. Defendants thereby aided SenseTime in concealing, withholding,

28    or monetizing/selling California Plaintiffs' and the California Subclass' property.  *See, e.g.,* ¶¶ 3-5,

180-206 above.

405.    Defendants share the captured user personal information with each other, so all Defendants are in receipt of California Plaintiffs' and the California Subclass' stolen personal information. *See, e.g.,* ¶¶ 2, 23, 86, 165 above.

406.    Defendants knew California Plaintiffs' and the California Subclass' property was stolen because they designed and operated LINE Messenger and B612 to do so. Defendants deliberately placed the SenseTime SDK into LINE Messenger and B612. Defendants also patented technology designed to take face geometry scans and send them to Defendants without authorization.

407.    Defendants at all relevant times held California Plaintiffs' and the California Subclass' stolen  personal information and have not returned it to them.

408.    **As it concerns the LINE Messenger app**:

a.    **Z Holdings, LINE Corp., LINE Plus,** and **Naver Corp.** owned and operated the LINE Messenger app.  These Defendants intercepted and obtained videos, URLs, and keywords contained within encrypted messages, and personally identifiable information—such as the device ID, the client ID, the Defendants' advertising ID, the phone number, and the model of the phone— through the LINE Messenger app.  These Defendants transmitted this data to the domain ga2u.line.naver.jp.  These Defendants knew that this data was obtained through false pretenses and in a manner constituting theft.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.    **Naver Cloud** and **Naver Cloud America** provided hosting on their own devices for the domains used to intercept and obtain videos, URLs, and keywords contained within encrypted messages.  These Defendants knew that this data was obtained through false pretenses and in a manner constituting theft.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data.  Naver Cloud and Naver Cloud America were not merely acting as passive ISPs in doing so.  To the contrary, they had actively been involved in designing and implementing the data flows and data

storage for LINE Messenger, including the unlawful interception alleged herein.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

c.      **LINE E-A is** liable for this conduct because it occurred pursuant to the common enterprise of which it is a part.  In the alternative, LINE E-A aided and abetted this misconduct by promoting the use of the LINE Messenger app to California residents, knowing that it was taking data from users through false pretenses and in a manner constituting theft.

d.      **Snow Corp.** and **Snow Inc.** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

409.   <u>**As it concerns the B612 app**</u>:

a.      **LINE Corp., LINE Plus, Naver Corp., Snow Corp.,** and **Snow Inc.** owned and operated the B612 app, which facilitated the collection of users' facial scans through the use of the SenseAR SDK.  These Defendants transferred these biometric identifiers and biometric information to the domain log.snow.me.  These Defendants knew that this data was obtained through false pretenses and in a manner constituting theft.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

b.      **Naver Cloud Corp.** and **Naver Cloud America** facilitated the collection and transfer of users' biometric identifiers and biometric information by providing hosting on their own devices for the domains used to obtain the biometric identifiers and biometric information.  These Defendants knew that this data was obtained through false pretenses and in a manner constituting theft.  These Defendants also aided in the collection of users' information by acquiring, installing, operating, and managing LINE Corp.'s, Snow Corp.'s and Snow Inc.'s server, data storage, and data management with respect to California Plaintiffs' and the California Subclass' data.  These Defendants are also liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

410.   **Z Holdings** and **LINE E-A** are liable for this conduct because it occurred pursuant to the common enterprise of which they are a part.

411.   California Plaintiffs and the California Subclass have suffered damages as a result of

Defendants' conduct.

412.    Defendants unlawfully profited from obtaining, copying, receiving, and holding California Plaintiffs' and the California Subclass' personal information; and from aiding and abetting in the concealment, sale, or withholding of the same. Indeed, as alleged above, LY Corporation admitted that "[b]y using the data possessed by each service, the Group will aim to improve advertising effectiveness by fortifying the delivery of advertisements and content best-suited to users." "Through these efforts, we aim to raise ad unit process over the medium-to-long-term."

413.    California Plaintiffs and the California Subclass retain a stake in the profits Defendants garnered from their personal information because the circumstances are such that, as between Plaintiffs and Defendants, it is unjust for Defendants to retain it.

414.    Under California law, Defendants are under a duty to give California Plaintiffs and the California Subclass the amount by which Defendants have been unjustly enriched.

415.    In the alternative, California Plaintiffs and the California Subclass are entitled to actual damages in an amount to be proven at trial.

