UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANELA SUNGA, et al., | Case No.  21-cv-05143-HSG |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT** |
| v. | |
| NAVER CORPORATION, et al., | REDACTED VERSION |
| Defendants. | Re: Dkt. Nos. 312, 314 |

Pending before the Court are Defendants' third-round motions to dismiss.  Dkt. Nos. 312, 314.[1]  The motions have been fully briefed.  *See* Dkt. Nos. 329, 331, 337, 339.[2]  The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b).  For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions to dismiss.

I.      **BACKGROUND**

The Court granted Defendants' first and second round motions to dismiss with leave to amend.  *See generally Ji v. Naver Corp.*, No. 21-CV-05143-HSG, 2022 WL 4624898 (N.D. Cal. Sept. 30, 2022) ("*Ji I*"); *Ji v. Naver*, No. 21-CV-05143-HSG, 2023 WL 6466211 (N.D. Cal. Oct. 3, 2023) ("*Ji II*").  In its last order on the second-round motions to dismiss, the Court found that

---

[1] The NAVER Defendants filed a notice of errata as to their motion to dismiss, and filed a revised motion with corrections to its citations, among other non-substantive edits.  Dkt. No. 324.
[2] The complaint and certain of the parties' briefs, as well as several exhibits relevant to these motions were filed under seal.  The Court's citations to the briefing throughout refer to the public versions of those documents, to the extent possible.  *See* Dkt. No. 358-2 (SAC); 358-3 (LINE MTD), 314 (NAVER MTD); 358-5 (Opp. to LINE MTD); 359-1 (Opp. to NAVER MTD); 337 ("NAVER Reply"), 339 ("LINE Reply").

Plaintiffs had asserted "more than attenuated, bare allegations," entitling them to jurisdictional discovery. *Ji II*, 2023 WL 6466211, at *3.

Plaintiffs filed a Second Amended Complaint ("SAC"), in which they add new jurisdictional allegations as to both sets of foreign defendants. Dkt. No. 358-3 ("SAC"). The SAC also drops certain plaintiffs and alleges nine causes of action: (1) Intrusion Upon Seclusion; (2) Violation of the Right to Privacy; (3) Violation of the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*; (4) Violation of the California False Advertising Law, Bus. & Prof. Code §§ 17500, *et seq.*; (5) Violation of California Invasion of Privacy Act, California Penal Code §§ 630, *et seq.*; (6) Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*; (7) Larceny / Receipt of Stolen Property, Cal. Penal Code § 496(a) and (c); (8) Conversion; and (9) Restitution / Unjust Enrichment. *See generally* SAC. The NAVER / SNOW Defendants[3] and the LINE Defendants[4] each move to dismiss the FAC in its entirety.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(2)

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). Where a state, like California, "allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution," federal courts ask whether the exercise of jurisdiction over a defendant "comports with the limits imposed by federal due process." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); Cal. Civ. Proc. Code § 410.10 (providing that California's long-arm statute is coextensive with the federal due process clause). The Due Process Clause requires that the defendant have "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945)

---

[3] The NAVER Defendants are NAVER Corporation, NAVER Cloud Corporation, and NAVER Cloud America Inc. The SNOW Defendants are SNOW Corporation and SNOW Inc.

[4] The LINE Defendants are LY Corporation (f/k/a Z Holdings), LINE Corporation/LY Corporation, LINE Plus Corporation, and LINE Euro-Americas Corporation. When relevant, the Court will refer to the "foreign LINE Defendants," which are LY Corp. (f/k/a Z Holdings) and LINE Corporation/LY Corp.

United States District Court
Northern District of California

2

(quotation omitted). There are two types of personal jurisdiction: "general or all-purpose" and "specific or case-linked." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

"In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss.'" *Id.* (quoting *Brayton Purcell LLP v. Recordon & Recordon,* 606 F.3d 1124, 1127 (9th Cir. 2010)). "That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). "[U]ncontroverted allegations in [plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor." *Brayton Purcell*, 606 F.3d at 1127 (internal citations omitted). "Declarations and affidavits are functional equivalents in this context." *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) (quotation omitted). Additionally, if the "jurisdictional facts are intertwined with the merits" such that "a decision on a jurisdictional issue is dependent on the merits . . . it is preferable that this determination be made at trial, where a plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits." *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977).

### B. Rule 12(b)(1)

Federal Rule of Civil Procedure Rule 12(b)(1) allows a party to move to dismiss for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). The issue of Article III standing is jurisdictional and is therefore "properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). To meet the burden of establishing standing, plaintiffs must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And where a

plaintiff seeks injunctive relief, they must also demonstrate a "real and immediate threat of repeated injury." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (quotation omitted).

### C.    Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quotation omitted).

Rule 9(b) imposes a heightened pleading standard where fraud is an essential element of a claim. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see also Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003).  A plaintiff must identify the "who, what, when, where, and how" of the alleged conduct, so as to provide defendants with sufficient information to defend against the charge. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (quotations omitted).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. Rule 9(b).

4

Even if the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*) (quotation omitted).

## III.    REQUEST FOR JUDICIAL NOTICE

Both the LINE Defendants and NAVER / SNOW Defendants seek judicial notice or incorporation by reference of several documents cited in their motions. Dkt. Nos. 313, 315. Plaintiffs do not object to these requests.

### A.    Legal Standard

As a general matter, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Fed. R. 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, there are two exceptions to this rule: the incorporation-by-reference doctrine and judicial notice under Fed. R. Evid. 201. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Both procedures permit district courts to consider materials outside a complaint without converting a motion to dismiss into a summary judgment. *Id.* at 998; *see also Lee*, 250 F.3d at 688–89.

The incorporation by reference doctrine is a judicially created doctrine that allows a court to consider certain documents as though they were part of the complaint itself. *Khoja*, 899 F.3d at 1002. This doctrine is to prevent a plaintiff from cherry-picking certain portions of documents that support his claims, while omitting portions that weaken his claims. *Id.* Incorporation by reference is appropriate "if the plaintiff refers extensively to the document or the document forms the basis of plaintiff's claim." *Id.* at 1002. However, "the mere mention of the existence of a document is insufficient to incorporate the contents" of a document. *Id.* at 1002. Under the incorporation-by-reference doctrine, a court may consider evidence on which the complaint "necessarily relies" if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). If these conditions are met, the court may treat such a document as part of the complaint, and may assume the truth of the

document's contents for purposes of a motion to dismiss under Rule 12(b)(6). *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). But while a court "may assume [an incorporated document's] contents are true for purposes of a motion to dismiss . . . it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1002.

Fed. R. Evid. 201(b) permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). In *Khoja*, the Ninth Circuit discussed the judicial notice rule and incorporation by reference doctrine, noting that a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." 899 F.3d at 999 (citation and quotations omitted). The Ninth Circuit has held that if a court takes judicial notice of a document, it must specify what facts it judicially notices from the document. *Id.* at 999. Further, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.* As an example, the Ninth Circuit held that for a transcript of a conference call, the court may take judicial notice of the fact that there was a conference call on the specified date, but may not take judicial notice of a fact mentioned in the transcript, because the substance "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Id.* at 999–1000.

**B.    Discussion**

The LINE Defendants request that the Court consider several documents outside the pleadings: two copies of LINE Corp.'s terms and conditions, the LINE Pay general terms of service, and a page from the U.S. Embassy & Consulates in Japan website. Dkt. No. 313 at 3.[5] Given Plaintiffs' non-opposition, the Court takes judicial notice of each of these documents. In doing so, the Court does not assume the truth of any of the facts asserted in them.

---

[5] Unless otherwise noted, all page numbers referenced herein are to the ECF page number at the top of the page.