**Eighth Cause of Action**

**(Conversion – California Plaintiffs Against All Defendants)**

416.    California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

417.    Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things such as data or communications. California Plaintiffs' and the California Subclass' personal information is their property. *Calhoun v. Google LLC,* 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021). California Plaintiffs and the California Subclass have a property interest in their personal information.

418.    Defendants unlawfully collected, used, and exercised dominion and control over California Plaintiffs' and the California Subclass' personal information without authorization.

a.    Defendants intercept and copy material portions of LINE Messenger user messages – *i.e.*, videos, URLs, and certain keywords – in unencrypted form. This interception and

copying is unauthorized and concealed from LINE Messenger users. California Plaintiffs and the California Subclass had no control over Defendants' actions. Defendants had complete control and dominion over California Plaintiffs and the California Subclass' personal information during and after the interception and copying.

b.      Defendants take and collect facial geometry scans from LINE Messenger and B612 users when they use the AR features of LINE Messenger and B612 for photos and videos. These scans are taken and collected without the authorization or consent of the LINE Messenger and B612 users. *See, e.g.,* ¶¶ 3-6, 193-207. California Plaintiffs and the California Subclass had no control over Defendants' actions. Defendants had complete control and dominion over California Plaintiffs and the California Subclass' personal information during and after the taking and collection of their facial geometry scans.

419.    California Plaintiffs and the California Subclass have suffered damages as a result of Defendants' conduct.

420.    Defendants wrongfully and knowingly exercised control over California Plaintiffs' and the California Subclass' information and have not returned it. Defendants are thus under a duty to give California Plaintiffs and the California Subclass the amount by which Defendants have been unjustly enriched.

421.    Defendants unlawfully profited from their unauthorized and unlawful collection, use, and exercise of dominion and control over California Plaintiffs' and the California Subclass' personal information. Indeed, as alleged above, LY Corporation admitted that "[b]y using the data possessed by each service, the Group will aim to improve advertising effectiveness by fortifying the delivery of advertisements and content best-suited to users." "Through these efforts, we aim to raise ad unit process over the medium-to-long-term."

422.    California Plaintiffs and the California Subclass retain a stake in the profits Defendants garnered from their personal information because the circumstances are such that, as between Plaintiffs and Defendants, it is unjust for Defendants to retain it.

423.    Under California law, Defendants are under a duty to give California Plaintiffs and the California Subclass the amount by which Defendants have been unjustly enriched.

424. In the alternative, California Plaintiffs and the California Subclass are entitled to actual damages in an amount to be proven at trial.

**Ninth Cause of Action**

**(Restitution / Unjust Enrichment – California Plaintiffs Against All Defendants)**

425. California Plaintiffs and the California Subclass repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

426. California Plaintiffs and the California Subclass have conferred substantial benefits on Defendants by downloading and using Defendants' apps. These benefits include Defendants' collection and use of the California Plaintiffs' and the California Subclass' private and personally-identifiable information and the revenues and profits resulting from targeted advertising and other uses of the information Defendants have taken from California Plaintiffs and the California Subclass.

427. Defendants have knowingly and willingly accepted and enjoyed these benefits.

428. Defendants either knew or should have known that the benefits rendered by California Plaintiffs and the California Subclass were given and received with the expectation that they would not take and use the private and personally-identifiable information that they have taken without permission. For Defendants to retain those benefits under these circumstances is inequitable.

429. Through deliberate violation of California Plaintiffs' and the California Subclass' privacy interests and statutory and constitutional rights, Defendants reaped benefits that led to each Defendant wrongfully receiving profits.

430. Equity demands disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of California Plaintiffs and the California Subclass.

431. As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, California Plaintiffs and the California Subclass are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits and other compensation obtained by Defendants through this inequitable conduct.