The NAVER / SNOW Defendants also ask that the Court consider documents outside the pleadings, which they argue fall into two categories: (1) financial reports and filings that are incorporated by reference in the complaint and (2) documents that are found on publicly available websites and subject to judicial notice. The Court declines to incorporate by reference the financial reports, Exhibits 4, 14, 17–18 to the Blunschi Declaration. The NAVER Defendants contend that these documents are the source of several of Plaintiffs' allegations regarding purported control to support their alter ego allegations, but the complaint does not specify which financial reports are the source of these allegations. However, given Plaintiffs' non-opposition, the Court takes judicial notice of these exhibits, as well as Exhibits 15 and 16, but does not assume the truth of any facts asserted in them.[6]

## IV. DISCUSSION

### A. Personal Jurisdiction

The foreign LINE Defendants, NAVER and NAVER Cloud move to dismiss Plaintiffs' claims against them based on a lack of personal jurisdiction. *See* LINE Mot. at 13; NAVER Mot. at 18. "When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). "The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a [state's] long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Id.* In California, the long-arm statute extends jurisdiction to the limits of due process, so the resolution of the Court's jurisdiction turns on the federal due process analysis. *See id.* at 1155. "For due process to be satisfied, a defendant, if not present in the forum, must have sufficient 'minimum contacts' with the forum state such that the assertion of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 315 (1945)).

Courts may exercise either general or specific jurisdiction over a defendant. *See Bristol-*

---

[6] The Court also notes that even if it does not consider these documents for their truth when deciding Defendants' 12(b)(6) motions, *see Khoja* 899 F.3d at 999, given Defendants' Rule 12(b)(2) motions, it may consider material outside of the pleadings, including evidence in affidavits and other written materials, *see Data Disc v. Sys. Tech. Ass'n*, 557 F.2d at 1285.

United States District Court
Northern District of California

*Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017).  The parties agree that the Court does not have general jurisdiction over the foreign LINE Defendants, NAVER, or NAVER Cloud, but they dispute whether the Court may exercise specific jurisdiction over them.  The Ninth Circuit analyzes specific personal jurisdiction under a three-part test:

> (1) the non-resident defendant must purposefully direct [its] activities or consummate some transaction with the forum or resident thereof; or perform some act by which [it] purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  Plaintiffs bear the burden on the first two prongs.  *Id.*  If they satisfy each one, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable.  *Id.* (quotation omitted).  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law."  *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995).

"For claims sounding in tort, like the privacy and data use violations [Plaintiffs] assert[] here," the Ninth Circuit employs a purposeful direction analysis known as the "*Calder* effects test."  *Briskin v. Shopify Inc.*, 135 F.4th 739, 751 (9th Cir. 2025).  This test "requires that the defendant (1) commit an intentional act, that is (2) expressly aimed at the forum state, and (3) which causes harm that the defendant knows will be suffered in the forum state."  *Id.* (citing *Brayton Purcell*, 606 F.3d at 1128).

### i.    Foreign LINE Defendants

The foreign LINE Defendants argue that Plaintiffs have not established a sufficient basis for personal jurisdiction.[7]  Specifically, they argue that Plaintiffs fail to meet the purposeful

---

[7] Foreign LINE Defendants note that Plaintiffs have "imprecisely named 'LY Corporation (f/k/a Z Holdings)' and 'LINE Corporation/LY Corporation' as Defendants."  LINE MTD at 12 n.1.  Because "Plaintiffs seek to establish jurisdiction over newly-sued LY Corp. based solely on allegations about ZH and LINE Corp.," foreign LINE Defendants assert their arguments as to personal jurisdiction by addressing the jurisdictional contacts of Z Holdings and LINE Corp.  *Id.*  Consistent with the parties' briefing, the Court does the same.

direction prong of the jurisdiction analysis. The Court agrees.

Central to the parties' dispute is the impact of the Ninth Circuit's decision in *Briskin*. *Briskin* affirmed long-standing precedent holding that to subject itself to jurisdiction in a forum state, a defendant must commit an intentional act, expressly aimed at the forum state, which causes harm the defendant knows will occur there. 135 F.4th at 751. Reviewing the law on "express aiming," the court noted that its precedent has looked to "whether the defendant "individually targeted' a plaintiff known to be a forum resident" to establish such aiming. *Id.* at 757 (quoting *Mavrix Photo, Inc.*, 647 F.3d at 1229). The Ninth Circuit clarified that "express aiming does not require differential targeting." *Id.* at 757. And the Ninth Circuit held that an "interactive platform 'expressly aims' its wrongful conduct toward a forum state when its contacts are its own choice and not random, isolated, or fortuitous, even if that platform cultivates a nationwide audience for commercial gain." *Id.* at 758. Consistent with its prior holdings, it also affirmed that to establish personal jurisdiction, a plaintiff must allege "'something more' to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state." *Id.* at 752 (quoting *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997)).

The plaintiff in *Briskin* had shown "something more" because he alleged two key factors. First, he alleged that Shopify knew of his location "either prior to or shortly after installing its initial tracking software." *Id.* at 756. And second, he alleged that in its normal course of business, Shopify targeted "California consumers to extract, collect, maintain, distribute, and exploit for its own profit" those consumers' payment information and personal identifying information using tracking software without their consent. *Id*. at 755–56. In other words, much like the defendant in *Mavrix Photo*, the defendant in *Briskin* had "individually targeted" a plaintiff it knew was a resident of California. *Id.* at 756–757.

Here, however, the Court finds that Plaintiffs have not shown that LINE Corp. or Z Holdings expressly aimed their conduct at California.

### a. LINE Corp.

Plaintiffs contend that LINE Corp.'s "intentional act" for jurisdictional purposes is that it was the "owner and operator of LINE Messenger," which it "intentionally distributes . . . in the

U.S. and California on app stores." Opp. to LINE MTD at 11. Plaintiffs argue that LINE Corp. expressly aimed intentional acts toward California in several ways. First, they contend that LINE Corp. "knew it had millions of California and U.S. LINE Messenger users," and that its business plans included campaigns to attract users in Greater Los Angeles, citing several documents identified in jurisdictional discovery. Opp. to LINE MTD at 12. Second, Plaintiffs assert that LINE Corp. generated profits from sales of in-app purchases to users in the U.S. and California, *id.* (citing SAC ¶¶ 122–131), as well as from sales of "Creator Stickers," "which anyone can create, including U.S. and California artists, businesses, public figures, and the like," Opp. to LINE MTD at 13. Third, Plaintiffs advance an alter ego and agency theory of jurisdiction, asserting that LINE Corp. developed three subsidiaries to expand LINE Messenger and B612 and appeal to U.S. and California markets. *Id.* at 14. Fourth, Plaintiffs argue that LINE Corp. used servers in New Jersey and California for LINE-related services. *Id.* at 15. Finally, Plaintiffs assert that LINE Corp. entered into agreements with Apple and Google to distribute LINE Messenger in their respective app stores, and that in doing so it did not implement a blocking feature that would restrict access to these apps in California. *Id.* at 17.

The Court finds that Plaintiffs' allegations are contradicted by LINE Corp.'s sworn affidavits, that their characterization of the jurisdictional record is overstated (and at times plainly misrepresented), and that none of Plaintiffs' evidence shows that LINE Corp. "expressly aimed" its allegedly tortious conduct at California. *Briskin*, 135 F.4th at 751.