## X.      **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request relief against Defendants as set forth below:

A.      Entry of an order certifying the proposed Class and Subclasses pursuant to Federal Rule of Civil Procedure 23;

B.      Entry of an Order appointing Plaintiffs as representatives of the Class and Subclasses;

C.      Entry of an Order appointing Plaintiffs' counsel as co-lead counsel of the Class and Subclasses;

D.      Entry of an Order for injunctive and declaratory relief as described herein, including but not limited to:

(i) enjoining Defendants from transmitting user data from the United States to China or to other locations where such data can be accessed from within China;

(ii) enjoining Defendants from collecting facial recognition data such as face geometries, including via the SenseTime SDK embedded into the Apps, contrary to user expectations;

(iii) enjoining Defendants from intercepting keywords, URLs, and videos, contrary to user expectations, sent in LINE Messenger chats that supposedly are encrypted end-to-end;

(iv) enjoining Defendants from taking and transmitting more private and personally-identifiable data than is reasonably necessary for operation of the Defendants' apps;

(v) enjoining Defendants from tracking users between the LINE Messenger and B612 apps, contrary to user expectations;

(vi) enjoining Defendants from taking and transmitting to anyone else the above-described user data;

(vii) requiring Defendants to remove from their apps all third party analytic libraries and SDKs that take and/or transmit user data;

(viii) requiring Defendants to destroy the user data taken pursuant to the above practices, including that user data in the possession of third parties;

(ix) requiring Defendants to provide confirmation that the above steps have been implemented;

E.     Entry of judgment in favor of each Class and Subclass member for damages suffered as a result of the conduct alleged herein, punitive damages, restitution, and disgorgement, to include interest and prejudgment interest;

F.     Award Plaintiffs reasonable attorneys' fees and costs; and

G.     Grant such other and further legal and equitable relief as the court deems just and equitable.

## XI.     <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all issues so triable.

DATED: May 16, 2025                                   By: */s/ Jonathan M. Rotter*

Kara M. Wolke - State Bar No. 241521
Jonathan M. Rotter - State Bar No. 234137
Raymond D. Sulentic - State Bar No. 316913
Holly K. Nye – State Bar No. 355966
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067-2561
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

DATED: May 16, 2025                                   By: */s/ Lesley E. Weaver*

Lesley E. Weaver – State Bar No. 191305
Joshua Samra – State Bar No. 313050
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, California 94612
Tel. (415) 445-4003
lweaver@bfalaw.com
jsamra@bfalaw.com

1   DATED:  May 16, 2025                    By: /s/  Nada Djordjevic
                                            _____
2
                                            Amy E. Keller (admitted pro hac vice)
3                                           Nada Djordjevic (admitted pro hac vice)
                                            Madeline Hills (admitted pro hac vice)
4                                           **DiCELLO LEVITT LLP**
                                            Ten North Dearborn Street
5                                           Sixth Floor
                                            Chicago, Illinois 60602
6                                           Tel. (312) 214.7900
                                            akeller@dicellolevitt.com
7                                           Ndjordjevic@dicellolevitt.com
                                            Mhills@dicellolevitt.com
8
9   DATED:  May 16, 2025                    By: /s/ Marc E. Masters
                                            _____
10
                                            Ekwan E. Rhow - State Bar No. 174604
11                                            erhow@birdmarella.com
                                            Thomas R. Freeman - State Bar No. 135392
12                                            tfreeman@birdmarella.com
                                            Marc E. Masters - State Bar No 208375
13                                            mmasters@birdmarella.com
                                            **BIRD MARELLA RHOW LINCENBERG**
14                                          **DROOKS & NESSIM LLP**
                                            1875 Century Park East, 23rd Floor
15                                          Los Angeles, California 90067-2561
                                            Telephone: (310) 201-2100
16                                          Facsimile: (310) 201-2110
17
18  DATED:  May 16, 2025                    By: /s/ Marc S. Williams
                                            _____
19
                                            Marc S. Williams – State Bar No. 198913
20                                            mwilliams@cohen-williams.com
                                            Martin J. Cristopher Santos – State Bar No. 306346
21                                          csantos@cohen-williams.com
                                            **COHEN WILLIAMS LLP**
22                                          724 South Spring Street, 9th Floor
                                            Los Angeles, CA 90014
23                                          Tel: 213-232-5162
                                            Fax: 213-232-5167
24
25                                          *Attorneys for Plaintiffs and the Putative Class*
26
27
28

### **ATTESTATION**

I, Jonathan Rotter, am the ECF user whose identification and password are being used to file this document. In compliance with Local Rule 5-1(i)(3), I hereby attest that each of the Signatories herein concur in this filing.


DATED:  May 16, 2025                    By: */s/ Jonathan M. Rotter*
                                        Jonathan M. Rotter

## CERTIFICATE OF SERVICE

I, Jonathan Rotter, hereby certify that on July 8, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Jonathan M. Rotter
Jonathan M. Rotter