As an initial matter, the Court rejects Plaintiffs' assertion that there is "no 'corporate separateness'" between LINE Corp. and its subsidiaries, and that the Court can assert jurisdiction over LINE Corp. based on conduct by those subsidiaries that targeted the U.S. and California. As LINE Corp. notes, the testimony Plaintiffs cite for the proposition that LINE Plus was created to "appeal to the U.S. and California markets" actually indicates that LINE Plus was created to develop business "outside of Japan." Dkt. No. 360-7 at 3–4. Although the deponent went on to explain that "outside of Japan" includes the United States, that does not equate to targeting business in California specifically. The Court also finds that Plaintiffs' citations to the record overstate any purported "control" that LINE Plus had over these subsidiaries. Opp. to LINE MTD

United States District Court
Northern District of California

at 13.  For example, Plaintiffs cite an internal document for the proposition that LINE Corp. directed its subsidiaries in pricing decisions.  *See* Opp. to LINE MTD at 13.  That document shows that a LINE E-A employee initially reached out to a LINE Corp. employee for guidance on a pricing models, but it also shows that the LINE E-A employee developed that company's own pricing model, sending it to LINE Corp. as an "FYI," and that the LINE Corp. employee was glad to see they had reached a "conclusion on pricing."  *See* Dkt. No. 360-8 at 2.  So while the document reflects some level of participation by LINE Corp. in these decisions, it does not tend to show the level of control that suggests that the companies are alter egos of one another.  Additionally, Plaintiffs do not explain how LINE Corp.'s agreement "███████████████████████████████████████████████████████████████████████████████" shows LINE Corp.'s control over LINE E-A operations in the U.S.  *See* Opp. to LINE MTD at 14.  The agreement at issue concerned ███████████ unrelated to the issues here, Dkt. No. 330-23, and Plaintiffs do not cite any case suggesting that such an agreement exhibits control.  Finally, Plaintiffs cite an agreement between LINE Corp. and LINE Plus to support its alter-ego and agency arguments, asserting that agreement shows that LINE Corp. reserved marketing strategy consultation and profit sharing rights from those marketing efforts.  But that same agreement expressly states that "██████████████████████████████████████████████████████████████████████████████" Dkt. No. 330-10 at 13.

The Court therefore finds that Plaintiffs have not met their burden to show that these entities have the required unity of interest to support an alter-ego theory.  *Gardner v. Starkist Co.*, 418 F. Supp. 3d 443, 463 (N.D. Cal. 2019) (explaining that neither total ownership and shared management personnel nor a parent company "reviewing and approving major decisions, placing several of its directors on the subsidiary's board, and involving itself in the subsidiary's pricing decisions" suffices to establish an alter-ego relationship).  The Court likewise finds that Plaintiffs have not shown that the subsidiaries "act[ed] on the principal's behalf and subject to the principal's control," or that LINE Corp. had the "right to substantially control its subsidiar[ies'] activities."  *Williams v. Yamaha Motor. Co.*, 851 F.3d 1015, 1024–25 (9th Cir. 2017).  As such,

United States District Court
Northern District of California

the Court finds that Plaintiffs' showing is insufficient to support an alter-ego or agency theory of personal jurisdiction. *See Helicopteros Nationales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction").

Plaintiffs also contend that LINE Corp. knew there were millions of U.S. and California LINE Messenger users and collected their data. Opp. to LINE MTD at 12. But the Court finds that Plaintiffs have not shown that LINE Corp., as opposed to its subsidiaries, directed any activity toward California (or the U.S. as a whole) to develop this user base, or that it even had specific knowledge of California users. For example, the two documents that Plaintiffs cite to support allegations about knowledge of California LINE Messenger users do not say anything about the number of users *in California*. *See* Dkt. No. 330-15 at 7; Dkt. No. 330-16 at 6. Rather, each document shows that there are ▮▮▮▮▮▮▮ in the U.S. as a whole. *Id.* And neither of these documents, or any other evidence Plaintiffs cite, show what if any steps LINE Corp. took to expressly aim its own conduct toward the U.S., let alone California. *Id.* The Court also rejects Plaintiffs' assertions that LINE Corp.'s privacy policy shows it targeted California. *See* Opp. to LINE MTD at 17. The fact that the app allows users to share their geolocation data (if they so choose) does not amount to express aiming at California. And the Court finds that the choice not to block LINE Messenger's availability to the United States as a whole on the Google and Apple app stores does not show that LINE Corp. directed its activities toward California. *See Voodoo SAS v. SayGames LLC*, 2020 WL 3781657, *4–*5 (N.D. Cal. July 7, 2020) (finding that the defendants' operation and distribution of apps available to and downloaded by users in California did not constitute express aiming); *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1075–76 (9th Cir. 2011) ("If the maintenance of an interactive website were sufficient to support general jurisdiction in every forum in which users interacted with the website, the eventual demise of all restrictions on the personal jurisdiction of state courts would be the inevitable result.").

The Court also rejects Plaintiffs' arguments regarding LINE Corp.'s alleged collection of California app users' data. Opp. to LINE MTD at 11–12, 18. Plaintiffs allege that LINE Corp.

collects this data through LINE Pay, an in-app payment service.  SAC ¶¶ 128–131.  But Plaintiffs' own allegations acknowledge that LINE Pay Corporation, not LINE Corp., "is the operator of the LINE Pay payment service," SAC ¶ 129, and Plaintiffs do not show how LINE Corp. targeted California users to collect any data obtained via LINE Pay Corporation's data collection. Plaintiffs allege that LINE Corp. maintains a record of location data for LINE Pay users that includes "country information," *id.*¶ 130, but not information specific to the state of California. Based on this record, the Court finds that unlike in *Briskin*, Plaintiffs have not shown that LINE Corp., as opposed to its subsidiaries, knew of the Plaintiffs' location in California before allegedly collecting their data and using it for commercial gain.  Additionally, the Court notes a disconnect between the data allegedly collected through the LINE Pay app and the data that is the basis of Plaintiffs' privacy related harm, namely their biometric data and contents of their private messages.  *See Briskin*, 135 F.4th at 760 ("The second requirement for specific jurisdiction is that plaintiff's claims 'must arise out of or relate to the defendant's contacts' with the forum State.") (citations omitted).  Here, none of the individual Plaintiffs even allege that they used LINE Pay, so they cannot rely on these allegations to establish that Defendants knew that they were in California before allegedly intercepting their biometric data.  Thus, unlike in *Briskin*, the Court cannot infer that LINE Corp. targeted an individual known to be in California before engaging in alleged privacy violations.

The closest Plaintiffs come to showing purposeful direction at California is a presentation they argue shows that LINE Corp. marketed LINE Messenger to users in Los Angeles.  Opp. to LINE MTD at 12; Dkt. No. 330-12.  LINE Corp. responds that this presentation was "created and circulated by and among LINE E-A and LINE Plus employees only," Dkt. No. 339 at 10, and it submitted a sworn affidavit by LINE E-A's CEO, Hyung Jun Kim, as well as the parent email to which the presentation was attached.  *See* Dkt. No. 339-1, 339-2.  Plaintiffs filed an objection, arguing that the Court should not consider the affidavit because it is improper new evidence under Local Rule 7-3(d)(1).  Dkt. No. 341.  In its discretion, however, the Court considers the affidavit, because it does not raise new arguments but instead responds to arguments and evidence raised by Plaintiffs in their opposition.  *Sweet v. Cardona*, 657 F. Supp. 3d 1260, 1275 (N.D. Cal. 2023)

(courts may exercise their discretion to consider information presented for the first time in a reply "when the new evidence appears to be a reasonable response to the opposition or upon giving the non-movant the opportunity to respond.") (citations and quotations omitted).  In his affidavit, Mr. Kim explains that the individuals on the correspondence are all either LINE E-A or LINE Plus employees.  Dkt. No. 339-1 ¶ 3.  In their correspondence, those employees discuss the details of the marketing initiatives detailed in the presentation, which makes sense given that one of them appears to be a member of the marketing team.  *See* Dkt. No. 339-2.  Having carefully reviewed the affidavit, the accompanying email, and the presentation itself, the Court finds that these documents do not support an inference that LINE Corp. directed this marketing initiative.  Instead, they show that LINE E-A and LINE Plus were the entities driving it.[8]

Additionally, the Court is unpersuaded by Plaintiffs' contention that LINE Corp. targeted California through sales of in-app purchases, including non-sponsored "creator" stickers.  Opp. to LINE MTD at 12–13.  The document on which Plaintiffs rely says nothing about whether any revenue from the sale of these stickers stems from California or the U.S.  It states only that LINE Corp. can generate revenue from these stickers, and that they are available "to all users regardless of location."  Dkt. No. 360-16 ¶ 4.  And the licensors and creators who make "creator" stickers "designate which country or countries to make their Stickers available in," *id.*, so LINE Corp. has no say over where those third-party creators make them available.[9]  Plaintiffs do not cite anything in the record to support their assertion that LINE Corp. "knows" these stickers are popular and therefore markets them to California or the United States as a whole, or that it encourages creators to make them available here, Opp. to LINE MTD at 13.  They also "do not dispute that LINE Corp. has no record of revenue from users in California."  LINE Reply at 11.  Although it stands to reason that any California users who purchase these stickers might generate revenue for LINE

[8] Plaintiffs point out that certain pages of the presentation bear the "LINE Corporation copyright" in the lower right-hand corner, and that this in and of itself also shows that LINE Corp. exercised control over its subsidiaries.  That copyright language does not appear on the pages detailing efforts to target users in Los Angeles, however, and consistent with the discussion above, the Court does not interpret it to show control over the subsidiaries.
[9] As for "Sponsored Stickers," the same sworn testimony on which Plaintiffs rely indicates that "Sponsored Stickers were (and are) generally only available to users in certain countries other than the United States."  Dkt. No. 360-16 ¶ 3.

14

United States District Court
Northern District of California

Corp., that does not show that LINE Corp. expressly aimed its allegedly tortious conduct at California or even the U.S. more broadly to generate this revenue. *See Briskin*, 135 F.4th at 758 (no express aiming where contacts with the forum state are not defendant's "own choice" and are "random, isolated, or fortuitous").

The Court is likewise unpersuaded by Plaintiffs' allegations regarding the LINE USA Official Account. SAC ¶¶ 111–116. LINE Corp. submitted an affidavit attesting that LINE E-A, not LINE Corp., operates the LINE USA Official account. Dkt. No. 312-7 ("Asai Decl.") ¶ 20. That contention is consistent with Plaintiffs' allegations that LINE Corp. directs the Official Account "together with its subsidiary, LINE E-A." SAC ¶ 114. In any event, the Court finds that Plaintiffs' allegations regarding the Official Account's express aiming at California through messages and specific advertising content are contradicted by another affidavit previously submitted by LINE Corp. See Dkt. No. 119-1 ¶ 6 (averring that Official Account users "are not able to send messages targeted to users located in California or the United States based on their location.").

Finally, the Court finds that Plaintiffs' allegations and argument about servers in the United States also do not move the needle. Defendants again submit sworn testimony that servers in California are not used to operate LINE Messenger. LINE MTD at 19 (citing Asai Decl. ¶¶ 23–24). LINE Messenger instead uses servers located in New Jersey that are owned by a third party and operated by NAVER Cloud, and those servers did not store LINE Messenger data, but instead relayed it to servers in Japan or Korea. Asai Decl. ¶ 22. Although the location of a server can be relevant to a jurisdictional analysis, *Will Co., Ltd. v. Lee*, 47 F.4th 917, 926 (9th Cir. 2022), and this appears to have been a hotly contested issue in jurisdictional discovery, the Court finds that even if the New Jersey servers were used to operate LINE Messenger, that is insufficient. *Hungerstation LLC v. Fast Choice LLC*, 857 Fed. Appx. 349, 351 (9th Cir. 2021) ("Our circuit has never decided that personal jurisdiction is proper over a private foreign entity *solely* because that entity engaged in tortious conduct from a location outside of the United States by remotely accessing servers located in the United States."). Accordingly, the Court finds that Plaintiffs have not made a prima facie showing that LINE Corp. expressly aimed any activity at California.

15

**b.  Z Holdings**

Plaintiffs argue that Z Holdings purposefully directed its activities toward California by (1) "directing the activity of LINE Corp." from March 2021 to October 2023, and (2) "participating in and deciding the actions of a subsidiary and by facilitating a subsidiary's conduct to affect the forum state."  Opp. to LINE MTD at 19–20.  The Court finds that neither theory supports specific jurisdiction.

As to their first theory, Plaintiffs allege that Z Holdings was the sole owner and operator of LINE Corp, and "participated in and directed conduct related to" Plaintiffs' claims of unlawful data collection.  SAC ¶¶ 88–89.  To lend support to these conclusory assertions, Plaintiffs now allege that Z Holdings discussed a goal of "strengthen[ing] customer attraction and social commerce using LINE" in a presentation, *id.* ¶ 89(b).  They also assert that Z Holdings "provided various levels of support to LINE Messenger's operations," including negotiating contracts on behalf of its subsidiaries and "collecting and handling user data from the LINE Messenger App."  Opp. to LINE MTD at 20 (citing SAC ¶ 89(c)–(f)).  But the Court finds that these allegations do not explain how Z Holdings made any efforts to expressly aim its conduct at California, or how it "directed" conduct related to the unlawful activity alleged, as is Plaintiffs' burden.  *See Schwarzenegger*, 374 F.3d at 802.

Plaintiffs' agency theory fares no better.  Binding Ninth Circuit precedent holds that a plaintiff asserting an agency theory of jurisdiction must allege facts showing that the parent company has the "right to substantially control its subsidiary's activities."  *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1025 (9th Cir. 2017).  Plaintiffs rely on out-of-circuit case law, Opp. to LINE MTD at 20, but those cases applied different standards.  Additionally, their allegations that Z Holdings "directed" LINE Corp. are directly contradicted by Z Holdings' sworn affidavit.  *See* Dkt. No. 312-8 ¶¶ 12, 19 (Z Holdings was not involved in LINE Corp.'s day-to-day operations and did not operate, distribute, develop, or provide technical support for LINE Messenger); *see also Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) ("[W]e may not assume the truth of allegations in a pleading which are contradicted by affidavit . . . .").  And Z Holdings' sworn testimony also indicates that each of the LINE

16

Defendants is adequately capitalized and otherwise observes corporate formalities, making them separate entities. *See* Dkt. No. 312-8 ¶¶ 14–17, 20–21. Although Z Holdings acknowledges that it shared a handful of overlapping directors with its subsidiaries between 2021 and 2023, that is insufficient to show either agency or alter ego. *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("It is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent to liability for its subsidiary's acts."). Accordingly, the Court finds Plaintiffs' assertion that LINE Corp., LINE Plus, and LINE E-A were the agents of Z Holdings to be unsupported by facts showing that Z Holdings had the "right to substantially control" their activities. *Yamaha*, 851 F.3d at 1025. Plaintiffs have not made a prima facie showing to establish that the Court has personal jurisdiction over Z Holdings.

### ii. NAVER and NAVER Cloud

NAVER and its subsidiary NAVER Cloud also assert that the Court does not have personal jurisdiction over them. Plaintiffs argue that each of these defendants purposefully directed their tortious conduct toward California. Opp. to NAVER MTD at 8–12. In the alternative, Plaintiffs assert that the Defendants are engaged in a common enterprise, that NAVER and NAVER Cloud are alter-egos, and that NAVER and its subsidiaries are each others' agents. *See id.* at 15–23. The Court agrees with Defendants.

### a. NAVER

Plaintiffs argue that NAVER's allegedly tortious conduct was "intentional and expressly aimed at the United States and California." *Id.* at 9. To support this argument, Plaintiffs allege that NAVER "knew that certain LINE Messenger and B612 app users were in California," that it "made business decisions with an intent to cultivate an audience" in the U.S., that it "transmitted LINE Messenger and B612 app users' personal data, " and that it "generates revenue . . . from . . . companies advertising on [its] platforms." *See id.* (citing SAC ¶¶ 27–34). Plaintiffs also allege that the source code for the B612 app includes the word "NAVER," and that when a LINE Messenger user makes a video call, the user's IP address is transmitted to an IP address that "falls

17

within a range of IP addresses allocated to Naver."[10]  *Id.* at 10.  Finally, they argue that a 2021 report shows that NAVER's privacy policies consider the implications for users across the globe, including those subject to the California Consumer Privacy Act.  *Id.*

On close review of the record, the Court finds that Plaintiffs have not shown that NAVER itself expressly aimed its conduct at California.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (the "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction" based on the "unilateral activity of another party or a third person") (internal quotations omitted).  Plaintiffs assert that they have made a prima facie showing sufficient to support the exercise of personal jurisdiction by alleging that NAVER knew app users were in California, made business decisions to cultivate an audience in the United States, and collected and transmitted app users' data.  Opp. to NAVER MTD at 9 (citing SAC ¶¶ 27–34).  But the allegations they cite for these assertions show that they seek to assert personal jurisdiction over NAVER based on actions of its subsidiaries.  *See, e.g.*, SAC ¶ 30, 33–34 (asserting jurisdiction over NAVER based on the conduct of its subsidiaries NAVER Cloud America and SNOW).

In response, NAVER has proffered sworn testimony that it "is not registered to do business in California or anywhere else in the United States," and owns no property or assets in the United States.  Dkt. No. 314-1 ¶¶ 6–7.  NAVER "does not currently and did not ever run any advertisements for its services on LINE Messenger or B612," "has never sold any advertisements that run" on those apps, and "has never provided or offered to provide B612 or LINE Messenger user data to its advertising clients."  Dkt. No. 314-3 ¶¶ 7–9.  NAVER also contests Plaintiffs' allegations regarding revenue generation, SAC ¶ 27(b), attesting that its annual report's reference to such revenue was to LINE Corp.'s revenue, not its own, because "NAVER does not currently sell and has never sold any digital content, such as mobile games or stickers, on LINE Messenger or B612."  Dkt. No. 314-3 ¶ 11.  Finally, Plaintiffs' allegations regarding data collection again rely

---

[10] Plaintiffs note that they "mis-transcribed by one digit" NAVER's IP address in the SAC, and ask the Court to treat the SAC as "amended on this point."  Opp. to NAVER MTD at 10 n.4. While the Court would not deny a finding of jurisdiction solely on this basis if it were otherwise sufficient, as discussed *infra* the Court rejects Plaintiffs' theory, mooting the need to decide whether to treat the SAC as further amended.

on the actions of subsidiaries, as well as the use of the word "NAVER" in the B612 source code. But the Court finds that those allegations do not explain how NAVER directed its conduct toward California or the United States. *See* SAC ¶ 31. Even if Plaintiffs had alleged the correct IP address in their SAC, they do not explain how the allegations regarding the IP address show NAVER targeted users in California or the United States. *See id.* ¶ 32.

Finally, the Court finds that Plaintiffs overstate the significance of the 2021 Integrated Report. The report mentions LINE Messenger twice, and B612 once, *see* Dkt. No. 314-11 at 010 & 019, but none of these references show how NAVER's business "depend[s] on expanding the user base" of these apps, SAC ¶ 31. The report does not support Plaintiffs' assertion that NAVER expressly aimed its allegedly tortious conduct at California or the United States. The report's discussion of the CCPA and global privacy policies does not mention either of these apps, and in any event, "compliance with California's privacy policy does not by itself demonstrate that Defendant intentionally targeted consumers in California." *Cole-Parmer Instrument Co. LLC v. Pro. Lab'ys, Inc.*, No. 20-CV-08493-LHK, 2021 WL 3053201, at *6 (N.D. Cal. July 20, 2021); *see also Shah v. Hilton Worldwide Holdings Inc.*, No. 25-CV-01018-EKL, 2025 WL 1683577, at *2 (N.D. Cal. June 11, 2025) ("passing reference to California" in a global privacy policy "does not by itself make the Website 'purposefully directed' at California.").

The Court therefore finds that Plaintiffs have not made a prima facie showing that NAVER directed its conduct toward California.

### b. NAVER Cloud

Plaintiffs cite three categories of allegations they say establish that NAVER Cloud is subject to the Court's jurisdiction. First, they rely on allegations that NAVER Cloud's subsidiary, NAVER Cloud America, operates in the United States and has a handful of employees who concurrently held positions at both companies. Opp. to NAVER MTD at 11. The Court has already found that these contacts are an insufficient basis for jurisdiction, and Plaintiffs offer no reason why the analysis should change now. *See Ji I*, 2022 WL 4624898, at *3–*4.

Plaintiffs next argue that Naver Cloud serves as an internet service provider ("ISP") and operates servers at two data centers, one in New Jersey and another in San Jose, which Plaintiffs

19

say reflects NAVER's express aiming at California. Opp to NAVER MTD at 12. Naver Cloud argues that this passive role as an ISP and operator of servers in the United States does not show express aiming, contending that "it merely provides infrastructure to its customers who then use that infrastructure to store data as they choose." NAVER MTD at 28. The Court agrees that this kind of activity is at most passive and finds persuasive the reasoning in *Dish Network, LLC v. Jadoo TV, Inc.*, No. CV 18-9768 FMO, 2020 WL 6536659 (C.D. Cal. Mar. 16, 2020). In *Dish*, the court analogized the role of managing network operations to cases concerning passive websites, finding that "operating a passive website" without "something more" could not confer jurisdiction. *Id.* at *6–*7. There was no evidence that the servers or domain names the defendant managed were interactive. And "even if the servers were interactive . . . that would not necessarily require the court to conclude that [the defendant] expressly aimed his conduct at California or the United States" without any evidence that he directed any actions there or was aware of the California market. *Id.* at *7. Similarly, here there is no evidence that Naver Cloud "personally engaged in any advertising [of LINE Messenger or B612] directed toward California or the United States," *id.* at *5, or that Naver Cloud directed the alleged collection or transmission of data as an ISP or was aware of the California user base. Plaintiffs argue that the "passive" nature of NAVER Cloud's business was "by design" because its services allow other Defendants to collect and transmit California users' data. Opp to NAVER MTD at 12. But the Court finds that Plaintiffs' argument inherently recognizes that other actors, not NAVER Cloud, expressly aimed their conduct at the forum. The same logic applies to Naver Cloud's operation of data centers in the United States. To the extent that any LINE Messenger or B612 data was stored on or transmitted to Naver Cloud's servers, the Court finds that Plaintiffs have not made a prima facie showing that Naver Cloud, as opposed to its customers, directed data to be stored on or transmitted to them.

### c. Common Enterprise Allegations

Finally, Plaintiffs assert that "Naver, NCC, Snow Defendants, and LINE Defendants are engaged in a common enterprise, subjecting them all" to the Court's jurisdiction. Opp. to NAVER MTD at 16. The Court understands Plaintiffs to assert two possible theories as a basis to establish

United States District Court
Northern District of California

20

jurisdiction over NAVER or NCC: alter ego and agency.[11]

### 1. Alter Ego

Plaintiffs contend that NAVER, NAVER Cloud, and NAVER Cloud America are alter egos of one another to facilitate the growth of LINE Messenger and B612 users. Opp. to NAVER MTD at 16. Generally, "corporate separateness insulates a parent corporation from liability created by its subsidiary, notwithstanding the parent's ownership of the subsidiary." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070 (9th Cir. 2015). "As in the context of corporate liability, the veil separating affiliated corporations may also be pierced to exercise personal jurisdiction over a foreign defendant in certain limited circumstances." *See id.* at 1071. "To satisfy the alter ego test, a plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Id.* at 1073 (cleaned up).

**Unity of Interest.** Courts consider several factors to determine whether there is a sufficient unity of interest to support a finding that two entities are alter egos of one another, including: "commingling of funds, failure to maintain minutes or adequate corporate records, identification of the equitable owners with the domination and control of the two entities, the use of the same office or business locations, the identical equitable ownership of the two entities, the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual, and failure to adequately capitalize a corporation." *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 52 (N.D. Cal. 2020). "This test envisions pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business— from broad policy decisions to routine matters of day-to-day operation." *Ranza*, 793 F.3d at 1073.

The Court finds that Plaintiffs have not made a prima facie showing of a unity of interest among the NAVER defendants. Plaintiffs assert that the following facts support their alter ego

---

[11] To the extent that Plaintiffs are asserting "common enterprise" as a separate basis for jurisdiction, that is "not [a] valid theor[y] of establishing personal jurisdiction in the Ninth Circuit to the extent that [it] stray[s] from the well-established alter ego and agency theories." *Iconlab Inc. v. Valeant Pharms. Int'l, Inc.*, No. 8:16-CV-01321-JLS-KES, 2017 WL 7240856, at *6 (C.D. Cal. Apr. 25, 2017).

United States District Court
Northern District of California

United States District Court
Northern District of California

theory: (1) NAVER has a majority ownership stake in Naver Cloud America and SNOW, and indirectly owned Z Holdings, LINE Corp. and LINE Plus, (2) Defendants had overlapping corporate officers and an "unknown number" of NAVER employees "often execute tasks" in service of its subsidiaries, (3) NAVER provided the investment to fund SNOW, (4) the NAVER Defendants had a common employee database and shared email domain, and (5) the NAVER Defendants "use the same offices and employees" and that NAVER's corporate website listed two offices in California.  Opp. to NAVER MTD at 18–23 (citing SAC ¶¶ 30, 38–39, 56).

As an initial matter, Plaintiffs' assertions regarding NAVER's allegedly overlapping offices and employees are contradicted by NAVER's sworn testimony.  *See* Dkt. No. 314-1 ¶¶ 6–10 (averring that NAVER is not registered to do business in California or anywhere else in the U.S., that "to the extent . . . NAVER's corporate website ever identified 'Overseas Offices' in, among other places, the United States, those offices belong to separately organized NAVER subsidiaries, not NAVER" and that NAVER does not have a "Chief Business Officer" in California).  The Court therefore finds that these allegations cannot support personal jurisdiction.

The Court finds Plaintiffs' remaining arguments insufficient for several reasons.  First, "it is well established that common ownership alone is insufficient to disregard the corporate form." *Allan & Assocs.*, 445 F. Supp. 3d at 53.  "[I]n the absence of evidence of actual control, courts generally presume that directors can and do 'change hats' to represent each corporation separately, despite their overlapping obligations as officers or directors for more than one entity." *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 956 (N.D. Cal. 2015) (citing *Bestfoods*, 524 U.S. at 69).  And Plaintiffs have not adduced, even after extensive jurisdictional discovery, any specific facts suggesting "evidence of actual control."  *Stewart*, 81 F. Supp. 3d at 956.  Additionally, Plaintiffs have presented only uncorroborated allegations that Defendants disregard corporate formalities, and they have not rebutted Defendants' sworn affidavits attesting that each of these entities is sufficiently capitalized and that their assets, accounts, and corporate records were not commingled.  *See Ranza*, 793 F.3d at 1073–74 ("Ranza has presented no evidence that NEON is undercapitalized, that the two entities fail to keep adequate records or that Nike freely

transfers NEON's assets, all of which would be signs of a sham corporate veil.").[12]  The Court finds that NAVER's initial investment to fund SNOW is insufficient to show a unity of interest. *See Doe v. Unocal Corp.*, 248 F.3d 915, 927 (9th Cir. 2001) (finding the "provision of loans and other types of financing to subsidiaries" was insufficient to support alter ego liability).  And finally, the Court joins others in this district that have found allegations of companies' shared email address domains and administrative functions insufficient "because these facts do not reflect an 'abuse of the corporate form and existence of an alter ego relationship."  *Yih v. Taiwan Semiconductor Mfg. Co., Ltd*., No. 5:20-cv-04184-EJD, 2020 WL 6290377, at *7 (N.D. Cal. Oct 27, 2020) (quotation omitted) (collecting cases).[13]

Accordingly, the Court finds that Plaintiffs have failed to make a prima facie showing that there is a unity of interest among the NAVER defendants. Because Plaintiffs have "not satisfied the 'unity of interest and ownership' prong of the alter ego test, [the Court] need not consider the 'fraud or injustice' prong."  *Ranza*, 793 F.3d at 1075 n.9

### 2. Agency

Plaintiffs also assert that NAVER and its subsidiaries are each others' agents because Defendants are engaged in activities that "but for the existence of the subsidiary, the parent would have to undertake itself."  Opp. to NAVER MTD at 23–24.  As discussed with respect to the foreign LINE Defendants, however, Plaintiffs' theory of agency liability has not been good law in

[12] Plaintiffs rely on deposition testimony by NAVER Cloud's corporate representative that he "had never heard of NCC having a board of directors meeting" to support their claim of disregard for corporate formalities.  Opp. to NAVER MTD at 22.  Even if this statement is binding (and the parties dispute that it is), it does not support Plaintiffs' alter ego claim given the totality of the record.

[13] Plaintiffs argue that Defendants improperly raise merits issues at the pleading stage by proffering expert opinion testimony on alter-ego liability.  Opp. to NAVER MTD at 16.  The Court did not need to rely on that declaration (or any other merits-related testimony in Defendants' declarations) in concluding that Plaintiffs have not met their prima facie burden as to alter ego liability.  The Court also finds distinguishable its decision in *Whitaker v. Nguyen*, No. 21-cv-04336-HSG, 2021 WL 5140178, at *2 (N.D. Cal. Nov. 4, 2021), because no discovery had been taken in that case.  Here, Plaintiffs have had ample opportunity to try to support their jurisdictional allegations through discovery.  And the Court rejects Plaintiffs' argument that alter ego (and agency) liability theories are highly fact intensive, making Defendants' attack on Plaintiffs' SAC premature.  In deciding a 12(b)(2) motion to dismiss, the Court may consider evidence outside of the pleadings, including affidavits submitted by the parties.  *Unocal Corp.*, 248 F.3d at 922; *see also Allan & Assocs.*, 445 F. Supp. 3d at 54.

23

this circuit for nearly a decade. *See Williams*, 851 F.3d at 1024–25 (holding that "under any standard for finding an agency relationship, the parent company must have the right to substantially control its subsidiary's activities."). Plaintiffs do not proffer any evidence showing (or even suggesting) that any of the Defendants have "the right to substantially control" the others' activities. *Id*. Additionally, the Court rejects Plaintiffs' assertion that NAVER Cloud is LINE Corp.'s agent under an addendum agreement in which NAVER Cloud is defined as LINE Corp.'s partner. The NAVER Defendants proffer uncontroverted testimony that the agreement "pertained to data centers in Korea for users located in Europe and had nothing to do with servers or LINE Messenger users located in the United States." Dkt. No. 314-4 ¶ 13. Accordingly, the Court finds that Plaintiffs have not met their burden to establish jurisdiction over the NAVER Defendants based on agency principles.

### iii.   Rule 4(k)(2)

Finally, Plaintiffs argue that jurisdiction is appropriate over the Foreign LINE and NAVER defendants under Rule 4(k)(2).[14] The Court finds that Rule 4(k)(2) does not provide a basis for jurisdiction.

To establish jurisdiction under Rule 4(k)(2), three requirements must be met:

> First, the claim against the defendant must arise under federal law. Second, the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction. Third, the federal court's exercise of personal jurisdiction must comport with due process."

*Pebble Beach*, 453 F.3d at 1159 (internal citations omitted). "The due process analysis under Rule 4(k)(2) is nearly identical to traditional personal jurisdiction analysis . . . [but] rather than considering contacts between [the defendant] and the forum state, [the Court] consider[s] contacts with the nation as a whole.'" *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th Cir. 2021).

Although the Court finds that the first two prongs have been met here, the third prong is not as to any of the foreign LINE or NAVER Defendants, because Plaintiffs fail to identify specific facts supporting their group pleading allegations. Plaintiffs do not meaningfully expand

---

[14] Considering jurisdiction under Rule 4(k)(2) is appropriate because Defendants do not challenge Plaintiffs' lone federal claim, brought under the Electronic Communications Privacy Act. SAC ¶¶ 381–94.

on their arguments under the traditional personal jurisdiction analysis to support their position that subjecting Defendants to the Court's jurisdiction comports with due process.  Plaintiffs assert that the foreign LINE Defendants purposefully directed the apps to the U.S. market, including by advertising and signing contracts to promote the app.  But they do not point to any specific facts supporting these allegations, and as the foreign LINE Defendants note, Plaintiffs' cited evidence shows that LINE Plus was ███████████████████████████.  Dkt. No. 330-10 at 7 ("███████████████████████████████████████").  As to the NAVER Defendants, Plaintiffs allege that "NAVER, NCC, NCA and the Z-LINE Defendants used devices" to link to certain IP addresses to "intercept and obtain" personal data from LINE Messenger.  Opp. to NAVER MTD at 26.  The Court finds that these group pleading allegations the Court previously (and repeatedly) rejected are insufficient.  Finally, Plaintiffs repeat allegations concerning NAVER Cloud's servers in California and New Jersey.  For the same reasons stated above, the Court finds that Plaintiffs have not made a prima facie showing that NAVER Cloud directed any data to be stored on or transmitted to those servers.

*    *    *

In sum, the Court finds that Plaintiffs have not shown the Court has jurisdiction over LINE Corp., LY Corp. (f/k/a Z Holdings), NAVER, or NAVER Cloud.  Accordingly, the motions to dismiss these entities for lack of personal jurisdiction are **GRANTED**.

### B.    Article III Standing

The SNOW Defendants argue that Plaintiffs lack Article III standing for their claims against them to the extent that they relate to LINE Messenger, because the SNOW Defendants own and operate the B612 app and are not involved in LINE Messenger.  NAVER MTD at 34.  Plaintiffs concede this point.  Opp. to NAVER MTD at 28.  Therefore, in accordance with its prior orders, the Court finds that Plaintiffs lack Article III standing for their claims against the SNOW Defendants to the extent they are based on alleged harm related to LINE Messenger.

### C.    Failure to State a Claim

#### i.    Intrusion Upon Seclusion and California Constitutional Right to Privacy (Claims 1 and 2)

25

In its previous two orders, the Court found that Plaintiffs "plausibly alleged a cognizable privacy interest in their facial biometric information." *Ji I*, 2022 WL 4624898, at \*11, *Ji II*, 2023 6466211, at \*9. Nonetheless, the LINE Defendants seek dismissal of Plaintiffs' claims for intrusion upon seclusion and violations of their right to privacy under the California Constitution, arguing that Plaintiffs have failed to allege "highly offensive" conduct. The LINE Defendants acknowledge that the question of whether their alleged actions are highly offensive requires a holistic review of several factors, *see In re Facebook, Inc. Internet Tracking Litigation*, 965 F.3d 589, 606 (9th Cir. 2020), but narrowly focus on two paragraphs of Plaintiffs' complaint to assert that their allegations are insufficient.

The Court finds no reason to revisit its prior rulings that Plaintiffs have plausibly alleged highly offensive conduct in support of their biometric information privacy claims. At this stage, Plaintiffs need only to allege "sufficient facts to support a cognizable legal theory," *Mendiondo*, 521 F.3d at 1104, and they have done so.

### ii. Unfair Competition Law and False Advertising Law (Claims 3 and 4)

The LINE Defendants argue that Plaintiffs fail to state a claim under California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL"). The LINE Defendants first argue that because no single Plaintiff alleges they even saw a representation regarding end-to-end encryption, or that they relied on any such representation, Plaintiffs have not met Rule 9(b)'s heightened pleading standard. LINE MTD at 30. Plaintiffs respond that they have alleged "that reasonable consumers were likely to be deceived by Defendants' [the who] affirmative misrepresentations about the security of their personal data [the what]," and that "Defendants' privacy policy and public statements [the when/where/how] assured App users that the contents of their messages were encrypted." Opp. to LINE MTD at 27. Plaintiffs argue that they have adequately alleged reliance, and also assert that Defendants' statements constitute actionable omissions. *Id.*

A plaintiff alleging claims under the FAL or UCL must allege actual reliance. *See Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020). "A plaintiff alleging false advertising or misrepresentation to consumers 'must show that the misrepresentation was an

26

immediate cause of the injury-producing conduct.  However, a plaintiff is not required to allege that the challenged misrepresentations were the sole or even the decisive cause of the injury-producing conduct.'"  *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1135–36 (S.D. Cal. 2021) (quoting *Moore*, 966 F.3d at 1020) (emphasis removed); *see also Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 330 (2011) ("A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of [the UCL] by alleging . . . that he or she would not have bought the product but for the misrepresentation.").  The Ninth Circuit in *Moore* found allegations of actual reliance sufficient where the plaintiffs "collectively allege[d]" that "[a]s a result of the false and fraudulent prescription requirement, each Plaintiff paid more for Prescription Pet Food than each Plaintiff would have paid in the absence of the requirement, or would never have purchased Prescription Pet Food."  *Moore*, 966 F.3d at 1020.

In *Moore* and *Stewart*, there was no dispute that the plaintiffs had seen the alleged misrepresentation.  But here, Plaintiffs cannot plausibly have "attach[ed] importance to [the] existence or nonexistence [of the misrepresentation] in determining [their] choice of action in the transaction in question," when they do not even allege that they ever saw the relevant statements. *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1056 (9th Cir. 2017) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009)).  In other words, *Moore*'s "reasonable consumer" test for materiality cannot mean that a plaintiff does not need to show that he even read (or was otherwise exposed to) the representation at issue, because if a plaintiff was not exposed to that representation, it could not have caused, even in part, his injury.  *See Cody v. Gainful Health Inc.*, No. EDCV 25-01373-KK-SPX, 2025 WL 3654171, at *6 (C.D. Cal. Dec. 9, 2025) ("Plaintiff fails to allege actual reliance because she fails to allege she 'heard, read, or saw' Defendant's allegedly false or misleading product packaging prior to purchasing it."); *cf. Stewart*, 537 F. Supp. 3d at 1135 (finding class of plaintiffs adequately alleged actual reliance where they alleged that they were exposed to the defendant's misrepresentations on its product packaging, and that at least one plaintiff pled actual reliance as to the defendant's deceptive statements in other advertising).

The Court finds that Plaintiffs' omission theory also fails.  "An essential element for a fraudulent omission claim is actual reliance."  *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225

United States District Court
Northern District of California

(9th Cir. 2015). "To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct. A plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision." *Id.* "[A] plaintiff can show this reliance 'by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1017 (N.D. Cal. 2020) (quoting *Daniel*, 806 F.3d at 1225). In *Daniel*, the Ninth Circuit held that although the plaintiffs had not shown that they viewed the challenged advertising materials, they had at least shown they "interacted with and received information from" Ford dealerships. *Daniel*, 806 F.3d at 1226. This was sufficient to show that the plaintiffs "would have been aware of the disclosure if it had been made through Ford's authorized dealerships." *Id.*

Here, Plaintiffs allege that "defendants omitted or partially represented material facts, i.e., that they collected, used, and shared users' personal data and that messages were not fully encrypted end-to-end." Opp. to LINE MTD at 27 (citing SAC ¶¶258, 262–65, 358). But they do not allege, as required by *Daniel*, that they "would have been aware of [the purportedly omitted facts] and behaved differently": they do not allege that they read the allegedly incomplete disclosure, and thus cannot plausibly allege that they would have behaved differently if the disclosure they did not read in the first place had been different. *See Daniel*, 806 F.3d at 1225; *see also Pardini v. Unilever United States, Inc.*, 961 F. Supp. 2d 1048, 1060 (N.D. Cal. 2013) ("Plaintiff has not pled that she ever looked at the nutrition panel. As such, it is implausible that she was deceived by its lack of disclosures."); *cf. Anderson*, 500 F. Supp. 3d at 1017 (consumers adequately alleged actual reliance where they alleged they had reviewed marketing and similar materials about the iPhone model at issue before making a purchase). The Court therefore finds that Plaintiffs' FAL claim fails, and so does their UCL claim to the extent it is based on Defendants' alleged misrepresentations or omissions.

Finally, the LINE Defendants separately argue that Plaintiffs' UCL claim fails under the "unfair" prong of the act. The Court disagrees. Plaintiffs adequately plead unfair conduct under at least the tethering test. Under that test, Plaintiffs need only "to show that the effects of

28

United States District Court
Northern District of California

[Defendants'] conduct are comparable to or the same as a violation of the law, or otherwise significantly threaten or harm competition." *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1047 (N.D. Cal. 2021) (quotations omitted). Plaintiffs allege that Defendants "violated privacy, data, and consumer protections established by constitutional and statutory authority," Opp. to LINE MTD at 28, including California's constitutional right to privacy, the California Invasion of Privacy Act ("CIPA"), and several other consumer protection statutes. *See, e.g.*, SAC ¶¶ 334–51 (California Constitution); 370–80 (CIPA), 381–94 (Electronic Communications Privacy Act). This is enough to state a claim under the unfair prong of the UCL. *See In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d at 1047–48; *see also In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1227 (N.D. Cal. 2014).

Accordingly, Plaintiffs' FAL claim is **DISMISSED WITHOUT LEAVE TO AMEND**. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (district court's discretion to deny leave to amend is "particularly broad" where leave to amend has previously been granted). Defendants' motion to dismiss the UCL claim is **DENIED** to the extent that claim is based on the "unfair" prong of the act.

### iii.    Larceny and Conversion (Claims 7 and 8)

Both the LINE and NAVER Defendants make several arguments attacking Plaintiffs' larceny and conversion claims. LINE MTD at 33–35; NAVER MTD at 35–38. "The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away." *People v. Davis*, 19 Cal. 4th 301, 305, 965 P.2d 1165, 1167 (1998). And to state a claim for conversion, a plaintiff must allege the following elements: "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015) (citations omitted). Construing the complaint in the light most favorable to Plaintiffs, the Court cannot say that they entirely fail as a

matter of law to state a claim for larceny or conversion.[15]  The Court finds that these claims are better assessed at a later stage of the proceedings when the record is more fully developed. Accordingly, the Court **DENIES** the motions to dismiss Plaintiffs' claims for larceny and conversion without prejudice to Defendants raising legal and factual challenges to these claims at the summary judgment stage.

### iv.     Plaintiffs Plead That They Lack an Adequate Remedy at Law

Finally, both the LINE and NAVER Defendants argue that Plaintiffs may not seek equitable relief for their UCL, FAL and unjust enrichment claims following the Ninth Circuit's decision in *Sonner v. Premier Nutrition Corporation*, 971 F.3d 834 (9th Cir. 2020).  One established equitable principle is that equitable remedies will not be awarded when there is an "adequate remedy at law."  *Sonner*, 971 F.3d at 844.

Courts differ in their treatment of *Sonner*  at the pleading stage.  Although some courts require plaintiffs to articulate why damages are an inadequate remedy, other courts decline to impose this requirement.  *Compare Watkins v. MGA Entertainment, Inc.*, 550 F. Supp. 3d 815, 837–38 (N.D. Cal. 2021), *with Murphy v. Olly Pub. Benefit Corp.*, 651 F. Supp. 3d 1111, 1129 (N.D. Cal. 2023).  As Plaintiffs note, this Court has recently held that explicitly alleging the absence of an adequate remedy at law is sufficient at the pleading state.  Opp to LINE MTD at 33; Opp. to NAVER MTD at 31 (both citing *Lawyer v. Homary Int'l Ltd.*, No. 24-CV-04113-HSG, 2025 WL 1571856, at *7 (N.D. Cal. June 2, 2025)); *see also Johnson*, 2022 WL 74163, at *3 ("[I]f a plaintiff pleads that she lacks an adequate legal remedy, *Sonner* will rarely (if ever) require more this early in the case.").  "[T]he fundamental thing that *Sonner*, by its own terms, requires at the pleadings stage is that the complaint 'allege that [the plaintiff] lacks an adequate legal remedy.'"  *Johnson v. Trumpet Behav. Health, LLC*, No. 3:21-CV-03221-WHO, 2022 WL

---

[15] To the extent that Plaintiffs argue that they have stated a claim for theft by false pretenses, *see* Opp. to NAVER MTD at 29, they are incorrect.  "To plausibly state a theft by false pretenses claim, plaintiffs must allege not only that [Defendants] made specific false representations to them, but also that plaintiffs transferred their property to [Defendants] in reliance on the representation."  *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1022 (N.D. Cal. 2024) (quotations omitted).  As explained in the discussion of the UCL and FAL claims, Plaintiffs fail to allege actual reliance.  They therefore cannot state a claim for theft by false pretenses, and this theory is DISMISSED WITHOUT LEAVE TO AMEND.

30

74163, at *3 (N.D. Cal. Jan. 7, 2022) (quoting *Sonner*, 971 F.3d at 844).  The Court finds Plaintiffs' express allegation that they lack an adequate remedy at law to be sufficient at this stage. SAC ¶ 361.  Accordingly, the Court **DENIES** the motions to dismiss Plaintiffs' equitable relief claims.

## V.    CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions to dismiss.  Dkt Nos. 312, 314.  The foreign LINE and NAVER defendants are **DISMISSED WITHOUT LEAVE TO AMEND**.

The Court further **SETS** a case management conference on May 12, 2026 at 2:00 p.m.  The hearing will be held by Public Zoom Webinar.  All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg.  All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities. The parties are further **DIRECTED** to file a joint case management statement by May 5, 2026.

**IT IS SO ORDERED.**

Dated:    4/23/2026

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

31